1        **UNITED STATES DISTRICT COURT**

2     **CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**

3       **HONORABLE CORMAC J. CARNEY, U.S. DISTRICT JUDGE**

4

5   UNITED STATES OF AMERICA,              )
                                           )
6                    Plaintiff,            )   **CERTIFIED TRANSCRIPT**
                                           )
7          vs.                             )   Case No.
                                           )   8:17-cr-00103-CJC-1
8   JOSEPH MARTIN GOVEY,                   )
                                           )
9                    Defendant.            )
                                           )

10

11

12

13              REPORTER'S TRANSCRIPT OF

14                 EVIDENTIARY HEARING

15            WEDNESDAY, JANUARY 17, 2018

16                    9:20 A.M.

17              SANTA ANA, CALIFORNIA

18

19

20

21

22

23

24              **DEBBIE HINO-SPAAN, CSR 7953, CRR**
                 FEDERAL OFFICIAL COURT REPORTER
                411 WEST FOURTH STREET, ROOM 1-191
25              SANTA ANA, CALIFORNIA 92701-4516
                      dhinospaan@yahoo.com

```
 1                    APPEARANCES OF COUNSEL:

 2

 3   FOR THE PLAINTIFF:

 4            SANDRA R. BROWN
              United States Attorney
 5            BY:  BRADLEY EDWARD MARRETT
                   GINA JEE-EUN KONG
 6                 Assistant United States Attorney
              United States Courthouse
 7            411 West Fourth Street
              Suite 8000
 8            Santa Ana, California 92701
              (714) 338-3505
 9
     FOR THE DEFENDANT:
10
              SCOTT TRIAL LAWYERS APC
11            BY:  TIMOTHY A. SCOTT, ESQ.
              1350 Columbia Street
12            Suite 600
              San Diego, California 92101
13            (619) 794-0451

14   FOR THE WITNESS DEPUTY BRYAN LARSON:

15            CORRIGAN WELBOURN & STOKKE APLC
              BY:  KATHERINE THERESA CORRIGAN, ATTORNEY AT LAW
16            4100 Newport Place Drive
              Suite 550
17            Newport Beach, California 92660
              (949) 251-0330
18

19

20

21

22

23

24

25
```

**UNITED STATES DISTRICT COURT**

1                          **I N D E X**

2

3    **WITNESSES**                                          **PAGE**

4    **BRYAN LARSON, CALLED BY THE PLAINTIFF**
          Direct Examination by Mr. Marrett              53
5         Cross-Examination by Mr. Scott                 72
          Redirect Examination by Mr. Marrett            157
6         Recross-Examination by Mr. Scott               166

7

8

9

10

11

12

13                         **EXHIBITS**

14                       (None offered.)

15

16

17

18

19

20

21

22

23

24

25

1        SANTA ANA, CALIFORNIA; WEDNESDAY, JANUARY 17, 2018

2                          9:20 A.M.

3                           - - -

4               THE COURTROOM DEPUTY:  Calling Item No. 1,

09:20AM  5   SACR 17-103, United States of America versus Joseph Martin

6   Govey.  Counsel, please state your appearances.

7               MR. MARRETT:  Good morning, Your Honor.  Brad

8   Marrett for the United States.  And with me at counsel table is

9   AUSA Gina Kong.

09:20AM 10               THE COURT:  Good morning, sir.

11               MR. SCOTT:  Good morning, Your Honor.  Tim Scott for

12   Mr. Govey.  He's present before the court in custody.

13               THE COURT:  Good morning, gentlemen.

14               THE DEFENDANT:  Good morning.

09:20AM 15               MS. CORRIGAN:  Good morning, Your Honor.  Kate

16   Corrigan on behalf of Bryan Larson.  And I am present in the

17   courtroom.  He's in one of the side rooms, but I wanted to let

18   the Court know for the purposes of the record that I am present

19   and I'm reviewing documents that were just handed to me about

09:20AM 20   five, ten minutes ago.

21               THE COURT:  Okay.  Do you need to look at those

22   documents to -- before we proceed?

23               MS. CORRIGAN:  Mr. Scott and I have agreed that

24   there's -- there's a certain portion of the documents that I

09:20AM 25   need to review prior to his cross on certain areas.  And so

1    he's agreed to -- I think he can get started, but then when he

2    gets to the point of those materials, I'm going to need to let

3    him know whether I finished reviewing them.  I should get the

4    review done in 30 to 45 minutes.

09:21AM 5            THE COURT:  Okay.

6            MS. CORRIGAN:  I've already started it.

7            THE COURT:  What I was thinking, but I'm open to

8    suggestions or recommendations on how to proceed, is that

9    Mr. Marrett would call the deputy first, ask some general

09:21AM 10   questions about the proposed search that was done, and then I

11   was going to turn it over to Mr. Scott for cross-examination.

12   Is that acceptable?

13           MR. MARRETT:  I think that's appropriate, Your

14   Honor.  And I think for purposes of timing, I think my direct

09:21AM 15   exam would probably be about 20 minutes.  Maybe 25 minutes and

16   that would maybe give Ms. Corrigan enough time to review the

17   documents.

18           THE COURT:  All right.

19           MS. CORRIGAN:  That may.

09:21AM 20           THE COURT:  Okay.  So are we ready to call the

21   deputy in?

22           MR. SCOTT:  Your Honor, I wanted to say one or two

23   things before we get started, if I can have a moment.

24           THE COURT:  Absolutely.

09:22AM 25           MR. SCOTT:  Two preliminary issues I wanted to

address related to filings that the government submitted within

the last few days.  And I don't know whether we're going to

take either of those up.  At least one of them colors what we

may do here this morning.

09:22AM    The first was filed yesterday afternoon.  The government

cited a couple additional Seventh Circuit cases regarding the

motion to admit prior offenses under 404(b) for Mr. Govey.  My

intention was to not continue to brief that unless the Court

would like me to.  My view is that Ninth Circuit law controls

09:22AM and that that doesn't really move the needle.  But if the Court

feels strongly that that's something that needs further

briefing on, I would be happy to do that.  But otherwise, I'm

prepared to submit the issue.

THE COURT:  I don't.  It doesn't change the

09:22AM tentative.  But I will say if for some unanticipated reason the

defense changes its strategy about whether the meth was

possessed by Mr. Govey, then I would be open to the possession

conviction coming in on rebuttal.  But it does not change my

analysis on the heroin distribution conviction.

09:23AM    MR. SCOTT:  Okay.  Very good.  And that's frankly

what I need to know.  And I can represent to the Court that

we're committed that we are acknowledging possession.  And I

know one of the things the government was concerned about was

the exact language in the stipulation.  We'll work that out.

09:23AM I'm sure we'll satisfy the government on that element.

1          THE COURT:  And I would always encourage

2    stipulations.  I always do.  But my ruling is based on your

3    representation of what you're going to say in opening

4    statement, what you're going to say in asking witnesses

09:24AM  5    questions and what you're going to say in closing arguments.

6    So I don't -- I'm not going to require the government to agree

7    to any stipulation.  They don't have to.  In fact, the way the

8    jury instructions read and the verdict form reads, there is no

9    stipulation.  So I don't have a problem with that.  But --

09:24AM 10          MR. SCOTT:  Okay.

11          THE COURT:  -- it doesn't change my analysis.

12          MR. SCOTT:  Okay.  Well, that makes it even easier.

13    I appreciate that.

14          The second thing has to do with the filing that was at

09:24AM 15    Docket No. 68, and it was sort of -- it wasn't really a motion,

16    it was a supplemental statement, I guess, that the government

17    made about the state of discovery and their discovery

18    obligations vis-à-vis the Orange County District Attorney's

19    Office.  It's still my intention to file some briefing on that

09:24AM 20    in writing, particularly on the issue of actual possession of

21    documents versus constructive possession of documents.  I still

22    intend to do that.

23          But just because some of this may color, you know, where

24    we're going and what we're doing today, I did just want to, I

09:25AM 25    guess, respond very quickly orally just to say that the defense

 1   is aware that there are two Deputy Larsons, that there are

 2   different people.

 3        We have not put all our eggs in the basket that this is,

 4   you know, the other Larson and that that mistake somehow

09:25AM  5   obviates everything we're doing here today.  It's not a

 6   mistake.  We've always known that there are two different

 7   Larsons.  And I just want to be very clear that our theory does

 8   not rise and fall on Deputy Bryan Larson.  This is -- these are

 9   arguments more generally about the Orange County Sheriff's

09:25AM 10   Department vis-à-vis Mr. Govey about other people, like

11   Investigator Beeman that we discussed before.

12        Bryan Larson is certainly in the thick of this, but he's

13   not the only one.  And so I just -- I want to dispel any notion

14   that there's some confusion that's fatal to the theory of our

09:25AM 15   case.  That's simply not true.

16        The other thing I wanted to say on that point was I'm

17   uncomfortable and feel I have to respond to the government just

18   sort of repeating, you know, these out-of-court statements from

19   the District Attorney's Office about why they dismissed the

09:26AM 20   case against Mr. Govey.  I don't envy the government's

21   situation here, but it's plain that they're simply, you know,

22   putting on paper and filing in court what the Deputy D.A. or

23   somebody told them on the phone.

24        And quite candidly, I take no pleasure in saying it, it's

09:26AM 25   simply belied by the record in the Superior Court.  So I didn't

want that to be unanswered or to suggest that we somehow, you

know, agree or, you know, are satisfied with the government's

explanation of that.  That's not the case.  As I said, we will

file briefing on actual versus constructive possession.

09:26AM    It's our position that when the government uses and

employs joint task forces, like the one here, the government

cannot shield its discovery obligation from Orange County files

or Orange County Superior Court files or sheriff's files

specifically when those become de facto federal witnesses.  And

09:27AM  I'll brief that more thoroughly.

Finally and most importantly for this morning, the

government has acknowledged in its papers that they have not

yet turned over documents that they do admit are in their

actual possession.  So even setting aside the constructive

09:27AM  possession issue, there are what I'm told approximately 25,000

documents on their way from the Department of Justice and the

fruit of their investigation of the Orange County scandal.  I'm

told that this isn't 25,000 pages, but rather it's 25,000

documents.  And who knows how many pages that's going to turn

09:27AM  out to be.

The reason I flag that and put that on the record is that

I know for a fact that Ms. Corrigan has not looked at any of

those documents.  And, you know, one can only guess what if any

effect that will have on the advice that she has given and will

09:28AM  give Deputy Bryan Larson.

1        And I also want to say that my hope is that whatever I'm

2   able to accomplish or any questions that I ask this morning is

3   simply based on the little bit of discovery that I received

4   thus far and certainly not what turned out to be revealed by

09:28AM 5   the Department of Justice disclosures.  The government has

6   provided about -- I think we're up to maybe 2500 pages of

7   discovery or thereabouts, somewhere in there.

8        And, you know, there's been sort of some dribs and drabs

9   from the Orange County DA's office, but I do want to be very

09:28AM 10  clear that we're still looking for documents, not just in the

11  District Attorney's Office, but from the sheriff's office.  And

12  I think that there may prove to be distinctions between files,

13  for example, on informants that are maintained by the sheriff

14  and their programs versus what made its way to the district

09:28AM 15  attorney.

16       But ultimately, you know, we've been -- I think we were

17  using the adjective "robust discovery" before, and thus far, it

18  hasn't been terribly robust.  And it may be eventually, but I

19  say that sort of to -- I guess to say that my cross this

09:29AM 20  morning will be without prejudice.  I don't want to give the

21  Court the idea that this is everything we might potentially do

22  in trial, some sort of a dry run, because it's obviously what I

23  suspect will prove to be very important potential impeachment

24  materials.

09:29AM 25       So thank you for your patience, Your Honor, in letting me

lay that out.  I'm saying this mostly for the record.  I'm not asking the Court to take some particular action at this time, but I appreciate you letting me say my piece.

THE COURT:  I appreciate that, Mr. Scott.

Let me respond to some of the comments.  First, my objection of this evidentiary hearing was, one, to confirm that Deputy Larson was, in fact, going to testify and not assert his Fifth Amendment right.  That was first and foremost; second, I was trying to get a sense if, in fact, Mr. Govey is -- and his case is related somehow to the jail informant scandal.  The government is taking the position that there is no relationship; you are saying that there is.  I don't know.

Obviously it is not my hope that we're going to be trying the jailhouse informant scandal in this case.  But even if Mr. Govey is not involved or related somehow to the jail informant scandal, I do believe that questions concerning Deputy Larson's invocation of the Fifth Amendment is relevant in this case for the simple fact of motive and bias of a witness.

As I understand it, there's nothing in the government's filing that has convinced me otherwise is Deputy Larson was called by the defense in the Ortiz case and asserted his Fifth Amendment right.  And when he's called by the government, he testifies about these things.  Now in this case he's being called by the government and he's willing to testify against.

1   So just on its face, that has a law enforcement -- arguably law

2   enforcement bias.

3       Ms. Corrigan, you may disagree with that, and that's

4   totally appropriate.  And Deputy Larson might have his own

09:31AM 5   explanation of what happened.  But the bottom line for purposes

6   of this trial and Mr. Govey's right to confront his accusers

7   and to cross-examine and impeach witnesses, he can bring out

8   that inconsistent position.  Deputy Larson talks about an issue

9   of intentional misconduct on occasions when the government's

09:32AM 10   calling him, but he refused to testify about it when the

11   defense calls him.  I don't see how I can keep that away from

12   the jury.  That's material.

13       So I don't know if it's going to go beyond that,

14   Mr. Scott.  Maybe you are right, there is a connection, but the

09:32AM 15   government has submitted evidence that Mr. Govey has had issues

16   with the DA's office and the sheriffs, but it wasn't part of

17   the jailhouse informant scandal.  And if that's the case, I'm

18   not so sure why we would want to be litigating the jailhouse

19   informant scandal.  But if you can show a connection, then

09:32AM 20   obviously I think some of that evidence should come in.  But

21   that was one of the objectives of why we're going to have this

22   hearing.

23           MR. SCOTT:  That makes a lot of sense, Your Honor.

24   And to the extent I can begin to demonstrate that connection

09:33AM 25   through Deputy Larson, then terrific, I'll do that.  There may

very well be things where Deputy Larson asserts that he doesn't

know or doesn't recall or whatever the case.  And in that event

I anticipate there probably would be some of that that I may

need to supplement that connection.  And I don't know that this

09:33AM  morning is the time to do that.  But I can certainly make

filings and try to tie that up for the Court.  So just with

leave to do that later, I understand the Court's comments and

it makes perfect sense to me.

THE COURT:  Well, one thing's clear, if

09:33AM  Deputy Larson testifies, he's going to be cross-examined.  So

we don't -- I don't think today we have to script exactly what

his testimony is going to be, and I didn't anticipate that.

Again, primary objective, is he going to testify?  And second

of all, if we could maybe get a little sense of is Mr. Govey

09:34AM  related or involved in the jailhouse informant scandal with

Deputy Larson.  And if so, then I'm not sure we're going to be

able to accomplish that much, but at least we can get a record

that there is a connection.  And if there's no connection, then

we're going to have to talk about, well, what's the scope of

09:34AM  cross-examination going to be at trial.

Ms. Corrigan.

MS. CORRIGAN:  Your Honor, if I might just briefly.

So as the Court knows, I've been appointed by this Court for

the purposes of the Fifth Amendment issues as they relate to

09:34AM  Bryan Larson.  And based on the information that I've been

given thus far, which has been very little, I have done some

analysis.  And -- but there's going to be ongoing analysis as

we pointed out earlier.  But as Mr. Scott mentioned on the

record, there's been some mention of some 25,000 documents.  I

09:35AM 5 don't know what they are.

I do want to just confirm what Mr. Scott says, that

nothing has been given to me.  I'm not aware of what -- if

those documents actually exist or what they -- what the content

is.  But certainly if those documents come into play, I'm going

09:35AM 10 to -- I'm going to need to review them so that I can further

advise my client on whether he should invoke or not.  And also,

just to clarify, my job is simply on that notion in terms of

what comes in, where the Court rules on cross-examination, I'm

going to leave that up to the parties to duke it out and for

09:35AM 15 you to be the ref.

But I just want to make it clear that if documents are

brought forward, I may need some further time to evaluate them,

particularly of 25,000 or whatever number of documents come

down the pike here.

09:35AM 20        THE COURT:  I don't want to say I'm concerned about

that.  Everything you said I understand and I do appreciate it.

And I'm not trying to curry your favor, I was comforted by the

fact that you were the lawyer who was going to represent

Deputy Larson and advise him of his rights in this regard.  As

09:36AM 25 you know, I have an obligation to protect all witnesses as I

1   have an obligation to protect the rights of both parties and

2   particularly Mr. Govey's constitutional rights.

3        I don't want to make your job impossible.  You have to do

4   what you have to do.  But again, my objective in this

09:36AM 5   proceeding was, is he going to testify or not?  And what you're

6   saying is, "Well, I" -- what I'm hearing.  I'm putting words in

7   your mouth -- is "I think he's going to testify, Judge, but I'm

8   nervous I have to advise him of what his rights are in this

9   regard."

09:37AM 10        And then he's going to -- you have to look at all these

11  documents, which I understand, but you understand the problem I

12  have is I don't want to start this trial and then have

13  Deputy Larson invoke his Fifth Amendment rights there.  That's

14  unfair to the jury, it's unfair to the system, because -- I'm

09:37AM 15  not trying to script it out or play it out, but if he invokes

16  in the middle of trial, he's a key percipient witness.

17        Mr. Govey's being denied his compulsory process.  I'm

18  going to have to declare a mistrial and probably dismiss the

19  charges.  That's where it's going.

09:37AM 20             MS. CORRIGAN:  Right.

21             THE COURT:  If that's what's going to happen, I need

22  to know that before we go to all the trouble.  So --

23             MS. CORRIGAN:  I agree.  And --

24             THE COURT:  And I'm not sure it's going to be

09:37AM 25  productive.  I don't want to be in a situation where I'm

```
 1    viewing is there a waiver here if he's going to testify about
 2    this stuff before me?  And then I'm put in a box is if he
 3    testifies today and then we get to trial and he's refusing to
 4    testify, I have to do a waiver analysis.  And if he continues
09:38AM  5    to refuse to testify and follows your instruction, guess what
 6    I'm going to have to do?
 7              MS. CORRIGAN:  Understood.
 8              THE COURT:  You know.  So --
 9              MS. CORRIGAN:  So with that --
09:38AM 10              THE COURT:  You need a little time to think about it
11    or get a better sense?
12         I would ask, Mr. Scott, you be very candid and transparent
13    with where you're going with this to Ms. Corrigan so we can get
14    this.  It's not in anybody's interest to -- well, let's just
09:38AM 15    figure it out how it goes along.  We need to know, is he going
16    to testify or not?
17              MS. CORRIGAN:  Frankly, Your Honor, I think one of
18    the problems -- and I don't want to speak for Mr. Scott, but I
19    think I can -- is that if there is this body of 25,000
09:39AM 20    documents, it sounds like he doesn't know what they are.  I
21    don't know what they are.  And it sounds like the government
22    needs to make -- do some analysis and determine if they're
23    going to turn them over, if they do, in fact, exist.
24         And the only way that I can -- I guess at this point -- I
09:39AM 25    don't have enough information at this point to give the Court a
```

UNITED STATES DISTRICT COURT

glimpse into whether these documents can be a potential

problem.  Hopefully they're not, but if they are, they are, and

I'll have to give the advice.  So based on what I've given thus

far, which has been very minimal, I have advised my client

09:39AM 5  accordingly.  But if there's some evidence out there or

documents that are going to change that analysis, I'm going to

have to review them.

And I completely understand what the Court's position is.

So I guess it's my -- I guess I'm throwing it out there that

09:40AM 10  until I know what the full scope is, I may not -- my analysis

may change in the coming days.  But whatever is given to me, I

will get through it as quickly as I can.  Get together with my

client and discuss it and figure out whether there is, in fact,

a problem or not.  And I'm not saying there is a problem.  I'm

09:40AM 15  just saying I'm a little concerned I'm hearing about 25,000

documents.  It's a lot of paper.

THE COURT:  I'm concerned too and I understand.  I'm

not disagreeing with you, but I have a few questions.  Have you

had conversations with Mr. Scott about basically what his

09:40AM 20  knowledge is of the information that's relevant to this case

and the examination of Deputy Larson?

MS. CORRIGAN:  We've had some brief discussions,

although I think that my sense is, and I'm sure that he will

correct me if I'm misunderstanding what he's saying, there's

09:40AM 25  potentially materials within these -- this body of documents

1    that could be out there that could possibly be a problem for

2    Deputy Larson.  I don't know.  Is that --

3          MR. SCOTT:  Of course I can't say having never seen

4    them, but what we do know is that the Department of Justice is

09:41AM 5    investigating the Orange County Sheriff's Department and

6    investigating this jail scandal to see whether the law has been

7    broken.  We know that Deputy Bryan Larson was part of the

8    special handling unit that is at the heart of this scandal.

9    You know, I know just from very general representations by the

09:41AM 10   government that his name comes up, he's -- there are documents

11   that pertain to him within this body of evidence that's going

12   to be turned over to us.

13        Beyond that, what specifically is in there, you know, I

14   can't say.  I do know and it's no secret to anybody here that

09:41AM 15   some of the key issues are whether inmates were, you know,

16   being moved to facilitate performing informant work on behalf

17   of the sheriff and derivatively, at least, the district

18   attorney.  Whether there was records of such, whether the

19   records were disclosed and turned over to defense attorneys in

09:42AM 20   a timely manner, whether there was some cover-up of this

21   informant program and the records have documented it.

22        And I can represent in good faith that I do think that

23   Bryan Larson is involved in all of that.  Whether he's culpable

24   in a criminal way or otherwise, I can't say.  And I don't know

09:42AM 25   what exactly those documents will say.  But that's where I'm

going.  And I do suspect there will be, at least, some fodder

for making the argument that has yet to be disclosed.

THE COURT:  And thinking out loud is a very

dangerous thing, and I seem to get myself in trouble, but I see

Mr. Sanders in the audience, and I know he is very familiar

with the scandal and the evidence that's out there.  Have

either of you had an opportunity to discuss this issue with

him?

MR. SCOTT:  I have.

THE COURT:  And it's hearsay, has he given you any

information to corroborate that Deputy Larson is involved in

the scandal?

MR. SCOTT:  Yeah, I do have reason to believe that

he is.  And, you know, I hesitate to go too much into, you

know, sort of my work product and my conversations and building

where I'm going.  Although as I said before, the things that I

laid out is where I'm going, and there's no secret about that.

And I guess I can say that, you know, my conversations

with Scott Sanders as well as the files that I inherited from

Renee Garcia, who was Mr. Govey's attorney in the 2012 case

that he was incarcerated for at the Theo Lacy jail, that body

of information and the -- my conversations with those people

absolutely do confirm, at least in my mind, that this is a

viable avenue to pursue, that Bryan Larson is involved in this.

And so I think the short answer is yes.

THE COURT:  And my short response is not trying to give any credence to it, but I've had extensive dealings with you in difficult cases, so I don't challenge a good-faith basis to go into there.  And have you conveyed your thoughts with Ms. Corrigan?

MR. SCOTT:  In a general way, yeah.  I mean, I haven't, you know, laid out for her, you know, "This is how I'm going to cross him on this document, and this is where I'm going to go on that document," I haven't done it to that level.  There's a little bit of tension here.  I agree with the Court 100 percent that I do want to be transparent with Ms. Corrigan to the extent that it moves the ball for all of us.  If I can persuade her that he should invoke, you know, we should find that out earlier rather than later.  I agree with that.

That being said, I think it's somewhat against my instincts to lay out a very detailed map of the cross-examination that he's about to undergo, just so that I can make sure I'm getting, you know, candid extemporaneous testimony from him, if that makes sense.

THE COURT:  It makes sense, but I think in this case, in this context and what the issues are, transparency is -- I'm not trying to disagree with you, but I'm having a hard time envisioning why transparency isn't in Mr. Govey's best interest.  Because if he invokes -- I mean, stranger things could happen, but I don't see how we're going to have a

1    trial if he invokes.

2          MR. SCOTT:  Oh, I agree.  And that's why I say I do

3    think there's a strong weight on that side of the scale to

4    just, you know, lay it out there.  And it's, you know, largely

09:45AM 5    what I've done.  I gave Ms. Corrigan my cross-examination

6    binder of exhibits that I plan to use this morning.  I allowed

7    her to copy that this morning and -- so maybe I'm being a

8    little overly cautious in describing my reticence.  I don't

9    think I held too much back.  And I agree with the Court in

09:46AM 10   general that transparency is probably in Mr. Govey's best

11   interest here.

12         THE COURT:  Ms. Corrigan --

13       I'll give you a chance to comment and respond,

14   Mr. Marrett.

09:46AM 15     But Ms. Corrigan, what do you suggest we do?

16         MS. CORRIGAN:  I would agree there is the general

17   discussion as to Deputy Larson, but now I'm getting concerned

18   that perhaps there is a smoking gun out there that I'm not

19   aware of.  I did, as the Court saw me walk in with copies, 100

09:46AM 20   pages this morning, Mr. Scott was good enough to give me his

21   binder, and I went down to the PD's office and copied it, but I

22   haven't had an opportunity to study these records.

