**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA — SOUTHERN DIVISION**

**HONORABLE CORMAC J. CARNEY, U.S. DISTRICT JUDGE**

UNITED STATES OF AMERICA,          )
                                   )
                 Plaintiff,        )   **CERTIFIED TRANSCRIPT**
                                   )
        vs.                        )
                                   )   Case No.
JOSEPH MARTIN GOVEY,               )   8:17-cr-00103-CJC-1
                                   )
                 Defendant.        )
_____)

REPORTER'S TRANSCRIPT OF

DAUBERT HEARING

TUESDAY, FEBRUARY 13, 2018

9:01 A.M.

SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST FOURTH STREET, ROOM 1-191
SANTA ANA, CALIFORNIA 92701-4516
dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

```
1                      APPEARANCES OF COUNSEL:

2

3    FOR THE PLAINTIFF:

4            NICOLA T. HANNA
             United States Attorney
5            BY:  BRADLEY MARRETT
                  GINA KONG
6                 Assistant United States Attorneys
             United States Courthouse
7            411 West Fourth Street
             Suite 8000
8            Santa Ana, California 92701
             (714) 338-3561
9
     FOR THE DEFENDANT:
10
             SCOTT TRIAL LAWYERS APC
11           BY:  TIMOTHY A. SCOTT, ESQ.
             1350 Columbia Street
12           Suite 600
             San Diego, California 92101
13           (619) 794-0451

14

15

16

17

18

19

20

21

22

23

24

25
```

UNITED STATES DISTRICT COURT

1      **SANTA ANA, CALIFORNIA; TUESDAY, FEBRUARY 13, 2018**

2                      **9:01 A.M.**

3                       **- - -**

4          THE COURTROOM DEPUTY:  Calling Item No. 1,

09:01AM 5   SACR 17-103, United States of America versus Govey.

6      Counsel, please state your appearances.

7          MR. MARRETT:  Good morning, Your Honor.  Brad

8   Marrett for the United States.  And with me at counsel table is

9   AUSA Gina Kong.

09:01AM 10         THE COURT:  Good morning.

11         MS. KONG:  Good morning.

12         MR. SCOTT:  Good morning, Your Honor.  Tim Scott for

13   Mr. Govey.  He's present before the Court in custody.  We also

14   have a proposed defense expert, Arthur Fayer, who is outside in

09:01AM 15   the witness room.

16         THE COURT:  Very well.  Good morning, gentlemen.

17      All right.  Well, the purpose of this hearing is to have a

18   *Daubert* hearing on both sides' experts, so why don't we start

19   with government's expert first.

09:01AM 20         MR. MARRETT:  That's fine, Your Honor.

21         MR. SCOTT:  Actually, if I can, and if the answer is

22   "no," the answer is "no."  Mr. Fayer is in the middle of a

23   murder trial in San Diego, they went dark this morning.  I told

24   him I would ask if we could put him on first so he can make his

09:02AM 25   way back down there.  If that's not okay, that's not okay, but

1    I thought I would at least ask if that's all the same to the

2    Court and the government.

3              THE COURT:  Any objection from the government?

4              MR. MARRETT:  I haven't spoken with Special Agent

09:02AM  5    Paris to see if he has time commitments.  I know we anticipated

6    with him going this morning.  I just need to check with him to

7    make sure that there's no conflict.

8              THE COURT:  That sounds fair.  Thank you.

9              **(Pause in proceedings.)**

09:02AM 10             MR. MARRETT:  I have no objection to that.

11             THE COURT:  All right.  Before we do get started,

12    again, I'm keeping a very open mind, but just going to be

13    candid and transparent, I wasn't convinced that we needed this

14    hearing for both sides' experts.  I was hoping and optimistic

09:03AM 15    that both sides would work it out.  It would just seem to me in

16    this type of case that it would be fair game for both sides'

17    experts to talk about the practices and methods of drug

18    distribution including packaging and quantities.  Quantities

19    that are typically -- that they've seen in distribution and

09:03AM 20    then what they think is, in their opinion based on their

21    experience, an amount for personal use.

22        It would be inappropriate, like I indicated before, for

23    the expert to start summarizing the evidence that was seized in

24    this case, and to indicate whether Mr. Govey had the drugs for

09:04AM 25    personal use or for distribution.  That's an issue for the

jury.  And I just think it's an improper opinion, not helpful

to the trier of fact under 702.  It's not the 704 ultimate

issue that I'm talking about.

So I think the case law is pretty clear that it would be a

denial of due process to prevent either side from putting on

that type of expert testimony.  The average citizen juror is

not familiar with distribution practices and methods.  And if

someone has extensive experience in this area, I don't see why

a problem is here.  If -- and so I -- I'm a little bit at a

loss why we're having this hearing for both experts in this

type of case.

MR. MARRETT:  Well, and -- take the lectern, Your

Honor.

So my understanding is that the scope of the testimony

that you're suggesting, I think, is what certainly we're

contemplating our expert testifying to.  And I would anticipate

the defense expert to be sort of the reciprocal testimony of

that.  And I think obviously what's good for the government is

good for the defense as far as the proper opinions being

offered.

My understanding is that the defense's objection is to --

and I'm sure Mr. Scott will correct me if I'm wrong -- is to a

particular piece of testimony that has come up in prior cases

where the government's expert has testified.  I don't

anticipate offering that testimony here, and so I don't think

1    that there is an issue really to be addressed.

2        There is one issue with the defense expert that I did want

3    to explore, at least raise with the Court, and that is the

4    defense expert has, in my understanding, testified previously

09:06AM  5    to when he's talking about personal use, amounts of users to

6    this bell curve analogy, and I think that the bell curve

7    analogy, that language is unduly prejudicial, because my

8    understanding is there hasn't been actually statistical

9    analysis done or any rigorous modeling of data.

09:06AM 10        And so to suggest to the jury that there is this bell

11    curve, which I think would resonate with the jurors' minds in

12    some sort of statistical analysis would be unfairly

13    prejudicial.  I think he can testify to all the same opinions

14    but without sort of putting it into this box of suggesting to

09:06AM 15    the jury that there's an underlying statistical analysis.

16        That's the only concern that I wanted to raise with the

17    defense expert's testimony.  And I'll let Mr. Scott address

18    that if perhaps that's not the testimony that he's anticipating

19    the expert to offer.

09:07AM 20            THE COURT:  All right.  Mr. Scott.

21            MR. SCOTT:  Your Honor, I might just be fast if we

22    just put it on quickly.  I'm mindful of the Court's guidance,

23    and I think we can do this fairly efficiently.

24            THE COURT:  Okay.  All right.  Let's do it.

09:07AM 25            MR. SCOTT:  Thank you, Your Honor.


**UNITED STATES DISTRICT COURT**

1        MR. MARRETT:  Are you going to allow defense counsel

2   do some direct examination first, Your Honor?

3        THE COURT:  Yes.

4      Hello, sir.  If you could please come forward.  Stand

09:07AM 5   right by the court reporter for a moment.  We're going to

6   administer an oath and have you take the witness stand.

7           **ARTHUR FAYER, DEFENSE WITNESS, WAS SWORN**

8        THE COURT:  For purposes of efficiency, Mr. Scott,

9   if you want to lead, particularly on qualifications and

09:08AM 10   experience.

11        MR. SCOTT:  Excellent, Your Honor.  Thank you.

12        THE COURTROOM DEPUTY:  Please state your appearance

13   and spell your last name.

14        THE WITNESS:  Arthur Fayer, F-a-y-e-r.

09:08AM 15             **DIRECT EXAMINATION**

16   BY MR. SCOTT:

17   Q    Mr. Fayer, good morning.

18   A    Good morning.

19   Q    I will accept the Court's invitation and ask a couple

09:08AM 20   leading questions to get us started here.

21      I asked you whether you would be willing to serve as a

22   potential expert in this case and to render an opinion or

23   opinions in this case; is that right?

24   A    Correct.

09:08AM 25   Q    And specifically I was interested in you coming to court

1 and sharing with the judge and potentially the jury based on

2 your own training and experience the sort of ranges of daily

3 consumption of methamphetamine that one might expect to see

4 from regular methamphetamine users.  Is that a fair summary of

09:09AM 5 what you and I have discussed thus far?

6 A    Yes, sir, it is.

7 Q    Okay.  So just in the name of efficiency, why don't I ask

8 you first for that opinion, and then I will circle back and ask

9 you about your background and qualifications.  Does that make

09:09AM 10 sense?

11 A    Yes.

12 Q    Okay.  So what would your testimony be in -- again, in

13 summary, as to what we could expect to see in terms of the

14 personal consumption of methamphetamine for regular users?