23       So based on what he just said, I now have concerns, and

24   I'm not -- frankly, I don't think it's an appropriate time now

09:47AM 25   to put my client on without me actually reading through all of

1  this, because it says to me there's something sitting in that

2  stack of copying that I need -- that should be of concern.  And

3  I think I need to read it and study it.

4        And then, I think, also in fairness, I need an answer from

09:47AM  5  someone if anyone -- not the Court, but if someone's going to

6  be willing to tell me whether there are, in fact, 25,000

7  documents that are out there that I need to evaluate.  Because

8  it sounds like -- and I have had general discussions with Scott

9  Sanders over time, because Scott and I know each other quite

09:47AM 10  well.  I haven't spoken with him regarding this matter in

11  particular.

12        And I haven't talked to him at all -- I don't recall any

13  discussions.  I know we haven't had any recent discussions, but

14  I don't recall any historical discussions relative to Bryan

09:47AM 15  Larson.  And if they were, they weren't meaningful to me at the

16  time because I didn't know who Deputy Larson was at the time.

17        But just so the Court's clear and I know we have a record,

18  I'm certainly open to sitting down with them.  If there is

19  something that I need to reconsider and if my client needs to

09:48AM 20  take the Fifth, I'll advise him to do so and he can make his

21  choices from there.

22              THE COURT:  So you're saying you want a continuance?

23              MS. CORRIGAN:  Well, at least for maybe an hour, I

24  don't know.  It shouldn't take me too long to read through

09:48AM 25  this.  And if maybe Mr. Scott -- I don't know if he's going to

            want to, but point me to where the problems are, I can take a
            look at them and get back to the Court.  But in light of now,
            there's confirmation that there's an ongoing investigation by
            DOJ relative to the sheriff's department, I think I need to
09:48AM     read through this stuff because I can't expose --
                    THE COURT:  You don't have to explain it to me.  I
            appointed you.
                    MS. CORRIGAN:  Right.  Understood.  I'm now
            concerned I'm going to be exposing something to my client that
09:48AM     I don't want to do that.  But if I'm not exposing issues, I can
            come back to the Court and let the Court know based on what
            I've read.
                    THE COURT:  So give you an hour?
                    MS. CORRIGAN:  If the Court would, that would be
09:49AM     great.  And I can let your courtroom deputy know when I'm
            ready.
                    THE COURT:  That would be fine.
                Mr. Marrett, before we take the brief break.
                    MR. MARRETT:  So let me back up first just to the
09:49AM     first issue that Mr. Scott raised about the 404(b) motion.  And
            I think, you know, we're going to work with Mr. Scott on a
            stipulation.  I just wanted to make a record that, you know, if
            we're not able to come to a stipulation, the government would
            want to reraise before trial its motion in limine to admit that
09:49AM     evidence.

1    I think if there is no stipulation as to knowledge, it's

2    still going to be a fact the government has to prove at trial,

3    an element to the offense, and the convictions would go to --

4    the prior convictions would go to the defense's knowledge and

09:49AM  5    proving his knowledge for -- in the government's case in chief.

6    THE COURT:  Well, you're trying to get distribution,

7    not possession.  And I think the law in this circuit is very

8    clear that it's strongly disfavored getting convictions of

9    possession in to prove distribution.  And again, if the defense

09:50AM 10    is personal use and Mr. Scott takes that position, I don't see

11    what extra relevance or value a conviction of possession is

12    adding.  In fact, it sounds to me like character propensity

13    evidence, and it's just not needed.  That's my response.

14    And I don't really care whether you stipulate or not.  I

09:51AM 15    don't mean that disrespectfully.  You don't have to stipulate.

16    I can't force you to stipulate.  But the joint statement that

17    I'm going to be reading to the jury during jury selection -- I

18    should say, the potential jury, is -- I don't think it can be

19    any clearer, Mr. Marrett.

09:51AM 20    MR. MARRETT:  No, I understand where the Court's

21    coming from.

22    THE COURT:  Let me just read it for the record:

23    "Defendant Govey admits possessing

24    methamphetamine but denies that he intended to

09:51AM 25    distribute it."

**UNITED STATES DISTRICT COURT**

I mean, usually when these possession convictions come in, it's because the defendant's saying, "I didn't know I had drugs.  I didn't know.  I thought it was baby powder or I thought it was crushed Advil" or something.  But he's admitting he possessed it.  I mean, the elephant in the room is the mandatory minimum that applies in Federal Court.  That's what's going on here.  And I just don't think it's fair for the government to try to dirty Mr. Govey up with his priors.

MR. MARRETT:  And for that reason, I think we'll be able to reach a stipulation, Your Honor.  I wanted to make the record that the joint stipulation isn't evidence in the case. The government needs to put in evidence during its case in chief as to defendant's knowledge.  Knowledge is an element of even the distribution offense.  And so government would need to put in some evidence.

If that's not by way of a stipulation, the government would need to put in other evidence, and I think the prior convictions would go to that intent.  So I'm just making my record on that.  I think it will be a non-issue because I think we will be able to reach a stipulation on this.

THE COURT:  All right.

MR. MARRETT:  So that was the first point.  I'm going to try to address several points that Mr. Scott raised in connection with the discovery, the DOJ documents and the government's joint statement.

1      First what I hear defendant to be raising is that his

2  theory is that there's some ephemeral bias against him by the

3  sheriff's department generally.  And the case law is that the

4  bias to be relevant has to be a bias between the witness and

09:53AM  5  the defendant.  And so in this case, unless there's evidence of

6  bias -- or the cross-examination is biased by Deputy Larson

7  towards the defendant, none of that is relevant.  And it

8  shouldn't be admissible.

9      And that's part of what the government's motion in limine

09:53AM 10  is, is that general references to the sheriff's department or

11  perhaps other deputies and their prior relationships with

12  Defendant Govey or even more extraneous than that, other

13  deputies and other inmates or other informants within the jail,

14  that's not relevant to any potential bias or motive that

09:54AM 15  Deputy Larson has vis-à-vis the defendant in this case.  And

16  that's what the *Abel* case -- the Supreme Court's *Abel* case and

17  other Ninth Circuit cases about bias talk about, that it's the

18  bias between the witness and the defendant in the case.

19      So I think that's an important point to keep in mind when

09:54AM 20  we're talking about what is the discovery going to be like and

21  what is the cross -- the scope or limits on cross-examination.

22          THE COURT:  Well, let me interrupt you, because I

23  don't want to be talking by each other.  You may be right that

24  the scope of cross-examination is going to be limited if your

09:54AM 25  version of events is true.  But Mr. Scott is representing to me

 1    he has a good-faith belief that your version is not true.

 2        Now maybe Deputy Larson, in accordance with his version,

 3    wasn't focusing on Mr. Govey directly, but there's some

 4    attitude or philosophy, motive, bias against him and the

09:55AM  5    deputies in Orange County against him, and somehow that is

 6    connection with the prosecution.  You deny that.  And if your

 7    version is true, then I certainly see the trial testimony being

 8    limited in scope.

 9            MR. MARRETT:  And I --

09:55AM 10            THE COURT:  Not for this hearing, because we have to

11    figure out if there is a connection.

12            MR. MARRETT:  Sure.

13            THE COURT:  But you have one major problem that

14    candidly, Mr. Marrett, you've never addressed, and that's the

09:55AM 15    box that I'm in, is Deputy Larson invoked his Fifth Amendment

16    rights.  He invoked them in uniform in a court of law in a

17    murder case.  That is very significant.  And he invoked them

18    when he was called as a witness by the defense.  All right.

19    And he was asked about intentional misconduct, and that's when

09:56AM 20    he invoked his Fifth Amendment rights; right?  So that is

21    significant.  And then he's willing to testify when he's called

22    by the government.

23        So I don't see how I can prevent the defense from asking,

24    "Deputy Larson, why were you willing to testify when the

09:57AM 25    government calls you, but when the defense called you, you

weren't willing to testify about this?"  How can I keep that

away from the jury?  I think it's going to get reversed.

Especially if you get some of the panels in this circuit,

they're going to immediately reverse me for denying him his

09:57AM 5   right to cross-examine the witness.

MR. MARRETT:  I want to make sure we're not talking

past each other in this because I think there's one issue about

Deputy Larson's prior invocation, why he invoked, what the

difference was when he testified.

09:57AM 10   THE COURT:  But that's for the jury.  I hear you.

And maybe -- I'm probably making Ms. Corrigan nervous too, but

I appointed her because there is the inference that it is a

government bias.  That might not be true, but that's not for me

to decide.  That's going to be for the jury to decide whether

09:58AM 15   he has a bias or not.  I can't say, "Well, he's not biased so

you can't ask those questions."

MR. MARRETT:  I suppose and I feel we may still be

talking past each other or maybe I'm not fully understanding

where the Court's coming from.  But I think, No. 1,

09:58AM 20   Deputy Larson's testimony today, I intend to get into -- into

it with him on direct examination his prior invocation.  I

think that his testimony on that subject will clear a lot of

the air surrounding this.

The second issue, though, is --

09:58AM 25   THE COURT:  I'm stopping you not to be rude, but it

doesn't matter from -- doesn't matter what he says on that.

His explanation might be totally reasonable and absolutely

true.  I'm just going to assume it.  But the defense is going

to say, "Oh, yeah, he's telling the truth.  And he just invoked

09:58AM   because his lawyer told him to" or whatever explanation he

gives.  They're not going to accept that, and it's going to be

for the jury to decide which version is true.  It's not going

to be for me to decide that.

MR. MARRETT:  But I think there's a difference, Your

09:59AM   Honor, between asking him, "Did you invoke before?  Why did you

invoke and then you testified later for the government?" and

that "There's this potential inference of bias because you were

called by the defense and didn't testify, and then you did

testify when you were called by the government."  That's one

09:59AM   issue.  But if --

THE COURT:  And that's actually in the most kindest

way to Deputy Larson as opposed to you invoke because you knew

you did something wrong and you were involved in a conspiracy

to violate defendant's constitutional rights.  I'm saying let's

09:59AM   assume it's not that, which the defense is saying it is.  I'm

assuming it's not.  But just the mere fact that he testified

about it when the government calls him, but he won't testify

when the defense calls him, that's an inconsistent position.

And the jury is entitled to understand why is there this

10:00AM   inconsistent position?  Is it because of these noble

1    understandable reasons that you're explaining, or is it because

2    of the nefarious reasons the defense are suggesting?

3            MR. MARRETT:  So -- and I want to tie this back

4    into two issues:  One, if it's the defense testing his

10:00AM 5    credibility about his reasons for invoking previously, the

6    defense can't get an extrinsic evidence to prove their theory

7    that he isn't credible when he's testifying about the reasons

8    for his prior invocation.

9            THE COURT:  Well, no, 608 deals with character for

10:00AM 10    truthfulness, no extrinsic evidence on that.  But those -- the

11    limitation on extrinsic evidence does not apply to mode of

12    bias.  And if he's a biased witness simply -- he only testifies

13    when the government calls him, he doesn't testify when the

14    defense calls him, that's bias.  That's not character for

10:01AM 15    truthfulness.

16            MR. MARRETT:  And Your Honor, beyond that fact,

17    though, if the defense is trying to get in any other evidence

18    of bias, it needs to be tied to Deputy Larson's bias vis-à-vis

19    this defendant.

10:01AM 20            THE COURT:  And that's why we're having this

21    hearing.

22            MR. MARRETT:  Understood, Your Honor.  But that case

23    that he invoked in did not involve this defendant.  It was in a

24    separate case, a separate defendant and it wasn't -- it was at

10:01AM 25    an evidentiary hearing.  In that case it wasn't at a trial in

1   that case.

2        THE COURT:  And it was a very important evidentiary

3   hearing that resulted in the dismissal of the charges.  But put

4   that aside is, again, one of the purposes of this hearing --

10:02AM 5   secondary purpose is to get a sense whether Mr. Govey is, in

6   fact, related to that informant scandal, and whether

7   Deputy Larson knows and was directly involved in anything that

8   happened to Mr. Govey, that -- let's assume you're right, he

9   was involved somehow in the informant scandal, but he has

10:02AM 10  nothing directly to do with Mr. Govey, he's still going to have

11  to answer questions about the inconsistent positions he took.

12  He'll have to answer questions and just deny "I don't know

13  anything.  Don't know anything about Mr. Govey."

14        Then Mr. Scott's going to be able to call potentially

10:02AM 15  other witnesses if he has evidence to suggest that although

16  Deputy Larson might not know about it, other deputies know

17  about Mr. Govey, and he is related to that.  And because he

18  wouldn't play ball or what have you, I'm speculating here, they

19  tried to intimidate him, and somehow that -- got together on

10:03AM 20  the task force or the referral to this case.

21        One of the things I said to you that I'm quite frustrated

22  is I don't understand until this is resolved, this being the

23  informant scandal, why is Deputy Larson involved in doing

24  searches?  Because this issue that's coming up in this case is

10:03AM 25  going to come up in every case, and it's a problem for the

1    government, this time U.S. Government.  The issue you and I are

2    facing is going to come up in every case where Deputy Larson is

3    a percipient witness.

4              MR. MARRETT:  Well, and I guess, Your Honor -- and I

10:04AM  5    think a lot of this, again, when Deputy Larson testifies, you

6    know, the Court will be able to see what his role is in this.

7    I think part of the -- again, and I don't want to keep beating

8    the same horse especially if it's a dead horse, but

9    Deputy Larson, his role vis-à-vis Mr. Govey, is what's relevant

10:04AM 10   to this case.  The fact that there's other deputies and other

11   folks at the sheriff's department involved with the Orange

12   County jails isn't relevant to Deputy Larson, his testimony in

13   this case, to the probation search in this case or any of the

14   facts that precipitated the charges in this case.

10:04AM 15             THE COURT:  You may be right.  You may be right.

16   But as long as the defense has a good-faith belief that your

17   version is not true, I'm in a position where I've got to let

18   him inquire.  But even putting aside that, that is, whether he

19   has direct involvement with Mr. Govey, just put it aside, he

10:05AM 20   asserted his Fifth Amendment right in a criminal state

21   proceeding and he wouldn't answer questions.  And so like it or

22   not, he's involved, and he's going to have to explain that.

23             If he testifies in this case, he's going to have to

24   explain that inconsistent position.  There's no way you're

10:05AM 25   going to be able to keep that out, not with me anyway, because

UNITED STATES DISTRICT COURT

1    that reflects an arguably biased witness to the defense.

2        So assume everything you're saying is true, and putting

3    aside, well, even if it's true, that doesn't necessarily mean

4    he doesn't have to answer questions to deny it or to convince

10:06AM 5    the jury that he had no direct involvement with Mr. Govey.

6    Let's put that issue aside.  He's going to have to answer why

7    he invoked when the defense called him as a witness on this

8    subject, and when the government calls him, he testifies.

9            MR. MARRETT:  And, Your Honor, I think after the

10:06AM 10   hearing today and after Deputy Larson testifies, I think the

11   government and the Court will be able to reassess more fully

12   the scopes or parameters that would be appropriate to

13   cross-examination at trial on these issues.

14           THE COURT:  I hope so, but I'm a little

10:06AM 15   frustrated -- probably more concerned than frustrated -- is I'm

16   not sure whether we're going to be really successful in trying

17   to limit the scope given how many documents are out there,

18   given Ms. Corrigan's feeling.

19       I think what I -- first and foremost, I got to figure out

10:07AM 20   is he going to testify or not.  Before I impanel a jury, I've

21   got to figure that out.  That's just not fair to the jury.

22   It's not fair to the system.  It's not fair to Mr. Govey.  I

23   don't think it's fair to the government.  And --

24           MR. MARRETT:  So let me shift gears for a minute,

10:07AM 25   Your Honor, because you mentioned the documents, and the

defense has stated they have a good-faith belief that there may

be documents out there.  So what I received -- what I received

on Saturday afternoon from the DOJ was a hard drive that has

25,000 records in it.  My understanding is that of those 25,000

10:07AM   records, about 2500 pertain -- or were hits on the name "Bryan

Larson."  So it's a much smaller universe of documents than the

25,000 that pertain to Deputy Larson.

And one thing that I'm a little bit confused about or

perhaps just misunderstanding, the defense in this case had

10:08AM   asked for previously the Frosio file.  And that was their

understanding of the connection between Deputy Bryan Larson and

Defendant Govey in this case.  And the government has received

that.  It produced to the Court in camera.  And my

understanding is that Deputy Larson was not involved with this

10:08AM   Frosio file.

And so beyond that, I haven't heard from the defense what

other documents or records they believe exist.  And at this

point, although the government has gone out and it's got the

files from DOJ and it's reviewing them, I really don't know

10:08AM   what I'm looking for.

And I can represent to the Court that of the documents

that I've been able to go through in the last day, which is

several hundred between myself and my colleague AUSA Kong, the

documents that I've seen were likely not even discoverable.

10:09AM   They're internal employee records.  They're internal e-mails

1    between sheriff's department and employees about investigations

2    that relate to other folks, ongoing investigations, things that

3    aren't related to this case or even the deputies in this case

4    in any way other than a name is copied in the cc line in an

10:09AM   5    e-mail.

6         And so I think that, you know, the government's going to

7    continue going through those.  And to the extent that, you

8    know, it can through a protective order provide those to the

9    defense, it will.  But at this point, I'm not aware of anything

10:09AM  10    that would lead me to believe that Deputy Larson would need to

11    invoke.  Obviously I can't advise him on that.  That's

12    Ms. Corrigan's job.  But the documents that I have reviewed, I

13    just don't know what the defense thinks is out there because I

14    haven't seen anything that changes my view on what his

10:10AM  15    testimony would be or whether he would invoke.

16         And other than this Frosio file that they've identified, I

17    don't know what I'm looking for.  We're going to go through it

18    to see if there's any Rule 16, *Brady* materials, but at this

19    point, if the defense has a good-faith basis to believe there's

10:10AM  20    other things that exist, I think there's some -- you know, the

21    ball's in the defense's court to at least identify for the

22    government the categories or types of documents that I should

23    be looking for that they believe exist or that they have a

24    good-faith basis to believe.

10:10AM  25              THE COURT:  Well, let me respond to that because I

**UNITED STATES DISTRICT COURT**

do appreciate what you said.  And I -- everything that I've

seen, I get a sense you are trying, and I appreciate that.

Going back to my earlier comments to Mr. Scott, I just think at

this point in this case, in this context, transparency is

10:11AM 5    imperative.

It's not in Mr. Govey's best interest to be trying the

jail informant scandal in this court.  It's just not.  But he

is entitled to zealously cross-examine any witness that

testifies against him.  And he's also -- if there was any type

10:11AM 10   of vindictive bias prosecution, which you vehemently deny, if

there's any truth or merit to that, he has a right to expose

it.

I would ask, again, and reiterate to Mr. Scott, if he has

specific documents that he knows are out there, give them to

10:11AM 15   you.  And give them to Ms. Corrigan so she can adequately

advise Deputy Larson.  But again, the source of this problem in

fairness to me, in fairness to the defense, and in fairness to

you, is Deputy Larson invoked when asked about it.  And the

reason he invoked may have been confusion, out of an abundance

10:12AM 20   of caution.  I don't know.  But he invoked.  And there are

consequences of him invoking.  He has now opened himself up to,

at the very least, that he's a biased witness for the

government, at the very least, and so I've got to deal with

this issue.

10:12AM 25   I understand what you're saying is the informant scandal,

UNITED STATES DISTRICT COURT

1    Mr. Sanders has done a very thorough, exhaustive job.  There's

2    months, years of testimony, documents, and you're not going to

3    be able to go through all of that and -- for the *Brady*/*Giglio*

4    materials.  I understand that.  I just don't know candidly what

10:13AM 5    I'm supposed to do because I am not equipped nor would it be

6    appropriate for me to micromanage your *Brady* obligations.  And

7    I don't want to have this trial turn into the jail informant

8    scandal case.  That's not -- again, I don't think that's fair

9    to Mr. Govey.  It might be entertainment for people, but that's

10:13AM 10   not why we're here.

11        So, I mean, I don't know.  I guess we try to do the best

12   we can.  We have the January 30th trial date we just moved

13   forward.  And we tried to produce whatever we can, but the

14   concern I guess I have on that is what if on habeas or other

10:13AM 15   review Mr. Scott finds a lot of very damaging documents and

16   they turn up?  And then all the time, money and effort that

17   we've done here is going to go to waste because it's going to

18   get set aside.

19             MR. MARRETT:  And I'm not asking Your Honor to

10:14AM 20   micromanage our discovery obligations, and the government will

21   review -- you know, turn over what it can to the defense in

22   advance of trial in this case.  And, you know, again, Your

23   Honor, I think the purpose of this hearing is to have

24   Deputy Larson testify to see if he was going to invoke and to

10:14AM 25   see if there's any limits we can put on cross-examinations.

1    Perhaps I'm just too far optimistic, but I really do think

2    his testimony today will shed some light on these issues both

3    through my direct and through Mr. Scott's cross-examination.  I

4    think there will be -- it will be productive.  And we'll be

10:14AM 5    able to at least inform the Court about, you know, what

6    Deputy Larson's role is.

7         THE COURT:  And I hope you're right.  I hope you're

8    right.  But I think we're clear, he's going to have to explain

9    to the jury why he invoked.  That's not going to be kept from

10:15AM 10   them.  And he's going to have to give that explanation.  I'm

11   not trying to put any negative connotations, views or comments

12   on him invoking, but by invoking, there are consequences to

13   that, and he's put you, and specifically the royal government,

14   when I say "you," in a difficult position.  Because when he

10:15AM 15   invoked, that means you have to go through all this jail

16   informant scandal discovery to make sure there's nothing that

17   has to be turned over.  That was the consequence of it.

18       And I'm not saying you're frustrated or mad with me, but

19   you need to realize it's not my fault.  I didn't invoke; he

10:15AM 20   did.  You didn't invoke; he did.  And he might have had very

21   legitimate reasons to do so, but he did.  And by doing that,

22   now there's consequences in this case.  And that's what you've

23   got to understand and, candidly, you've got to accept.  Because

24   this judge ain't going to say, "Never mind.  We're just going

10:16AM 25   to go forward."  And I'm not saying you're asking me to do

1    that, but I ain't going to do that.

2          MR. MARRETT:  Understood, Your Honor.  I think I've

3    made my record through my filing on that.  I don't think

4    there's anything I can obviously argue to change your mind on

10:16AM  5    that, so I'm not going to push that issue here.  But if there's

6    any other things the Court wants me to address that Mr. Scott

7    raised, I'm happy to do so.

8          THE COURT:  No.  In a way I feel bad for all of us,

9    including you.  We're in this difficult position and we want to

10:16AM 10    get this trial going.  I know Mr. Govey is very anxious to have

11    this trial.  He wanted it long ago.  And I feel that tension.

12    And I'm sure Mr. Govey doesn't feel better, because I feel that

13    tension, but I really want you to have your trial.  I wanted it

14    last year.  I know he wants his day of reckoning, and we got to

10:17AM 15    do it.

16          But again, we have this discovery issue, and I just don't

17    know how it's going to resolve.  Because I -- there's a part of

18    me that says, "Well, let's just plow forward and do the best we

19    can."  We plow forward and then some documents come out during

10:17AM 20    habeas that would have changed things.  And then we've wasted

21    all this time, money, and effort.  But I think that's the --

22    unfortunately, that's the nature of the issue before us.  And

23    again, that issue is because Deputy Larson invoked.  Rightfully

24    or wrongfully or somewhere in between, that's why we're here.

10:18AM 25    That's why we're having this, and that's why we're having this

1    problem.

2              MR. SCOTT:  Can I say something quickly, Your Honor?

3    And I say this only because in the spirit of transparency the

4    Court was discussing also because the government expressed some

10:18AM 5    confusion about our theory as to this one particular piece of

6    evidence, it's never been our theory that Deputy Bryan Larson

7    was the keeper of the Frosio file or was even Frosio's handler.

8         And I just want to say for the record our theory and the

9    reason we're requesting that information is because Mr. Frosio,

10:18AM 10   this informant, was the informant.  He was the operative that

11   helped build a murder solicitation case against Mr. Govey while

12   he was in custody.  It was one of these situations where, you

13   know, Mr. Govey's in custody on a relatively -- you know,

14   certainly a less serious-type charge.  But then lo and behold

10:19AM 15   after, you know, Mr. Frosio does some machinations, he's facing

16   a solicitation of murder charge.

17        It's our theory and our view that Frosio was sort of a

18   Massiah pawn, if you will.  He was an operative and the tool

19   for some of the Massiah violations that Mr. Sanders has been

10:19AM 20   alleging all these years.  And it's one of the main pillars of

21   this scandal.  And my understanding is that it was in a context

22   of Mr. Govey's repeated discovery requests in his 2012 case

23   that he was never provided with these files.

24        And I think some of the specific nomenclature for them,

10:19AM 25   there's TRED records, T-R-E-D records.  There's special

UNITED STATES DISTRICT COURT

1    handling logs that existed.  And it was always represented that

2    they didn't exist, that there was no such thing.

3         Finally, years later after Mr. Sanders' yeoman efforts and

4    after all the other things that came to pass, finally it did

10:20AM 5    come to light, okay, there are TRED records.  They do exist.