09:09AM 15 A    It ranges widely.  We're all different.  And typically we,

16 in the profession of substance abuse treatment, we talk about a

17 first-time user, an experimental user, recreational user, a

18 sort of habitual user, problem user, and then what we use to

19 call addicted or substance dependent person.

09:10AM 20      So in that range it starts off -- I'm sorry, in my

21 experience, nowadays if you've never done it before, there's a

22 unit of dosage called a party dose, a tenth of a gram that's

23 commonly seen as a small, thin line, for example, if they're

24 inhaling it.  And it ranges from that experimental or

09:10AM 25 first-time user to, in my experience, as much as a half an

1    ounce as much as -- that would be 14 grams, 14.15 grams in a

2    day, that much.

3         An average user, if you look at a bell curve, whether

4    there's two tails at either end, bell curve is describing a

09:11AM 5    picture of a bell, in the middle it would be nowadays one to

6    two, two-and-a-half, maybe more grams per day.  And the heavy

7    user would be closer to three to five grams on average

8    nowadays.  And the outliers weigh on the far end of heavy using

9    half an ounce or such enormous numbers.

09:11AM 10   Q    All right.  Well, let me stop you there and unpack that

11   briefly.  You described kind of on one end of the spectrum what

12   you described as a recreational or first-time user; is that

13   right?

14   A    Correct.

09:11AM 15   Q    So when you -- and I think you mentioned a number

16   one-tenth of a gram?

17   A    Correct.

18   Q    So if I understood your testimony, one-tenth of a gram

19   could be a single dosage or single use of methamphetamine, but

09:12AM 20   that would typically be in the context of kind of a first-time

21   experimenter or first-time recreational user of

22   methamphetamine.  Did I state that correctly?

23   A    Correct.

24   Q    Now you said a half ounce or using up to 14 grams a day.

09:12AM 25   Is it fair to say that that, at least in your experience, is

1    not common, is not sort of the average use that you have seen?

2    A    It is not.

3    Q    So that's kind of like an extreme -- I don't know about

4    extreme, but that's kind of an outlier, that's on the other end

09:12AM 5    of the spectrum in terms of daily use?

6    A    Correct.  Yeah, I would say it is extreme, yes.

7    Q    Okay.  So just so we're clear, I want you to envision

8    sort of a regular user, somebody who's using methamphetamine on

9    even a daily basis.  What did you say as sort of the -- you

09:12AM 10   would expect to be typical or average, if there is such a

11   thing, daily usage of methamphetamine, assuming somebody is

12   using it every day?

13   A    Right, which many users do consume daily.  It's the nature

14   of the drug.  If one is good, two is better.  So it leads, of

09:13AM 15   course, to what we would call addictive behavior using daily.

16   And I earlier said one to three grams, but closer to two grams

17   for a regular user who's still appearing to function in

18   society, two to three grams, in that area.

19   Q    That's each day?

09:13AM 20   A    Yeah.  Every day, over and over.

21   Q    And what about setting aside sort of the half ounce

22   outlier, what about a thoroughly addicted heavy user, what

23   would be sort of the heartland of daily use in that scenario?

24   A    Three to five grams per day.

09:13AM 25   Q    Okay.  Now you used the term "bell curve" and kind of

**UNITED STATES DISTRICT COURT**

```
  1    traced that with your hands and, you know, show the tail on

  2    each side.  Just to be clear, have you done some sort of formal

  3    statistical analysis in terms of, you know, daily usage, or are

  4    you using the term "bell curve" more colloquially to talk about

09:14AM 5    the heartland of your experience?

  6    A     Colloquially I would say in the sense that for this

  7    discussion -- or in my professional career, I've not done that

  8    statistical analysis.  Although I did take Statistics 1 in

  9    college.

09:14AM 10   Q     Okay.  So you're not trying to dress this up with any

 11    particular extra scientific filigree, this is more just trying

 12    to communicate kind of the averages that you've seen in your

 13    experience?

 14    A     Yes.

09:14AM 15   Q     Okay.  So let's circle back around now.  What can you

 16    share with us in terms of your work experience that enables you

 17    to share the opinions that you've just shared with us this

 18    morning?

 19    A     I've been working in the field -- for some reason I'm

09:14AM 20   sliding out of this chair -- I've been working in the field for

 21    close to 31 years.  Coming up on 31 years.

 22    Q     When you say "the field," what field is that?

 23    A     Substance abuse, dependence treatment and --

 24    Q     All right.

09:15AM 25   A     -- program management.
```

**UNITED STATES DISTRICT COURT**

1    Q    So going back 31 years, what was -- how did you break

2    into the field so to speak?

3    A    I actually broke into it by accident.  I was on probation,

4    and I was asked by my probation officer to come and share my

09:15AM  5    experience from early recovery with one of her probationers,

6    and that continued for a while.  And it led me to going to

7    school.  And while I was in school, I continued working with

8    the San Francisco Probation Department unpaid.  I graduated

9    and -- no, I didn't complete.  That was a master's program.  I

09:15AM  10   did not complete it.  I got hired by UCSD.  I was headhunted, I

11   guess, is the phrase we use.

12        So I moved here, San Diego, 30 -- just about 31-and-a-half

13   years ago and went to work.  No, 30 years ago, 30-and-a-half

14   years ago, I'm sorry, to work at UCSD as a counselor,

09:16AM  15   drug/alcohol counselor for students in trouble and as an

16   instructor in their DUI program.  So that was my first job.

17   Q    So let me stop you there.  I was going to get into this

18   later, but you sort of touched upon it.

19        Do you have some personal experience in your life that

09:16AM  20   helps to inform and color your views and opinions that you're

21   offering here?

22   A    I do.  I'm a recovering addict, the way we phrase it.  I'm

23   coming up on 34 years clean and sober if I make it in March,

24   another -- a little less than a month from now.  And I became

09:16AM  25   addicted first to marijuana while I was in law school, last

UNITED STATES DISTRICT COURT

1    year of law school and never took the bar exam.  And continued

2    using drugs, continuing -- as we all know about the continuing

3    increasing use and drug behavior for 20 -- just under 24 years.

4    And I was arrested and convicted in San Francisco in 1984,

09:17AM  5    June.  I've been clean since March of '84, clean and sober.

6    That led to my recovery.  But the addiction was severe and long

7    lasting.

8    Q    And as your experiences both in addiction and in

9    sobriety, is that part of your experience in this matter?

09:17AM 10    A    Correct.  It would, therefore, be over 50 years.

11    Q    All right.  So you said after you became sober, you

12    obtained a job at UCSD as a drug and alcohol counselor?

13    A    Correct.

14    Q    Is that for the college students that were either at risk

09:17AM 15    or suffering from substance abuse issues?

16    A    Correct.

17    Q    All right.  Take us forward, then, after UCSD in terms of

18    work experience.

19    A    I then went to work after a few years at McAlister

09:17AM 20    Institute, which is a nonprofit large contractor with San Diego

21    County and Napa County now providing -- and that company

22    provides drug -- all kinds of drug services, rehab services.  I

23    was hired to run the -- back then it was called drug diversion

24    program, now it's called DEOJ, Deferred Entry of Judgment.

09:18AM 25    It's present here in Orange County.  It's a state-mandated

1    program; all counties provide some form of it.

2        And I ran that program for 23 years, 23-and-a-half years

3    as well -- during the time of working for this large company, I

4    became the director of their education.  I provided all kinds

09:18AM 5    of education and training services.  And finally, the last

6    three years was their director of all outpatient services.

7    Q    In the context both of working at UCSD, McAlister, and as

8    executive for the Deferred Entry of Judgment program, various

9    court systems, did you do interviews with people who used drugs

09:19AM 10   on a daily basis?

11   A    I did.  I did about an hour-and-a-half-long assessment of

12   each person that entered the DEOJ program over those 23 years

13   that I was there.

14   Q    As you sit here today, do you have a rough estimate of

09:19AM 15   how many people suffering from substance abuse that you've

16   interviewed over the years about their usage and habits?

17   A    Well, I'd have to draw out the words "suffering from

18   substance abuse" because some of those participants weren't

19   suffering, they were in the wrong place at the wrong time,

09:19AM 20   which is what everybody says.  But a few were -- I would say

21   over 16,000, 17,000 individuals.  We got about 800 new people a

22   year, and I did all of the assessments.

23   Q    All right.  Do you have any certifications as it comes to

24   drug and alcohol counseling or expertise?

09:20AM 25   A    Yes.  In 1990 I completed the first year that it was

1    provided, CAS, called certification addiction specialist.  It's

2    now been subsumed by what's called KDAC.  But I never -- I

3    didn't have to do the extra work when that came, the governing

4    body.  But CAS is what I am, which is a certified addiction

09:20AM  5    specialist.  It was a six-month program provided by San Diego

6    County.

7    Q    And do you provide training or education to other people

8    who are seeking to get certified in a similar fashion?