6    There are special handling logs.  They do exist.

7         The Frosio file, so to speak -- and again, I don't mean

8    the district attorney's files, I mean the sheriff's file, the

9    special handling file, whatever documents they used to document

10:20AM 10    their informant program would have revealed not just that these

11    records weren't disclosed in Mr. Govey's case, his 2012 case,

12    but also that these records existed and they weren't disclosed

13    in the *Dekraai* case and the *Ortiz* case and some of these other

14    very, very serious cases where similar discovery requests had

10:20AM 15    been denied or stonewalled.  And again, I'm using, you know,

16    the language of our position.  And I don't mean that to be

17    pejorative to the government specifically here.

18         So the reason I say all these things is, respectfully,

19    it's a little red herring to say, "Well, Bryan Larson wasn't

10:21AM 20    involved in Frosio."

21              THE COURT:  But let me interrupt you because I still

22    need a link between all of that, including Mr. Govey's 2012

23    case.  What's the link with that and these charges?  And before

24    you answer that question, that's the key question,

10:21AM 25    Deputy Larson testifies, you're going to be able to ask him

about his inconsistent position.  But now you're asking

something much bigger, wider in scope saying that these charges

against Mr. Govey somehow are related to that 2012 case and the

informant scandal.  What is that -- what is that link?

10:21AM          MR. SCOTT:  So I think there's a couple different

links.  One of the links is that there was testimony that was

presented in that 2012 case that was undermined by some of this

other evidence.  There was exculpatory evidence that was not

presented, and I think that that will go to the credibility of

10:22AM the investigators who are working on this including Mr. Beeman.

Now I don't know that Larson testified in the Govey case

and that's why I'm setting him aside just for the moment.  So I

think there's credibility issues there in terms of building a

case while withholding exculpatory evidence.  So that's one

10:22AM aspect of it, his credibility issue.

THE COURT:  Mr. Beeman was involved in this federal

case against Mr. Govey?

MR. SCOTT:  Oh, absolutely.  He was part of the

search.  He was part of the -- yeah, he was part of the search

10:22AM that found the methamphetamine and the alleged counterfeit in

this very case.  And I believe he was also instrumental in

bringing the case over here to the Feds.  That's my

understanding.  It's something I want to explore.  But that's

my belief.

10:23AM          But there's no question, it's a not a matter of my belief

that he was part of the search team, the arrest team.  He

questioned Mr. Govey in this case.  He questioned other

witnesses in this federal case.  The government doesn't plan to

call him as a witness, but I certainly do.

10:23AM 5          THE COURT:  So he's a percipient witness?

6          MR. SCOTT:  Right.

7          MR. MARRETT:  Your Honor, I do want to correct the

record a little bit on this.  My understanding is, and I'll

proffer this now, but Deputy Larson will testify to this,

10:23AM 10  Investigator Beeman was not part of the search team that went

to the house initially.  He was later called to come to the

house to participate in the interviews.

13     So he's not part of the team that went to the house to do

a probation check or part of the folks who, you know, went into

10:23AM 15  the house and did the search but was later at the scene.  So

he's percipient to some events, but not to the extent that --

of being involved in deciding to go do the search or searching

for people at that house.  That was not his role.  That's my

understanding.  And I think Deputy Larson will testify to that.

10:24AM 20         MR. SCOTT:  I guess we'll find out.  But, I mean, at

a minimum, let's take everything the government said at face

value, after Mr. Govey apparently is arrested, Beeman then

responds after the fact.  I guess arguably that's even more

helpful to me.  And then he participates in the interrogation

10:24AM 25  of Mr. Govey and the questioning of the other witnesses at the

scene.

So let's set that aside.  Beeman is in on the ground floor
with the 2012 case against Mr. Govey.  In our view, was at
least privy to the fact that exculpatory evidence was not
10:24AM presented in the 2012 case.

And then the second part of this is that ultimately that
case is dismissed.  Now the government wants to repeat the
district attorney's position that that was to protect witnesses
or something.  I think the reality in the case we're making is
10:24AM that the district attorney was in the position that they had
not disclosed these TRED records and special handling logs and
other things throughout years of Mr. Govey's case and, also,
all of these other very serious, very important cases.

And rather than letting that Frosio file see the light of
10:25AM day and rather than letting all of that evidence taint all
those other cases and expose them to scandal and liability,
they simply dismiss the case against Mr. Govey instead.  So
that leaves the Orange County Sheriff's office in a position of
having some embarrassment about being part of not turning over
10:25AM that documentation.

And also, if we take them at their word that they think
Mr. Govey's a bad guy, Mr. Govey walks as a result of sort of
vesting them in this discovery battle.  And I think that does
give rise to a colorable case that they would have a motive, if
10:25AM not to -- I can even say it this way:  Let's assume that

1    nobody's going to set Mr. Govey up, at least to stretch a case

2    from a simple possession case to a federal min man case or from

3    a simple possession of a couple counterfeit bills to try and

4    make him responsible for manufacturing them.  Sort of having

10:26AM  5    their thumb on the scale of the punishment that will be visited

6    on him for relatively low-level Superior Court crimes and try

7    to literally make a federal case out of it.  Or even if it was

8    Superior Court, a more serious Superior Court case than would

9    otherwise be.

10:26AM 10        So I say that just to sort of, again, try to be clear

11    about where I'm going and what I think some of the links are.

12             THE COURT:  And it's an estimate I'm asking for, an

13    estimate, how many witnesses -- let's assume just for argument

14    that I allow you to ask these percipient witnesses for their

10:26AM 15    credibility about these events.  How many witnesses are we

16    talking about and how long -- since it's credibility, not for

17    the actual truth, you're just asking for credibility, how long

18    do you think that's going to extend the trial by?

19             MR. SCOTT:  Maybe -- and I'm just estimating, maybe

10:27AM 20    two days.

21             THE COURT:  Okay.

22             MR. SCOTT:  I mean, I think it's a mistake to try to

23    have, you know, the *Dekraai* case Part 2 in here.  I don't think

24    that moves the ball particularly for Mr. Govey, and I don't

10:27AM 25    think that's effective in front of the jury.  So I certainly --

1    I would try to be efficient.  I would try to be -- do it in a

2    cogent and coherent way for the jury.  So I would say maybe two

3    days at the outside.  Maybe -- and I'm just spitballing here,

4    three to six witnesses to prove up the little scenario I just

10:27AM 5    described for the Court.

6            THE COURT:  I guess I would ask, then, in this hour

7    that we're going to give Ms. Corrigan, is that you talk to

8    Mr. Marrett, because maybe Mr. Marrett can -- could use a

9    little focus on what he's supposed to look for to get you that

10:28AM 10   stuff now.  Or if he has a problem with it, he can at least

11   raise it with me, and then I can say "Yea" or "Nay, it's got to

12   be turned over."

13           MR. SCOTT:  And the things I'm saying here out loud,

14   I don't think are particularly new ground.  I mean, the Court

10:28AM 15   might recall in my discovery motion -- and the Court properly

16   said, "I don't want to get into micromanaging," but I did

17   essentially repeat and attach my letters which kind of lay out,

18   you know, the Massiah issues and Mr. Govey's case getting

19   dismissed and potentially false evidence being presented to the

10:28AM 20   grand jury.  So I have kind of gone page and verse on this

21   before, but I will continue to, you know, describe as best I

22   can to the government where I'm going with this.

23           MR. MARRETT:  Let me respond briefly, just because

24   it sounds to me listening to what Mr. Scott is arguing is that

10:29AM 25   what's the focus of his vindictive prosecution argument is that

UNITED STATES DISTRICT COURT

1    there was some reasons out there that the District Attorney's

2    Office dismissed the case.  Well, the district attorneys aren't

3    the ones involved in this investigation, it's the sheriff's

4    department.

10:29AM 5        And whatever the District Attorney's Office's reasons was

6    for prosecuting or dismissing the case, that's not imputed to

7    the deputies themselves.  They play different roles in the

8    process.  And in particular, to the extent that the

9    government's witnesses are not involved in that 2012 case,

10:29AM 10   principally Deputy Larson.

11       So I just wanted to respond to that because it sounds like

12   we're getting very far afield of the facts of this case, what

13   the deputies in this case did, what their roles were and

14   getting into the deliberative process of the DA's Office in a

10:29AM 15   case that's, you know, four years, five years old now and

16   unrelated to how this investigation came about, how the arrest

17   happened in this case, any of the facts of this case.

18            THE COURT:  I hear you, and that's why I asked the

19   question how much time and how many witnesses are we talking

10:30AM 20   about.  And I have a little comfort, quite frankly, from

21   Mr. Scott's answer of how much time he would need.  But again,

22   the issue, as I see it, is the credibility, competence, and

23   integrity of all the percipient witnesses that were involved.

24       And Mr. Scott, I believe, must be given some leeway to

10:30AM 25   inquire on any issue dealing with the competence and integrity

1    of a key percipient witness.  That's just the way it is.  And

2    especially when the competence, credibility, integrity of a

3    percipient witness is attacked, it all seems to arise out of

4    the informant scandal.

10:31AM  5        If you're understanding what I'm saying is, putting aside

6    the informant scandal, defense would be able to attack the

7    competence, credibility and integrity of any percipient law

8    enforcement witness within reason.  And that -- if they were

9    all these separate acts of lack of integrity, competence, I

10:31AM 10   would have to, I guess, do some sort of 403 analysis,

11   Mr. Marrett.  But in this case, we're not talking about all

12   separate incidents and events, they seem to all arise out of

13   this informant scandal where the percipient witnesses are being

14   accused by the defense of engaging in wrongdoing.

10:31AM 15        I don't know if I'm making any sense; is, okay, we're not

16   going to deal with any witness in the informant scandal that

17   has no percipient knowledge in this case.  But if a percipient

18   witness involved in this case, this federal case, is involved

19   in that informant scandal, Mr. Scott's going to be able to

10:32AM 20   attack his credibility, integrity and competence, if that makes

21   sense or at least some sort of guidepost of where I'm thinking.

22   And that's why I understand his estimate of two to three days.

23        MR. MARRETT:  And I think as the Court pointed out,

24   I don't know what witnesses Mr. Scott intends to call.  Perhaps

10:32AM 25   Investigator Beeman is one of them, but it sounds like there

**UNITED STATES DISTRICT COURT**

may be others.  But once I have more information about who

those folks might be, then I think I can, you know, come back

to the Court with sort of a 403 or even a relevance-type

analysis and make my arguments then.

10:33AM 5       THE COURT:  And I encourage you to do that.  But the

one thing I -- I'm just not seeing eye to eye with you because

you seem to be resisting me very strongly on this bias for

Deputy Larson.  And I'm not -- I know you have a job to do,

and -- but at the same time, that, to me, seems pretty basic

10:33AM 10 that -- at least I'm getting the impression you're really

struggling with it and you're doing it very respectfully.  So

you're not in trouble with me, but I'm frustrated that I can't

see how the prosecutor doesn't see that.

If I denied him his chance to cross-examine about this

10:34AM 15 inconsistent position, you mean to tell me, Judge Berzon,

Judge Reinhardt, Judge Fisher, Judge Fletcher -- I can go on

and on, Judge Paez, even Judge Kleinfeld that they're not going

to say, "You didn't let him ask him that."

MR. MARRETT:  Let me assure the Court, I understand

10:34AM 20 what the Court is ruling and what the Court's description of

the bias is.  I have a complete understanding of that.  Where

you're feeling the resistance from me is to the scope of the

cross-examination.  I think there is on the one hand testimony

about why did you invoke, why is it inconsistent?  And that can

10:34AM 25 get into the bias that you testify for the -- for the

1    government, but you don't testify for the defense.

2        Beyond that, there's, I think, a 403 analysis about all of

3    the potential allegations of misconduct involving other

4    informants, other inmates, other folks that currently I'm not

10:35AM 5    aware about that there is anything.  But I think that is far,

6    you know -- it's getting more and more far afield from the bias

7    that I understand the Court to be saying the defense is going

8    to be allowed to present.

9        THE COURT:  There's certainly some lines there.  But

10:35AM 10   the difficulty, Mr. Marrett, is trying to define those lines

11   before the witness even testifies.  And even if, as you

12   believe, the witness has no involvement, no knowledge about

13   that, he needs to be asked a certain number of questions that

14   make it clear that he has no knowledge, nor involvement.

10:35AM 15       MR. MARRETT:  And I understand there will have to be

16   those foundational-type questions.

17       THE COURT:  Exactly.

18       MR. MARRETT:  And I think the resistance you're

19   feeling from me, I'm trying to make it clear to the Court that

10:36AM 20   I think those lines should be drawn perhaps far shorter than

21   where the defense think they should be drawn.  So when I'm

22   making my objections at trial in this case or even as we're

23   able to frame the issues after Deputy Larson's testimony today,

24   I want the Court to know that that's where I'm coming from and

10:36AM 25   that I think there's -- you know, the limit on the

1    cross-examination should be curtailed.  If --

2         THE COURT:  Well, good for you, and I take no

3    offense you objecting, especially if it doesn't disrupt the

4    presentation in the evidence, I have no problem with that.  I

10:36AM  5    just think my experience tells me it's going to be very

6    difficult to draw those lines.  What I can do and what I will

7    do is time limits.  If we were going to try this jailhouse

8    informant scandal, we would be here for months.  It ain't going

9    to happen.

10:36AM 10         You know, Mr. Scott has given me some comfort that, you

11    know, we're talking about two or three days.  So at least I

12    have that for a backstop, okay, this is not going to turn into

13    a circus or zoo.  So it's not that I necessarily disagree with,

14    you know, we don't want to turn this into *Dekraai* 2, *Dekraai* 3,

10:37AM 15    what have you.  I get that.  I agree.  But in my experience,

16    it's going to be very difficult to draw the lines where you can

17    go, where you can't go.

18         And we will spend more time, and it will be more

19    disjointed and disruptive to the jury arguing over, "Did you

10:37AM 20    cross the line here?  Did you cross the line there?"  I'm more

21    inclined to say, "Mr. Scott, now I have an appreciation for

22    what the issue is and the involvement.  You got two or three

23    days.  And sir, that's it.  You do what you have to do, but I'm

24    only going to give you two or three days."

10:38AM 25         So in a way, I agree with you, that we can't let this get

1   out of control.  It's my job not to make it get out of control,

2   but I disagree with you if you're suggesting there's going to

3   be easy lines to draw.  I don't see those easy lines.

4           MR. MARRETT:  Understood.  Thank you, Your Honor.

10:38AM   5           THE COURT:  Okay.  Ms. Corrigan, I know you haven't

6   been able to do much while we've been having this hearing.  So

7   if you would do what you need to do and let me know.  It's

8   about 10:40 now.  Out of organization and efficiency, should we

9   just pick back up at 1 o'clock?  Would that be better?

10:38AM  10           MS. CORRIGAN:  Actually, Your Honor, I did have a

11   chance to read through the main document that I had concerns

12   over.  I think we could reconvene at 11:15, if that's okay, or

13   earlier.  Because I think that perhaps Mr. Scott and I can have

14   a very brief conversation.  I was able to read through what I

10:39AM  15   think are key issues.  I want to just confer with him for a

16   couple moments, and I think we may be actually -- could get

17   going pretty quick.  I can let Ms. Kunig know.

18           THE COURT:  Great.  Thank you.

19           THE COURTROOM DEPUTY:  All rise.

10:39AM  20       Court is in recess.

21           **(Recess from 10:39 a.m. to 11:23 a.m.)**

22           THE COURT:  All right.  What's the status?

23           MR. MARRETT:  My understanding, Your Honor, is we're

24   ready to proceed with Deputy Larson's testimony.

11:23AM  25           THE COURT:  All right.

1         Is that true?

2              MS. CORRIGAN:  That is correct, Your Honor.

3              THE COURT:  Where do you want to sit?  Do you want

4    to sit there at the end of the table?

11:23AM 5              MS. CORRIGAN:  I think that would probably be most

6    efficient.

7              THE COURT:  Or you can sit in the jury box.

8              MS. CORRIGAN:  I think I'll take the jury box.

9              MR. MARRETT:  Is there anything else the Court wants

11:23AM 10   to address, or should I get Deputy Larson?

11             THE COURT:  I don't think there's anything we need

12   to address.  But you're going to be about 20 minutes?

13             MR. MARRETT:  20, 25 minutes.

14             THE COURT:  Okay.  Good morning, Deputy.  We're

11:24AM 15   going to administer an oath and have you take the witness stand

16   right here.

17         **BRYAN LARSON, PLAINTIFF'S WITNESS, WAS SWORN**

18             THE COURTROOM DEPUTY:  Please state your name and

19   spell it for the record.

11:24AM 20             THE WITNESS:  Bryan Larson, B-r-y-a-n L-a-r-s-o-n.

21             THE COURT:  Please proceed.

22                     **DIRECT EXAMINATION**

23   BY MR. MARRETT:

24   Q    Deputy Larson, where are you currently employed?

11:24AM 25   A    The Orange County Sheriff's Department.

1    Q     How long have you worked at the Orange County Sheriff's

2    Department?

3    A     Almost ten years.

4    Q     And what is your current position with the Orange County

11:25AM 5  Sheriff's Department?

6    A     I work the north gang team.

7    Q     And as a deputy sheriff, how long have you been assigned

8    to that team?

9    A     About a year and a half.

11:25AM 10  Q     And as a deputy sheriff with the north gang enforcement

11   team, what are your primary responsibilities?

12   A     We investigate any kind of gang activity within our area,

13   do probation checks with our assigned probation officer.

14   Q     Are you assigned to investigate any particular gangs?

11:25AM 15  A     I am.

16   Q     What gangs are you assigned to investigate?

17   A     Currently right now I'm assigned to La Colonia and

18   Big Stanton.

19   Q     Are you assigned to investigate white race gangs?

11:25AM 20  A     No.

21   Q     Is someone else in your unit assigned to investigate

22   white race gangs?

23   A     Yes.

24   Q     Prior to working with the north gang enforcement team,

11:26AM 25  what other positions did you hold within the sheriff's

**UNITED STATES DISTRICT COURT**

department?

A       After graduating the academy in April 2008, I was assigned
to Theo Lacy Facility.  From there I worked pretty much all the
locations, all the modules, different positions there.  From
11:26AM  there I went to classification.  After classification, I was
assigned to special handling.  After special handling I was
assigned to the net team -- correction, I was assigned to north
patrol where I was later assigned to FTO.  And after FTO I went
to the net team.  And then after the net team I'm at gang team
11:26AM  right now.

Q       You mentioned that you were assigned at some point as a
classification deputy.  What is a classification deputy?

A       Deputy -- usually the inmates coming off the street, we
interview them to determine their correct classification where
11:27AM  we can house them.  Depending on --

Q       This classification, is that based on security risk or
something else?

A       Yeah, depends on, you know, if they're different levels of
sophistication, inmates have to have different color bands and
11:27AM  programmed together differently.

Q       What were your duties as a special handling deputy?

A       To investigate any kind of gang crimes or anything to do
with politics at the jail.

Q       Is that for the security of inmates and staff?

11:27AM  A       Yes, it is.

**UNITED STATES DISTRICT COURT**

1    Q    Approximately when were you assigned to special handling

2    unit at the Orange County jail?

3    A    I believe early 2011 to mid-2013.

4    Q    During your time in the special handling unit, did you

11:27AM  5    know another gentleman named Jonathan Larson?

6    A    I did.

7    Q    And did he also work in that unit?

8    A    Yes.

9    Q    You may have mentioned this, as part of your duties as a

11:28AM 10   deputy in the north gang team that you're currently on, do you

11   perform probation checks?

12   A    I do.

13   Q    What is a probation check?

14   A    Probation check can be anywhere from contacting someone on

11:28AM 15   the street who's on probation and conducting the search on

16   their person, or responding to their residence where we conduct

17   the search to make sure that they are living at that location

18   and to see if they have any -- anything that are violating

19   their terms.

11:28AM 20   Q    Are probation checks something you do routinely?

21   A    Yes.

22   Q    Approximately how many probation checks would you say you

23   do a month?

24   A    I would say at least 20 to 30.

11:28AM 25   Q    And so since being on the north gang enforcement team,

1    approximately how many probation checks have you been a part

2    of?

3    A      Over 500.

4    Q      Do you have a probation officer assigned directly to your

11:28AM 5    unit?

6    A      I do.

7    Q      Now before going on a probation check, do you check in

8    with that assigned probation officer?

9    A      Not on all of them.

11:29AM 10   Q      Do you check probation records before you go on a

11   probation search?

12   A      If it's not one of our -- like assigned to our probation

13   officer, yes, we'll check with either record check or

14   contacting Probation.

11:29AM 15   Q      And would that record check reveal whether the

16   probationer has search and seizure conditions?

17   A      It would.

18   Q      And would it tell you what address their -- probation

19   address is listed as?

11:29AM 20   A      It would.

21   Q      Have you also on occasion checked GPS monitoring devices

22   that probationers have?

23   A      Yes.

24   Q      So let me take you back to June 6, 2017.  Were you

11:29AM 25   involved that day in a search at 1540 West Edithia Avenue in

1    Anaheim?

2    A     I was.

3    Q     And why were you at that house that day?

4    A     I was told we were going to conduct a probation check at

11:30AM 5    that address for two probationers.

6    Q     And before -- let me back up.  Do you recall who the

7    probationers were that you were checking on that day?

8    A     I do.

9    Q     Who were they?

11:30AM 10   A     They were -- I have to look at my report.

11   Q     Would that refresh your recollection?

12   A     Yes.

13              THE COURT:  You may do so, sir.

14              MR. MARRETT:  May I approach, Your Honor?

11:30AM 15              THE COURT:  You may.

16              MR. MARRETT:  Would you like me to take it back from

17   the witness?

18              THE COURT:  Yeah.  Why don't you stay close there

19   and let the deputy look at it.  Once his recollection is

11:31AM 20   refreshed, then he can give it back to you.

21              THE WITNESS:  Okay.

22   Q     BY MR. MARRETT:  Does that refresh your recollection?

23   A     It does.

24   Q     Who were the probationers that you were checking on that

11:31AM 25   day?

```
 1   A      Douglas Dowden and Troy Miller.
 2   Q      And before going to the house, did you or someone on your
 3   team check their probation status?
 4   A      Yes.
 5   Q      And were you able to determine whether those probationers
 6   had that address listed with the Probation Department?
 7   A      From their DMV record check, that's where we found it.
 8   Q      Before going to the house, did you also perform a GPS
 9   monitoring check?
10   A      I did not.
11   Q      Did someone in your team perform the check?
12   A      Yes.
13   Q      And did you learn whether any other probationers with GPS
14   monitoring were at the house that day?
15   A      I did.
16   Q      And was there another probationer that had GPS monitoring
17   that was at the house that day?
18   A      There was.
19   Q      Who was that?
20   A      Michael Renk.
21   Q      Had you been to 1540 West Edithia prior to June 6, 2017?
22   A      I have.
23   Q      Approximately how many times?
24   A      I would say two to three times.
25   Q      And why have you been at that house so many times?
```

11:31AM (line 5)
11:31AM (line 10)
11:31AM (line 15)
11:32AM (line 20)
11:32AM (line 25)

1   A    It's a known crash pad for white race gang members.

2   Q    Now in the prior instances going to 1540 West Edithia,

3   was Defendant Govey there?

4   A    No.

11:32AM 5   Q    Was Defendant Govey one of the probationers you were

6   looking for on June 6?

7   A    No.

8   Q    Before June 6, had you ever met the defendant Joseph

9   Govey?

11:32AM 10   A    Yes.

11   Q    And when had you previously met him?

12   A    I met him -- I met him when I was in the County jail.

13   Q    And what was the approximate time frame that you last

14   remember meeting with the defendant?

11:32AM 15   A    I couldn't remember.

16   Q    When was the last date that you worked in special

17   handling?

18   A    August of 2013.

19   Q    And did you work in any other roles in the jail after

11:33AM 20   that date?

21   A    No.

22   Q    After August of 2013, when you were in the jails, did you

23   ever encounter the defendant?