9    A    I do.  I provide trainings in several formats.  Mostly I'm

09:20AM 10    hired by the County for drug/alcohol training for people

11    working in the profession of substance abuse.  I also provide

12    CEU training credits for psychopharmacology and a few other

13    areas of the substance abuse spectrum.

14    Q    Have you been admitted and accepted as an expert witness

09:21AM 15    in courts of law before?

16    A    Yes, sir.

17    Q    Rough estimate of how many times you've been recognized

18    as an expert?

19    A    About 150 times.

09:21AM 20    Q    All right.  And that would include both state and federal

21    court on some occasions?

22    A    Yes, I've been in federal court three times.

23    Q    Okay.  That's all I have at this time.  Thank you.

24         THE COURT:  Very well.

09:21AM 25         Mr. Marrett.

1          MR. MARRETT:  May I proceed, Your Honor?

2          THE COURT:  You may.

3                    **CROSS-EXAMINATION**

4    BY MR. MARRETT:

09:21AM 5    Q    Good morning, sir.

6    A    Good morning.

7    Q    You testified that you had interviewed I think it was

8    between 16- and 17,000 addicts over the course of your career;

9    is that right?

09:22AM 10   A    No.  I said that in terms of the course of employment with

11   McAlister Institute.  I've done many more since then and at the

12   same time, but not with that employment.

13   Q    Okay.  Well, about how many have you done?

14   A    I'm sorry?

09:22AM 15   Q    About how many interviews have you done?

16   A    Over 20,000.

17   Q    And have those all been interviews of methamphetamine

18   users?

19   A    No.

09:22AM 20   Q    Approximately how many were of methamphetamine users?

21   A    Hard to say exactly, of course.  Half, maybe a bit more.

22   It's the dominant drug of choice in the field that I'm in.

23   Q    And so when you interview these folks, you interview them

24   for about an hour and a half.  Is that what you said?

09:23AM 25   A    Yes, sir.

**UNITED STATES DISTRICT COURT**

```
 1   Q    And you're interviewing them about their use habits?
 2   A    It's part of it, yes.
 3   Q    What other topics do you cover in that interview?
 4   A    Sorry?
 5   Q    What other topics do you cover in that interview?
 6   A    Thank you.  It's basically eight different topics covering
 7   their legal history, their substance abuse history, their
 8   family life, education, employment, medical, psychological
 9   issues that may or may not be present.
10   Q    And so one of those topics is their use habits; right?
11   A    Yes, sir.
12   Q    And so of the -- about half of the 20,000 people that you
13   interviewed, how many of them told you that they used about a
14   gram a day?
15   A    I don't have that number.  But I would say that that would
16   be close to a majority or close to it, maybe 40 percent.  But I
17   really -- I can't tell you accurately.
18   Q    So you testified that a tenth of a gram is a party hit?
19   A    Yes, I did.
20   Q    How many of the folks that you interviewed told you that
21   they used a tenth of a gram a day?
22   A    Almost none.  They all said more than that.  Typically I
23   did have some folks that were new to the experience of that
24   drug and they would do that tenth of a gram, and then they
25   would do several more in the course of a party.
```

**UNITED STATES DISTRICT COURT**

```
 1   Q    In the course of a party, is that what you said?
 2   A    In the course -- yeah, during the time that evening, for
 3   example.
 4   Q    Okay.  And the people that were using the tenth of a gram
 5   a day, were you seeing them in the context of these drug
 6   diversion programs?
 7   A    Yes, sir.
 8   Q    So they had been arrested; is that right?
 9   A    That's correct.
10   Q    And what was the typical quantity that they had been
11   arrested with?
12   A    None sometimes.  You mean in possession?
13   Q    Well, they must -- I assume they were arrested for
14   possession?
15   A    No.  They could be arrested for under the influence.
16   Q    Okay.  So how many of the people arrested for possession
17   had a tenth of a gram quantity on them?
18   A    None.
19   Q    How many of the people arrested had a gram quantity on
20   them?
21   A    That much or more.  But I -- all of them.  I don't have
22   exact number if they're arrested for possession.  And a few
23   were arrested for possession -- more than a few for sale where
24   the Court has allowed them to take the program in the
25   furtherance of justice.
```

09:24AM (line 5)
09:24AM (line 10)
09:25AM (line 15)
09:25AM (line 20)
09:25AM (line 25)

**UNITED STATES DISTRICT COURT**

Q    Now you mentioned somebody or sort of the extreme cases
of somebody that uses a half ounce a day; is that what you
said?

A    I did.

Q    How many individuals did you interview that used over a
half an ounce?

A    Over 100.

Q    So 100 people that you interviewed told you they used a
half ounce a day?

A    Yes.  And I join that number, again, without codification
or serious research, which would be semi-impossible since my
experience goes back so many years.  We shred all documents
after four years.  But a fair number.  And I didn't even
mention there's a few and maybe five that have said an ounce a
day, which I find impossible, but...

Q    So when somebody tells you that they use a half an ounce
or ounce a day, do you do anything to confirm what they're
telling you in these interviews?

A    Good question.  I don't in the sense that I question their
statement and ask them how they have the time to do that, and
they explain their method of use.  As they're using, they spill
it.  They tend to describe the behavior which strikes true to
me as someone that once did the same drug myself.

Q    But there's nothing you do to confirm what they're
telling you?

```
 1   A    There's no way to do that.

 2   Q    Well, do you interview any of their friends?

 3   A    I'm sorry?

 4   Q    Do you interview any friends or family members?

 5   A    No, not -- I do sometimes nowadays in my current career

 6   since I retired from McAlister Institute.  I do sometimes, but

 7   I don't talk to them about the quantity of use.  I do sometimes

 8   talk to family, yes.

 9   Q    So now, sir, you testified that you were using the term

10   "bell curve" to describe the distribution of individual users;

11   is that right?

12   A    Yes.

13   Q    And you said you were using that term colloquially; is

14   that right?

15   A    I'm sorry?

16   Q    You're using it colloquially?

17   A    Correct.  I use it much as if you and I were reading a

18   magazine and there were pie charts or bell curves in the story,

19   just to try to get a visual picture of what we're talking

20   about.

21   Q    You said that you took Statistics 1 in college?

22   A    I did.

23   Q    So you understand, then, sir, that a bell curve is a

24   specific type of a statistical distribution; right?

25   A    I do.
```

**UNITED STATES DISTRICT COURT**

1    Q    And in the middle of the bell curve there's an average;

2    is that right?

3    A    I'm sorry?

4    Q    There's an average that falls in the middle of the bell

09:27AM 5    curve?

6    A    A mean, yes.

7    Q    A mean?

8    A    We use the word "mean."

9    Q    And there's a concept called standard deviation?

09:28AM 10   A    There is.

11   Q    And can you describe what that is.

12   A    Well, it's the amount of error that's statistically

13   determined that's likely in describing the average that would

14   be a deviation from that number .3 percent, .5 percent, that

09:28AM 15   sort of thing.  It is a term that I've run into all the time

16   but have never really used.

17   Q    And there's also the concept of variance; right?

18   A    There's what?

19   Q    The concept of variance.

09:28AM 20   A    I don't know it offhand.  I know what the word means.

21   Things vary from this to that, but I don't know the concept or

22   remember it.

23   Q    I'm just going to put this up on the screen.  Do you have

24   that in front of you on the screen?  Can you see that on your

09:28AM 25   screen?

**UNITED STATES DISTRICT COURT**

1    A    I see the screen.

2    Q    Okay.  And so I'll represent to you that I actually got

3    this from Wikipedia this morning, but this is charting out

4    different types of bell curves.  Do you see that there?

09:29AM  5    A    I do.

6    Q    And the difference in these bell curves, the shape of the

7    bell curve is because there's a variance?

8    A    I'll have to accept that.  You're already ahead of me.  I

9    see all the standard deviation numbers on the sides and -- but

09:29AM  10   again, you're taking me into the expertise that I don't have.

11   I'll accept that those are different types of bell curves

12   because certainly the picture is different.  And I don't know

13   the word "variance" as it applies.  I don't see it here.

14   Q    Well, sir, the -- this up here --

09:29AM  15   A    I see that.

16   Q    -- this number, so that symbol there is for the standard

17   distribution.  And when you square it, that's the variance

18   number.  So these are just -- these are applying bell curves

19   with different variances.  Do you see that?

09:29AM  20   A    I do.

21   Q    And you see how the shape of the bell curves are

22   different?