24   A    No.

11:33AM 25   Q    In the four years between the time that you were in the

**UNITED STATES DISTRICT COURT**

```
 1    jail and June 6 of 2017, had you ever spoken with the

 2    defendant?

 3    A    No.

 4    Q    During those four years, had you ever been involved in

 5    any investigations involving the defendant?

 6    A    No.

 7    Q    During those four years had you ever been involved in any

 8    prosecutions involving the defendant?

 9    A    No.

10    Q    Before going to the house on June 6, did anybody tell you

11    that the defendant was going to be there?

12    A    No.

13    Q    Did you talk to any in-custody informants to gather

14    information about whether the defendant was going to be there?

15    A    No.

16    Q    Did you talk to any out-of-custody informants to

17    determine whether the defendant was going to be there?

18    A    No.

19    Q    Did you talk to any investigators or other deputies about

20    information on whether the defendant was going to be at the

21    house that day?

22    A    No.

23    Q    Did you have any information at all before going to

24    1540 West Edithia that day that the defendant was going to be

25    there?
```

| | | |
|---|---|---|
| | 1 | A     No. |
| | 2 | Q     When you went into the house to conduct the probation |
| | 3 | check, did you see the Defendant Govey there? |
| | 4 | A     I did. |
| 11:34AM | 5 | Q     And did you recognize him? |
| | 6 | A     I did. |
| | 7 | Q     And how did you recognize him? |
| | 8 | A     I just know what he looks like. |
| | 9 | Q     Was that from your encounters with him in the jail? |
| 11:34AM | 10 | A     Correct. |
| | 11 | Q     Was the defendant detained in the house that day? |
| | 12 | A     Yes. |
| | 13 | Q     Is that standard protocol for you to detain anybody in |
| | 14 | the house during the probation search? |
| 11:34AM | 15 | A     Yes. |
| | 16 | Q     Was everybody in the house that you encountered that day |
| | 17 | detained? |
| | 18 | A     Yes. |
| | 19 | Q     When you went to the house, did you -- on June 6, did you |
| 11:35AM | 20 | go alone? |
| | 21 | A     No. |
| | 22 | Q     Approximately how many other deputies were with you that |
| | 23 | day? |
| | 24 | A     There was nine or ten. |
| 11:35AM | 25 | Q     Was someone designated as the lead case agent for the |

**UNITED STATES DISTRICT COURT**

| | |
|---|---|
| 1 | probation check that day? |
| 2 | A    There was. |
| 3 | Q    And who was that? |
| 4 | A    Deputy Gallivan. |
| 11:35AM 5 | Q    At some point did you become the lead investigator or |
| 6 | lead case agent on this case? |
| 7 | A    Correct. |
| 8 | Q    And why was that? |
| 9 | A    That was because Deputy Gallivan was leaving the next day |
| 11:35AM 10 | for vacation. |
| 11 | Q    What does it mean to be a lead case agent for probation |
| 12 | check? |
| 13 | A    To take over the investigation, do all the paperwork, all |
| 14 | the interviews, just assume investigation. |
| 11:35AM 15 | Q    Are you familiar with Orange County Sheriff's Department |
| 16 | investigator Bill Beeman? |
| 17 | A    I am. |
| 18 | Q    And was Investigator Beeman one of the deputies on your |
| 19 | team who went to the house that day to conduct the probation |
| 11:35AM 20 | check? |
| 21 | A    No. |
| 22 | Q    At some point did Investigator Beeman come to the house |
| 23 | that day? |
| 24 | A    He did. |
| 11:36AM 25 | Q    Was that -- were you the one that called |

**UNITED STATES DISTRICT COURT**

| | | |
|---|---|---|
| | 1 | Investigator Beeman to come to the house? |
| | 2 | A      No. |
| | 3 | Q      Other than this case, have you ever been the lead case |
| | 4 | agent in an investigation involving Defendant Govey? |
| 11:36AM | 5 | A      No. |
| | 6 | Q      Other than this case, have you ever been involved in a |
| | 7 | prosecution concerning defendant? |
| | 8 | A      No. |
| | 9 | Q      Have you ever been involved in writing any reports that |
| 11:36AM | 10 | were later used in a prosecution by the District Attorney's |
| | 11 | Office? |
| | 12 | A      Yes. |
| | 13 | Q      And what was the context of that report? |
| | 14 | A      It was the follow-up to a handcuff key that was found on |
| 11:36AM | 15 | him. |
| | 16 | Q      And who was the handcuff key found by? |
| | 17 | A      Deputy Shefcheck (phonetic). |
| | 18 | Q      And what unit are they with? |
| | 19 | A      He was working the hospital at the time. |
| 11:36AM | 20 | Q      When did you learn that the district attorney had filed a |
| | 21 | case against Defendant Govey for this handcuff key incident? |
| | 22 | A      Just last week. |
| | 23 | Q      Before last week did you know about that handcuff key |
| | 24 | case? |
| 11:37AM | 25 | A      I did. |

```
 1    Q     You knew about the prosecution in the case before last
 2    week?
 3    A     No, not the prosecution.
 4    Q     The DA, did they ever reach out to you for information
11:37AM 5    about that case?
 6    A     No.
 7    Q     Did they ever reach out to you for discovery?
 8    A     No.
 9    Q     Did they ever call you to testify in that case?
11:37AM 10    A     No.
 11    Q     Were you ever consulted by the district attorney in any
 12    way in connection with that case?
 13    A     No.
 14    Q     Did you learn what ultimately happened to that case?
11:37AM 15    A     Just from looking it up last week.
 16    Q     And what did you learn?
 17    A     That it got dismissed.
 18    Q     Are you aware that around 2012, the Orange County
 19    District Attorney's Office dismissed another case against the
11:37AM 20    defendant involving allegations that the defendant solicited
 21    murder and other charges?
 22    A     I am.
 23    Q     Were you involved in the prosecution of that case?
 24    A     No.
11:37AM 25    Q     Were you the investigating deputy in that case?
```

**UNITED STATES DISTRICT COURT**

```
 1   A    No.

 2   Q    Were you involved in the decision to dismiss that case?

 3   A    No.

 4   Q    Did anything about that 2012 case influence your reason

 5   for being at the house on June 6?

 6   A    No.

 7   Q    Did anything about that 2012 case influence the charges

 8   you recommended in connection with the search for June 6?

 9   A    No.

10   Q    Did anything about that 2012 case influence anything you

11   did in connection with that case?

12   A    No.

13   Q    When you first encountered Defendant Govey while working

14   in the jail, was that in the special handling unit?

15   A    I think it was when I was just a prowler in the mods.

16   Q    And in your duties working as a prowler in the mods, what

17   did you learn about Defendant Govey?

18   A    I learned -- I don't -- can you restate the question.

19   Q    Sure.  When you were working as a prowler, did you ever

20   speak with Defendant Govey?

21   A    I don't know if I did or not.

22   Q    Do you recall anything specific that you learned about

23   him and his classification or status as an inmate?

24   A    Oh, once I was in classification, I learned that he was a

25   red bander and his background and his moniker.
```

**UNITED STATES DISTRICT COURT**

Q     When working in the jail, is that the last time you had

direct contact with the defendant before June 6?

A     Yes.

Q     Are you familiar with an individual named Alexander

Frosio?

A     I am.

Q     Did you ever work with Alexander Frosio in an informant

relationship?

A     No.

Q     Were you ever responsible for supervising Alexander

Frosio?

A     No.

Q     Did you ever use Alexander Frosio to gather information

about Defendant Govey?

A     No.

Q     Are you familiar with a person named Jason Fenstermacher?

A     I am.

Q     And how are you familiar with him?

A     He was an inmate in our jail, very violent guy.  And then

one day he said he wanted to quit that lifestyle.

Q     And did you ever work with him to build a case against

Defendant Govey?

A     No.

Q     Did you ever work with any inmates to build a case

against Defendant Govey?

| | |
|---|---|
| 1 | A    No. |
| 2 | Q    Did you ever work with any inmates to obtain information |
| 3 | specifically about Defendant Govey? |
| 4 | A    No. |
| 11:40AM 5 | Q    So let me shift subjects a little bit.  Are you familiar |
| 6 | with the *Dekraai* case? |
| 7 | A    A little bit. |
| 8 | Q    Did you testify in any of the proceedings in the *Dekraai* |
| 9 | case? |
| 11:40AM 10 | A    No. |
| 11 | Q    Are you familiar with the case, the *The People vs. Ortiz*? |
| 12 | A    A little bit. |
| 13 | Q    Do you know what that case was about? |
| 14 | A    No. |
| 11:40AM 15 | Q    Were you the case agent on the *Ortiz* case? |
| 16 | A    No. |
| 17 | Q    Were you called to testify as a witness at an evidentiary |
| 18 | hearing in that case? |
| 19 | A    I was. |
| 11:41AM 20 | Q    And was that on October 8, 2015? |
| 21 | A    Yes. |
| 22 | Q    Before testifying, did the district attorney tell you |
| 23 | what your testimony was going to be about? |
| 24 | A    No. |
| 11:41AM 25 | Q    Before testifying, did anybody tell you what topics you |

**UNITED STATES DISTRICT COURT**

```
 1    were going to be testifying about?

 2    A    No.

 3    Q    Either before or after that testimony, did anybody ever

 4    tell you why you were being called as a witness to testify at

 5    that evidentiary hearing in the Ortiz case?

 6    A    No.

 7         MR. MARRETT:  Just one moment, Your Honor.

 8    Q    Do you recall being asked during that testimony in the

 9    Ortiz case whether you were involved in any kind of agreement,

10    conspiracy or effort to violate inmates' either civil or

11    constitutional rights, at any point in time?

12    A    Yes.

13    Q    Did you invoke the Fifth Amendment in response to that

14    question?

15    A    No.

16    Q    What was your response?

17    A    "No."

18    Q    Is that response still accurate today?

19    A    Yes.

20    Q    When you testified at that hearing, did you also invoke

21    the Fifth Amendment in response to other questions?

22    A    I did.

23    Q    Why did you invoke the Fifth Amendment?

24    A    I was appointed a lawyer through our association, and I

25    took very bad legal advice.
```

**UNITED STATES DISTRICT COURT**

1    Q      If you could go back, would you still invoke the Fifth

2    Amendment?

3    A      Absolutely not.

4    Q      Why not?

11:42AM 5    A      Because look what happened now.

6    Q      If you were asked the same questions that you had invoked

7    on during your testimony in the *Ortiz* case, would you be able

8    to answer those questions today?

9    A      Yes.

11:42AM 10   Q      Are you aware that the *Ortiz* case has been retried since

11   2015?

12   A      No.

13   Q      Were you ever called as a witness in any of those

14   retrials?

11:42AM 15   A      Not that I'm aware of.

16   Q      Were you ever contacted by the DA for information in

17   connection with any of those retrials?

18   A      No.

19   Q      After you testified in the *Ortiz* case, did you testify at

11:43AM 20   a federal trial in the case *United States vs. Ojeda*?

21   A      I did.

22   Q      Was that testimony on December 9, 2015?

23   A      Yes.

24   Q      Did you invoke the Fifth Amendment response to any

11:43AM 25   questions during that trial?

```
 1   A     No.
 2   Q     Since 2015, have you also testified in other State Court
 3   proceedings?
 4   A     Yes.
 5   Q     Approximately how many times?
 6   A     I'd say five to ten.
 7   Q     Did you invoke the Fifth Amendment in any of those
 8   instances?
 9   A     No.
10   Q     Do you anticipating invoking the Fifth Amendment in
11   response to any questions put to you at trial in this case?
12   A     No.
13              MR. MARRETT:  May I just have one moment, Your
14   Honor?
15              THE COURT:  You may.
16              (Pause in proceedings.)
17   BY MR. MARRETT:
18   Q     So Deputy, there's a couple terms you used that I want to
19   make clear for the record what they are.  You used the term
20   "prowler" when talking about one of the positions that you
21   worked inside the jails.  What is a prowler?
22   A     A prowler is a deputy assigned to a certain mod or
23   location, which is -- their duties is to maintain the security,
24   feed the inmates, give them their visits, do walkthroughs, that
25   sort of activity.
```

1    Q    So for lack of a better description, is the prowler the

2    person that walks around the mod keeping the security?

3    A    Correct.

4    Q    And you also use the term "red bander."  What does that

11:44AM 5    term mean to you?

6    A    It's ad seg, our highest level of security, the most

7    violent of the inmates.

8    Q    And I asked you about the *Ortiz* case and whether the

9    district attorney had ever talked to you about the topics of

11:45AM 10   your testimony before you testified.  Were you ever approached

11   by the defense before your testimony in that case?

12   A    No, I don't think so.

13   Q    Did anybody from the defense team or defense attorney

14   tell you what topics were you going to be testifying about?

11:45AM 15   A    No.

16              MR. MARRETT:  Nothing further, Your Honor.

17              THE COURT:  Very well.

18                      **CROSS-EXAMINATION**

19   BY MR. SCOTT:

11:45AM 20   Q    Deputy, good morning.

21   A    Good morning, sir.

22   Q    Couple preliminary questions.  Did you testify before the

23   grand jury in this federal case?

24   A    No.

11:45AM 25   Q    Have you ever testified in a legal proceeding involving

1    Joseph Govey, whether this case or any other?

2    A      No.

3    Q      What documents did you review in preparation for your

4    testimony today?

11:46AM 5    A      Just my police reports and, I think, transcripts of the --

6    from the *Ortiz* case.

7    Q      When you say "police reports," I assume that you mean for

8    starters the incident report that you filed after the search

9    and the arrest of Mr. Govey for this federal case; is that

11:46AM 10   correct?

11   A      Correct.

12   Q      It's like an 11-page standard police report; is that

13   true?

14   A      Yes, sir.

11:46AM 15   Q      But you said "police reports."  Were there others beyond

16   the one that I just described that you reviewed in preparation

17   for today?

18   A      Yes.

19   Q      And what was that?

11:46AM 20   A      The arrest warrant for Govey right after the federal

21   warrant went out for his arrest.

22   Q      The arrest warrant for the federal case that we're here

23   for today?

24   A      Yes, sir.

11:46AM 25   Q      Okay.  Any other documents?

1    A    The handcuff key follow-up that I did.

2    Q    Okay.

3    A    And the 20-some-page document reference to kites.

4    Q    Okay.  The latter of which the 20-some-page document

11:47AM 5    referring to kites, that was in regard to an inmate by the name

6    of Fenstermacher; is that true?

7    A    Correct.

8    Q    The person who the USA just asked you questions about --

9    A    Yes.

11:47AM 10    Q    -- were you provided those reports by the government in

11    this case or vice versa?

12    A    No.  I looked him up on my hard drive.

13    Q    All right.  You were asked questions about your testimony

14    or lack thereof in the case *The People vs. Ortiz*; right?

11:47AM 15    A    Yep.

16    Q    And before we get into the actual invocation of the Fifth

17    Amendment, I want to ask you a couple preliminary questions,

18    okay?

19    A    Sure.

11:48AM 20    Q    You agree -- would you agree with me that in general,

21    part of a police officer's job is to testify when called upon?

22    A    It is.

23    Q    In fact, it's one of your duties as a sworn officer to

24    give testimony whenever you're brought to court; is that true?

11:48AM 25    A    Yep.

```
 1   Q      And that duty is the same whether the prosecutor calls

 2   you or the defense calls you, is that true?

 3   A      Correct.

 4   Q      You have a duty to testify either way for either side;

 5   right?

 6   A      Yep.

 7   Q      Whether it helps the government or the people?

 8   A      True.

 9   Q      Or even if it helps the defense; right?

10   A      Correct.

11   Q      Now when it comes to invoking the Fifth Amendment -- you

12   know what I mean when I say "invoke the Fifth Amendment";

13   right?

14   A      Correct.

15   Q      Essentially stating "I choose not to testify on the

16   grounds that what I say may incriminate me"; right?

17   A      Correct.

18   Q      Just so we're talking about the same thing?

19   A      Yes.

20   Q      Now, you understand that a witness can't just invoke the

21   Fifth Amendment because they don't feel like coming to court

22   that day, for example; right?

23   A      Correct.

24   Q      I mean, you know that today; right?

25   A      Yep.
```

**UNITED STATES DISTRICT COURT**

```
 1    Q    And you knew that in 2015 when you were called to court
 2    for the Ortiz case; right?
 3    A    Yeah.
 4    Q    In 2015 you knew that a witness can't invoke their Fifth
 5    Amendment rights if they're busy; right?
 6    A    Yep.
 7    Q    You understood that a witness can't invoke their Fifth
 8    Amendment rights even if the testimony that they may be called
 9    upon to give is embarrassing to them.  You knew that back in
10    2015; right?
11    A    Yep.
12    Q    In 2015, you knew that the only permissible grounds for
13    invoking is a good-faith belief that the testimony that you
14    give may incriminate you; right?
15    A    Sure.
16    Q    Now you said that on direct examination that you were
17    not -- that the topics of the testimony you were going to give
18    in Ortiz were not discussed with you beforehand.  Is that what
19    you said?
20    A    Correct.
21    Q    So the DA didn't tell you what it was going to be about?
22    A    I was talking with my lawyer.
23    Q    And the defense didn't tell you what it was going to be
24    about is what you said; right?
25    A    Correct.
```

1    Q    Now I thought the question that was put to you was, did

2    anybody tell you what the testimony was going to be about;

3    right?

4    A    I don't know.  Maybe I misheard it.

11:50AM  5    Q    So what you're telling us is that you did have some

6    discussions about what the testimony was going to be about with

7    somebody?

8    A    They wouldn't tell me what it was about.

9    Q    Who wouldn't tell you?

11:50AM 10    A    My lawyer.  I was asking questions trying to figure out

11    what was going on.

12    Q    Okay.  I want to be clear, it's your testimony today that

13    you were provided a lawyer by the police officer's association?

14    A    Yes.

11:51AM 15    Q    By your union essentially?

16    A    Correct.

17    Q    And you wanted to know why you were appointed a lawyer?

18    A    No, I wanted to know what the discovery was, what was --

19    the questions was going to be asked of me.

11:51AM 20    Q    And the lawyer would not tell you; is that what you're

21    saying?

22    A    Yeah.  They moved around the questions.

23    Q    And at some point, as I understand your testimony, that

24    lawyer suggested to you that you ought to take the Fifth?

11:51AM 25    A    Yes.

**UNITED STATES DISTRICT COURT**

```
 1   Q    And then you did go ahead and take the Fifth?
 2   A    Yep.
 3   Q    All right.  With the knowledge of what that means and the
 4   permissible basis for doing so that we just discussed; right?
 5   A    I don't think I fully understood what it meant --
 6   Q    Okay.
 7   A    -- at that time.
 8   Q    You were first asked -- well, first they swore you in;
 9   right?
10   A    Yes.
11   Q    And you swore to tell the truth, the whole truth, and
12   nothing but the truth; right?
13   A    Yep.
14   Q    And one of the first questions that was asked of you was
15   whether you were a member of the special handling unit with the
16   Orange County Sheriff's Department.  Do you remember that?
17   A    I do.
18   Q    And you did not give a response to that question, did
19   you?
20   A    I didn't.
21   Q    Instead you said, "On the advice of my counsel, I decline
22   to answer that on Fifth Amendment grounds" or words to that
23   effect?
24   A    Sure.
25   Q    The "sure" mean "yes"?
```

11:51AM  5
11:52AM 10
11:52AM 15
11:52AM 20
11:52AM 25

```
 1    A    Yes.

 2    Q    So you took the Fifth on the question of whether you were

 3    a member of the special handling unit; right?

 4    A    I took it how I was told to say it.  I was told not to

 5    answer any questions.

 6    Q    My question to you was, as to the question, were you a

 7    member of the special handling unit, your answer was to invoke

 8    the Fifth Amendment; is that a true statement?

 9    A    Yes.

10    Q    You were also asked a specific question about whether you

11    were involved in bringing inmates down to be interviewed at the

12    jail; correct?

13    A    I don't think so.

14    Q    All right.  You should have a binder there next to you.

15    I think it's by your left elbow.  And if you could turn to

16    Exhibit G.  Do you have Exhibit G in front of you?

17    A    I do.

18    Q    Do you recognize it as a court reporter's transcript?

19    A    It is.

20    Q    Dated October 8, 2015?

21    A    It is.

22    Q    In the case *People vs. Eric Ortiz*?

23    A    Yep.

24    Q    That's the same case that we've been discussing here this

25    morning?
```

11:52AM (line 5)
11:53AM (line 10)
11:53AM (line 15)
11:53AM (line 20)
11:53AM (line 25)

**UNITED STATES DISTRICT COURT**

| | | |
|---|---|---|
| 1 | A | Correct. |
| 2 | Q | The one that you invoked at? |
| 3 | A | Yes. |
| 4 | Q | If I can get you to turn to Page 14. |
| 11:54AM 5 | A | Okay. |
| 6 | Q | You see on Page 14 the transcript reflects that it's you |

that's being sworn in to give testimony?

8    A    Correct.

9    Q    And you were asked some questions by Mr. Lowenstein?

11:54AM 10    A    Yes.

11    Q    Who was Mr. Lowenstein, by the way?  Was that the deputy

12    district attorney?

13    A    I think it's the defense attorney.

14    Q    It was the defense attorney?

11:54AM 15    A    Yeah.

16    Q    Correct?

17    A    I think so.

18    Q    Okay.  So apparently the defense attorney was the one

19    that called you to the witness stand that day?

11:54AM 20    A    Correct.

21    Q    All right.  And you knew that?

22    A    Yes.

23    Q    Now at the top of Page 15, Line 4, you were asked the

24    question:

11:54AM 25         "Deputy Larson, have you worked with

|          |   |                                                                    |
|----------|---|--------------------------------------------------------------------|
|          | 1 | Santa Ana PD as part of your duties as special                     |
|          | 2 | handling deputy to bring inmates over -- excuse                    |
|          | 3 | me -- bring inmates down for interviews to be                      |
|          | 4 | conducted by law enforcement?"                                     |
| 11:55AM  | 5 | Did I read that question correctly?                                |

Q    Okay.  Do you recall now, having seen the transcript, that you were asked whether you were involved with bringing inmates down to be interviewed by law enforcement?

A    Yeah.

Q    Okay.  Do you recall now, having seen the transcript, that you were asked whether you were involved with bringing inmates down to be interviewed by law enforcement?

A    Yep.

Q    You were asked that question, yes?

A    Yes.

Q    And your answer to that question was, "I decline to answer any questions and invoke my rights under the Fifth Amendment"; right?

A    Right.

Q    So in addition to whether you were a member of the special handling unit, another area that you invoked on was whether you were involved in bringing inmates down to be questioned.  That's the second area; right?

A    Correct.

Q    Now there was another question put to you at the bottom -- or I'll just ask you whether you were involved in the cultivation and recruitment of informants within the Orange County jail; right?

```
  1   A      Correct.

  2   Q      You remember being asked that question?

  3   A      Yep.

  4   Q      And your answer to that question was, "I decline to

11:55AM  5   answer any questions and invoke my rights under the Fifth

  6   Amendment"; right?

  7   A      Right.

  8   Q      Now as to that first topic, whether you were a member of

  9   the special handling unit, you weren't willing to answer

11:56AM 10   questions that day; right?

 11   A      Right.

 12   Q      But I understand that you are now willing to answer

 13   questions about whether you were a member of the special

 14   handling unit; is that true?

11:56AM 15   A      True.

 16   Q      Okay.  I understood you to say at the beginning of your

 17   testimony today that you were assigned to the special housing

 18   (sic) unit in early 2011; is that correct?

 19   A      The what unit?

11:56AM 20   Q      The special handling unit.

 21   A      Okay.  Yes.

 22   Q      Is that accurate?

 23   A      Yes, I believe so.

 24   Q      All right.  And that that continued for -- how long did

11:56AM 25   you say?
```

**UNITED STATES DISTRICT COURT**

```
        1   A    A little over two years.
        2   Q    Now you were asked whether you're familiar with another
            deputy in the special handling unit by the name of Larson;
        3
        4   right?
11:57AM 5   A    Correct.
        6   Q    Jonathan Larson?
        7   A    Correct.
        8   Q    And you said you were?
        9   A    Correct.
11:57AM 10  Q    And you recognize him as being part of the special
        11  handling unit; is that right?
        12  A    Yes.
        13  Q    Was Deputy Jonathan Larson also at the Theo Lacy Facility
        14  or is he somewhere else?
11:57AM 15  A    He's somewhere else.
        16  Q    Where was he?
        17  A    ROC.
        18  Q    And IRC?
        19  A    Yes.
11:57AM 20  Q    Which, for the record, stands for what?
        21  A    Intake and (sic) Release Center.
        22  Q    To your knowledge, approximately how many deputies made
        23  up the special housing (sic) unit back in 2011?
        24  A    You're talking about the special handling unit?
11:57AM 25  Q    Yes, sir?
```

```
 1    A     Four.
 2    Q     There were four deputies in all of special housing (sic)
 3    in 2011?
 4    A     Special handling; right?
 5    Q     Yes, sir.
 6    A     Okay.  Four at each facility.
 7    Q     Four at each facility?
 8    A     Correct.
 9    Q     So that's four at Theo Lacy?
10    A     Yes.
11    Q     Four at IRC?
12    A     I think it was four at the IRC.  I didn't work there, but
13    I believe it's the same.
14    Q     Okay.  And where else?  Men's jail?
15    A     No, that's it.
16    Q     That's it?
17    A     Uh-huh.
18    Q     So there were a total of eight deputies in the entire
19    special housing (sic) unit; is that right?
20    A     Special handling.
21    Q     Yes.
22    A     Yes.
23    Q     Okay.  Who do you remember being in that unit aside from
24    you and Larson, you and Jonathan Larson?  And I'm thinking back
25    to 2011 now.
```

**UNITED STATES DISTRICT COURT**

| | |
|---|---|
| 1 | A     2011? |
| 2 | Q     Let's just say during the time that you were there.  So |
| 3 | 2011 to 2012 or 2013. |
| 4 | A     Deputy Blackburn, Deputy Tutaj, Deputy Casas, Deputy |
| 11:59AM 5 | Murray. |
| 6 | And at the IRC was Grover, Garcia, Larson, and Bieker? |
| 7 | Q     Now we've heard the name Bill Beeman in these |
| 8 | proceedings.  How does he fit in to the structure of the |
| 9 | special housing (sic) unit, if at all? |
| 11:59AM 10 | A     No structure.  He didn't fall into the unit. |
| 11 | Q     Okay.  Was he, like, a supervisor above the unit?  Was he |
| 12 | part of a special -- some sort of a special operations unit? |
| 13 | What is his position to you? |
| 14 | A     He's assigned to special operations. |
| 11:59AM 15 | Q     Okay.  And what was Officer Beeman's -- or |
| 16 | Investigator Beeman's position in 2017 at the time of the |
| 17 | arrest of Mr. Govey? |
| 18 | A     Special operations. |
| 19 | Q     So the same? |
| 11:59AM 20 | A     Correct. |
| 21 | Q     Now you testified that Investigator Beeman was not part |
| 22 | of the initial encounter in 2017 on the date of Mr. Govey's |
| 23 | arrest; right? |
| 24 | A     Correct. |
| 12:00PM 25 | Q     That he then came to the scene afterwards; is that right? |

**UNITED STATES DISTRICT COURT**

             1   A     Correct.

             2   Q     Why wasn't Inspector (sic) Beeman brought to the scene

             3   afterwards, to your knowledge?