23   A    I do.

24   Q    And so you haven't done a statistical analysis of the

09:29AM  25   interviews that you've done to determine which shape of the

UNITED STATES DISTRICT COURT

1    bell curve might apply to your analyses?

2    A     Correct.

3    Q     And now when you talk about standard deviation, we're

4    talking about how far away from the mean somebody would be;

09:30AM  5    right?

6             MR. SCOTT:  I'll just object as relevance and 403.

7             THE COURT:  For purposes of this hearing, I'll

8    overrule it, but I understand your objection.  Because

9    Mr. Marrett, he's -- when he used the word "bell curve" in his

09:30AM 10    opinion, it wasn't in the statistical sense, it was just trying

11    to communicate the concept of outliers and typically what the

12    range is.  So I'm not sure the statistical examination is

13    relevant to be perfectly frank.

14             MR. MARRETT:  I understand, Your Honor.  I suppose

09:30AM 15    that's my point is that he's testified to this bell curve

16    distribution.  That has a connotation -- statistical

17    connotation.  And my understanding, there hasn't been any

18    statistical analysis of these users.

19             THE COURT:  Your understanding is correct.  And he

09:31AM 20    said that on direct as well as on cross.  So now you're taking

21    him through statistical analysis that he didn't do, and that's

22    not what he was saying.

23             MR. MARRETT:  Okay.  I will move on, then.

24    Q     Now, sir, as part of your testimony in this case, are you

09:31AM 25    going to be testifying about the indicia that might be present

```
 1   if somebody is using methamphetamine personally versus somebody
 2   who's selling or distributing methamphetamine?
 3   A    It's up to the attorney to ask me those questions.  I
 4   don't know.
 5   Q    Well, sir, are there indicia that are present when
 6   somebody's distributing methamphetamine?
 7             MR. SCOTT:  I'll interpose, Your Honor.  For what
 8   it's worth, I will not elicit that testimony during his direct.
 9   So if -- I don't object if Mr. Marrett wants to ask those
10   questions, but I can represent to the Court and government that
11   that will not be part of the expert opinion that I'll be
12   offering.  I'm simply offering the amount of daily usage and
13   leaving it at that.
14             THE COURT:  You have that representation.
15             MR. MARRETT:  Well, I do want to ask a couple more
16   questions about this just for the purposes of this hearing.
17   Q    Because sir, when you say that somebody uses a gram a day
18   or three to five grams a day, you're doing that based on an
19   interview that you've done with that person; right?
20   A    Correct.
21   Q    And so everybody that you've interviewed, they're
22   different.  They use different amounts of methamphetamine;
23   right?
24   A    Correct.
25   Q    And somebody who's using a smaller amount of
```

**UNITED STATES DISTRICT COURT**

```
  1    methamphetamine -- strike that.
  2         In a given case, whether a person -- if you don't know by
  3    having interviewed the person what their daily use is, are
  4    there indicia that you would look to to determine whether
09:33AM 5  somebody has a quantity of methamphetamine for personal use or
  6    sales?
  7                   MR. SCOTT:  Object as vague and also relevance.
  8                   THE COURT:  Do you understand the question?
  9                   THE WITNESS:  No.  Could you repeat it, please.
09:33AM 10                  MR. MARRETT:  I'll break it down.
 11    Q    Sir, have you interviewed the defendant in this case?
 12    A    I have not.
 13    Q    So you haven't done the hour-and-a-half interview like
 14    you do with other individuals in your program?
09:33AM 15   A    Correct.
 16    Q    And so without having interviewed the defendant, do you
 17    know anything about the defendant's use habits?
 18    A    I do not.
 19    Q    And in a given case, if there's a quantity of
09:34AM 20   methamphetamine and you don't know the person's use habits, are
 21    there indicia that you would look to to determine whether that
 22    quantity is for personal use or distribution?
 23                   MR. SCOTT:  I'm going to object because that's not
 24    the opinions being offered.
09:34AM 25                  THE COURT:  Overruled for purposes of this hearing.
```

1          THE WITNESS:  So the last question was in a given

2     case if I haven't interviewed -- please repeat.  I'm sorry.

3     Q     BY MR. MARRETT:  Sure.  So in a given case, if you

4     haven't interviewed an individual, so you don't know from their

09:34AM 5     own words how much they use in a day, are there indicia that

6     you can look towards, objective factors, to inform you as to

7     how much they're using or whether they're not using at all, but

8     selling?

9     A     So if I'm up here testifying about intent to sell, for

09:35AM 10     example, I would be looking and would be able to find evidence,

11     let's say indicia, that might support a statement of quantity

12     of use.  If I'm not testifying about that issue, I wouldn't be

13     concerned with indicia of sales.  I wouldn't look into it.

14     Does that make sense?  It would depend on what I'm here for, I

09:35AM 15     guess.

16     Q     I understand.

17          And so I guess my question is, then, if you don't know

18     anything about this particular defendant, is there anything

19     you've looked at in this case to tell you how much the

09:35AM 20     defendant might be using on a daily basis?

21     A     You mean about our defendant here?

22     Q     About our defendant here.

23     A     I'm sorry?

24     Q     Yes, about this defendant.

09:35AM 25     A     No, I know nothing.

Q    And is there anything -- objective information you've
been provided by defense counsel that would provide a basis for
your opinion as to how much this particular defendant might be
using in a day?

09:36AM A    Nothing --

        MR. SCOTT:  I'll just object.  That misstates the
opinion, the premise of the question.

        THE COURT:  Sustained to the question, but I believe
he answered it.  He said "nothing."

09:36AM Q    BY MR. MARRETT:  Now somebody who's using three to five
grams a day, are they going to have physical manifestations of
their -- their drug addiction?

A    At times they will.  At times they will.

Q    And what would those physical manifestations, if they
09:36AM have them, what would they be?

A    Breaking out sores, behavioral indications, various --
really -- this is interesting.  In the past we would say --
there's a colloquial phrase, they're sucked up, very thin.
More and more of the clients that I'm seeing today are eating
09:37AM with this current methamphetamine that comes in from Mexico.
So weight, various appearances.  There's a phrase called "meth
mouth" where the teeth -- the methamphetamine prevents the
uptake of calcium into the body.  And for some, maybe ten
percent causes rapid deterioration of enamel.  So there is --
09:37AM and I mentioned sores, breaking out.  And jittery behavior,

1    gnashing of the teeth back and fourth called bruxism.  Those

2    could be -- but many who use that quantity do not display any

3    symptoms at all physically that you would observe.

4    Q    How about somebody using sort of the extreme, the half

09:37AM  5    ounce a day, are they exhibiting all those objective physical

6    manifestations?

7    A    Not all of them, no.  Unbelievably the few that have

8    actually told me one ounce did not display anything other than

9    fidgety behavior, I would say.  None of those -- there's only a

09:38AM 10    few that had the sores that I'm referring to.  There's been a

11    few, though, that do display them.  So again, we're all

12    different, so it's hard to pin it down to any one particular

13    type of display of noticeable symptomology.

14    Q    And have you reviewed the defendant's medical file or

09:38AM 15    anything to inform you as to whether he's ever displayed those

16    physical manifestations?

17    A    I have not.

18    Q    Now when you talk with the folks that you interview about

19    their use patterns, do you talk to them about how many days in

09:39AM 20    a row they might be using?

21    A    Yes.

22    Q    And so somebody using one gram a day or at least in sort

23    of the middle of your bell curve analysis, are they all using a

24    gram a day, or are some of them using a gram on Monday and then

09:39AM 25    not using again until the weekend?

UNITED STATES DISTRICT COURT

```
 1   A    Well, those folks in the middle tend to be regular users,
 2   virtually habitual users.  So they tend to be daily consumers
 3   of the drug.  But they also will take a weekend off, or there's
 4   a few that only do it on the weekends but still come under the
 5   understanding of a regular habitual user where the job keeps
 6   them from using, or family.  But then there's a two- or
 7   three-day period where they don't -- where they do use and
 8   don't sleep at all going to a run, as we say.
 9   Q    And how about people sort of on the other end of the bell
10   curve, the people towards the party hit, do they have a
11   different use habit?
12   A    Yes.
13   Q    And what is their use habit?
14   A    Occasional, serendipital (sic).  There happens to be
15   somewhere where there's drugs where they don't buy it, that
16   sort of thing.  In other words, they're not keeping it at home.
17   And what happens, of course, is there's a progression as comes
18   with all drugs, and they begin joining the regular users
19   typically.
20   Q    And in your analysis of what the average user is, have
21   you documented or recorded how many of the people are daily
22   users versus the weekend users?
23   A    No.  Not beyond my own observations and notes to myself
24   about what's been happening over the years.  Plus observing my
25   own using experience.
```

**UNITED STATES DISTRICT COURT**

1    Q      And in your own using experience, that's part of the

2    basis for your testimony; is that right?