             4   A     I have no clue.

12:00PM      5   Q     Well, would you agree that Inspector (sic) Beeman then

             6   joined you in questioning Mr. Govey that day?

             7   A     He did.

             8   Q     And joined you in questioning each of the persons that

             9   were found at the residence that day?

12:00PM     10   A     He did.

            11   Q     And it was some ten people total; right?

            12   A     Correct.

            13   Q     You and Beeman together were the persons that questioned

            14   each of those people?

12:00PM     15   A     Correct.

            16   Q     But you have no idea why he was participating in those

            17   interrogations with you?

            18   A     Participating or showed up to the residence?

            19   Q     Let's set aside showing up.  Why was he participating in

12:01PM     20   the investigation, to your knowledge?

            21   A     He just wanted to sit in, I guess.

            22   Q     And is that somehow part of his ambit or part of the

            23   scope of his duties as special operations?

            24   A     Yeah, he's assigned to the white races gangs.

12:01PM     25   Q     Is perhaps that's why he came to the scene, to your

**UNITED STATES DISTRICT COURT**

```
 1    knowledge?

 2    A    To my knowledge, maybe.  I didn't call him.  I didn't ask

 3    for him to be there.

 4    Q    He just showed up unbeknownst to you or without advance

 5    warning to you?

 6    A    Correct.

 7    Q    Okay.  Now one of the other topics that you invoked on

 8    was pulling inmates out to speak to them; is that right?

 9    A    Correct.

10    Q    All right.  You testified that you knew Mr. Govey or you

11    knew of him since at least 2011; is that true?

12    A    True.

13    Q    Now in November of 2011, Mr. Govey was in custody; right?

14    A    I don't remember.

15    Q    Did you -- to your knowledge, was Mr. Govey ever pulled

16    out of general housing and subjected to questions by deputies

17    in the special housing (sic) unit?

18    A    I don't know.

19    Q    Did you ever participate in questioning Mr. Govey about

20    when he was in the Theo Lacy Facility?

21    A    I don't know.  I don't remember.

22    Q    You don't -- I just want to be clear about your

23    testimony.  Are you saying, "No, I never pulled Mr. Govey out

24    and spoke to him" or "I don't recall if maybe I did or maybe I

25    didn't"?
```

**UNITED STATES DISTRICT COURT**

```
 1   A     I don't recall.

 2   Q     Okay.  Not you didn't, but "I don't know.  I don't

 3   remember"?

 4   A     I don't remember.

12:03PM 5   Q     Did you meet with the government?  And by that, I mean

 6   the USA, the prosecutor team on this case, back in December of

 7   2017.

 8   A     I think so.  I don't know the exact dates.

 9   Q     Was that in person or on the phone or both?

12:03PM 10   A     I believe it's in person.

11   Q     You believe or you know that you met with them in person?

12   A     Well, if I met with them, it would be in person.  If I

13   didn't meet with them, I wouldn't be on the phone.

14   Q     My question is, do you know for a fact that you met in

12:03PM 15   person last year with the prosecutor team?

16   A     I don't know the exact dates.  I don't remember.

17   Q     Let's set aside the dates.  Did you meet with these

18   folks?  And I'm pointing to USA Brad Marrett and the government

19   on this case last year sometime.

12:03PM 20   A     I think so.

21   Q     Where did you meet?

22   A     We met at the Federal Building.

23   Q     Okay.  Who was present?

24   A     The first meeting was just Brad and the -- I'm drawing a

12:04PM 25   mind blank.  Jim Sanders.
```

|     |   |                                                                      |
|-----|---|----------------------------------------------------------------------|
| 1   | Q | This is Special Agent Jim Sanders?                                    |
| 2   | A | Correct.                                                             |
| 3   | Q | Of the ATF?                                                          |
| 4   | A | Correct.                                                             |
| 12:04PM 5 | Q | Who is in the courtroom today; right?                         |
| 6   | A | He is.                                                               |
| 7   | Q | He's the gentleman with the yellow tie back there?                   |
| 8   | A | Yes.                                                                |
| 9   | Q | Now during that meeting, were you asked by Mr. Marrett               |
| 12:04PM 10 |  | whether you had had prior contact with Mr. Govey in the jails?   |
| 11  | A | I think so.                                                         |
| 12  | Q | And didn't you tell Mr. Marrett that you have had                   |
| 13  |   | personal contact with Govey in the jails?                          |
| 14  | A | Probably.                                                           |
| 12:05PM 15 | Q | Didn't you tell Mr. Marrett that you conducted a taped       |
| 16  |   | interview with Govey?                                              |
| 17  | A | I don't remember that.                                             |
| 18  | Q | If I were to show you notes that had been disclosed to me         |
| 19  |   | in the course of this case, might that refresh your memory one    |
| 12:05PM 20 |  | way or the other?                                                  |
| 21  | A | It might.                                                          |
| 22  | Q | We'll turn to Exhibit B in the binder in front of you.            |
| 23  |   | For the record, sir, Exhibit B seems to be a page of              |
| 24  |   | handwritten notes or parts of two pages of handwritten notes.     |
| 12:05PM 25 |  | Do you see that?                                                   |

**UNITED STATES DISTRICT COURT**

1   A       Yeah.

2   Q       And it's dated December 14, 2017, at the top?

3   A       Okay.

4   Q       11:32 a.m.; right?

12:06PM  5   A       Yep.

6   Q       And it says at the top, Deputy Bryan Larson, that's you?

7   A       Yep.

8   Q       And then it says USA Brad Marrett; right?

9   A       Correct.

12:06PM 10   Q       And Special Agent James Sanders?

11   A       Correct.

12   Q       Is that part I described, the date and the participants,

13   is that consistent with your memory of the meeting that you had

14   with the government in this case?

12:06PM 15   A       Yes.

16   Q       So mid-December last year; right?

17   A       Yep.

18   Q       Okay.  Now I want to direct your attention about halfway

19   down the page.  And I'm starting at the line that says, "Larson

12:06PM 20   knows Govey from working on assignment in the jails."  Do you

21   see where it's written there?

22   A       Correct.

23   Q       And that's true; right?

24   A       That's true.

12:06PM 25   Q       You told these guys, and I mean the federal prosecutors,

UNITED STATES DISTRICT COURT

```
 1  that you knew Govey from working on assignments in the jails;
 2  right?
 3  A    Correct.
 4  Q    Then it says, "Larson has had personal contact with Govey
12:07PM  5  in the jails"; right?
 6  A    Correct.
 7  Q    And that's true?
 8  A    True.
 9  Q    Okay.  Then it says, "Larson conducted taped interview
12:07PM 10  with Govey" is the next sentence?
11  A    Sure does.
12              MR. MARRETT:  I just want to object to the extent
13  that these are not his notes.  These are the notes of the ATF
14  agent that I think --
12:07PM 15              MR. SCOTT:  I think that's been made clear.  And I
16  object to the speaking objection.
17              THE COURT:  Sustained.
18       Go ahead.  Continue your question.
19  Q    BY MR. SCOTT:  All right.  The next sentence says,
12:07PM 20  "Larson conducted taped interview with Govey"; right?
21  A    Correct.
22  Q    So Deputy Larson, you did, in fact, say that to the
23  federal government back in February 2017; right?
24  A    Sure did.
12:07PM 25  Q    Okay.  So we do now know that you did conduct the taped
```

1    interview with Mr. Govey back when he was in the Orange County

2    jail; right?

3    A     No.  Nope.

4    Q     You said that, but it's not true?

12:07PM 5    A     No, I said -- not talking about the interview for this

6    case.

7    Q     Okay.  So it's your testimony here today that to the

8    extent you said that you conducted a taped interview with

9    Mr. Govey, you're referring to his arrest in June of 2017?

12:08PM 10   A     Correct.

11   Q     So we're very clear, you never conducted a taped

12   interview with Mr. Govey back when he was incarcerated in the

13   Orange County jail system?

14   A     Not that I recall.

12:08PM 15   Q     You may have, but you don't know?

16   A     Not that I recall.

17   Q     Okay.  The next line after you described a taped

18   interview with Govey, it says here on that same page, "Larson

19   would recognize Govey's voice if heard on a recording";

12:08PM 20   correct?

21   A     Correct.

22   Q     Now how would you recall a voice based on a recording?

23   Were you harkening -- first of all, did you say that to the

24   government?

12:08PM 25   A     Yes.

Q    All right.  When you said that, were you harkening back

to your experience at the Orange County jails, or would you

recognize his voice from the brief encounter you had with him

in June of 2017?

12:09PM  A    Probably both.

Q    All right.  So you -- both.  So you would be relying at

least in part with -- on interactions you had with him back at

the Orange County jail in recognizing his voice; is that right?

A    Or phone calls I listened to.

12:09PM  Q    Okay.  Now you didn't discuss on direct examination phone

calls that you listened to regarding Mr. Govey, did you?

A    No.

Q    Okay.  The truth is, when you were part of the special

handling unit, you listened to hours of phone calls involving

12:09PM  Mr. Govey, did you not?

A    I don't know about Govey in general.  But yeah, I've

listened to phone calls from Govey.

Q    I'm sorry?

A    You just said "hours of phone calls."  I don't know how

12:09PM  many hours I listened to him.  I listened to multiple inmates.

Q    The question is, you have listened to numerous phone

calls where Mr. Govey was on the phone at the Orange County

jail; right?

A    A few.

12:10PM  Q    How many is "a few"?

94

```
         1    A     I don't know.
         2    Q     That's part of the reason you could recognize his voice;
         3    right?
         4    A     Correct.
12:10PM   5    Q     All right.  Didn't the government ask you on direct
         6    examination whether you had any contact or communication with
         7    Mr. Govey at the Orange County jail?  Didn't they ask you that?
         8    A     I believe so.
         9    Q     Didn't you -- correct me if I'm wrong, didn't you tell us
12:10PM  10    that you did not, to your knowledge, have interactions with
        11    Mr. Govey?
        12    A     I don't recall.
        13    Q     But we now agree that you did; right?
        14    A     Well, I'd have contacts when he goes to court, just
12:10PM  15    walking by his cell, if that's contact.
        16    Q     I'm talking about in the context of a special handling
        17    deputy, did you ever have interactions with Govey?
        18    A     I walk around and see him all the time.
        19    Q     Sir, again, I'm trying to get to whether you had
12:10PM  20    in-person communications with Mr. Govey when you were a special
        21    handling deputy.
        22    A     I'm sure I did.
        23    Q     And you also listened to phone calls; we just established
        24    that?
12:10PM  25    A     Correct.
```

**UNITED STATES DISTRICT COURT**

1   Q    Okay.  We'll get to this a little bit more in a moment,

2   but one of the things that you did as a special handling deputy

3   was to try to cultivate informants within the jail; right?

4   A    What's "cultivate"?

12:11PM  5   Q    Well, you would develop relationships and establish the

6   flow of information from informants to you in the special

7   handling unit about events in the jail; is that true?

8   A    Correct.

9   Q    Okay.  Now for starters, Mr. Govey, to your knowledge,

12:11PM 10   never agreed to be an informant in any capacity; true?

11   A    True.

12   Q    He had the opportunity, if he wanted to; right?

13   A    I don't know.

14   Q    Did you ever approach Mr. Govey about whether he would

12:11PM 15   like to be an informant?

16   A    I don't think so.

17   Q    To your knowledge, did anyone else?  Or would you know?

18   A    I wouldn't know.

19   Q    Now you've -- in the search warrant -- you wrote a search

12:12PM 20   warrant in this case; right?

21   A    I did.

22   Q    Now in the context of the search warrant, you have to do

23   a probable cause statement; right?

24   A    Correct.

12:12PM 25   Q    And part of that includes laying out your experience and

1    your background; right?

2    A      Correct.

3    Q      It sort of establishes the foundation for the testimony

4    you're about to give; is that your understanding?

12:12PM 5    A      Correct.

6    Q      Okay.  Now one of the things that you wrote in the search

7    warrant in this case was that you had spoken to thousands of

8    inmates regarding crimes that they had committed which allowed

9    you to become familiar with and learn different methods of

12:13PM 10   committing crimes and things like that; right?

11   A      Correct.

12   Q      All right.  Now when you said you spoke to thousands of

13   inmates, you're talking about inmates in the Orange County jail

14   system; right?

12:13PM 15   A      And outside.

16   Q      All right.  Well, inmates are, by definition,

17   incarcerated?

18   A      Correct.

19   Q      So you may have spoken to suspects or other people on the

12:13PM 20   outside, but "inmates" means people you spoke to in the jail;

21   right?

22   A      Correct.

23   Q      Okay.  So you wrote that you spoke to thousands of

24   inmates regarding crimes they've committed.  Do you remember

12:13PM 25   writing that?

A       Yep.

Q       About the commission of assaults; right?

A       Correct.

Q       Vehicle thefts and burglaries?

12:13PM A       Correct.

Q       And you go on and on about your experience with drugs and with different crimes; right?

A       Sure.

Q       Now you know that if an inmate has an attorney appointed
12:14PM to them and is awaiting trial on a case, you're not permitted to go and speak to that inmate without their attorney being present about the case; right?

A       Correct.

Q       There's no confusion about that; right?

12:14PM A       Correct.

Q       Okay.  So do I take it to mean that when you say that you've spoken to thousands of inmates about the crimes they've committed, how do you do that without -- is that about crimes that they committed in the past, not the ones that they're
12:14PM pending trial for?

A       I never specifically asked them of what crimes that they were in on.  But when I worked the booking loop or around that area, the inmates getting released, I would talk to them about various crimes they've committed.

12:14PM Q       When you say you were working the booking loop --

```
 1   A    Like on the booking loop or in classification when we

 2   release inmates, that was one of the times I would speak with

 3   inmates about that kind of thing.

 4   Q    Was that the only time?

 5   A    No.

 6   Q    Were the other times when the inmates were not on their

 7   way out the door?

 8   A    Correct.

 9   Q    So can we agree that there were times when you were

10   talking to inmates about the crimes that they committed while

11   they were still inmates in the jail?

12   A    Correct.

13   Q    Now did you have a way of ascertaining or knowing whether

14   you were talking with inmates about crimes they were pending

15   trial for or crimes they had commit in different contexts?

16   A    A lot of times I would do a hypothetical.

17   Q    Like how?

18   A    Like say on the same time -- especially because I want to

19   be in gangs, I would ask them just about their tattoos, what

20   that does -- what kind of crimes does their gang commit in

21   general.

22   Q    And you would pose those kinds of questions and those

23   hypotheticals to inmates while they were still doing their time

24   sometimes?

25   A    Correct.
```

12:14PM

12:15PM

12:15PM

12:15PM

12:15PM

**UNITED STATES DISTRICT COURT**

```
 1   Q    Do you know whether any of those inmates were facing gang

 2   enhancements for the crimes that they were incarcerated for?

 3   A    I don't know.

 4   Q    Well -- and you do know what I mean when I say "gang

12:16PM 5   enhancements"; right?

 6   A    Correct.

 7   Q    I mean, you alleged one in this case, did you not?

 8   A    Correct.

 9   Q    Under 186.22 of the California Penal Code?

12:16PM 10   A    Correct.

11   Q    It can subject a person to a substantially higher

12   sentence than they would otherwise receive?

13   A    Correct.

14   Q    So what steps, if any, did you take to make sure you

12:16PM 15   weren't questioning inmates about their gang status or

16   affiliation while they were facing 186.22 enhancements?

17   A    I would tell them basically "Not here" and "Can't talk to

18   you about your case," but I would ask questions in reference to

19   not their case is what I'm trying to say.

12:16PM 20   Q    And my question is, but what if their case is about gang

21   enhancements?

22   A    Then I wouldn't ask them that.

23   Q    How would you know?

24   A    Because I told them I'm not here to talk to them about

12:16PM 25   their case.
```

**UNITED STATES DISTRICT COURT**

1   Q    Okay.  Is that all of the steps that you took to make

2   sure you weren't inadvertently questioning somebody about a

3   pending case?

4   A    Correct.

12:17PM 5        MR. SCOTT:  Okay.  Your Honor, I see that it's

6   12:15.  I still have a bit more to go.

7        THE COURT:  Why don't we take our lunch break.  Pick

8   back up at 1:15.

9        THE COURTROOM DEPUTY:  All rise.

01:15PM 10       **(Lunch recess from 12:17 p.m. to 12:17 p.m.)**

11       THE COURT:  Deputy, you realize you're still under

12   oath, sir?

13       THE WITNESS:  Yes, Your Honor.

14       THE COURT:  Please proceed, Mr. Scott.

01:18PM 15       MR. SCOTT:  Thank you, Your Honor.

16                 **CROSS-EXAMINATION (RESUMED)**

17   BY MR. SCOTT:

18   Q    Good afternoon again, Deputy.

19   A    Good afternoon.

01:18PM 20   Q    I wanted to start by cleaning up some questions that I

21   asked this morning, and your attorney was kind enough to share

22   with me a number of times this morning evidently from what I'm

23   told, I was saying to you "special housing unit" trying to

24   refer to the assignment that you had within the jail, and then

01:18PM 25   you kept correcting me saying "special handling unit"; is that

1    correct?

2    A    Correct.

3    Q    Okay.  So I just want to make clear with the

4    clarifications that you made, did you understand me, though, to

01:18PM 5    be asking about your job as a special handling deputy?

6    A    Yes.

7    Q    Even when I was accidentally saying "special housing

8    unit"?

9    A    Correct.

01:19PM 10    Q    You didn't answer any questions this morning under the,

11    you know, the belief that I was referring to, you know, SHU

12    housing for an inmate or special housing unit distinct from

13    your job as a special handling deputy, did you?

14    A    No.

01:19PM 15    Q    Okay.  Thank you for allowing me to clarify that.

16         And thank you, Ms. Corrigan, for clarifying that.

17         I was just going to touch on one area that we talked

18    about this morning before we move on.  This morning you shared

19    with us that you invoked at the Ortiz hearing on the advice of

01:19PM 20    a union-appointed attorney; is that correct?

21    A    Correct.

22    Q    Now was that -- and I'm not asking about the specific

23    substance of communications with this person, but was the

24    morning of the Ortiz hearing the first time you had ever met

01:19PM 25    that person?

```
    1   A    I don't recall.
    2   Q    I understood you to say this morning that you wanted to
    3   know what this was about, and you asked the union attorney for
    4   discovery or for what this was all about.  Do you remember
01:20PM 5   that?
    6   A    Correct.
    7   Q    And I want to be clear, you asked -- you wanted this
    8   person to tell you orally why you were being appointed counsel;
    9   right?
01:20PM 10   A    Correct.
   11   Q    And it's your testimony that the person wouldn't even
   12   tell you why you were being appointed an attorney?
   13   A    They would -- they wouldn't answer my questions to how I
   14   would need to know them.
01:20PM 15   Q    Okay.  Well, what does that mean?  I mean, what did you
   16   want to know that you weren't being told before making this
   17   important decision about invoking?
   18   A    What kind of discovery or evidence they had, just like
   19   everyone gets discovery.
01:20PM 20   Q    You wanted to know what evidence who had?
   21   A    The defense.
   22   Q    So you wanted to know before deciding whether or not to
   23   invoke your rights, what evidence the defense had about the
   24   special handling unit?
01:21PM 25   A    About me.  I thought it was about me.
```

**UNITED STATES DISTRICT COURT**

1    Q    Okay.  It's your testimony that the attorney would not

2    tell you what, if any evidence, the defense had against you?

3    A    She mentioned one name and that was it.

4    Q    What name did she mention?

01:21PM 5    A    Fenstermacher.

6    Q    So she -- you learned that an informant by the name of

7    Fenstermacher, who we'll get to in a moment, may have had

8    something to do with the reason you were being called to the

9    stand?

01:21PM 10    A    She just said the name and didn't get into detail.  So

11    that's what I took of it.

12    Q    Well, did you ask what about Fenstermacher?

13    A    Yes, I did.

14    Q    And what was her response?

01:21PM 15    A    I don't recall, but she wouldn't tell me.

16    Q    Okay.  And then did you try to ask any other questions

17    about, you know, what the hearing was about or what your

18    potential exposure might be?

19    A    I tried to.  I don't recall what they were -- what she

01:22PM 20    said though.

21    Q    Well, when you say, "I don't recall what she said," did

22    she just say, "I'm not going to tell you," or did she say, "You

23    know, you don't need to know that"?  I'm trying to understand

24    what you based your decision not to testify on, if I can ask it

01:22PM 25    that way.

A     Can you ask it a different way?

Q     Well, I'm not sure I can.  Let me say it this way -- let me ask a different question, I guess.

      Is it your testimony, then, that you made the decision to invoke your Fifth Amendment rights simply based on an attorney telling you that you ought to without telling you why?  I mean, is that a fair statement?

A     Correct.

Q     And so you -- and you had no problem doing that?  You said, "Okay.  I guess I'll invoke"?

A     Well, because of the attorney telling me, I thought they would have the knowledge of what's going on.

Q     Now you didn't invoke for every single question that was asked; right?

A     Correct.

Q     There was one sort of big-picture question asking you if you had conspired to violate people's constitutional rights; right?

A     Correct.

Q     And that question you didn't invoke?

A     Correct.

Q     You simply said "no"?

A     Correct.

Q     So -- but isn't it true that the attorney had advised you, "Look, just don't answer any questions whatsoever"?  Isn't

**UNITED STATES DISTRICT COURT**

1   that what she told you?

2   A    Correct.

3   Q    So from that, I understand that you elected to disregard

4   that attorney's advice on that one particular question; right?

01:23PM 5   A    Correct.

6   Q    She told you, and you figured she knew better, but you

7   decided to answer anyway?

8   A    Yeah, I was feeling actually -- rethinking everything at

9   that time.  It wasn't an easy situation for me.

01:23PM 10   Q    What do you mean you were rethinking it at that time?

11   A    I was -- I was rethinking the action I was doing.  If you

12   were in the courtroom seeing me, you'd see I was -- I didn't

13   know if it was the right decision or not.  I was still throwing

14   it back and forth.

01:24PM 15   Q    But then didn't you again invoke two questions after that

16   question about conspiring?

17   A    Correct.

18   Q    So you kind of went back and forth and invoked on some

19   questions, answered one, and then invoked on some others?

01:24PM 20   A    Correct.

21   Q    So why did you decide to disregard your attorney's advice

22   on that one question but invoke your rights on the other ones?

23   Why did you decide to do that?

24   A    I actually got upset at that question because I knew it

01:24PM 25   wasn't true.

```
 1   Q    Okay.  Are there any other reasons you decided to
 2   disregard the attorney's advice on that one question?
 3   A    No.
 4   Q    Okay.  So we're clear and then I'll move on, you're
 5   telling us that you were ready and willing to answer questions
 6   about the fact that you were in the special handling unit; is
 7   that true?
 8   A    I don't understand.
 9   Q    Is it your testimony that you wanted to testify at the
10   Ortiz trial?
11   A    I should have testified.  I just got bad legal advice is
12   what I'm saying, and I went by that.
13   Q    Have you ever brought, like, any sort of malpractice case
14   against that attorney?
15   A    No.
16   Q    Have you complained to your union about that attorney?
17   A    No.
18   Q    There was an Internal Affairs investigation about the
19   fact that you invoked your rights; wasn't there?
20   A    Correct.
21   Q    And that's something you had to go through?
22   A    It's still open.
23   Q    It's still open?
24   A    Correct.
25   Q    There hasn't been a resolution of whether any sanctions
```

**UNITED STATES DISTRICT COURT**

```
 1   will be imposed on you or what the professional effects of you

 2   invoking will be?

 3   A    No.

 4   Q    What's your understanding of when the Internal Affairs

 5   investigation is going to resolve?

 6   A    I would assume after the case is complete.

 7   Q    Which case?

 8   A    The whole -- whatever, Ortiz and Dekraai.

 9   Q    Okay.  So that's open, to the best of your knowledge?

10   A    To the best of my knowledge, yes.

11   Q    You are aware that -- or are you aware that there's an

12   investigation by the United States Department of Justice --

13   A    I am.

14   Q    -- as well?

15   A    Yes.

16   Q    And that's also an open case?

17   A    It's ongoing right now.

18   Q    Okay.  And specifically so the record's clear, an

19   investigation by the United States Department of Justice into

20   the Orange County Sheriff's Department and this -- what's

21   colloquially described as the Orange County inmate scandal;

22   right?

23   A    Correct.

24          MR. MARRETT:  Your Honor, I object to that question

25   and move to strike.  The question calls for what the Department
```

Timestamps in left margin:
- 01:25PM (line 5)
- 01:26PM (line 10)
- 01:26PM (line 15)
- 01:26PM (line 20)
- 01:26PM (line 25)

         1    of Justice's investigation is, and this witness is not a part

         2    of that investigation and wouldn't know what that investigation

         3    has ongoing.

         4              THE COURT:  We don't need to argue the objection.  I

01:26PM  5    know we don't have a jury here, so I'm not as uptight.  One of

         6    my pep peeves is speaking objections, as Mr. Scott knows.