3    A      That's part -- yes.

4    Q      And what was your experience, were you using daily?

09:41AM  5    A      No.

6    Q      What was your use pattern?

7    A      I was a little bit unusual, especially back then.

8    Typically I would purchase an ounce at a time.  And the day I

9    purchased it, I would use for the next few days, three, four

09:41AM 10    days.  And I would use, as I recall dimly, two, three grams a

11    day, and then I'd put it away and I wouldn't touch it for two,

12    three weeks.  Then I'd do it again until it was gone.  So I had

13    this very strange control.  I was able to stop.  And that was

14    my experience with that drug in the 24 years that I did that or

09:42AM 15    21 years that I did that drug.  It remained that way up until

16    the last four years, and then it was more daily.  It was daily.

17    Q      Now when you talk to people about their use habits, do

18    you also talk to them about their habits of where they keep

19    their drugs, where they store them or how much they carry on

09:43AM 20    them?

21    A      Only if it's relevant it comes up.  I mean, there's three

22    things you mentioned.  I do ask them if they travel with it or

23    if they keep it in a safe place and use it only at home or at

24    someplace that they use.  Those specific questions, we're more

09:43AM 25    concerned with how much they use, how they use it, how often

**UNITED STATES DISTRICT COURT**

```
 1    they use it.  Those are the basic questions.  And I don't ask
 2    them where they get it.  That's not my job.  But it does come
 3    up quite often, especially now.  I'm in San Diego County, and
 4    we're right on the border.  So that proximity aspect comes up
 5    all the time offered by the client.
 6    Q    So the person using a gram a day, when you've asked them
 7    whether they travel with it or they store it, what is the
 8    typical response?
 9    A    What is the question?
10    Q    For the person who's your average user using a gram a
11    day, when you've interviewed those folks and ask them whether
12    they travel with it or how they store it, what has been their
13    typical response?
14    A    I don't think I've ever asked anybody how you store it.
15    You mean like in a jar or a can or -- but in any case, aside
16    from that, the answers are varied as there are people in terms
17    of the answer, for example, "Do you travel?" or "Do you carry
18    it with you?"  Some do, some don't.  And the one-gram-a-day
19    person, they don't tend to carry it with them.  But the average
20    user today is probably a little greater than one gram a day.
21    Q    And does that person carry it with them, the person who's
22    using more than one gram a day?
23    A    The more they use, the more likely they are to carry the
24    drug, yes.
25              MR. MARRETT:  Can I just have a minute, Your Honor?
```

09:43AM  5
09:44AM 10
09:44AM 15
09:44AM 20
09:45AM 25

```
 1              THE COURT:  You may.
 2              (Counsel conferred off the record.)
 3              THE COURT:  Mr. Fayer, while we're waiting, what is
 4  the shelf life for meth?
 5              THE WITNESS:  In my opinion?
 6              THE COURT:  Yes.
 7              THE WITNESS:  Lifetime.  Doesn't go bad.  And if it
 8  does, you just do a little bit more, but it doesn't disappear
 9  at all.
10              MR. MARRETT:  I have nothing further, Your Honor.
11              THE COURT:  Very well.
12          Anything further?
13              MR. SCOTT:  No, sir.
14              THE COURT:  Sir, you can step down.  I appreciate
15  your time.
16              THE WITNESS:  Thank you, sir.
17              THE COURT:  Good morning, Agent.  Would you please
18  come forward.  Stand right by the court reporter.  We're going
19  to have you take an oath.
20              STEVEN PARIS, PLAINTIFF'S WITNESS, WAS SWORN
21              THE COURTROOM DEPUTY:  Please state your full name
22  and spell your last name for the record.
23              THE WITNESS:  Steven, S-t-e-v-e-n, Paris, P-a-r-i-s.
24              THE COURT:  Mr. Marrett, as it was for Mr. Fayer, if
25  you want to lead, just try to get to the opinions that you
```

09:45AM 5
09:46AM 10
09:46AM 15
09:47AM 20
09:47AM 25

```
  1  propose to offer at trial.  I think that would be more helpful
  2  than just a little few questions about his experience.
  3            MR. MARRETT:  Sure.  Thank you, Your Honor.
  4                      DIRECT EXAMINATION
  5  BY MR. MARRETT:
  6  Q    Special Agent Paris, in a given case, when you're
  7  analyzing the evidence, are there indicia that you look towards
  8  to see whether a particular quantity of methamphetamine is for
  9  distribution or for personal use?
 10  A    Yes.
 11  Q    And what are some of those indicia?
 12  A    Well, there's some quantities that are obviously not for
 13  personal use, but in quantities that could go either way.  I
 14  look at the totality of the circumstances.  So if they were
 15  packaged in a bunch of individual quantities, if there's
 16  similar quantities, that indicates they're for sale, if there's
 17  scales, packaging materials.  As opposed to personal use, I
 18  would expect to find pipes, needles, razor blades, items that
 19  indicate personal use.
 20  Q    And what is the -- sorry.  Strike that.
 21            Within the scale of drug distribution from a user all the
 22  way up to a wholesaler, what are some of the different roles
 23  that are played?
 24  A    Well, it could be multiple roles.  I mean, the drugs are
 25  made somewhere, so there's wholesale quantities and
```

09:47AM  5
09:48AM 10
09:48AM 15
09:48AM 20
09:48AM 25

**UNITED STATES DISTRICT COURT**

manufactured quantities, and then they have to be distributed

out to the street, and that could be in various levels.

There's bigger dealers that deal in multi-pound or kilogram

quantities.  And large organizations such as that would have

09:49AM  potentially transporters, people that protect it, man stash

houses, all the way down to lookouts on the street.  When

you're talking about street-level sales, less people are

involved to the point where it could be one person taking care

of multiple roles.

09:49AM  Q    So for the person who's the street-level retailer, what's

the range of quantities that you would expect them to have with

them for purposes of distribution?

Q    Well, that could vary, certainly.  The -- pretty much the

minimum sales quantity on the street is a tenth of a gram.  So

09:49AM  something like an ounce quantity could be a sales use; that's

280 sales units right there.

Q    Now, sir, you're a special agent with the DEA?

A    Yes.

Q    And how long have you been a special agent?

09:50AM  A    Approximately 26 years.

Q    And did you go to the DEA academy?

A    I did.

Q    And in addition to -- well, in the 26 years that you've

been a special agent, how many investigations or arrests have

09:50AM  you done?

```
 1   A     Well, on average, I'm involved in 80 to 100 investigations
 2   a year; and arrests, approximately 100 persons a year.  So
 3   casewise, definitely more than 2,000.  Investigations and
 4   arrests, approximately 2600.
 5   Q     And approximately how many of those would you say have
 6   been methamphetamine investigations?
 7   A     The large majority in this area, certainly methamphetamine
 8   is one of our most commonly investigated drug crimes.
 9   Q     And through the course of those investigations, have you
10   interviewed witnesses?
11   A     Yes.
12   Q     And have you interviewed the arrestees?
13   A     Yes.
14   Q     Have you interviewed cooperators?
15   A     Yes.
16   Q     Have you interviewed confidential informants?
17   A     Yes.
18   Q     Have you done surveillance operations?
19   A     Yes.
20   Q     Hand-to-hand transactions?
21   A     Yes, I have.
22   Q     Have you spoken with other law enforcement about
23   methamphetamine distribution cases?
24   A     Yes.
25   Q     And through those interviews and conversations, have you
```

09:50AM (line 5)
09:51AM (line 10)
09:51AM (line 15)
09:51AM (line 20)
09:51AM (line 25)

**UNITED STATES DISTRICT COURT**

 1    spoken with others or the people who are using about their use

 2    habits?

 3    A    Yes.

 4    Q    Have you also spoken with them about their distribution,

09:51AM 5    how they distribute their drugs?

 6    A    Yes.

 7    Q    Have you also received any additional training or

 8    certifications relating to methamphetamine?

 9    A    Yes.

09:51AM 10    Q    And what would those be?

 11    A    In addition to attending the DEA academy, which obviously

 12    is focused on drug law enforcement, I was also selected to

 13    attend a clandestine laboratory investigator school back in the

 14    early '90s.  Meth labs were prevalent in this area, and meth

09:52AM 15    lab or clandestine laboratory investigator school specifically

 16    had to do with manufacture and distribution of methamphetamine

 17    to the point where we learned how to make meth under the guide

 18    of a DEA chemist.  There's various methods in materials that

 19    can be used.