         7         The objection is overruled and the motion is denied.

         8    Q    BY MR. SCOTT:  All right.  Could you please turn to

         9    Exhibit E in the binder in front of you.

01:27PM 10    A    All right.

        11    Q    You recognize Exhibit E?

        12    A    I do.

        13    Q    It's a report that you authored; is that correct?

        14    A    Correct.

01:27PM 15    Q    Dated February 23rd of 2012?

        16    A    Correct.

        17    Q    And it bears your badge number?

        18    A    My PIN number.

        19    Q    Your what?

01:27PM 20    A    My PIN number.  P-I-N, PIN.

        21    Q    Personal identification number?

        22    A    Yes.

        23    Q    This is a report that you drafted regarding interactions

        24    that you had with an inmate by the name of Fenstermacher; is

01:27PM 25    that true?

```
 1   A      Correct.

 2   Q      And this is the -- what I believe you described this

 3   morning as the Fenstermacher kite report?

 4   A      Correct.

01:27PM  5   Q      All right.  Now I -- you told us this morning that this

 6   is among the documents that I think you said you pulled off of

 7   your hard drive and reviewed in preparation for your testimony

 8   today; is that right?

 9   A      Correct.

01:28PM 10   Q      This is your hard drive at your place of business?

11   A      Yes.  Sheriff's Department hard drive.

12   Q      So the U.S. Attorney's Office didn't hand you this

13   Fenstermacher kite report or e-mail it to you and say, "Hey,

14   Deputy, get familiar with this before we go to court"?

01:28PM 15   A      No.

16   Q      You pulled the Fenstermacher kite report of your own

17   initiative?

18   A      Correct.

19   Q      Why?  Why did you know that you ought to look at the

01:28PM 20   Fenstermacher kite report before you came to court here today?

21   A      Because I was told that it might be coming up.

22   Q      Who told you?

23   A      I think it was in one of our meetings.

24   Q      Who told you?

01:28PM 25   A      I'm trying -- I don't know.
```

1    Q    You believe somebody from the government said, "Hey, this

2    Fenstermacher situation might come up"?

3    A    I'm trying to remember how it came up.  Oh, I know now.

4    Q    Well, I thought I understood you to say a moment ago that

01:29PM  5    you decided to pull this report of your own initiative?

6    A    I was actually pulling reports with Govey's name in it to

7    review them, and his name was in this report.

8    Q    Is there some way that you can search your hard drive to

9    determine whether documents or files contain Govey's name?

01:29PM 10    A    You can.

11    Q    Is that what you did in this case?

12    A    No, I just searched visually and looked through report

13    names.

14    Q    Well, I'm assuming that the Fenstermacher report isn't

01:29PM 15    named "Govey"; right?

16    A    No, but I looked through all the -- read all of them.  And

17    when I saw his name in it, that's when I got it.

18    Q    So you read every report -- I mean, you certainly didn't

19    read every report you've ever written; right?

01:30PM 20    A    No.  The ones from 2000 -- when I was in the jail.

21    Q    I see.  So you read your reports that you authored during

22    that period of time?

23    A    Correct.

24    Q    Okay.  And you determined that this related to Govey?

01:30PM 25    A    Yes, his name is in it.

**UNITED STATES DISTRICT COURT**

```
 1   Q    Okay.  Now -- and you actually testified about this on

 2   direct examination today, apparently there was this gentleman

 3   by the name of Fenstermacher who was an inmate in the Orange

 4   County jail system; right?

 5   A    Correct.

 6   Q    Specifically at the Theo Lacy Facility; is that true?

 7   A    Correct.

 8   Q    And apparently in November of 2011, Mr. Fenstermacher

 9   approached you; right?

10   A    True.

11   Q    Does that mean "yes"?

12   A    I mean, I'd have to refresh my memory.  I don't know the

13   date exactly.

14   Q    If you'd like to, it's dated -- or the page numbers are

15   002 and 003 in Exhibit E there.

16   A    November 23rd.

17   Q    Of 2011?

18   A    Correct.

19   Q    Okay.  So in December of 2011, Mr. Fenstermacher

20   approached you apparently; right?

21   A    Did you say December?

22   Q    November.

23   A    Okay, yes.

24   Q    And said words to the effect of he wanted to change his

25   lifestyle?
```

01:30PM  5
01:30PM 10
01:31PM 15
01:31PM 20
01:31PM 25

**UNITED STATES DISTRICT COURT**

```
         1    A     Correct.
         2    Q     He no longer wanted to be part of inmate politics, or
         3    that's what he represented to you?
         4    A     Correct.
01:31PM  5    Q     And decided that he wanted to try to get his life back;
         6    right?
         7    A     Correct.
         8    Q     And "help us out with information"; right?
         9    A     Correct.
01:31PM 10    Q     And that's the way you wrote it up in your kite report
        11    was that Fenstermacher wanted to, quote, "help us with
        12    information," closed quotes; right?
        13    A     Correct.
        14    Q     Who's "us"?
01:32PM 15    A     In general, the special handling unit.
        16    Q     So that's you and the other three deputies at the Theo
        17    Lacy?
        18    A     Correct.
        19    Q     And the other special handling deputies at the other
01:32PM 20    facility?
        21    A     No, I don't think them.  It's kind of like separate.
        22    Q     So just the four of you?
        23    A     Yeah.
        24    Q     Okay.  You responded to Mr. Fenstermacher; right?
01:32PM 25    A     Yes.
```

```
 1   Q    And you told him that you would pull him out on
 2   interviews; right?
 3   A    Correct.
 4   Q    In fact, you told him you would pull him out on frequent
 5   interviews, yes?
 6   A    Correct.
 7   Q    So that he could give you -- or you said "us"
 8   information; right?
 9   A    Correct.
10   Q    Information that might help out cases?
11   A    Correct.
12   Q    Now what cases are you talking about?
13   A    I think that was a little mistyped right there.
14   Q    Was mistyped?
15   A    Yeah.  I think it was -- if he did stuff, it could help
16   him out on his case, if the DA would do that.  I explicitly
17   told him that the DA -- that's their job.  I have nothing to do
18   with that.
19   Q    Let me unpack that a little bit.  You said that it's up
20   to the Deputy D.A. whether he can get help on his case; right?
21   A    Yes.
22   Q    Okay.  So certainly you wouldn't be promising
23   Mr. Fenstermacher whether anything that he does can benefit his
24   case; right?
25   A    Exactly.
```

**UNITED STATES DISTRICT COURT**

```
 1    Q    So you wouldn't be talking with him about his case in

 2    particular?

 3    A    No.

 4    Q    Or any benefits he might get; correct?

 5    A    Correct.

 6    Q    So you were describing something else?

 7    A    Yes.

 8    Q    Okay.  What you were describing is that he -- and I'm

 9    looking at the first full paragraph of Page 3 of your report,

10    that "you pull him out on frequent interviews so he could give

11    us information that might help out cases"; right?

12    A    Correct.  But that's what I was trying to tell you, I

13    probably mistyped that.

14    Q    Okay.  Well, we just agreed that you wouldn't have been

15    talking about his case; right?

16    A    Correct.

17    Q    Because you're not in that business to make promises to

18    him; right?

19    A    Correct.

20    Q    What you typed is helping him out or is him helping you,

21    plural, us, on cases; right?

22    A    What I'm trying to tell you is that was probably mistyped.

23    Q    Well, did you try to type "bases"?

24    A    "Bases"?

25    Q    Or "faces"?
```

A     No just the way it was typed.  I told you what I meant.

Q     Well, respectfully, I'm not sure what you meant.  What it

says is that Mr. Fenstermacher could give you information that

might help out cases.

01:34PM 5    A     Correct.

Q     Sir, doesn't that mean help out the special handling unit

on pending criminal cases?

A     Absolutely not.

MR. MARRETT:  Objection.  Asked and answered.

01:34PM 10   THE COURT:  Overruled.

Q     BY MR. SCOTT:  But we know it's not his case; right?

A     Correct.

Q     So if it's not about his case, then what were you writing

when you said he could help out on cases, plural?

01:35PM 15   A     Like I told you before, it was probably mistyped.

Q     And what does that mean?  What were you trying to type?

A     I was trying to tell him if he gave any information that

would benefit him, I can give him some consideration.

Q     Okay.  Deputy, with all respect, is it your testimony to

01:35PM 20   this court under oath that you endeavored to type down "I told

Mr. Fenstermacher I could not make promises about benefits he

was going to receive on his case," and what came out instead

was "he could give us information that might help out cases"?

Is that what you're telling us, sir?

01:35PM 25   A     That's what I can recall and what I can see right here.

1    Q    That's your testimony under oath?

2    A    Correct.

3    Q    Okay.  Are you sure about that testimony as everything

4    else you've testified about today?

01:35PM 5    A    Correct.

6    Q    Okay.  You would agree, would you not -- let's assume

7    hypothetically that this is not a typo.  Let's pretend a

8    different deputy wrote it, okay?  Would you agree that a deputy

9    getting an inmate to gather information about pending cases

01:36PM 10   could potentially be a violation of constitutional rights?

11             MR. MARRETT:  Objection.  Calls for an expert

12   testimony and calls for speculation.

13             THE COURT:  As framed, sustained.

14   Q    BY MR. SCOTT:  I want to talk about your understanding

01:36PM 15   specifically, okay?  Were you aware back in 2011 that if you

16   were getting an inmate to gather information about pending

17   cases on other inmates, that that could potentially be a

18   constitutional issue?

19             MR. MARRETT:  Objection to the extent that it

01:36PM 20   misstates the law.  Hypothetical.

21             THE COURT:  Your understanding, sir.  You can

22   answer.  If you have an understand- -- understand the question.

23             THE WITNESS:  Say it one more time.

24   Q    BY MR. SCOTT:  Maybe I'll ask it open-ended.

01:37PM 25        What's your understanding of the extent to which deputies

**UNITED STATES DISTRICT COURT**

```
  1   can employ informants to gather information on pending cases
  2   against inmates?
  3               MR. MARRETT:  And objection just to the extent it
  4   calls -- it's vague as to the time frame.
01:37PM  5               THE COURT:  Overruled.
  6               THE WITNESS:  Now or back then?
  7   Q    BY MR. SCOTT:  Back then first.
  8   A    Back then?  I didn't know.
  9   Q    Okay.  What do you mean?
01:37PM 10   A    I didn't know that that would be wrong.
 11   Q    Okay.  Did you do that sometimes?
 12   A    To the best of my knowledge, I didn't do that.
 13   Q    Do you have some hesitation?
 14   A    No.  Because -- no.
01:37PM 15   Q    Okay.  Now you just drew a distinction between back then
 16   and now?
 17   A    Correct.
 18   Q    Do you have a different understanding today?
 19   A    I do.
01:37PM 20   Q    What's your understanding today?
 21   A    That it's a Massiah violation.
 22   Q    When did you first gain the understanding that using
 23   informants in that manner might be a Massiah violation?
 24   A    As soon as this whole thing went down, we had training in
01:38PM 25   our department.
```

```
 1   Q    Do you remember what year that was?

 2   A    I don't off the top of my head.

 3   Q    Was that before or after you invoked your rights on the

 4   witness stand in the Ortiz case?

 5   A    It was after.

 6   Q    So you decided to accept the advice to take the Fifth

 7   Amendment before you learned about the legal implications of

 8   potential Massiah violations; is that correct?

 9   A    Correct.

10   Q    Okay.  Deputy, this report reads that you:

11             "...would pull him out on frequent interviews

12        so that he could give us information that might

13        help out cases."

14        You wrote that sentence before you learned that that kind

15   of behavior as written might be a Massiah issue; right?

16   A    Correct.

17   Q    So isn't it possible that that's precisely what you were

18   doing, exactly what it says, you just didn't know any better at

19   the time?

20   A    No.

21   Q    So you still maintain that this is just a big typo and

22   that you were not using Mr. Fenstermacher to gather information

23   that might help you out on cases?

24   A    Correct.

25   Q    Okay.  Now back then, sir -- so it's fair to say that
```

**UNITED STATES DISTRICT COURT**

```
 1  Mr. Fenstermacher became an informant?

 2  A     Correct.

 3  Q     And you did, in fact, pull him out for frequent

 4  interviews?

 5  A     Correct.

 6  Q     And you did, in fact, receive whatever information he had

 7  to share with you; right?

 8  A     Correct.

 9  Q     Information that he had gathered while being an informant

10  out in the jail; right?

11  A     Correct.

12  Q     And do I assume correctly that this information, you

13  didn't just keep it?  I mean, it wasn't just for you, Deputy

14  Bryan Larson, to use as you saw fit; right?

15  A     Correct.

16  Q     The information he was providing you, as far as you were

17  concerned, was for the benefit of the special handling unit

18  certainly as a whole; right?

19  A     Correct.

20  Q     And part of the whole idea is to memorialize the

21  information that's received so that it can be of use for safety

22  and security in the jail; right?

23  A     Can you restate the question.

24  Q     Yeah.  You have to put -- part of managing and

25  interacting with an informant is sort of trapping and
```

 1  memorializing the information they provide; right?

 2  A     What do you mean by "memorializing"?

 3  Q     Well, you have to have some sort of records of what the

 4  person said to you; right?

01:40PM  5  A     I don't think so.  I don't think I understand your

 6  question.

 7  Q     Let me back up.  Did you share the information that

 8  Mr. Fenstermacher gave you with other members of the special

 9  handling unit?

01:41PM 10  A     Yes.

11  Q     And correct me if I'm wrong, there was, like, a special

12  handling log at the Theo Lacy Facility back in 2011; right?

13  A     I don't recall.

14  Q     What do you mean you don't recall?

01:41PM 15  A     I don't recall.

16  Q     There may have been a special handling unit log?

17  A     I don't think so.  I'm not aware of it.

18  Q     What are TREDs?

19  A     TRED?

01:41PM 20  Q     Yeah.

21  A     It's simply like a historic entry.  Every inmate right

22  when you come in, it starts from the classification.  Just says

23  their demeanor, what their level of classification is.  And

24  then you can add in TREDs, obviously any kind of movement, if

01:41PM 25  there's a fight that needs sep orders to keep them away from

1    each other, any kind of activity.  If there's fights in the

2    jail, like I said, it's noted on their TRED that they're

3    involved.

4    Q    Okay.  TREDs exist for every inmate in the Orange County

01:42PM 5    jail?

6    A    Yes.

7    Q    What records, if any, exist for people that have decided

8    to become informants?

9    A    I don't think there was any.

01:42PM 10   Q    Well, when Mr. Fenstermacher would come to you in one of

11   these meetings and share with you the information that he had

12   learned, did you take notes?

13   A    No.

14   Q    You just listened orally?

01:42PM 15   A    Correct.

16   Q    Well, like, let's look at this report, for example.  This

17   report memorializes days and weeks of interactions with

18   Mr. Fenstermacher, doesn't it?

19   A    Correct.

01:42PM 20   Q    You agree -- I mean, it's -- you talk about him first

21   approaching you in November of 2011; right?

22   A    Correct.

23   Q    And towards the end you're describing kites that were

24   alleging sent as late as February 23rd of 2012; right?

01:43PM 25   A    Correct.

```
  1   Q    So we're talking about like a three-month period of time
  2   at least; right?
  3   A    Sure.
  4   Q    Where Mr. Fenstermacher has met with you on numerous
01:43PM 5   different occasions; right?
  6   A    Correct.
  7   Q    And so is it your testimony that you sat down on
  8   February 23rd of 2012 and wrote from memory everything that he
  9   had told you over multiple meetings the past three months?
01:43PM 10  A    Nope.
 11   Q    How did you remember what was said?
 12   A    Because he gave me the kites with all the information.
 13   Q    So you went off the kites exclusively?
 14   A    Correct and whatever he wrote.
01:43PM 15  Q    So his kites and his notes?
 16   A    Correct.
 17   Q    Okay.  Where did you keep those in the interim?
 18   A    In the office.  In the special handling office.
 19   Q    Was there some sort of file that was set aside for
01:43PM 20  Mr. Fenstermacher?
 21   A    Yes.
 22   Q    So he had a file?
 23   A    Well, it was a folder with stuff he was giving me.
 24   Q    Was that just kind of a thing you made up, or is there a
01:43PM 25  protocol for maintaining a file on an informant witness?
```

```
 1   A     That's just what I did.
 2   Q     Did you ever receive any training on how to document
 3   interactions with informants?
 4   A     I didn't.
 5   Q     There was no practice or procedure in the special
 6   handling unit on how to interact with informants?
 7   A     No, sir.
 8   Q     So every deputy who cultivated a relationship with an
 9   informant in terms of documentation anyway, was sort of making
10   it up as they went along?
11   A     Correct.
12   Q     You understand today that it has come to light that there
13   was a special handling log at the IRC; right?
14   A     Correct.
15   Q     You know that?
16   A     I do.
17   Q     And you know that part of this Orange County issue is the
18   fact that certain deputies failed to acknowledge under oath
19   that there was such a thing in earlier hearings.  You know
20   that; correct?
21   A     Correct.
22   Q     And that's part of the problem is that they denied the
23   existence of records, that it turned out it really did exist?
24   A     Right.
25   Q     Including the TREDs.  You know today, as you sit here,
```

**UNITED STATES DISTRICT COURT**

1    that certain law enforcement officers denied under oath the

2    existence of TREDs; right?

3    A    Correct.

4    Q    And it later came to light that there really is a thing

01:45PM  5    called TREDs?

6    A    Correct.

7    Q    Now back in 2014, the Dekraai case was going on; right?

8    A    I think so.

9    Q    All right.  Did you understand in 2014, did you learn

01:45PM 10    from any source that defense attorneys were asking about TREDs

11    and special housing logs, if there were records like that?

12    A    I just -- I heard from -- I don't know who, but yeah, I

13    did.

14    Q    And you know that they were not disclosed until much

01:45PM 15    later; right?

16              MR. MARRETT:  Objection.  Calls for speculation to

17    the extent this is --

18              THE COURT:  Overruled.

19         If you know, sir.

01:46PM 20              THE WITNESS:  I don't know.

21    Q    BY MR. SCOTT:  Well, I thought we just established that,

22    you know, as you sit here today that the failure to disclose

23    those things is part of the problem in this case; right?

24    A    Correct.

01:46PM 25    Q    Did you know back in 2014 that they were being requested,

         1    yet the special handling deputies were not giving them over?

         2    Did you know that?

         3    A    I didn't know that.

         4    Q    Nobody ever talked to you about that?

01:46PM   5    A    No.

         6    Q    You never received or requested documents or an inquiry

         7    about the existence of certain records?

         8    A    I don't know -- I got asked about certain things and

         9    turned over whatever needed to be turned over.  I don't know

01:46PM  10    exactly what they were.

        11    Q    When were you asked to turn over certain things?

        12    A    I don't know.

        13    Q    What case?

        14    A    I don't know.  It had to do with Dekraai, I think.

01:46PM  15    Q    Who asked you?

        16    A    Our department commander, I think.  I'm not sure.

        17    Q    What did you give over?

        18    A    I don't think I gave over anything.

        19    Q    I thought you just told us that you gave over whatever

01:46PM  20    was asked for.

        21    A    I think I was thinking of the Department of Justice

        22    investigation.

        23    Q    Were you ever asked for records during the pendency of

        24    these Orange County criminal cases?

01:47PM  25    A    I don't know.

Q    So I just want to be real clear, after everything we've

just discussed, are you certain that to your knowledge, to your

memory we're talking about, there was never some sort of

special housing (sic) log that was -- or let me back up because

01:47PM  5   I made the same mistake, so strike that -- special handling

log?

A    Correct.

Q    To your knowledge, the special handling unit did not keep

a log at the Theo Lacy Facility; is that right?

01:47PM 10   A    Correct.

Q    To your knowledge, was there any system, any

recordkeeping device where you as a handler for someone like

Mr. Fenstermacher would document information that he provided

to you?

01:48PM 15   A    No.

Q    Nothing whatsoever?

A    Not that I can recall.

Q    Well, that's different than -- so are you saying there

wasn't something like that or you don't remember?

01:48PM 20   A    I don't remember.

Q    Was Mr. Fenstermacher ever moved to a different cell for

him to continue his information-gathering activities?

A    Yes.

Q    All right.  Tell us about that.  What do you remember?

01:48PM 25   A    I just remember that he was in isolation and then he got

moved to Mod P.

Q    When was he moved to Mod P?

A    I don't know.

Q    Was it after he approached you and said he wants to get

01:48PM  out of that lifestyle?

A    Yes.

Q    Was he, in fact, moved to Mod P in response to his

willingness to be an informant?

A    Say that one more time.

01:49PM  Q    It wasn't a coincidence that he was moved from isolation

to Mod P after he became an informant, was it?

A    No.

Q    He was moved to Mod P specifically because he was an

informant, yes?

01:49PM  A    Yes.

Q    And who was he moved next to when he was moved to Mod P?

A    I don't know.

Q    So we agree that the decision to move him was based on

him being an informant; right?

01:49PM  A    Correct.

Q    Doesn't it stand to reason that the place he was moved to

was influenced by the fact that he was an informant?

A    No.

Q    Why not?

01:49PM  A    Because I could put him anywhere to get the information

1      that I wanted.

2      Q      What information did you want?

3      A      Jail politics, safety and security of the jail.

4      Q      So are you the one that moved him?

01:49PM 5      A      I don't remember.

6      Q      Why was he moved to Mod P?

7      A      That's where his normal housing location was.

8      Q      How long was he an informant?

9      A      I don't know.

01:50PM 10     Q      Did he end up going back to isolation when he was done?

11     A      I have no clue.  I was out to patrol by then.

12     Q      Deputy Larson, doesn't it stand to reason that if a

13     person that you described as a very violent dangerous inmate is

14     moved out of isolation, there had better be a good reason for

01:50PM 15     it?  Isn't that just kind of a generally true statement?

16     A      No.

17     Q      Didn't you say he was a red bander?

18     A      I did.

19     Q      He was in isolation because of his behavior; right?

01:50PM 20     A      No.

21     Q      Why was he in isolation?

22     A      I don't know.

23     Q      Well, how do you know it wasn't for his behavior if you

24     don't know why it was?

01:50PM 25     A      I don't know.

**UNITED STATES DISTRICT COURT**

```
 1   Q    So the answer to my question is you don't know why he was
 2   in isolation?
 3   A    I don't remember.
 4   Q    When an inmate is moved from isolation to essentially
 5   general population, that's what it was; right?
 6   A    Correct.
 7   Q    He was put from the hole to main line, to put it in jail
 8   terms; right?
 9   A    Correct.
10   Q    Doesn't there need to be a report or some sort of entry
11   and a log or some sort of written justification anywhere to
12   sort of make a record of why a person like Mr. Fenstermacher is
13   being put out on the main line?
14   A    No, because isolation is only for discipline or overflow.
15   Q    Now Deputy, didn't I just ask you a second ago, wasn't he
16   in there because of his behavior?
17   A    Yeah, but I said I didn't know.
18   Q    So he was there either for discipline or for overflow, is
19   that what you're saying?
20   A    Correct.
21   Q    Okay.  So in any event, once Mr. Fenstermacher is out on
22   the main line, he does, in fact, start bringing you
23   information; correct?
24   A    Correct.
25   Q    You pull him out frequently, just like you said you
```

01:51PM (line 5)
01:51PM (line 10)
01:51PM (line 15)
01:51PM (line 20)
01:52PM (line 25)

**UNITED STATES DISTRICT COURT**

```
  1   would, yes?

  2   A     Correct.

  3   Q     And sure enough, he's got information about other

  4   inmates; right?

01:52PM  5   A     Correct.

  6   Q     And one of those inmates that he gathered information on

  7   was Mr. Govey; true?

  8   A     Correct.

  9   Q     In fact, your report references Mr. Govey on a number of

01:52PM 10   different occasions; right?

 11   A     Correct.

 12   Q     For example, if you could turn to Page -- give me one

 13   moment.

 14         For example, if you look at Page 12 of your report.

01:53PM 15   A     Okay.

 16   Q     There's an entry, it says, "Sent on 1/2/12 kite No. 13."

 17   Do you see that?

 18   A     I do.

 19   Q     Okay.  And according to you, it says, "The kite confirms

01:53PM 20   that Joey Govey from PENI -- which is an acronym for Public

 21   Enemy Number 1; right?

 22   A     Yep.

 23   Q     -- has been placed on no communication or green light;

 24   right?

01:54PM 25   A     Correct.
```

1    Q    And then there's some reasons for telling somebody about

2    some other person in the jail; right?

3    A    Correct.

4    Q    Basically something he said led to him being on no

01:54PM 5    communication or green light status; right?

6    A    Correct.

7    Q    Now no communication has a specific meaning within this

8    jail culture; right?

9    A    Sure.

01:54PM 10   Q    What does that mean?

11   A    Just says if you're a member of the gang or associate of a

12   gang, you can't talk to them.

13   Q    It's kind of being ostracized in a way, isn't it?

14   A    Correct.

01:54PM 15   Q    It's sort of like being shut out from the politics of the

16   particular group?

17   A    Right.

18   Q    Getting the shoulder from the rest of the people that are

19   involved?

01:54PM 20   A    Correct.

21   Q    Now green light has another special meaning, doesn't it?

22   A    It does.

23   Q    Tell us what a green light means.

24   A    Green light is -- can mean anywhere from assault to kill.

01:54PM 25   Q    Basically green light means that other people in the

1   organization have a go, have a green light, so to speak, to

2   attack the particular inmate that the green light is on; right?