09:52AM 20        And, of course, over the 26 years we receive in-service

 21    training, attend training at various organizations such as the

 22    California Narcotic Officers' Association has conferences, and

 23    there's numerous organizations of that type, the California --

 24    I'm sorry -- the International Narcotic Interdiction --

09:52AM 25    officers -- Association.  There's constantly updates, new

methods, training bulletins that are frequently put out by my

organization.

Q    Do you also teach and train others?

A    I do.

09:53AM    Q    And for what organizations do you teach or train?

A    DEA puts on a variety of schools.  They put on a basic

narcotic officers school.  They put on schools for task force

officers, a bunch of different kinds of training.  I have

taught for DEA for numerous years and have taught for outside

09:53AM organizations such as the California Narcotic Officers'

Association in the past as well.

Q    Sir, as a special agent with the DEA, are you familiar

with the drug schedules?

A    Yes.

09:53AM    Q    And within which schedule does methamphetamine fall?

A    Schedule II.

Q    And what does it mean to be a Schedule II controlled

substance?

A    Means that there are some medical uses for that type of

09:53AM drug.

Q    And as a drug with some medical indication, does the DEA

or medical community subscribe a dosage amount to

methamphetamine?

A    Yes.

09:54AM    Q    And what is that amount?

```
 1   A     Well, I don't know about methamphetamine specifically, but
 2   amphetamine derivatives.  So one of the most common would be
 3   Adderall.  Adderall is an amphetamine-based product.  The
 4   dosage unit is approximately five milligrams.
 5   Q     Okay.  Sir, when you were testifying about sort of the
 6   small street distribution quantity of a tenth of a gram, is
 7   that opinion at all based on what the medical community or DEA
 8   considers to be a dosage amount?
 9   A     No.
10   Q     Is the tenth of a gram distribution quantity that you
11   talked about based on your training and experience?
12   A     Yes.
13              MR. MARRETT:  I have nothing further, Your Honor.
14              THE COURT:  All right.  Cross-examine, Mr. Scott.
15              MR. SCOTT:  Thank you, Your Honor.
16                        CROSS-EXAMINATION
17   BY MR. SCOTT:
18   Q     Good morning.
19   A     Good morning.
20   Q     So I'm trying to get a sense of what opinions you've been
21   asked to share with the jury in this case.
22   A     Sure.
23   Q     I heard the prosecutor ask you some questions this
24   morning about what you look to in terms of indicia, either of
25   sales or personal use; is that correct?
```

```
  1    A     Yes.
  2    Q     And you mentioned that if you're looking at potentially a
  3    sales case, you might see scales, for example?
  4    A     Yes.  It's common.
09:55AM  5    Q     Or individual packaging, individual bindles, things of
  6    that nature?
  7    A     That is also common.
  8    Q     Okay.  So I'll just ask you, have you been asked or are
  9    you planning to give opinions of that nature in this case?
09:55AM 10    A     I'm sorry.  I don't understand your question exactly.
 11    Q     Are you going to offer opinions like that in this case?
 12    A     If I'm asked to.  I mean, I'll answer the questions that I
 13    am asked.  I do not know what those questions are going to be
 14    specifically.
09:55AM 15    Q     Well, you were just asked about various roles in a
 16    particular -- I guess these are roles in a drug-trafficking
 17    organization; is that correct?
 18    A     Sure.
 19    Q     Does that mean "yes"?
09:55AM 20    A     Yes.
 21    Q     All right.  And to your knowledge, have you discussed
 22    discussing roles like that with the jury in this case?
 23    A     I do not specifically know anything about this case other
 24    than just general opinions that I'm going to be asked.
09:56AM 25    Q     Okay.  So I got pressed on this a little bit.  What are
```

**UNITED STATES DISTRICT COURT**

```
 1   the opinions that you're offering in this case?
 2   A    As far as I know, just general drug use or distribution,
 3   methods and commonalities.
 4   Q    And specifically what are those commonalities and methods
 5   that you're going to be opining in this case?
 6   A    I don't really know what to tell you.  I don't know the
 7   questions.
 8   Q    Well, okay.  Do you know whether you're going to be asked
 9   if the amount of methamphetamine in this case was for personal
10   use or was for distribution?
11   A    I'm assuming I will be asked to offer an opinion on that.
12   But again, I do not know if that is the question that will be
13   asked.
14   Q    All right.  Have you received any instruction on what you
15   are not going to be permitted to testify about?
16   A    No.
17   Q    Okay.  You were -- you were asked about an opinion about
18   a sales unit.
19   A    Yes.
20   Q    And what is that opinion?
21   A    Well, a tenth of a gram is -- tenth of a gram is pretty
22   much the smallest sales unit, and that is not based so much on
23   my opinion as it's documented, meaning various law enforcement
24   organizations, including mine, track and keep data on different
25   prices, impurities of narcotics for numerous reasons.  One
```

**UNITED STATES DISTRICT COURT**

1    would be for undercover operations to know about what the

2    approximate sales -- or I should say price impurity is at

3    certain levels.  But they also keep track of it for purposes of

4    is it supply and demand?  Is it going up and down?  Are they

09:58AM  5    making a difference in certain areas?  So a tenth a gram is

6    the minimal sales unit that is tracked.

7    Q    Let me stop you there.  Did I understand you to say that

8    it's -- that you yourself don't so much have an opinion on what

9    a minimum sales unit is?  This is more what either the DEA or

09:58AM  10    other narcotics law enforcement agencies say it is?

11    A    No, I'm saying that a tenth of a gram is a commonly known

12    minimum sales quantity.

13    Q    All right.  So when you were talking about DEA tracking

14    it and other organizations tracking it, you're talking about

09:58AM  15    what?

16    A    I'm talking about methamphetamine.

17    Q    Well, no.  My question is what are the sources or this

18    data that you're describing.

19    A    Oh, okay.  Well, undercover operations -- undercover

09:59AM  20    officers negotiate or actually make undercover purchases.

21    Items or quantities that are seized, they record what the

22    average price and purity is in certain areas.  And specifically

23    there's even -- they send officers out to make buys in certain

24    areas just to see what the price and purity is in those areas.

09:59AM  25    Q    So is this data written down somewhere?  Is there like a,

1    you know, a newsletter that you get on a monthly basis --

2    A    There is a database that --

3    Q    Excuse me, let me ask the question.

4    A    Oh, sorry.

09:59AM 5    Q    Is there a quarterly journal?  Or what source material

6    are you describing for this minimum sales dosage?

7    A    Well, there are several intelligence databases that can be

8    consulted.  Certainly DEA has their own.  And then there is a

9    regional clearinghouse that keeps data that's run by the State.

09:59AM 10   It records data in the counties in this Los Angeles area which

11   would include Orange, Riverside and San Bernardino, in addition

12   to Los Angeles County.

13   Q    How often -- how many times in your career have you seen

14   a tenth of a milligram individual bindles packaged up for sale?

10:00AM 15   A    Tenth of a milligram or tenth of a gram?

16   Q    I'm sorry, tenth of a gram.

17   A    I have seen it especially when I worked gangs,

18   specifically in crack cocaine-type deals.  It was sold on the

19   street in that quantity, and they sold methamphetamine in those

10:00AM 20   quantities as well.

21   Q    All right.  So my question was how frequently in

22   methamphetamine context, which is what we're talking about

23   here, have you actually seen a tenth of a gram individual

24   bindles?

10:00AM 25   A    I've certainly seen it.  I wouldn't say I see it often

1  mostly because working for the organization that I do, we deal

2  in high-level-type quantities.  So during search warrants or

3  other enforcement activities such as that, I've seen it.  I

4  don't see it often because we deal in multi-pound quantities

10:01AM  5  most frequently.

6  Q    So what is the more frequent sales of units that you're

7  familiar with?

8  A    Well, it depends on what we're talking about.  Because

9  again, at my level, we're talking -- or we're negotiating as

10:01AM 10  dealers, as mid-level dealers to buy larger quantities.

11  Q    Let's assume street-level dealers.

12  A    Yeah, it varies.  I mean, I've worked cases where they

13  have casitas, both in Orange County and Los Angeles County,

14  casitas being houses frequently in residential neighborhoods

10:01AM 15  where there's gambling, prostitution.  And within those

16  residences they're selling small quantities to people that are

17  customers of gambling and prostitution, and they're sold in

18  small quantities like that.

19       So, I mean, working for the DEA, we work only narcotics

10:02AM 20  cases.  And there's a wide range in variety of different sales

21  quantities that can occur.  And I would say that those would

22  be -- you know, I'd have to know the specifics -- more

23  specifics of the case.  And that's why I look for totality of

24  the circumstances when giving an opinion.  Because something

10:02AM 25  like a gram could certainly be use quantity, it could also be a

1   sales quantity.