3   A    Correct.

4   Q    Green light in some circumstances might mean a beating;

01:55PM  5   correct?

6   A    Correct.

7   Q    Or a stabbing?

8   A    Correct.

9   Q    Or death in some circumstances; right?

01:55PM 10   A    Correct.

11   Q    All right.  So you learned that apparently as of

12   January 2nd, 2012, apparently there was a green light on

13   Mr. Govey by the members of this particular organization;

14   right?

01:55PM 15   A    Correct.

16   Q    Suggesting perhaps he was not in such good standing with

17   PENI?

18   A    Exactly.

19   Q    Or the Aryan Brotherhood?

01:55PM 20   A    Correct.

21   Q    Now if we were to go through each page of this report,

22   would you agree with me that there are any number of different

23   entries and discussions of Mr. Govey and his alleged

24   activities --

01:56PM 25   A    Correct.

```
 1    Q      -- inside the jail?

 2    A      Correct.

 3    Q      All right.  Based on your review, what do you recall in

 4    terms of what you learned from Mr. Fenstermacher about

01:56PM  5    Mr. Govey?

 6    A      I don't recall that.

 7    Q      Well, sir, didn't you review this very report in

 8    preparation for this hearing today?

 9    A      I did.

01:56PM 10    Q      Okay.  So what did you see about Mr. Govey in the report?

11    A      Well, what I can remember from reviewing was a lot of jail

12    politics.  That's pretty much what this whole report is about.

13    Q      It's about jail politics?

14    A      Yeah.

01:56PM 15    Q      Let's look at Page 4 up at the top.  Kite No. 4, do you

16    see that, December 6, 2011?

17    A      I do.

18    Q      And you're describing a kite that apparently said "F

19    Joey," meaning Mr. Govey?

01:57PM 20    A      Correct.

21    Q      So some other member is saying, you know, "F you" about

22    Mr. Joey?

23    A      Correct.

24    Q      All right.  The very next kite, No. 5, describes more

01:57PM 25    kites involving Mr. Govey and politics with the PENI group?
```

**UNITED STATES DISTRICT COURT**

```
        1   A      Correct.

        2   Q      And then to be fair, there's other kites like on Page 7,

        3   December 18, 2011, okay?

        4   A      Okay.

01:57PM 5   Q      What does kite No. 2 describe?

        6   A      It describes someone wanting to assault someone.

        7   Q      And Mr. Govey's involved in that as well?

        8   A      It just says about Govey that he was politicking behind

        9   people's backs and claiming non-active PENI, but it's a fake

01:58PM 10  front.

        11  Q      Okay.  The next page, Page 8, December 19, 2011,

        12  describes Fenstermacher telling you about a handcuff key;

        13  right?

        14  A      Correct.

01:59PM 15  Q      That at least according to Mr. Fenstermacher, he received

        16  from Mr. Govey, right?

        17  A      Correct.

        18  Q      So this isn't really so much politics as potentially a

        19  new offense; right?

01:59PM 20  A      Correct.

        21  Q      I mean it is an offense.  It's a criminal violation to

        22  have a handcuff key in jail; right?

        23  A      Correct.

        24  Q      So at least in this instance, Mr. Fenstermacher is

01:59PM 25  purporting to give you information on new charges that might be
```

1    brought against Mr. Govey; right?

2    A    Correct.

3    Q    And you described this morning that at some point the

4    deputy district attorney did file new charges against Mr. Govey

01:59PM 5    as a result of that handcuff key?

6    A    Correct.

7    Q    Now you also know about a gentleman named Frosio; right?

8    A    I do.

9    Q    You weren't his specific handler; right?

01:59PM 10    A    I didn't really talk to him at all.

11    Q    But you know who he is?

12    A    I know who he is.

13    Q    And you are aware that Mr. Frosio was part of a case

14    against Mr. Govey involving the alleged solicitation of a

01:59PM 15    murder; right?

16    A    I didn't know that.

17    Q    Have you ever learned that?

18    A    I just recently learned it.

19    Q    You didn't know that back in 2011, 2012?

02:00PM 20    A    Correct.

21    Q    Okay.  Now on Page 9, December 12, 2011, you describe a

22    kite sent from Mr. Govey to a different gentleman and

23    Mr. Fenstermacher; right?

24    A    Okay.  Yes, No. 1?

02:00PM 25    Q    Yeah.  Doesn't that describe Mr. Govey kind of letting

**UNITED STATES DISTRICT COURT**

1    people know that some people in the jail think that

2    Fenstermacher is a rat?

3    A    Correct.

4    Q    And Mr. Fenstermacher was a rat; right?

02:00PM  5    A    Correct.

6    Q    I mean, not to be pejorative, but he was an informant;

7    right?

8    A    Correct.

9    Q    And here's Mr. Govey in a kite saying that people kind of

02:00PM  10   think that that's what's going on?

11   A    Right.

12   Q    Now that's a problem for a special handling deputy if one

13   of their informants is outed as an informant, isn't it?

14   A    Could be.

02:01PM  15   Q    That person could be in jeopardy?

16   A    Could be.

17   Q    You, as a special handling deputy, have a responsibility

18   not to let your informants get hurt inside the jail; right?

19   A    Correct.

02:01PM  20   Q    So if Mr. Govey is potentially outing an informant of

21   yours, that could cause you problems, yes?

22   A    It could.

23   Q    Once Mr. Fenstermacher was put on the main line, was he

24   moved again?

02:01PM  25   A    I don't know.

**UNITED STATES DISTRICT COURT**

```
 1    Q    Where would you look to remember?  How would you find out

 2    if you wanted to go figure out where Mr. Fenstermacher was

 3    moved?

 4    A    Someone would have to get a housing roster.

 5    Q    Housing roster?

 6    A    Uh-huh.

 7    Q    Would the housing roster reflect why somebody was moved?

 8    A    No.

 9    Q    Would there be any documents anywhere that would reflect

10    why Mr. Fenstermacher was moved?

11    A    Maybe in the TRED.

12    Q    Anything else?

13    A    Huh-uh.

14    Q    That's a "no"?

15    A    No.  Sorry.

16    Q    So this morning you were asked a series of questions

17    about whether you communicated with Mr. Govey when you were at

18    Theo Lacy; right?

19    A    Correct.

20    Q    And I think you said -- this morning you said "no,"

21    didn't you?  Or you did say, "I don't remember"?

22    A    I think I was -- I don't recall.

23    Q    Okay.

24    A    But, I mean, what do you mean by "communicate"?

25    Q    Well, I was just asking what you testified to this
```

02:01PM 5
02:02PM 10
02:02PM 15
02:02PM 20
02:02PM 25

**UNITED STATES DISTRICT COURT**

1    morning.

2    A    Well, all right.  I don't recall.

3    Q    All right.  But we agree that you have reviewed any

4    number of kites regarding Mr. Govey from the time that you were

02:02PM 5    a special handling deputy; right?

6    A    Correct.

7    Q    And apparently some kites actually from Mr. Govey; is

8    that right?

9    A    Correct.

02:03PM 10    Q    And you listened to Mr. Govey's voice on the phone?

11    A    Not recently.

12    Q    Well, when you were special handling deputy, you did?

13    A    Correct.

14    Q    I'm going to jump forward quickly to June of 2017.  That

02:03PM 15    was the arrest in this case; right?

16    A    Yep.

17    Q    Okay.  Now --

18    A    Wait.  June -- okay, yeah, June 6.

19    Q    Of 2017?

02:03PM 20    A    Yes, sir.

21    Q    Okay.  There were ten different people detained during

22    this -- what you described as a probation search; right?

23    A    Correct.

24    Q    Mr. Govey, who was arrested?

02:03PM 25    A    Correct.

1    Q    And nine other people who were there at the house that

2    same day?

3    A    Correct.

4    Q    One of the persons owned the house; right?

02:03PM  5    A    Correct.

6    Q    Vincent Forbes?

7    A    Correct.

8    Q    And then there were a number of different persons that

9    apparently were either staying there or happened to be there at

02:04PM 10    the time of your probation search; right?

11    A    Yes.

12    Q    Now of those ten people, how many did you arrest?

13    A    I think there was for sure two.

14    Q    Mr. Govey was one?

02:04PM 15    A    Uh-huh.

16    Q    And who was the other one?

17    A    I would have to look at his name.  I don't know how to say

18    it right.  It starts with an "A."

19    Q    And did you arrest the person whose name starts with an

02:04PM 20    "A" for some sort of probation or parole violation or an

21    outstanding warrant?  Or was it for what you found that day

22    during the search?

23    A    It was for resisting arrest, I think.

24    Q    So there was some sort of altercation during the actual

02:04PM 25    search?

1    A    Correct.

2    Q    Okay.  I mean, he threw a punch at one of you guys or

3    something like that, or at least resisted a detention?

4    A    Yeah.  I wasn't in the room so I can't say what happened.

02:04PM 5    Q    Okay.

6    A    It was resisting arrest.

7    Q    Okay.  So with the exception of the person who apparently

8    had an altercation or resisting incident, the only other person

9    who was arrested was Joseph Govey?

02:05PM 10    A    I think so.

11    Q    To your knowledge and memory, no one else was arrested

12    for the narcotics that were found in the southeast bedroom?

13    A    No.

14    Q    And no one else in that home was arrested for the

02:05PM 15    potential evidence of counterfeiting currency that was found in

16    the house that day; right?

17    A    No.

18    Q    Now you and Officer Beeman, Investigator Beeman, I think

19    you told us this morning, questioned each of the ten people

02:05PM 20    that were there that day; right?

21    A    Correct.

22    Q    In fact, you recorded your conversations with them?

23    A    Correct.

24    Q    Did you question the other nine people who were there

02:05PM 25    about the drugs that were found?

**UNITED STATES DISTRICT COURT**

A    I believe I did.  But I might have asked them -- I'd have

to listen to the recordings.

Q    You don't recall as you sit here?

A    Yeah.

02:06PM 5    Q    Just general law enforcement practice, wouldn't you want

to sort of find out what all of the occupants of a home know or

don't know about contraband that's found there?

A    Yeah, correct.

Q    It would be good police practice to either tie people to

02:06PM 10   contraband that's found or exclude them as potential suspects?

A    Correct.

Q    So do you think you're probably following good police

practice, ask each of the other nine what they knew about the

drugs that were found?

02:06PM 15   A    I asked them where they lived and what rooms were theirs,

and they denied all the rooms.

Q    Did you ask the other nine people what they knew about

the counterfeit evidence that was found?

A    I don't recall.

02:06PM 20   Q    Well, is it your testimony that you just asked them

"Which bedroom is yours?"

A    I know -- I'm pretty sure I asked them every single one

who lives here and what bedrooms are theirs to establish who --

what belongs to who.

02:07PM 25   Q    Do you have any reason to think that a person who didn't

```
 1   claim one of the bedrooms might still have something to do

 2   with, for example, the counterfeit bills found within them?

 3   A    I could.

 4   Q    So did you ask to find out?

 5   A    I don't recall.

 6   Q    Would it have been good police practice to ask these

 7   other people about the counterfeit evidence that was found in

 8   the room?

 9   A    Yes.

10   Q    Would it have been less good police practice to not ask

11   them about the counterfeit found in the room at all?

12   A    I don't know.

13   Q    Now you said that you were assigned -- you were asked

14   some questions about the particular gangs that you were

15   assigned to presently in your position?

16   A    Correct.

17   Q    Or at least that you were assigned to as of June 2017;

18   right?

19   A    Correct.

20   Q    And because you told us that you were generally in the

21   north gang unit; right?

22   A    Correct.

23   Q    I'm not -- probably saying it not quite right.

24   A    No, you're right.

25   Q    The north gang unit?
```

02:07PM 5
02:07PM 10
02:07PM 15
02:07PM 20
02:08PM 25

```
 1   A    Yes.

 2   Q    All right.  And the specific gangs you said are Big

 3   Stanton?

 4   A    Back then it was El Modena in Orange and La Colonia.  I

 5   just got Big Stanton a couple weeks ago.

 6   Q    Okay.  So back in June of 2017, it was the other two that

 7   you said, La Colonia and --

 8   A    And our east side, which would be VML (sic).

 9   Q    Fair to say that each of those three, Big Stanton and the

10   other two you named are Hispanic street gangs?

11   A    Correct.

12   Q    None of them are white -- ethnically white gangs?

13   A    Correct.

14   Q    Okay.  So you weren't specifically assigned to any white

15   gangs back in June of 2017?

16   A    Correct.

17   Q    And yet there you are doing a probation search at this

18   address, Edithia; right?

19   A    Correct.

20   Q    Which you testified this morning is known to you and

21   other Orange County deputies as a, quote-unquote, "crash pad"

22   for people with ties to white-tight organizations; right?

23   A    Correct.

24   Q    So why are you participating in this probation search for

25   gangs that you don't work?
```

02:08PM (lines 5, 10, 15, 20)
02:09PM (line 25)

**UNITED STATES DISTRICT COURT**

1   A    Because I'm part of the gang team and my partner was in

2   charge, so I'm going to go back him up.

3   Q    Who's your partner?

4   A    Gallivan.

02:09PM 5   Q    Okay.  And that wasn't like a one-off thing in this case,

6   was it?

7   A    No, that's general practice.  We all work -- we all work

8   together, and we all go to probation checks together and --

9   regardless of what gang it's assigned to.

02:09PM 10   Q    So the gang unit is the gang unit; right?

11   A    Correct.

12   Q    So these questions about, you know, you work Big Stanton

13   and this gang doesn't really have anything to do with whether

14   you would be helping to investigate a white gang; right?

02:09PM 15   A    Well, I'm assigned to those so I take all that for my

16   duties.  And if needed, I can step up to any of my other

17   partner's duties.

18   Q    I thought I just heard you say you all go together when

19   someone does a probation check.

02:10PM 20   A    Whoever is available.

21   Q    Okay.  Deputy Larson, you're the one that recommended

22   certain charges after the arrest in this case; right?

23   A    Correct.

24   Q    You recommended possession with intent to sell the

02:10PM 25   methamphetamine that was found?

```
  1    A      Correct.

  2    Q      As well as certain counterfeit charges?

  3    A      Correct.

  4    Q      You also recommended a gang enhancement?

02:10PM  5    A      I did.

  6    Q      Even though that's white-type gangs not the one assigned

  7    to you; correct?

  8    A      Correct.  My partner was going to be the expert.

  9    Q      Okay.  So did he tell you to recommend that, or did

02:10PM 10    you -- did you do that of your own accord?

 11    A      No, we were told to do it.

 12    Q      Who told you to do it?

 13    A      Gallivan.

 14    Q      And the case was referred to the Orange County District

02:11PM 15    Attorney's Office for prosecution; correct?

 16    A      Correct.

 17    Q      In fact, you know it was filed in the Orange County

 18    District Attorney's Office?

 19    A      Correct.

02:11PM 20    Q      It was filed in Superior Court?

 21    A      Correct.

 22    Q      Now at some point you were made aware that Mr. Govey was

 23    going to be arrested on a federal warrant; right?

 24    A      Correct.

02:11PM 25    Q      That the case was going to be brought over to be
```

```
 1   prosecuted federally?

 2   A    Correct.

 3   Q    For the exact same things that you found in June of '17?

 4   A    Correct.

 5   Q    It's not like there was new evidence or something that

 6   happened that made it a federal case; right?

 7   A    Correct.

 8   Q    So asking just your understanding, why did it suddenly

 9   become a federal case?

10          MR. MARRETT:  Objection.  Calls for speculation.

11          THE COURT:  What you were told or what you became

12   aware of, sir.

13          THE WITNESS:  I technically don't know how cases go

14   from state to federal.  I'm just aware that that's what

15   happened.

16   Q    BY MR. SCOTT:  The question more specifically is, what

17   were you told or what did you understand about why it was

18   transferred over to federal?

19   A    I wasn't told anything.

20   Q    It just happened one day?

21   A    Correct.

22   Q    Okay.  You were present for an interview that took place

23   with this informant, Mr. Fenstermacher, back in early 2012 with

24   the District Attorney's Office, do you remember that?

25   A    Correct.
```

02:11PM 5
02:11PM 10
02:11PM 15
02:12PM 20
02:12PM 25

**UNITED STATES DISTRICT COURT**

| | | |
|---|---|---|
| | 1 | Q      And Investigator Beeman was also there? |
| | 2 | A      Correct. |
| | 3 | Q      You were there? |
| | 4 | A      Correct. |
| 02:12PM | 5 | Q      Deputy District Attorney Mendelson was there? |
| | 6 | A      Correct. |
| | 7 | Q      And the reason that you were all there was because |
| | 8 | Mr. Fenstermacher was giving some information on a -- about a |
| | 9 | case that the deputy district attorney was involved in; right? |
| 02:13PM | 10 | A      I thought it was a proffer. |
| | 11 | Q      Okay.  Well, what's your understanding of what a proffer |
| | 12 | is? |
| | 13 | A      I understood it as that an inmate would give whatever |
| | 14 | information they could with their defense attorney, their -- |
| 02:13PM | 15 | everyone present.  Pretty much a debrief. |
| | 16 | Q      Okay.  Now do you see Exhibit F in front of you? |
| | 17 | A      Yes. |
| | 18 | Q      Do you recognize it as a transcript? |
| | 19 | A      It is. |
| 02:13PM | 20 | Q      A transcript of an interview with Jason Fenstermacher? |
| | 21 | A      It is. |
| | 22 | Q      All right.  Have you ever seen this document before? |
| | 23 | A      I haven't. |
| | 24 | Q      Okay.  Just looking at the first couple pages of it, do |
| 02:13PM | 25 | you recognize it generally from what you can tell as a |

```
 1  transcript of this January 2012 debrief that we were just

 2  describing?  And take your time to look at it.  I'm not going

 3  to -- I'm just trying to get you oriented to the document.

 4  A    It's pretty big.

 5  Q    And I'm not trying to kind of get you to, you know,

 6  endorse every single page of it.  Just in the interest of time,

 7  I'm just trying to -- by having you look at the first couple

 8  pages, does that kind of jog your memory that, yeah, this at

 9  least appears to be consistent with your memory of this

10  interview with Mr. Fenstermacher in the District Attorney's

11  Office and Investigator Beeman?

12  A    Correct.

13  Q    Okay.  So according -- apparently -- well,

14  Mr. Fenstermacher was there obviously; right?

15  A    Correct.

16  Q    You remember that independently that obviously he was at

17  the Fenstermacher meeting; right?

18  A    Correct.

19  Q    And Investigator Beeman was there; right?

20  A    Correct.

21  Q    Now Beeman was not in the special handling unit, though,

22  was he?

23  A    No.

24  Q    You were yourself?

25  A    Correct.
```

**UNITED STATES DISTRICT COURT**

Q    Do I assume correctly that you were at this debrief for

proffer because Mr. Fenstermacher was sort of your informant

for lack of a better word?

A    No.

Q    You weren't Mr. Fenstermacher's handler?

A    What do you mean by "handler"?

Q    Well, you tell me.  When there's an informant, isn't

there a particular deputy or officer that's kind of in charge

of managing their cooperation?

A    Today I would say where I work right now, I would consider

myself a handler if I had an informant.

Q    Like out in the street?

A    Yes.

Q    Okay.  Well, by whatever name you want to call it, were

you sort of the special handling deputy who was associated or

supervising Mr. Fenstermacher's efforts there in the jail?

A    I think we all were.

Q    As a team?

A    Yeah.

Q    Okay.  Why were you specifically at this meeting, then?

A    Because every time that we conduct interviews with anyone,

we have to maintain the security of the jail.  So I would go to

interviews with every agency that asked for an interview.  If I

was on duty, we would go to the interview room and sit in

there.

```
 1   Q    Okay.  What's your understanding of why Investigator
 2   Beeman was present in this interview?
 3   A    Probably because he specializes in whites.
 4   Q    Alleged white gang members?
 5   A    Correct.
 6   Q    How long has Investigator Beeman, in your words,
 7   specialized in whites?
 8              MR. MARRETT:  Objection.  Calls for speculation.
 9              THE COURT:  If you know, sir.
10              THE WITNESS:  I don't know.
11   Q    BY MR. SCOTT:  But he was back in 2012?
12   A    Yes.
13   Q    All right.  Do you have an independent memory, not word
14   for word, but do you remember generally this debrief that
15   Mr. Fenstermacher gave to Deputy District Attorney Mendelson,
16   Investigator Beeman and the others that were there?
17   A    I don't.
18   Q    You remember nothing about it?
19   A    No.
20   Q    You remember it happened?
21   A    I know it happened.
22   Q    Do you recall or does it jog your memory whether
23   Mr. Fenstermacher shared with the deputy district attorney and
24   with Investigator Beeman that Mr. Govey was, quote-unquote, "in
25   a hat"?
```

02:16PM (line 5)
02:16PM (line 10)
02:17PM (line 15)
02:17PM (line 20)
02:17PM (line 25)

151

```
 1   A     I don't recall.
 2   Q     Now you know what I mean when I say somebody is "in a
 3   hat?
 4   A     I do.
 5   Q     That's jail or prison slang for somebody who's been
 6   targeted to be killed by a gang; right?
 7   A     Green light.
 8   Q     It's the same thing as a green light?
 9   A     Correct.
10   Q     Although doesn't "in the hat" suggest it's more serious,
11   like more on the killing end of the spectrum than just the
12   beating end of the spectrum?
13   A     I wouldn't be able to say "yes" or "no" to that.  I don't
14   know.
15   Q     Okay.  If you were to -- if I were to share certain
16   portions of the transcript that you admittedly were present
17   for, do you think that might jog your memory of certain things
18   that were said that day?
19   A     It could.
20   Q     Let's go to Page 29 and 30, then.
21   A     All right.
22   Q     You see towards the bottom of Page 29 Mr. Fenstermacher
23   is describing a kite?
24   A     Yep.
25   Q     Sent to various white inmates, Mr. Hardcastle, somebody
```

Timestamps: 02:17PM (5), 02:18PM (10), 02:18PM (15), 02:18PM (20), 02:18PM (25)

```
 1    with the moniker of Whiskey regarding Mr. Govey?

 2    A    Correct.

 3    Q    According to Mr. Fenstermacher, the word was that

 4    Mr. Govey was to be killed?

 5            MR. MARRETT:  Objection to the extent he's trying to

 6    refresh the witness's recollection.  I'm not sure if he's

 7    asking him if he remembers this now or if he is asking him to

 8    verify the statements.

 9            THE COURT:  Overruled.

10    Q    BY MR. SCOTT:  You see where I'm reading from?

11    A    Yeah.

12    Q    Okay.  And then at the top of Page 30, Mr. Fenstermacher

13    says -- or Investigator Beeman asked him "Killed?"

14         And then Mr. Fenstermacher said "Killed."

15         And Beeman said "Really?"

16         And Fenstermacher said "Yes.  Not stabbed, killed."  Do

17    you see where I'm reading from?

18    A    I see that.

19    Q    Is it starting to come back to you that Mr. Fenstermacher

20    shared the fact that Mr. Govey was supposed to be killed

21    essentially on-site by other white gang members?

22    A    I don't recall that day.  Obviously it was sad, but I

23    don't recall.

24    Q    Well, you also agree that based on the kites that you and

25    I reviewed in your own report, that that's consistent with what
```

02:19PM (line 5)
02:19PM (line 10)
02:19PM (line 15)
02:19PM (line 20)
02:20PM (line 25)

**UNITED STATES DISTRICT COURT**

1    those kites said too; right?

2    A    Correct.

3    Q    I mean, you apparently at one point had in your hand

4    kites suggesting that Mr. Govey was green lighted?

02:20PM 5    A    Correct.

6    Q    In the hat.

7    A    Green lighted.

8    Q    All right.  Apparently subject to being killed?

9    A    Correct.

02:20PM 10   Q    Now to put it mildly, the fact that an inmate is green

11   lighted by other members of his -- of a particular organization

12   suggests that they're not in good standing with that

13   organization; right?