2   Q    Okay.  Well, you said a lot of things there, but the

3   question that I had -- first we established in your experience

4   is that a tenth of a gram is in actuality a relatively rare

10:02AM 5   amount of sales that you've seen; right?  You haven't seen that

6   on a day-in, day-out basis, people actually selling in

7   tenth-of-a-gram bindles?  Would you agree with that?

8   A    I would say that it's not uncommon.  I don't see it every

9   day.  But certainly tenth of a gram is a sales quantity.

10:03AM 10   Eighth of an ounce, 16th of an ounce, those are all common

11   street-level quantities.

12   Q    So we're getting closer to the question than I first

13   asked here.  Let's set aside the casita, which is where

14   somebody is buying a line at a time at a bar or something like

10:03AM 15   that.  Is there sort of a heartland in your experience of what

16   a normal sales unit is on the street?

17   A    I would say a 16th of a gram, a teener in street language,

18   or an eighth -- 16th of an ounce or eighth of an ounce, 8-ball

19   in streetland, which are two very common sales quantities.

10:03AM 20   Q    Not so much the --

21   A    Not as often.  I mean, that is -- yes.

22   Q    Okay.  Now are you going to be offering opinions in this

23   trial about what constitutes a common personal use amount of

24   methamphetamine?

10:04AM 25   A    I do not know that.

1          MR. SCOTT:  Can we get some guidance?

2          THE COURT:  I assume your direct examination, those

3     were your main opinions you were going to be asking about?

4          MR. MARRETT:  That's right, Your Honor.  The

10:04AM  5     examination is going to focus on the indicia -- the objective

6     manifestations or indicia of sales versus personal use as well

7     as sort of the range that is seen in street-level distribution.

8          MR. SCOTT:  So we're not going to be opining on how

9     many grams a person might use in a given day or anything like

10:04AM 10     that?

11          MR. MARRETT:  I mean, that could be part of the

12     testimony, but that's not what I understood the purpose of this

13     *Daubert* hearing was to establish.

14          MR. SCOTT:  I guess I can just keep going.  Feels

10:04AM 15     like we have a little --

16          THE COURT:  Keep going, but candidly I'm getting a

17     little frustrated with both sides.  What I've heard on -- at

18     least on direct is totally appropriate.  I feel like both sides

19     are trying to do civil discovery here.  This was just a *Daubert*

10:05AM 20     hearing to whether this was reliable testimony and helpful to

21     the trier of fact.  And, you know, in fairness to the system,

22     to the witnesses, we're not here to do a dry run of either

23     side's experts.  And I haven't heard anything from Agent Paris

24     or from Mr. Fayer that is controversial or -- I'm wondering why

10:05AM 25     am I here?  Why am I listening to this?

```
 1              MR. MARRETT:  And Your Honor, I think during my
 2    cross, I tried to explore the bell curve area.  And I think we
 3    can argue that.  I think I understand where the Court's going
 4    with that.  My understanding of the defense's objection to
10:05AM 5    Special Agent Paris's testimony has to do with the issue of
 6    medical dosage quantity.
 7              And during direct exam, we established that that dosage
 8    quantity doesn't form the basis of his opinions as to what
 9    street distribution quantities are or what those indicia might
10:06AM 10   be.  So I'm not sure what remaining objection the defense has
11    other than to try to explore the special agent's testimony in
12    sort of a dry run.
13              THE COURT:  Mr. Scott, why don't you just ask your
14    questions.  But if you can keep in mind what I said.  This is a
10:06AM 15   *Daubert* hearing, it's not civil discovery.
16              MR. SCOTT:  Very good.
17    Q    All right.  Do you have an opinion on what a personal --
18    a personal dosage unit is?
19    A    I would say that it varies depending on the user and the
10:06AM 20   purity of the methamphetamine.
21    Q    All right.  Would you agree that the -- okay.  So it's
22    contextual.  It depends on the person consuming the
23    methamphetamine?
24    A    Depends on the person, depend on the purity.  Can even
10:07AM 25   depend on the method of use.
```

1    Q    All right.  And you said as part of the basis of your

2    opinion is that you've interviewed people about their drug use;

3    is that right?

4    A    Yes.

10:07AM 5    Q    Now do I assume correctly that you interviewing people is

6    in the context of drug trafficking investigations?

7    A    Well, there's a large variety of people I interview.

8    Certainly we interview informants, but also we interview people

9    that we arrest.  We go to search warrants and interview people

10:07AM 10   that are present that might not necessarily get arrested.  And

11   some of them could be customers of the drug locations that

12   we're going to.

13   Q    But they're all in the context of some sort of drug

14   trafficking investigation typically; right?

10:07AM 15   A    Sure.

16   Q    I mean, you're not taking social history of people to

17   treat them for substance abuse?

18   A    That is correct, yes.

19   Q    Okay.  You know, that's not -- obviously your job is to

10:08AM 20   try to get drug traffickers?

21   A    Yes.

22   Q    You do know from your interviews of people that

23   oftentimes people don't just use methamphetamine one time a

24   day; right?

10:08AM 25   A    Yes.

1    Q     Oftentimes, especially for regular users, they use the

2    drug multiple times in a day; right?

3    A     That could be the case, yes.

4    Q     And many people unfortunately use methamphetamine every

10:08AM 5    day; is that true?

6    A     I do know that that occurs, yes.

7    Q     And so do you have any opinion on sort of a normal

8    one-time use for a regular methamphetamine user?

9    A     Again, I would say that it varies depending on the user

10:08AM 10   and what their tolerances are.  I could offer you some

11   opinions, but it would definitely vary from user to user.

12   Q     So to your knowledge, anyway, you're not planning on

13   offering any specific opinions in that regard?

14   A     Again, I don't know what questions I'll be asked.  Nobody

10:09AM 15   gave me a list or a list of questions.  I was just asked to

16   answer questions based on my training and experience.

17   Q     All right.  Well, if Mr. Marrett does ask you, "What in

18   your experience is sort of normal personal use amount?" what

19   are you going to say?

10:09AM 20   A     I would say that it depends on, again, the user, that

21   people have different tolerances, different methamphetamine

22   experience.  First-time user I would say would not be uncommon

23   for a tenth of a gram to be quartered.  So split in four.  And

24   that tenth of a gram might last them two to four uses.  Might

10:09AM 25   last one to two people two to four uses.  Somebody with a

**UNITED STATES DISTRICT COURT**

1    frequent habit might take the tenth of a gram.

2         And what I'm told is common is to smoke it in 20th of a

3    gram.  Depending, again, if we're talking smoking, if we're

4    talking ingesting, injecting, wouldn't be uncommon for them to

10:10AM  5    use a 20th of a gram at a time and maybe use a couple times a

6    day, like you say.  But sometimes depending on the purity of

7    the methamphetamine, the effects can last anywhere from 8 to 12

8    to 18 hours a day.

9         So it depends on how often that they would re-up or take

10:10AM 10    another hit.  But I am told that anywhere from three-tenths to

11    half a gram a day for frequent users is -- is a common amount

12    for somebody who actually has a tolerance for it.  And that a

13    gram would last them three to four days.

14    Q    That's what you're told?

10:10AM 15    A    During interviews, that is the most common recited

16    quantities.

17    Q    Is there any other bases of those opinions other than

18    these interviews that you assert?

19    A    That's just what -- that's just what we find in the

10:11AM 20    majority of people that I talk to.  And again, it depends on

21    how often.  I'm not, as you said, involved in clinical or

22    rehabilitation.  The users that I interview, that's what they

23    say.

24    Q    When's the last time somebody told you that they smoked a

10:11AM 25    20th of a gram of methamphetamine?

```
 1  A     Well, we've been -- again, we do a lot of search warrants

 2  at various locations that we interview the people that are

 3  there.  Depending on not only their use habits, but also the

 4  amount of -- there's a lot of individuals that frequent these

 5  places that not only are strung out, so to speak, but they have

 6  limited amount of funds.  And for them to be able to get a 10th

 7  of a gram hit is what they're there for.

 8  Q     When's the last time somebody told you they smoked a 20th

 9  of a gram of methamphetamine?

10  A     I would say it was within the last year.

11  Q     All right.  Do you remember the case or the situation?

12  A     No.  We do a lot of cases every day.

13  Q     Okay.  So one person told you that within the last year,

14  is that what you're saying?

15  A     I'm saying that I was -- you asked me when was the last

16  time I was told, and I would say within the last year.

17  Q     Can you remember the last time before that?

18  A     I don't know.

19        MR. SCOTT:  Okay.  All right.  Well, I guess that's

20  all I have, Your Honor.

21        THE COURT:  Very well.

22     Anything further?

23        MR. MARRETT:  Nothing further, Your Honor.

24        THE COURT:  Agent, you can step down.  Appreciate

25  your time, sir.
```

1    All right.  With respect to Mr. Fayer, I believe his

2    testimony is appropriate.  He has extensive 31 years of

3    experience in drug addiction treatment and counseling.  I

4    anticipate he's going to be asked questions about meth usage,

10:13AM 5    how it's typically ingested, how often it's typically ingested

6    and the quantities typically ingested.  At least that was the

7    focus of the examination I heard today, and that's totally

8    appropriate and, I think, helpful to the trier of fact on the

9    critical issue in this case, whether the meth that was seized

10:13AM 10    was for personal use or distribution.