14   A    Correct.

02:20PM 15   Q    It states the obvious, but it's hard to say that somebody

16   is a member in good standing of the Aryan Brotherhood if the

17   Aryan Brotherhood has green lighted them; correct?

18   A    Correct.

19   Q    Okay.  Do you know whether in 2012 the District

02:21PM 20   Attorney's Office was pursuing a gang allegation against

21   Mr. Govey?

22   A    I don't know.

23   Q    Do you know whether Mr. Govey was being charged with

24   performing acts for the benefit of PENI or the Aryan

02:21PM 25   Brotherhood?

```
 1    A    I don't know.

 2    Q    Do you know whether this evidence that you gathered from

 3    kites and that apparently Mr. Fenstermacher had repeated to the

 4    District Attorney's Office, whether that was ever disclosed to

02:21PM  5    defense attorneys?  Do you know one way or the other?

 6    A    I don't know.

 7    Q    Did you ever receive a list of alleged PENI members from

 8    Mr. Fenstermacher?

 9    A    I don't recall.

02:22PM 10    Q    Didn't he indicate that he was going to endeavor to

11    provide you a list of people that were active?

12    A    Was that during this debrief?

13    Q    I can tell you that it was, but do you remember?

14    A    I don't remember.

02:22PM 15    Q    I think you also referenced it in your report as well.

16    A    I don't remember.

17    Q    Where would you go to look if you wanted to find out

18    whether Mr. Fenstermacher had ever provided you with a list of

19    active PENI numbers?

02:22PM 20    A    If he provided me with that, it would have been in the

21    same folder where the kites were.

22    Q    Whatever happened to that folder where the kites and

23    other notes from Mr. Fenstermacher --

24    A    I booked all the kites into evidence, and the rest of the

02:22PM 25    folder was left behind.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q    Okay.  Hold on.  You said the kites were booked into
 2   evidence?
 3   A    Correct.
 4   Q    And you said the rest of the folder was left behind?
 5   A    Whatever was in it.  I don't know if there was anything in
 6   it.
 7   Q    Well, what's the rest of the folder?
 8   A    Just a manila folder with envelopes full of kites.
 9   Q    Okay.  But what you just said was that the kites were
10   booked into evidence and the rest of the folder was left
11   behind; right?
12   A    Yes.  So I don't know if anything was in the folder or
13   not.  It would have had his name on it.
14   Q    When you say "booked into evidence," you mean like at the
15   Orange County Sheriff's Department?
16   A    Yep.  I think my report says that.
17   Q    Okay.  When you book something into evidence, you have to
18   associate it with a case number; right?
19   A    Correct.
20   Q    In fact, your report bears a case number?
21   A    Yep.
22   Q    It's 12-something something; right?
23   A    Yep.
24   Q    And why don't we say it for the record, it's apparently
25   12-31832; right?
```

**UNITED STATES DISTRICT COURT**

```
 1    A    That's what it says on there.
 2    Q    If you want to, you can look at Exhibit E.  But I'll just
 3    tell you that's what the case number is.
 4    A    Okay.
```
02:23PM 5    Q    What does that case number pertain to though?  Is it a
```
 6    criminal case?  Or did you open that just for Mr. Fenstermacher
 7    or --
 8    A    No, it's just a simple case number for an information
 9    report that I wrote.  I didn't do anything or send it to anyone
```
02:24PM 10   or file any cases with it.
```
11    Q    So this Case No. 1231832 just pertains to
12    Mr. Fenstermacher?
13    A    No, just that report.
14    Q    Oh, just this report?
```
02:24PM 15   A    Correct.
```
16    Q    Would that have been the case number that you logged the
17    kites in under as well?
18    A    I don't understand.
19    Q    The kites apparently were put into the evidence lockup of
```
02:24PM 20   the Orange County Sheriff's Department?
```
21    A    Correct.
22    Q    And --
23    A    The kites for this report?
24    Q    I'm sorry?
```
02:24PM 25   A    The kites for this report?

**UNITED STATES DISTRICT COURT**

```
 1   Q     Right.

 2   A     Correct.

 3   Q     So when a piece of evidence is booked into the sheriff's

 4   department evidence lockup, do you put this case number on it,

 5   or is there a different case number identifier that's --

 6   A     No.  Same case number.

 7   Q     Okay.  That was the question.

 8         I think that's all I have.

 9             THE COURT:  Is there anything further?

10             MR. MARRETT:  Few things, Your Honor.

11         May I proceed, Your Honor?

12             THE COURT:  Please do.
```

**REDIRECT EXAMINATION**

```
14   BY MR. MARRETT:

15   Q     Deputy Larson, during cross-examination, counsel asked

16   you a lot of questions about interactions that you had with

17   Mr. Govey in the jails while you were a prowler and

18   classification and special handling.  During the time that you

19   were in the jail, approximately how many inmates did you

20   encounter?

21   A     Thousands.

22   Q     And when you worked in the jail, how long ago was that?

23   A     2013, about -- coming up on four, five years.

24   Q     And so when you say you encountered thousands of inmates,

25   how many did you talk to of those thousands of inmates?
```

**UNITED STATES DISTRICT COURT**

A      Probably over thousands.

Q      And do you remember every conversation you've had with those inmates?

A      No.

02:26PM  Q      Do you remember every conversation that you had with Defendant Govey?

A      No.

Q      How about interviews or proffer sessions that you've done with inmates, approximately how many of those would you say you
02:27PM  did during your time in the jail?

A      Probably just a couple, maybe a handful.  Three max. That's what I can remember.

Q      And do you remember the content of every one of those proffer sessions that you had?

02:27PM  A      No, because I would normally sit in the hallway and really not pay attention.

Q      So what was your purpose of being at these proffer sessions?

A      The security of the jail.

02:27PM  Q      During your time at the jail, in addition to the kites that defense counsel asked you about in the report that you wrote, how many other kites did you come across in your time as a deputy?

A      Hundreds.

02:28PM  Q      And how are kites passed in the jail?

A     Usually -- well, there's a few ways.  When day rooms are

open and everyone is out during the day room, they can slip

them through the doors from sector to sector.  Another way is

going to court and pass them in court.

02:28PM  Q     And what is your reason as a deputy in the special

handling unit for reading kites that you come across?

A     Well, a kite is a message intended that law enforcement

doesn't get, so it's probably sensitive.  Can have anything

from green light list, like we spoke about earlier, to a simple

02:28PM  message just saying "hi."

Q     And so why is it important for you -- let's say with the

green light list.  Why is it important as a deputy to review

and read notes?

A     Because if we have anyone in general population out on the

02:29PM  yard, we want to interview them to see if there was any issue

or what the issue was, and then we would have to move them to

total separation for the time being till the issue was being

cleared up.

Q     So is this for inmate security?

02:29PM  A     Yes.

Q     Is it also for deputy security?

A     It's for -- yes, that too, and it's for safety of the

inmate.

Q     And so when you review the kites and you interview the

02:29PM  inmate, if there's some potential danger to them, are they

1    moved?

2    A      Yes.

3    Q      And what type of movement might happen?  Different pods

4    or different segregation status?

02:29PM  5    A      It could be a different mod that -- any mod that has a

6    total separation, housing, where they're housed by themselves

7    and only come out by themselves.

8    Q      And I think you mentioned some other things that might be

9    in a kite.  What other type of things do you see as a deputy

02:30PM 10    when you're reading kites?

11    A      Roll calls.

12    Q      What's a roll call?

13    A      List of the entire population in a certain mod.  It lists

14    gang, where they're from, their moniker, their court date.

02:30PM 15    This is just in general.  That's pretty much the information

16    that's on it.

17    Q      Why would it be important for a special handling deputy

18    to have that information?

19    A      Well, it identifies if there's certain crimes with

02:30PM 20    monikers.

21    Q      Can you -- are there certain inmates that you can't house

22    together because of their gang affiliations?

23    A      Not -- that's kind of a weird question.  When inmates go

24    into the Orange County jail, they fall under the Mexican Mafia

02:30PM 25    for Hispanics umbrella, which they all have to get along,

unless they get authorization to sold (sic) each other.  So a

rival can be friends inside jail.

Q     Well, what about white race gang and somebody from the

Hispanic gang, would they -- could they be housed together?

02:31PM A     Yes.

Q     And would it be important -- would there be information

in these roll calls that would be important to determining

whether people need to be segregated?

A     Unless there was a note on the roll call, like the green

02:31PM light list.

Q     You said if there was a green light list?

A     If there's a green light list, that's the only -- I don't

know if I understand your question.

Q     So my question is, is there other information -- you said

02:31PM there's a green light list that might be a reason to separate

inmates?

A     Correct.

Q     Is there any other information in those kites that would

be important, whether it's politics information or things of

02:31PM that nature that would, as a special handling deputy, inform

you where people would be housed or segregated?

A     Yeah.  I mean, if somebody wrote a kite saying this dude's

going to get whacked, then obviously I have to move them.

Q     As a special handling deputy, you said that you listen to

02:32PM jail calls?

**UNITED STATES DISTRICT COURT**

```
 1    A      Correct.

 2    Q      What are some of the reasons that you listen to jail

 3    calls?

 4    A      For contraband coming in and out of the jail, security,

 5    for intelligence.

 6    Q      And are those things related to your duties in insuring

 7    the safety and security of the inmates in the facility?

 8    A      Correct.

 9    Q      And how about inmates, you said that you asked them about

10    their tattoos.  Is that something that you do as part of your

11    ordinary booking process at the jail?

12    A      Correct.

13    Q      And why is that part of the ordinary booking process?

14    A      It's just -- I don't know.  It's just the way that I was

15    taught.

16    Q      Is it important for you as a deputy classifying an inmate

17    to know what their tattoos mean and what potential gang

18    affiliations there are?

19    A      Correct.

20    Q      And why is that important?

21    A      Well, depends like if you're seeing a tattoo -- if you

22    recognize a tattoo that was maybe a PC gang or something like

23    that, you would have to separate them.  But they probably were

24    already PC at the time.

25    Q      What's a PC?
```

02:32PM 5
02:32PM 10
02:33PM 15
02:33PM 20
02:33PM 25

**UNITED STATES DISTRICT COURT**

```
 1    A      Protective custody.

 2    Q      What does that mean to you?

 3    A      They walked off the yard or is now on disregard.  So

 4    they -- or they're done with politics and -- it's a blue band

 5    is what they call it.

 6    Q      So somebody who's done with jail politics or done with

 7    gang politics might get a blue band in jail?

 8    A      Correct.

 9    Q      And that informs you as a deputy they need to be housed

10    differently?

11    A      Correct.

12    Q      And you mentioned before that Defendant Govey was a red

13    band?

14    A      Correct.

15    Q      What is a red band again?

16    A      Ad seg or administration segregation.

17    Q      Why would somebody get a red band?

18    A      Just could be from his history of violence or violence

19    against deputies.  Mainly his criminal history.

20    Q      You were asked about the -- some of the kites in the

21    interview that -- the proffer session that you had been

22    involved with with Mr. Fenstermacher, and the defense attorney

23    had asked you some questions about Mr. Govey's standing with

24    the Aryan Brotherhood or PENI.  Do you recall his questions?

25    A      Correct.
```

02:33PM 5
02:33PM 10
02:33PM 15
02:34PM 20
02:34PM 25

**UNITED STATES DISTRICT COURT**

```
 1   Q     Are the Aryan Brotherhood and PENI the same gang?

 2   A     No.

 3   Q     What's the difference to your understanding?

 4   A     The Aryan Brotherhood is a prison gang, and PENI is a

 5   street, and they pretty much fall under the Aryan Brotherhood

 6   who runs everything.

 7   Q     Are you personally aware of Mr. Govey ever renouncing his

 8   gang membership in Public Enemy Number 1?

 9   A     No.

10   Q     Now one of the kites that you were asked about referenced

11   a handcuff key.  Do you recall that testimony?

12   A     Correct.

13   Q     Now the handcuff key case that you were involved in with

14   the District Attorney's Office, that handcuff key was found by

15   a deputy; is that right?

16   A     Correct.

17   Q     So is that a different handcuff key than what you're

18   referencing in the report?

19   A     I believe so.

20   Q     And the case that you reported to the DA, that wasn't

21   based on the information that you received from Jason

22   Fenstermacher?

23   A     No, it's a separate incident.  And I just wrote a

24   follow-up to that deputy's case.

25   Q     Now you were asked some follow-up questions about the
```

**UNITED STATES DISTRICT COURT**

1    June 6, 2017 search at 1540 West Edithia.  Do you recall those

2    questions?

3    A    Yes.

4    Q    When you went to the house, did you see Defendant Govey

02:36PM  5    come out of the southeast bedroom?

6    A    I didn't.

7    Q    Did you see anybody else come out of that bedroom?

8    A    No.

9    Q    While you were there, did you see anybody else go into

02:36PM 10    that bedroom other than law enforcement?

11    A    No.

12         MR. MARRETT:  Just a moment, Your Honor.

13         THE COURT:  Very well.

14    Q    BY MR. MARRETT:  Deputy Larson, if somebody is in bad

02:37PM 15    standing with the Aryan Brotherhood, you said that's a prison

16    gang?

17    A    Yes.

18    Q    When they go out on the street can they still participate

19    in a street gang?

02:37PM 20    A    Depends if they get out of the hat.

21         MR. MARRETT:  I have nothing further, Your Honor.

22         THE COURT:  Very well.

23         Anything further?

24    ///

02:37PM 25    ///

**UNITED STATES DISTRICT COURT**

### RECROSS-EXAMINATION

BY MR. SCOTT:

Q     What does that mean, "Depends on if they get out of the hat"?

A     If they fix their issue with the organization.

Q     And if they cannot get out of the hat, then the answer to the question that was just asked of you is "no"; right?

A     Correct.

Q     "No," a person cannot participate in that street gang's activities if they're still in the hat; right?

A     Well, correct.  But Aryan Brotherhood is not PENI.

Q     But it sits atop PENI?

A     Correct.  Well, they run the prison system.

Q     And certainly the Aryan Brotherhood has influence outside the prison system as well?

A     Correct.

Q     All right.  During my examination of you a few moments ago, I was asking you if you remembered who told you to look at the Fenstermacher report; right?

A     Correct.

Q     It seemed like maybe you remembered at some point?

A     Yes.

Q     Okay.  Who was it?

A     Well, I remember that I looked because I was coming to trial with Govey, that I looked at all of my reports that had

Govey's name and to refresh my memory, because I don't know

what was going to be asked.

Q    Okay.  So nobody told you to look at that?

A    No.

02:38PM 5    Q    You testified just here on redirect a moment ago about a

green light list that's maintained by the jail.  Did I

understand that right?

A    Maintained by the jail?

Q    Yeah, maybe I misheard you.  You agreed that if you

02:39PM 10 understand that there's a green light against an inmate, you

have to take steps to protect that inmate; is that right?

A    Correct.

Q    You need to move them if that's what's required to

protect them?

02:39PM 15 A    Correct.

Q    And I thought I heard you say that there's some sort of

list of inmates that the jail is aware of being targeted?

A    Only from when we confiscate a roll call -- or sorry --

green light list.

02:39PM 20 Q    Okay.  So maybe I misheard you.  A green light list is

something that the gang potentially maintains?

A    Correct.

Q    And if that list comes to your attention as a special

handling deputy, you need to take steps to protect the people

02:39PM 25 on that list?

1    A    Exactly.

2    Q    Okay.  Now here there's no question that you received

3    physical kites suggesting that Mr. Govey was green lighted?

4    A    Correct.

02:39PM 5    Q    What, if anything, did you do to make sure that Mr. Govey

6    wasn't harmed?

7    A    I didn't have to do anything.  He was already in total

8    separation.

9    Q    When was Mr. Govey in total separation?

02:40PM 10   A    He's always total sep.

11   Q    So the entirety of the time that Mr. Govey was in -- I

12   was going to say in the Theo Lacy jail while you were a special

13   handling deputy, he was in total separation?

14   A    As far as I know.

02:40PM 15   Q    So based on that, you essentially did nothing additional

16   to make sure that he wasn't harmed as a result of being green

17   lighted?

18   A    He was in the same spot that every green lighter was in.

19   Q    Was that the reason he was in total separation?

02:40PM 20   A    No.

21   Q    Why was he in total separation?

22   A    I don't recall off the top of my head, but I can -- it's

23   probably because of his history in the red band.  Red bands can

24   only program together and that has to be approved.  Usually

02:41PM 25   they're by themselves.

UNITED STATES DISTRICT COURT

Q     You said, "I don't recall, but I could" -- were you about

to say you could check something --

A     No.

Q     -- to find out?

A     I mean, you could check the TRED probably.  The TRED might

have it.  But I don't know if it would be in there or not.

Q     So, for example, could we go back and obtain the TREDs

for Mr. Fenstermacher today?

A     Sure.

Q     Same with Mr. Govey?

A     I mean, I don't know how you do it, but you probably

could.

Q     Okay.  And same with essentially the people who were at

the Orange County jail in recent memory?

A     Sure.

Q     This is a computerized system?

A     Correct.

          MR. SCOTT:  Okay.  That's all I have.  Thank you.

          THE COURT:  Very well.  Sir, you can step down.

You're excused for right now.

     Ms. Corrigan, are you going to stick around?

          MS. CORRIGAN:  I think I should just in case there

are any issues that come up.  But I think I'll discuss it

elsewhere.

          THE COURT:  Is there any further issues we need to

discuss this afternoon?

MR. MARRETT:  I don't know if there's any further issues, Your Honor.  If the Court would indulge me, I'd like to at least argue what we've heard today what I think shows Deputy Larson is going to testify at trial.  And I think in my view of his testimony today, I think it resolves a lot of the issues that we talked about.  But I'd be happy to entertain questions the Court has.

THE COURT:  I'm not sure I follow you in that regard.  Certainly if there's anything you want to submit in writing on your position, but my position stands is that Deputy Larson can be asked questions about the informant scandal, and he can be asked specifically why he invoked his Fifth Amendment earlier.  And now he's willing to testify about that.

As far as the scope of how thorough Mr. Scott's going to get into that, my hope is that as a result of this hearing, Mr. Scott will now be able to reassess what exactly he wants to ask Deputy Larson about.  And to the extent he wants to get him to deny any involvement, that would be appropriate.  But I don't see the cross-examination being that lengthy.  And I'm nervous about trying to restrict its scope because I don't know what those lines would be.  And I think we'd spend more time arguing about it or taking objections outside the presence of the jury than it would be just to get him on and off the stand.

From what I heard today, it doesn't sound like he has
really any direct involvement in the informant scandal.  And
some of the other deputies may have more knowledge or
involvement or participation.

02:44PM  MR. MARRETT:  And I think, Your Honor, that brings
up one additional point is that at the Court's suggestion
between the break and the hearing here, I spoke with Mr. Scott
about what documents he's looking for, what the basis is for
his good-faith belief that this Deputy Larson has engaged in --
02:44PM  what essentially he's alleging to be misconduct or obstruction
of justice or something else.  And, you know, frankly, I
mean -- and Mr. Scott may be able to go back and think about
some other documents that he's asking for, but I don't know
still what Mr. Scott believes is his basis or what those
02:45PM  factual -- what the facts are that support that good-faith
belief for the documents that I can go and search for at this
point.

THE COURT:  Nor do I.  But again, I can't
micromanage either side.  And to the extent you can work it
02:45PM  out, great.  To the extent you can identify with specificity
what the issues are and tee them up for me, certainly I'm here
to try to resolve them.  But I don't know what I can say to you
that I already haven't said, is Deputy Larson apparently is
going to be testifying.  He's going to talk about the search.
02:45PM  He's going to talk about what he found, what he did.  And then

1    on cross-examination Mr. Scott's going to ask him about, among

2    other things, his inconsistent position about not testifying

3    before and now testifying.

4         MR. MARRETT:  Thank you, Your Honor.  If you have

02:46PM  5    further questions, I'm happy --

6         THE COURT:  No, I don't.  It probably makes sense

7    that we get back together one more time before we actually

8    impanel the jury on the 30th.  If you could just give me a

9    moment to talk to Melissa to see what a good date would be, and

02:46PM 10   I'll run that by you, see if that works for everybody.

11        **(Court and clerk conferred off the record.)**

12        THE COURT:  Okay.  Either Wednesday or Thursday

13   afternoon next week.  I'm thinking about 2 o'clock.

14        MR. MARRETT:  Either time will work for the

02:47PM 15   government.

16        THE COURT:  Mr. Scott, is there a preference?

17        MR. SCOTT:  Wednesday the 24th would be better than

18   Friday, if that's good with the Court.

19        THE COURT:  Okay.  Wednesday, January 24th, at

02:47PM 20   2 o'clock.  We'll have the final, final pretrial conference.

21        I looked at the proposed revision to the jury instruction,

22   Mr. Marrett, that you submitted on counterfeiting, deleting

23   that one sentence, and I agree, that should be deleted.  I sent

24   out a proposed final instructions, both before the trial,

02:48PM 25   during the trial, and after the trial.  And if you have any

further comments, revisions or issues, please raise them.

I think all the rulings on the motions in limine are now clear.  I'm sticking with my tentative on the prior convictions.  But if something happens at trial where, Mr. Marrett, you think now that is a disputed issue about knowledge that it was meth, then you can, outside the presence of the jury, raise the issue with me.  I think the record's clear of my reasoning, and I think the record's also clear, Mr. Marrett, on your disagreement with that.

As far as -- and then the only, I think, outstanding motion, then, was the assertion of the Fifth Amendment, but I think that's clear that I'm going to allow that, but not that I appointed Ms. Corrigan.

There's something that came up here.  I don't know if I'm concerned about it or the parties are concerned, but there was a lot of talk about gang affiliation, particularly Mr. Govey's gang affiliation.  Given the defense theory, is it going to -- is this something that you realize is going to come up or allegations of it coming up and that's what you want?

MR. SCOTT:  I realize that it may be difficult to put on the case that I want to put on in terms of bias and the whole jail thing without getting into that.

THE COURT:  Right.

MR. SCOTT:  So I see the opening-the-door issue, and I'll just have to give that some thought if I'm comfortable

```
 1    doing that.  But as I stand here, I agree I can't do one
 2    without the other.
 3              THE COURT:  That's the way I was seeing it.  And in
 4    fairness to the government, if that's your position, then if
 5    Mr. Marrett wants to raise some of those issues on direct
 6    examination of any other witnesses, he's got to be allowed to
 7    do it just for efficiency and fairness.  But if there's any
 8    change in strategy in that regard, Mr. Scott, I'd ask you let
 9    Mr. Marrett know and then let me know as well.  But I'm going
10    to assume limited gang references will come in.
11         I don't want to hear the history of the Aryan Brotherhood,
12    and I don't want to hear the history of any other white
13    supremacist gang and the type of crimes they commit.  That's
14    not relevant.  But the fact that it is a gang, it seems to me
15    to be relevant.
16         If we need any jury instruction to make sure that the jury
17    does not use that for improper character purposes, we can do
18    that.  And I don't know if, Mr. Scott, that's going to require
19    also an issue that I need to deal with on jury selection.
20              MR. SCOTT:  Okay.  I'll give the entire issue some
21    thought, Your Honor.
22              THE COURT:  All right.  Then maybe we can talk about
23    that when we get together next Wednesday.
24              MR. SCOTT:  Very good.
25              MR. MARRETT:  I think that would be appropriate,
```

 1   Your Honor.

 2          THE COURT:  Okay.  I don't have any other issues.

 3          MS. CORRIGAN:  I have one thing for housekeeping

 4   purposes, Your Honor.

02:51PM 5          THE COURT:  Yes, Ms. Corrigan.

 6          MS. CORRIGAN:  I don't know if I understood the

 7   Court earlier, but just for purposes of clarification of the

 8   record, I think I understood the Court to indicate that the

 9   Court believed that the Ortiz case had been dismissed as a

02:52PM 10  result of my client's invocation.  And I have communicated with

11   Rudy Lowenstein, who was a defense lawyer in that case on a

12   number of occasions, but particularly today after I -- what I

13   believe I heard the Court say, I confirmed with him that, in

14   fact, the invocation did not cause a dismissal in that case,

02:52PM 15  that there was other issues that caused a mistrial later down.

16          And that case, just so the Court's aware, is now

17   potentially going into a fourth trial.  It has nothing to do

18   with anything that -- it had nothing to do with my client's

19   involvement.  I don't know if I misheard the Court, but I

02:52PM 20  wanted to make sure that was clear.

21          THE COURT:  You didn't mishear me.  There had to be

22   some consequences; right?  Was testimony stricken?

23          MS. CORRIGAN:  I don't know.  But at least from my

24   discussions with Mr. Lowenstein, it appears that it had no

02:52PM 25  effect.  But I can clarify that if the Court wants further

1   clarification.

2            THE COURT:  I think that would be helpful.  I

3   appreciate it.

4        Mr. Scott, do you know off the top of your head were the

02:53PM 5   charges dismissed because of the deputies, including

6   Deputy Larson's invocation or was just testimony stricken?

7            MR. SCOTT:  I don't know off the top of my head.

8            MS. CORRIGAN:  I'll find out.  I have good

9   communication with Mr. Lowenstein.  And he's been very helpful

02:53PM 10   on this.

11        And then, also, Ms. Renee Garcia and, also, the DA

12   involved in the other case, both indicated to me that the

13   reason for the dismissal had -- my client never testified in

14   that matter.  And so there was no issue relative to my client

02:53PM 15   in any invocation in that case.  So I just wanted to make sure

16   that we're all working with the same facts.

17            THE COURT:  No, I appreciate it.  I would also

18   appreciate, though, a follow-up because I want to know exactly

19   what the consequences were.  There had to be some consequences.

02:53PM 20            MS. CORRIGAN:  In the Ortiz matter, yes.  And I will

21   inquire, and I know that that matter at that time was in front

22   of Judge King, and I'll make an inquiry with Mr. Lowenstein,

23   and hopefully I'll get more clear information on that.

24            THE COURT:  Good enough.

02:54PM 25        All right.  See everybody next week.

1          THE COURTROOM DEPUTY:  All rise.

2          **(Proceedings concluded at 2:54 p.m.)**

3                        --oOo--

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1            *CERTIFICATE OF OFFICIAL REPORTER*

2

3    COUNTY OF LOS ANGELES   )
                            )
4    STATE OF CALIFORNIA     )

5              I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, in and for the United States District Court for

7    the Central District of California, do hereby certify that

8    pursuant to Section 753, Title 28, United States Code that the

9    foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14

15   *Date:  January 26, 2018*

16

17

18

19                              */S/ DEBBIE HINO-SPAAN_*

20                              *Debbie Hino-Spaan, CSR No. 7953*
                                *Federal Official Court Reporter*
21

22

23

24

25