11    Similarly, I feel Agent Paris's testimony is entirely

12    appropriate.  His testimony will be limited to drug

13    distribution practices and methods including packaging, other

14    indicia of distribution, and then the quantities typically

10:14AM 15    denied or maintained for personal use.  His testimony on those

16    issues is based on his extensive, 25 years of experience with

17    the DEA, participating in over a thousand investigations and

18    interviewing hundreds of suspects and cooperating sources.

19    Again, his testimony will be helpful to the trier of fact

10:14AM 20    in determining the critical issue in this case, whether the

21    meth seized in this case was for Mr. Govey's personal use or

22    for his distribution to others.  Again, I want to reiterate

23    though, he should not render any opinion or be asked any

24    question whether the meth in this case was for personal use or

10:14AM 25    distribution, nor should he be asked a question referring to

the meth or other evidence seized in this case because I don't

believe that testimony is helpful to the trier of fact and that

it will usurp the jury's function of determining Mr. Govey's

guilt.  Anything further we need to discuss?

10:15AM  5    MR. MARRETT:  Your Honor, just to make sure that I

instruct the witnesses appropriately as to the scope of the

expert testimony, I want to make sure I understand the Court's

ruling clearly.

No. 1, Special Agent Paris or the defense expert can't

10:15AM 10  opine that the 44.4 grams of methamphetamine in this case, what

their opinion is as to what that was for?

THE COURT:  Correct.

MR. MARRETT:  And likewise couldn't be asked a

hypothetical question about a similar quantity?

10:15AM 15    THE COURT:  Correct.

MR. MARRETT:  And then as far as the actual evidence

seized in this case and my understanding from the Court's

ruling is that the experts can testify generally as to, for

example, what a pay/owe sheet is and why that's important to

10:15AM 20  them in their assessment of a case?

THE COURT:  Yes.

MR. MARRETT:  But cannot -- I can't put that pay/owe

sheet from -- that was seized in this case in front of them and

have them testify about it?

10:16AM 25    THE COURT:  Correct.

**UNITED STATES DISTRICT COURT**

1          MR. MARRETT:  I think that clarifies.  Thank you,

2    Your Honor.

3          THE COURT:  All right.  Anything further, Mr. Scott?

4          MR. SCOTT:  I guess -- and I'm mindful of what the

10:16AM 5    Court said, and I feel a certain frustration too, but for

6    different reasons, so I appreciate the Court's patience.  I

7    just want to say the source of the frustration is that you kind

8    of have to know what the precise opinions are in order to, in

9    my mind anyway, conduct an efficient and reasonable *Daubert*

10:16AM 10   hearing.  It's sort of concerning to me that apparently even

11   the agent doesn't know what he's going to be opining about.

12        You can tell by the way he sort of pivots into long

13   answers that it's not going to surprise me at all if he starts

14   offering long opinions that haven't been vetted this morning.

10:16AM 15   The first time anyone ever said "pay/owe sheet" was Mr. Marrett

16   here at the lectern today.  That would have been a nice thing

17   to ask the agent about, his background, his experience with

18   pay/owe sheets.

19        So I guess I just want to offer a general objection that

10:17AM 20   it's still not particularly clear to me what opinions this man

21   is going to be offering in this case against Mr. Govey.  If

22   it's simply, you know, about packaging and scales and this and

23   that, I agree, fair, and so be it.

24        You know, I guess if he talks about street-level sales

10:17AM 25   versus people crossing the border, I don't know that it's

54

relevant, but I don't object.  Beyond that, I don't know what
other opinions he's going to offer, and I don't know that the
government's laid a foundation for them.

THE COURT:  Well, I do believe that the disclosure,
especially after the hearing we had today, there's been more
than enough.  And I know you, you're very skilled, you know the
questions you're going to ask.  It would have been nice, I
guess, if the pay/owe sheet question was asked, but I don't see
that as controversial or prejudicial.  I know you'll be able to
deal with that.  And that is under the general category of
indicia of drug distribution activity.  It's very common in
distribution cases.

So again, I think the parameters of what's fair and what's
not fair are pretty clear, at least they are in my mind.  And
I'm going to expect both sides to ask their questions within
those parameters.  And if it goes outside that, then I expect
an objection, not a speaking objection, to say "beyond the
scope," "irrelevant," and then I will rule accordingly if the
other side doesn't.

MR. SCOTT:  Your Honor, to avoid speaking
objections, what I would intend to do, unless the Court would
like me to do it differently, is if I perceive that there are
opinions being offered that haven't been disclosed, that
haven't been approved in the context of a *Daubert* hearing, my
plan would be to say, "Objection.  Rule 16.  Scope."  Something

1   like that.  Something sort of cryptic.  But the Rule 16 in

2   particular is kind of saying, you know, we haven't heard this

3   before, or this is new, undisclosed stuff.  Unless the Court --

4           THE COURT:  That's fine.

10:19AM 5           MR. SCOTT:  Okay.

6           THE COURT:  Again, my hope is we -- this was the

7   subject of a motion in limine.  This was the subject of this

8   hearing.  I sure hope we don't have that issue, then I would be

9   frustrated that we've truly wasted our time here.

10:19AM 10      Okay.  So I think we have one final pretrial conference

11  next Friday.  I'll look forward to that.  I'll have the final

12  draft jury instructions for your final consideration.  And if

13  there's any other issue we need to discuss, we can deal with it

14  then.

10:19AM 15          MR. SCOTT:  One final thing I wanted to put on the

16  record, and I hope this isn't a warning of me whining about

17  things, but I feel I owe it to Mr. Govey to say for the record,

18  the continuance that was granted in this case --

19          THE COURT:  Yes, sir.

10:20AM 20          MR. SCOTT:  -- the four weeks was over our

21  objection, and we've made our record on that.  I do want to say

22  for the record that since -- before the government filed that

23  motion asking for the continuance, and in that motion where

24  they said -- you know, represented that there was a team of a

10:20AM 25  dozen attorneys sort of poised to do this review, we have not

received a single additional page of discovery.  I'm not asking

the Court to take action on that, I'm just saying for the

record that I have requested that whatever Department of

Justice files are being reviewed, that they be disclosed on a

rolling basis.  And I just want to put that on the record that

we haven't received anything since before the date the

government moved to continue.

THE COURT:  We'll see how the situation unfolds.

MR. MARRETT:  And the -- I don't want to belabor the

point.  Just to respond for the purposes of the record, Your

Honor, I can say that we've completed about 75 percent of our

sort of initial review and anticipate a production to the

defense in advance of the final pretrial conference next week.

And I anticipate it's going to be substantially less than the

25,000 records that we've been reviewing.  I anticipate the

burden on the defense to go through is going to be relatively

minimal and moderate, and they should be able to get through

those documents, I anticipate.

THE COURT:  I don't want to prejudge or speculate

about what it is.  I sincerely hope that's not an extensive

document dump the day before the pretrial conference because I

imagine Mr. Scott's going to have a motion renewing his motion

which I denied without prejudice.  So it is what it is.  And

I'll look forward to seeing everybody next Friday.

MR. SCOTT:  I agree it is what it is, and I would

1    just respectfully urge that if 75 percent of it is done, we

2    should be seeing about 75 percent of that fruit at this point

3    on a rolling basis.  But again, I made my record.  So thank

4    you, Your Honor.

10:22AM    5              THE COURT:  Okay.  All right.

6              THE COURTROOM DEPUTY:  All rise.

7              **(Proceedings concluded at 10:22 a.m.)**

8                        **--oOo--**

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

1    *CERTIFICATE OF OFFICIAL REPORTER*

2

3    COUNTY OF LOS ANGELES   )
                              )
4    STATE OF CALIFORNIA     )

5              I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, in and for the United States District Court for

7    the Central District of California, do hereby certify that

8    pursuant to Section 753, Title 28, United States Code that the

9    foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14

15   *Date:  February 22, 2018*

16

17

18

19                          */S/ DEBBIE HINO-SPAAN_*

20                          *Debbie Hino-Spaan, CSR No. 7953*
                            *Federal Official Court Reporter*
21

22

23

24

25

**UNITED STATES DISTRICT COURT**