1          **UNITED STATES DISTRICT COURT**

2      **CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**

3        **HONORABLE CORMAC J. CARNEY, U.S. DISTRICT JUDGE**

4

5   UNITED STATES OF AMERICA,            )
                                          )
6                   Plaintiff,            )   **CERTIFIED TRANSCRIPT**
                                          )
7          vs.                            )
                                          )   Case No.
8   JOSEPH MARTIN GOVEY,                  )   8:17-cr-00103-CJC-1
                                          )
9                   Defendant.            )
    _____)

10

11

12

13              REPORTER'S TRANSCRIPT OF

14                 PRETRIAL CONFERENCE

15            FRIDAY, FEBRUARY 23, 2018

16                   11:02 A.M.

17              SANTA ANA, CALIFORNIA

18

19

20

21

22

23  _____

24          **DEBBIE HINO-SPAAN, CSR 7953, CRR**
            FEDERAL OFFICIAL COURT REPORTER
            411 WEST FOURTH STREET, ROOM 1-191
25          SANTA ANA, CALIFORNIA 92701-4516
                 dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

1   **APPEARANCES OF COUNSEL:**

2

3   **FOR THE PLAINTIFF:**

4           NICOLA T. HANNA
            United States Attorney
5           BY:  BRADLEY MARRETT
                 GINA KONG
6                Assistant United States Attorneys
            United States Courthouse
7           411 West Fourth Street
            Suite 8000
8           Santa Ana, California 92701
            (714) 338-3561
9
    **FOR THE DEFENDANT:**
10
            SCOTT TRIAL LAWYERS APC
11          BY:  TIMOTHY A. SCOTT, ESQ.
            1350 Columbia Street
12          Suite 600
            San Diego, California 92101
13          (619) 794-0451

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

**SANTA ANA, CALIFORNIA; FRIDAY, FEBRUARY 23, 2018**

**11:02 A.M.**

**- - -**

THE COURTROOM DEPUTY:  Calling Item No. 1,

SACR 17-103, United States of America versus Joseph Martin

Govey.

Counsel, please state your appearances.

MR. MARRETT:  Good morning, Your Honor.  Brad

Marrett and Gina Kong on behalf of the United States.

THE COURT:  Good morning to both of you.

MR. SCOTT:  Good morning, Your Honor.  Tim Scott for

Mr. Govey.  He's present before the Court in custody.

THE COURT:  Hello, Mr. Govey.  Hello, Mr. Scott.

Well, this morning isn't going to go the way I was

anticipating it, to be perfectly frank.  I was quite troubled

when I received the government's in-camera filing yesterday, so

much so that I'm of the mindset that Mr. Govey's Sixth

Amendment constitutional rights to a speedy trial, compulsory

process and confrontation is being compromised.

I have a few questions for you, Mr. Scott, that I'd like

first, and then I want to hear from the government.  Would you

be good enough to go to the lectern, please.

MR. SCOTT:  Yes, sir.

THE COURT:  I have a general sense, Mr. Scott, of

Mr. Govey's theory on attacking the credibility of the

percipient witnesses, particularly Mr. Beeman and

Deputy Larson.  And I think today is really the day of

reckoning, and I need to know with as much specificity as you

can give me what is the bias, what is the basis for the bias,

11:04AM what documents or information do you have to support that, how

would you prove that?

I realize you're at a disadvantage that there's 20,000

pages of documents that the government's motion that was filed

in camera, which I put on the public docket, because I didn't

11:04AM see anything in the motion itself that was privileged.  And I

know you don't know what's on there.  I don't know what's on

there because there's no way with five days before trial I can

look at over 20,000 pages of documents to determine really

important issues on whether there's attorney-client privilege,

11:05AM work-product privilege, deliberative privilege or that I would

be compromising the safety of witnesses, cooperating witnesses

for the DA or for the sheriff's department.

I have had security cases, national security cases where

there's classified information and a defendant is charged, and

11:05AM you're put in that uncomfortable position of, "Government, if

you want to charge a spy or a terrorist with these serious

charges, you're going to have to cough up some of this

information."  And the government is given the choice, cough it

up and reveal your sources, or dismiss the charges.  We're past

11:06AM that position now.  And I take exception, and I'm sure you

agree with this, I do not like protective orders that say,

"okay, here is some sensitive information.  You can see it,

Mr. Scott, but you cannot share it with Mr. Govey."

He's supposed to have a public and speedy trial.  How in

the world are you -- is he not able to see that, and how are

you not able to use it at the trial?  I have a very negative

reaction to that.  So you can take me at my word, I think it's

a very serious situation we're in, and now I need to know from

you in specificity, not generalities, what do you know, what do

you have so I can make an informed decision on where we go from

here.

MR. SCOTT:  Yes, Your Honor.  I'll share with the

Court what I think I have, what I think I know.  I'm tempted to

paraphrase Secretary of Defense Rumsfeld about known knowns,

known unknowns and unknown unknowns.  But suffice it to say,

I'll start with what I was handed this morning, which is a

February 23rd, like I said, a letter dated today, which

encloses a disc containing Bates-numbered Tier 1 confidential

discovery.  And the Bates range now goes up to 75,462 pages.

So I'll need to both make a description and a confession along

those lines.

I went back to the protective order to make sure that --

what Tier 1 meant versus what Tier 2 meant.  Because Tier 1

discovery, as I looking, again, is discovery that purportedly,

according to the protective order, I'm not supposed to share

with Mr. Govey.  Certainly he can't even see it.  I can't even

show him the pieces of paper.  And I just -- I just saw again

this morning, I think technically under the wording of the

protective order, literally nobody, other than me, is supposed

11:08AM  to look at it, unless I'm mistaken.

And so I have to -- I have to fall on my sword here that

in trying to review 75,000 pages, I've been having a paralegal

try to help me with that, and I guess I violated that order.

So I just want to confess that to the government and the Court.

11:09AM  I didn't do it --

THE COURT:  That's not a problem.  That's not a

problem.  And when I saw the protective order, candidly, that I

signed, it was pursuant to the parties' stipulation.  I was

troubled with it.  And I figured if there was a really

11:09AM  important document that you found, you were going to bring it

to my attention and say, "Judge, you need to release me from

this protective order, because I need to discuss it with

Mr. Govey and I intend to use it at trial."

So I didn't want to start getting bogged down in legalese.

11:09AM  It seemed you had agreed with the government to that protective

order, so I signed it.  But I had concerns about it.

MR. SCOTT:  Well, I did too.  And I think I said

this on the record and tried to bake in what I could into the

order is that I -- I sort of signed it grudgingly just to get

11:09AM  the darn stuff to start with.  And then the Court's right, if I

 1    can then identify what's helpful and usable, you know, then we

 2    can fight that good fight at some later point was kind of my

 3    plan.  But the problem is I just -- there's just too much

 4    information to, No. 1, to digest in that period of time, much

11:10AM  5    less to then start bringing, you know, motions and litigating

 6    the issue in any intelligent way.

 7        So where I am is that I have 75,000 pages where in the --

 8    we're in the process with the help of a paralegal of trying to

 9    digest it.  We're nowhere near done with that.  In fact, I

11:10AM 10    really don't have a solid update from my paralegal.  We've both

11    been working around the clock and neither one of us see an end

12    in sight in terms of being able to have this reviewed and in a

13    way to use it before trial.  And that's just the facts of it.

14    And --

11:11AM 15        THE COURT:  And that doesn't surprise me.  So that

16    doesn't even address the now over 20,000 pages of documents

17    that is the subject of this motion that I received yesterday.

18        MR. SCOTT:  And, you know, it's not -- it would be

19    one thing if we envision a situation where this isn't Tier 1

11:11AM 20    versus Tier 2, and I could bring a disc to the MDC and, you

21    know, then Mr. Govey would be involved looking at it and we

22    would have a team looking at it.  You know, that doesn't exist

23    here because I can't share it with him.  And not only that, I

24    can't even share with him the things that I've looked at to see

11:11AM 25    if -- you know, to see if it matters, to see how it squares

1    with his experience in the Orange County jail.

2         Because to go to the merits of it just a little bit, as

3    I've said, and I hope to incorporate by reference, you know,

4    anything that I've written and said about this up until today

11:11AM 5    in terms of our theory of the case, but we've always said that

6    Mr. Govey -- this isn't just a matter -- forgive me for

7    starting and restarting.  This isn't a matter that he happened

8    to be arrested by deputies who themselves were involved in the

9    jail scandal.  That would be one thing.  Where, you know, the

11:12AM 10   invoking on the stand or, you know, having violated other

11   defendants' constitutional rights or being the subject of

12   investigation, I think that those are all credible areas of

13   cross-examination for any defendant that they arrest, you know,

14   going forward, but this isn't that case.

11:12AM 15        As we've always said, our case is that plus the fact that

16   Mr. Govey was sort of at ground zero for the jail scandal

17   itself.  And what I mean by that is he was one of the inmates

18   that was housed, that the deputies and the special handling

19   unit was interested and continued to investigate.  They

11:13AM 20   believed that he was involved in some sort of a gang.  And

21   again, we dispute those facts, but that's the case they were

22   building.

23        He was among the people who was subjected to what we would

24   argue is a pretty troubling or suspicious practice of arresting

11:13AM 25   him on relatively -- I don't want to say minor, but fairly

pedestrian charges.  Sort of run-of-the-mill Superior Court

felony charges.  But then while he's in custody on the strength

of informants who have been housed next to him, now suddenly

he's looking down the barrel of solicitation of murder and a

murder conspiracy, very, very serious charges that rest on the

good word, I say facetiously, of informants.

So he was, in our view, a victim of some of the real

misconduct that has been identified through the strong work of

Scott Sanders and others in the Orange County jail.  His was

among the cases -- and I think it's kind of the cutting edge of

the cases through a defense attorney named Renee Garcia, who

was working closely with Mr. Sanders, who pressed this issue

and was sort of in the vanguard of litigating the informant

issues and the fact that these files -- these records were not

being turned over and that they were -- the defense attorneys

felt that they were on the wrong end of sort of a shell game of

the kind that finally came to light in the *Dekraai* hearings.

THE COURT:  Do you have any of the specific names

that are involved that you can tell me?

MR. SCOTT:  In terms of officers?

THE COURT:  Yes.

MR. SCOTT:  Well, to start with, the -- one of the

informants that was central against Mr. Govey was a person by

the name of Alexander Frosio.  And one of the important facets

of the Superior Court cases that were pending against Mr. Govey

1    was repeated requests for TRED records or special handling unit

2    logs or other materials that would document this gentleman,

3    Mr. Frosio.  So we've been sort of using the shorthand "the

4    Frosio file."  And, in fact, I'll represent to the Court that

11:15AM  5    I've -- you know, I continue to serve subpoena duces tecums for

6    that file from the special handling unit.  And it's my

7    understanding I have not received it yet.

8         There's the gentleman that the Court might recall I had

9    some interaction with Bryan Larson about.  There was a

11:15AM 10    different informant by the name of Fenstermacher who was

11    cultivated and used as an informant and was also gathering

12    evidence for Mr. Govey.

13              THE COURT:  Against Mr. Govey?

14              MR. SCOTT:  Yes, sir, against Mr. Govey.

11:15AM 15         Now I should say parenthetically that he also sort of

16    inadvertently created some *Brady* against Mr. Govey in that he

17    disclosed that Mr. Govey at some point had gotten himself a

18    quote-unquote "in the hat" where he had been purportedly green

19    lighted by the Aryan Brotherhood and several organizations.

11:16AM 20    Mr. Fenstermacher shared that.  And then that information was

21    not disclosed to the government -- or to the defense in the

22    Superior Court case.  So it's sort of a confluence of these

23    things of --

24              THE COURT:  This case is a 2012 solicitation of

11:16AM 25    murder case?

 1          MR. SCOTT:  Correct.  Along with -- there's multiple

 2    counts, but that was certainly the most serious in the lead

 3    count.

 4          It was my understanding -- it is my understanding that it

11:16AM  5    was Mr. Beeman who led the charge in organizing much of these

 6    informant campaigns and was instrumental in building the

 7    solicitation case and these other cases against Mr. Govey.

 8          There was both Mr. Beeman as well as several other

 9    Sheriff's deputies that testified in front of the grand jury

11:17AM 10    about this solicitation case, and yet failed to disclose the

11    fact that Mr. Govey was purportedly in the hat based on their

12    own informant that they had been cultivating.  So it was, I

13    guess when in State Court is a *Johnson* issue, but it's also a

14    *Brady* issue to the extent it was undisclosed.

11:17AM 15          And then ultimately it came to a head where because of

16    Scott Sanders' parallel work in the *Dekraai* case, it started

17    coming to light that there are records of informants.  There is

18    a Frosio file.  There are housing records in the special

19    handling unit, records that shed light on this informant

11:17AM 20    program that they had.  And rather than disclose those, because

21    Judge Goethals, who coincidentally was presiding over

22    Mr. Govey's case as well as Mr. Dekraai finally said, "Look,

23    you have to turn over this Frosio file."  And shortly

24    thereafter, the case against Mr. Govey was dismissed.

11:18AM 25          And so based on the whole backstory of the way they built

that case against Mr. Govey, combined with the fact that it's

the same officers at play today, at least insofar as it's

Mr. Beeman and Mr. Larson who were both special handling

deputies, it's our view that, one, their testimony is subject

to attack just on the credibility basis.  That's apart and

aside from Mr. Govey being at the epicenter, so to speak, of

this scandal.

     But certainly given the fact that he was at the epicenter

of it, it is our theory that because they did their best to

build this case against Mr. Govey, they did it wrongly, they

cheated in order to do it.  They violated the constitution in

doing it.  And when they were caught or about to be caught and

the case was dismissed instead, that leaves a bad taste in

their mouth.  And probably they rationalized that justice would

be served in getting him for something or getting him more time

for what -- than he would otherwise get for the subsequent

thing that they arrested him for.

     And I want to be clear, you know, can I stand here and

say, you know, that these guys planted -- you know, planted

methamphetamine on him and, you know, ginned up an entire case?

I'm not saying that because I don't have the facts as I stand

here to make that allegation.  But the allegation I do make,

and it is supported by the facts, is that when they happened

upon Mr. Govey with a very pedestrian, relatively low level --

not relatively low level.  For federal court standards,

1  absolutely low level, 37-gram methamphetamine case, they made a

2  deliberate --

3          THE COURT:  Let me interrupt you because it's

4  obviously important to any questions I have.  37.5 grams,

11:20AM  5  that's less than two ounces?

6          MR. SCOTT:  Yes.

7          THE COURT:  Does that fit in a Ziploc little baggie?

8          MR. SCOTT:  Oh, absolutely.  It fits in --

9          THE COURT:  Snack size?  Sandwich size?

11:20AM 10          MR. SCOTT:  It fits comfortably in a sandwich size.

11  It would fit in a snack size for certain.  Yeah.  That's --

12  it's really in terms of net, because there's 28 grams in an

13  ounce; right?  28 and change, so it's -- you know, it's an

14  ounce and change essentially.  Not quite an ounce and a half, I

11:20AM 15  guess.

16          THE COURT:  I can't remember ever being involved in

17  a federal case with such a low quantity.

18      Let's just assume it was for personal and distribution.  I

19  know you dispute that, but I -- it's not my call on what cases

11:21AM 20  the federal government brings, but I'm just dumbfounded that we

21  would initiate the time, expense and trouble of the federal

22  machinery to go after such a low quantity of drugs.  I mean, if

23  this was a murder case, it was a drug cartel, it was the Aryan

24  Brotherhood murdering people, you know, I understand.  I would

11:21AM 25  endorse that.  But I'm absolutely baffled that the government

**UNITED STATES DISTRICT COURT**

charged this case and pursued it especially with all the

baggage of the witnesses.

And I've always been troubled that this is any way

compromising the federal civil rights investigation that we

11:21AM  had.  And I was very troubled that I had to sign off on that

order knowing that you and Mr. Govey are getting information

that's really important that's confidential.

It's relevant, but it's, I guess, not the heart of our

focus.  And I interrupted you.  Please keep going, because the

11:22AM  more detail you can give me, the more helpful it is.  And I

think you left off saying, okay, case dismissed, Mr. Govey was

there.  You don't know whether they deliberately planned on

being there.  But once they saw him there -- and this is, I

assume, Deputy Larson?

11:22AM  MR. SCOTT:  Yeah, I think the testimony that came

from Deputy Larson was that -- and frankly, I'm prepared to

credit it that they didn't necessarily know that Mr. Govey was

going to be at that place at that time that they were sort of

shaking down that house more generally.  But what he told --

11:23AM  THE COURT:  The location is known for white

supremacists?

MR. SCOTT:  Yeah.  That's the way they describe it,

yeah, that it's a crash pad of sorts.  And they were doing

probation checks to see what they could find there.

But what Deputy Larson told us himself at the Fifth

1  Amendment kind of, I guess, 104 hearing that we held was that

2  as soon as he -- as soon as it was learned that Mr. Govey was

3  there, somebody called Beeman immediately.  And Beeman came

4  down afterwards.

11:23AM 5       So I think it's pretty clear that once Mr. Govey was on

6  the radar, then Beeman responds.  And all of a sudden it's a

7  case they're interested in, and they're really pressing against

8  Govey.

9            THE COURT:  Did Mr. Beeman actually interrogate

11:23AM 10 Mr. Govey?

11           MR. SCOTT:  He was the primary interrogator.  It was

12 Larson and Beeman were the two that were involved in

13 questioning every person at that property.  So absolutely, yes,

14 it was both of them together.

11:24AM 15          THE COURT:  Did Mr. Govey agree to talk to them?

16           MR. SCOTT:  He invoked his rights.  There was a

17 little bit of back and forth, but -- and at one point Mr. Govey

18 did make a statement, you know, "What am I charged with?"

19      And they said, "Sales of methamphetamine."

11:24AM 20     Mr. Govey responds, "Sales?  You got to be kidding me.  I

21 use meth; I don't sell meth.  I think you're stretching it,"

22 words to that effect.  But he did invoke.  And so it wasn't a

23 lengthy interrogation.

24           THE COURT:  What did they ask him, if you know?

11:24AM 25          MR. SCOTT:  They asked him what he was doing at the

**UNITED STATES DISTRICT COURT**

property, if he lived there.  And he invoked in short order.
And then -- but it was Mr. Govey who, after he invoked, asked,
"What am I being charged with?"  So it wasn't a lengthy
interrogation by any stretch.  So I don't think they got any
11:24AM 5   substance before that.

6          **(Mr. Scott and defendant confer off the record.)**

7              MR. SCOTT:  So where I left off was, you know,
trying to give the benefit of the doubt -- I'm trying to be
fair about this and not claiming that they, you know, planted
11:25AM 10  evidence per se or did any of that.  But it's absolutely our
view, and I think this is where the Court asked the question
about, you know, the size of this case going to federal court,
that it was pitched to federal court and brought to federal
court specifically so that they could figure out how to give
11:25AM 15  Mr. Govey more prison time.

16             THE COURT:  And do you know who pitched it to the
feds?

18             MR. SCOTT:  I think it was Mr. Sanders who was part
of the task force that included Mr. Beeman and others that has
11:25AM 20  been working in conjunction with the Orange County Sheriff's
Department on Mr. Govey and people like him for a number of
years now.

23         What I was about to say is the reason I'm comfortable
making an allegation like that is the Court might recall at the
11:26AM 25  last hearing here I essentially said something like that.  I

said, "I'm moving for the production of any, you know, text messages or e-mails or other communication between Sanders and Beeman" or "Sanders and other Orange County Sheriff deputies," and that was granted.

And the government did provide some evidence like that including a text message where Agent Sanders says, "I'd like to take this case federal. I talked to the Orange County deputies and they're okay with it as long as I can get him more prison time." And then the deputy on the other side, who I presume is Beeman, although I don't know that from the text itself said, "Good job," you know, thumbs up essentially.

And so it's -- there's documents demonstrating that this is a federal case only so that Mr. Govey can get more prison time, specifically the minimum mandatories that apply based on his record and some of the other things.

I -- particularly now that we're in the posture that we're in where the -- where Deputy Larson took the witness stand in this case and explained under oath that he only invoked in a prior case because he got very bad advice from a -- from an attorney that was appointed to him by the union and that he had nothing to hide and nothing to fear and had not tried to violate defendant's rights through Massiah violations or otherwise, he made some pretty stark claims.

And I even gave him an out as we were looking at reports that he had written where he admitted in writing trying to work

with informants to build cases against inmates.  And he denied

it.  He said, "I think I used the wrong words" or "I wrote that

incorrectly" or something.

And I even gave him the out.  I said, "Isn't it possible,

Deputy Larson, that you just -- you hadn't received this

Massiah training by then?  You didn't know -- you were doing

that, but you didn't know it was wrong?"

And he wouldn't acknowledge that.  He said, "No, I never

did that under any circumstances even before I knew that it was

wrong."

And so how that all ties up is that I think now --

especially now with all that water under the bridge, anything

that the Department of Justice has that shows that that is what

they were doing, you know, that they were building and

cultivating informants like that, that they were doing these

things that violated inmates' rights, particularly now that

they've denied it under oath, denied it in any number of

different settings and given the fact that it all involves

Mr. Govey, you know, it is relevant.  And that's the reason

that I think the government's motion to preclude that was

denied, as I understand it, and that's the reason this

discovery was ordered to be produced.

But now I'm in the position of trying to digest 75,000

pages without being able to discuss any of it with Mr. Govey

and apparently whatever else exists in camera.  I can't do it

1    before the trial begins.  And I would have filed a motion to

2    dismiss in writing a week ago.  And I should say for the

3    record, too, that when we stood here at the last status and

4    I -- you know, I sort of sent that shot across the bow again,

11:29AM 5    and I said I hadn't received a piece of paper since we got a

6    continuance, and the government represented that they were 75

7    percent done with their review, but yet I still hadn't received

8    any paperwork.  And after that hearing I then started receiving

9    it every couple days or something like that to the point we're

11:29AM 10    now within the past whatever it was, week, week and a half

11    since our last hearing, we're now up to 75,000 pages, probably

12    more, if we include Tier 2 discovery, if we include

13    non-protected discovery.  And then, of course, whatever else is

14    in camera.

11:30AM 15        So what I was starting to say is, you know, I was tempted

16    to -- just to file the motion to dismiss.  But the pickle that

17    puts Mr. Govey in is that that automatically tolls time under

18    the Speedy Trial Act.  So it's kind of a damned if you do,

19    damned if you don't.  He's been agitating -- and properly so,

11:30AM 20    and I don't fault him for it -- he's been wanting his day in

21    court for some time.  It's caused tremendous strain between the

22    two of us when I can't deliver that for him.  It causes

23    tremendous strain between us when I can't share discovery with

24    him.  He's kind of coming out of his skin, and I really don't

11:30AM 25    blame him.

1     But if I file a written motion to dismiss, then the

2  government can say, "Well, that tolls the speedy trial clock,

3  you know, and you can now review to your heart's content and,

4  you know, that's excludable time."  So I was prepared even

11:31AM  5  before the Court made any comments this morning, the first

6  thing I was going to say is that I'm orally here at this

7  hearing moving to dismiss for all of the reasons I just said.

8     And I think it's a confluence of Mr. Govey's Sixth

9  Amendment right to confront his accusers, to have access to the

11:31AM 10  documents and the evidence that would do that.  Not his

11  attorney, not his attorney's paralegal, but him, the ability to

12  see those things and contribute to the defense in a meaningful

13  way.

14     I also think it's a *Brady* issue.  I'm not accusing the

11:31AM 15  government of intentionally withholding *Brady* from me at this

16  juncture because I don't have to, because the law is that they

17  have the duty to turn over anything to me that's in the

18  possession or their constructive possession, which I've always

19  argued absolutely includes the United States Department of

11:32AM 20  Justice even if it happens to be their DC division.

21     This was not a surprise to them that this investigation is

22  going on.  But the law is equally clear that these *Brady*

23  disclosures have to be made in time to be of use to the

24  defense.  And there is a legion of cases that talk about the,

11:32AM 25  you know, how that timing breaks down, whether the Court

**UNITED STATES DISTRICT COURT**

granted a -- in the middle of trial continuance or exercise its

discretion not to, and so on and so forth.  But the law is

clear, I didn't get it in enough time to be able to

meaningfully use it.  So I think that there should be dismissal

11:32AM 5  on those grounds as well.

And in addition to that, the fact that it's kind of a

damned if you do, damned if you don't, if I make those motions

or if I ask for a continuance to review 75- or 100,000 pages,

we're prejudicing Mr. Govey's trial rights.  I suppose the

11:32AM 10 government is going to say an index came with discovery.

That's helpful as far as it goes, but that doesn't get me where

I'm going.  I need to be able -- with this sensitive

information as relevant as it is.

And I should say this was already called out by the

11:33AM 15 government.  I suspect that's kind of the government's argument

is, like, "Well, we gave you an index.  What are you

complaining about?"  Maybe they won't argue that, but I'm just

anticipating that they're going to factually present to the

Court that they provided an index.  That doesn't help me a

11:33AM 20 great deal because in my experience the utility of an index is

it tells you what you can discard and what you can just not

bother looking at.

And I think we're already a step past that analysis.  What

I mean by that is if the government has already looked at the

11:33AM 25 DOJ files, the government, using their own sometimes

parsimonious standards of what I could and could not make use

of and what is and is not discoverable already made the

decision that it is important enough, relevant enough to

disclose and then to give it to me.  I feel it's incumbent upon

me and my staff to go through every page.  And the index

doesn't turn the pages any faster for me or enable me to

utilize them in a meaningful fashion.  And none of those has

any effect on my ability to work with Mr. Govey under the Sixth

Amendment.

So I'm open to any other questions the Court has.  And I

should say that this was my -- I wasn't prepared to give sort

of my exhaustive statement on what our theory of the case was

and how it applies, and so I hope the Court and the record

takes this in the extemporaneous spirit that it was given.  But

that's my response to the Court's question right now.

THE COURT:  Well, we're in the situation we are.

And unfortunately, neither you nor I have the luxury of being

deliberative and doing research and writing.  I have a factual

question and then a few legal questions.

Factual question:  Are you aware of -- is it

Investigator Beeman?  Mr. Beeman?  Deputy Beeman?  Which is it?

MR. SCOTT:  I think his title is investigator.

MR. MARRETT:  That's right.

THE COURT:  Investigator Beeman, did he testify

before Judge Goethals?

1        MR. SCOTT:  I know that he was not one of the

2   deputies that invoked.  I can say that with some assurance.

3   Beyond that, I don't know the answer to that question.

4        MR. MARRETT:  I know that he's testified at at least

11:35AM 5   one of the evidentiary hearings and did not invoke.

6        THE COURT:  Okay.  And has he, to your knowledge, if

7   you -- are you aware, was he questioned by any of the federal

8   investigators in the civil rights investigation?

9        MR. SCOTT:  I have to believe that discovery would

11:35AM 10   reveal that, that the DOJ files would give me the answer to

11   that, but I don't know the answer to that because I haven't

12   been able to get through all of that discovery.  So the short

13   answer to that is I don't know.

14        MR. MARRETT:  The answer is yes, Your Honor.  There

11:36AM 15   have been, I believe, two interviews.

16        THE COURT:  Okay.

17        MR. SCOTT:  And so --

18        MR. MARRETT:  And I will represent that in the

19   discovery that we produced to you, I believe the discovery that

11:36AM 20   was produced yesterday there are a record of the relevant

21   portions of that interview that had been produced to the

22   defense.

23        THE COURT:  All right.

24        MR. SCOTT:  So I think what -- and I hope I'm not

11:36AM 25   interrupting the Court, but I think that exchange right this

24

11:36AM

1    moment really kind of demonstrates what I'm talking about here.

2    That's a perfectly reasonable question for the Court to ask and

3    a very important question -- that's an important fact for me to

4    know.  I mean, I have this man under subpoena.  If the

5    government doesn't call him, I'm going to call him.

6        And as I stood here, even though I have these documents

7    apparently, and I take Mr. Marrett at his word, I don't know

8    the answer to that question because I cannot go through all

9    this material.  So I just share that with the Court that we've

10   demonstrated here in realtime the problems that I'm having and

11   what we're up against given the record where it is.

12             THE COURT:  I understand it.

13        Now I have a little bit different legal analysis than what

14   you said.  I -- you've now renewed your motion to dismiss the

15   charges.  And there's a lot of important legal principles at

16   play.  There's the *Brady*, *Brady* obligations, timely disclosure,

17   and disclose where you can meaningfully use it.  And I

18   understand what you're saying, and I agree that *Brady* is at the

19   heart of it.

20        But I think the way I look at it, you need to take a step

21   back.  And it would be -- you're asking me to dismiss the

22   charges based on my supervisory authority.  And you have to

23   show two things:  You have to show a government misconduct,

24   flagrant.  Negligence is not good enough, but recklessness is.

25   Reckless disregard for constitutional rights to Mr. Govey.

1 Deliberative indifference to his rights is enough.  And you

2 have to show prejudice.

3     I'm not struggling with the prejudice component because in

4 this case, Mr. Govey's constitutional right to a speedy trial

11:38AM 5 is being prejudiced by the failure to timely disclose these

6 documents that you can use it.  So that gets me to is -- the

7 issue is was there flagrant government misconduct?  And that's

8 the way I see it.

9     Because the -- you're saying it doesn't have to be

11:39AM 10 intentional.  I'm familiar with that law, but that's kind of in

11 a concept of when you had a trial or comes up during the trial,

12 it's not really before trial.  And technically we're still

13 before trial.  And you have to show misconduct on the

14 government's part, and it's got to be more than negligence.

11:39AM 15     And what we have here is the informant scandal, it's

16 common knowledge in Orange County, common knowledge for years.

17 You're deaf, dumb, and blind if you do not know the seriousness

18 of that, and particularly when there's a federal investigation

19 going on.  So we know that.  And then the percipient witnesses

11:40AM 20 involved in this case, one who actually sees the drugs in 2015

21 asserted his Fifth Amendment rights.

22     And as you know, and I believe you agree with me, I found

23 that very significant.  You don't have a uniformed Orange

24 County Sheriff going to a courtroom in a murder case -- I guess

11:40AM 25 there was a murder conviction -- and assert his Fifth Amendment

1    rights not wanting to talk about the informant scandal.  And

2    how that could not see the light of day in any case where

3    Deputy Larson is a witness is beyond me.

4         So with that said, my question to you is, I have a little

11:41AM 5    bit of a different legal analysis, or the way I'm looking at it

6    is pretty minimally.  Do you agree with that analysis?  If you

7    do agree with it, tell me why you believe the government's

8    conduct here has been in reckless disregard of Mr. Govey's

9    constitutional rights under the Sixth Amendment.

11:41AM 10             MR. SCOTT:  I think that is the correct legal

11    analysis.  I think it's the *Chapman* case that informs the

12    Court's supervisory power to dismiss for a *Brady* violation.

13    And the Court's correct, I think that that is accurate, that it

14    needs to be something more than negligent.

11:41AM 15        I guess what I want to first say by way of response is in,

16    you know, my prior comments saying I'm not accusing the

17    government of intentionally doing this or that.  I'm doing that

18    for two reasons:  One, because I take -- I try to take

19    seriously my professional obligations and my -- you know,

11:42AM 20    ethical duties not to overtry my case as far as that goes and

21    to accuse them of things that I don't have hard evidence for.

22        And what I'm thinking of is I don't have some e-mail, you

23    know, where Brad Marrett is saying, "We're going to turn the

24    screws on Mr. Govey and withhold *Brady* to do him in."  I mean,

11:42AM 25    I don't think that there's anything out there like that.  That

1    was kind of the spirit of the comments I was making before.

2        But the answer to the question, does this rise at least to

3    the level of recklessness?  I'm not trying to be unctuous.  I

4    can't say it better than how the Court said it, that you would

11:42AM 5 have to be deaf, dumb and blind to not anticipate this issue.

6    I mean, it's -- you can't pick up the newspaper without seeing

7    this issue.  It's been covered on the local news.  It's in

8    every "Daily Journal" and, you know, it's talked about in

9    hallways, and it really is the buzz of the legal community and

11:43AM 10 has been for a number of years.  And so it just -- it defies

11   logic.  It defies any sense to suggest that you could indict a

12   case relying chiefly on a person who's invoked in uniform under

13   oath and relying on this -- on a unit in the group of personnel

14   who are currently the -- in the cross-hairs of an investigation

11:43AM 15 by your own office and not anticipate that this might be a

16   problem.  And I think that that's a far sight more than

17   negligence.  And, you know, it certainly comfortably fits

18   recklessness.  And I think that more than gets it done under

19   the analysis that the Court laid out.

11:43AM 20        THE COURT:  Okay.  Mr. Marrett, I assume you want to

21   be heard, sir.

22        MR. MARRETT:  Thank you, Your Honor.

23        So I want to back up for a second and address kind of the

24   first question that the Court posed to Mr. Scott, and that was,

11:44AM 25 you know, identify what are the facts or the documents that are

going to support your theory in the case.  And early on there

were two things that the defense had asked for:  The Frosio

file and some grand jury testimony from Investigator Beeman.

Those are the only two sets of documents that the defense has

11:44AM  ever identified as documents that they believe exist and that

they want to have.  I can represent that those have all been

produced to the defense.

Beyond that, the defense hasn't identified anything that

they believe exist that would support their case that hasn't

11:44AM been disclosed and -- or I should say also timely disclosed.

So I don't think, frankly, that the defense can establish that

there's been any prejudice.  And backing up even further --

THE COURT:  Wait.  I'm sorry, Mr. Marrett.  I have a

big problem with that.  Mr. Govey, I've been very aware of,

11:45AM he's been very upset with me, he's been very upset with

Mr. Scott.  He wanted to go to trial last year before

Christmas.  And over his objection on at least two occasions,

I've continued the trial.  Speedy trial rights is in our Sixth

Amendment.  It's in the federal statute.  He has a right to a

11:45AM speedy trial, and he's not been going to trial.

And putting aside, because I do not know the details of

the 75,000 pages of documents that Mr. Scott's referring to, I

am aware that you hit me with a motion yesterday asking me to

go review 20,000 pages of documents and make a decision on

11:46AM whether to sustain the privilege asserted by the District

1    Attorney's Office and the Orange County Sheriff's Department,

2    whether these documents are privileged because of the

3    deliberative privilege or the attorney work product.

4        And then you asked me to, "And if you do not sustain the

11:46AM 5    privilege" -- oh, excuse me, I left one out -- "And that in

6    these documents if they are disclosed, you're going to put

7    people's life at risk, that they could be killed."  You hit me

8    with that yesterday afternoon.  I have to make a decision of

9    that magnitude, over 20,000 pages of documents before a trial

11:46AM 10   starts on Monday.

11       And then you tell me -- and you file it under seal and

12   Mr. Scott and Mr. Govey doesn't even get to see the motion.

13   And then you say, "And if you don't sustain the privilege,

14   don't show it to Mr. Govey, just show it to Mr. Scott."  I

11:47AM 15   mean, what world are we living in?  How is that realistic or

16   practical?

17            MR. MARRETT:  So let me -- let me take a step back,

18   Your Honor, because I think, No. 1, talking about pages takes

19   out of perspective the efforts that the government has gone to

11:47AM 20   in this case.

21            THE COURT:  It doesn't matter.  I'm going to assume

22   once I screamed foul and once Mr. Scott screamed foul that you

23   put an army of U.S. attorneys on it.  Okay.  I get that.  But

24   the point is -- and it goes to a comment that I thought maybe I

11:47AM 25   regretted saying earlier to you is the Orange County Sheriff's

Department made an informed decision that they were going to put Deputy Larson and the other deputies involved in the special handling unit on the street.

Any case that they're involved in as a result of that decision, every case they're involved in, this issue of their credibility is now on the table. And every case that the federal government decides to do through the joint task force, you want to prosecute a defendant -- you want to prosecute a defendant where these officers are percipient witnesses, you're going to have to do a *Brady* disclosure. And I don't know whether you were involved at the get-go, so I'm not trying to shoot the messenger.

I take it -- I agree with Mr. Scott, I -- my little limited dealings with you, I don't think you're an intentional malicious guy that you wanted to deny Mr. Govey of his Sixth Amendment rights. I'm not saying that. But what I don't understand is why did the feds take this case? Why would you compromise a federal investigation into the Orange County Sheriff's Department? Why would you drag the federal government into this informant scandal, which on its face is very, very troubling for 37.5 grams of meth?

Let's say he's distributing it to his friends where he's living at. That's not a federal case, you know. And this isn't my call, I understand that. That's the U.S. Attorney's call. And I respect the separation of powers. But you now

have sucked me into this because now I have a defendant who
wants to go to trial and you very recently produced 75,000
pages of documents to Mr. Scott that there's no way he can get
through by Tuesday.  And then you hit me with over 20,000 pages
of documents, and I have to make a decision by Tuesday whether
you got to produce those and I could be putting some lives at
risk?  That's what you're telling me in the motion that you --
the sheriffs don't want me to turn these over to Mr. Scott.

        And, you know, I'm at a loss because I've had national
security cases where you're dealing with some of the most
sensitive state secrets.  And I have been aware of cases, if
you reveal that information, sources will be killed and have
been killed.  And those are sources that are protecting our
national security of our country.  And in those cases, the
powers that be, whether that be the CIA, whether that be the
FBI, counterterrorism, the government has to make a decision,
dismiss or disclose.  And in many cases they say "dismiss."

        You didn't make that decision.  You're saying we're going
forward.  But there is no way that Mr. Scott or I can
meaningfully go through this document dump and give you the
rulings that you want or for him to meaningfully use them at
trial.  So there has to be a continuance.  And if there's a
continuance, I violated his speedy trial rights.  So I just
think a prejudice argument is a no-brainer for me.

                MR. MARRETT:  Well, and I do just want to make a

record, Your Honor.  I'm not trying to argue against you, but

the request from the defense for discovery for all of the

information about Deputy Larson's time and special handling,

all of the information about Investigator Beeman, all the

information about two other inmates in the jails was an

extremely broader request.

And I think, frankly, the government in collecting and

reviewing the documents that we received, over 25,000 records

from the Department of Justice, although we produced a

substantial number of pages, my understanding is that the

actual number of records, some were closer to 2,000, so it's

less than ten percent of the records that we got.  And even

that --

THE COURT:  But it -- I'm not going to play the

semantical game of records.  What matters to me is pages.  I

cannot get through 20,000 pages of documents by Tuesday to make

incredibly significant decisions.  And then Mr. Scott has to go

through that.  It's a physical impossibility.  And I feel we're

getting down a road that, quite frankly, I don't think you want

to go down.  Your *Brady* obligation is independent of anything

the defense asks.

So the fact that what I know, and Mr. Scott can clarify

that, the minute he was on this case, he was snapping at your

heels probably because Mr. Govey was putting pressure on him,

"Hey, we think that this is a vindictive prosecution.  We think

1    there's motive and bias by the deputies that were involved.

2    We're going to want this discovery.  We're going to want this

3    discovery."  And that was last year.

4              MR. MARRETT:  It was, Your Honor.  And when

11:53AM 5    Mr. Scott made that request to me, I began my efforts to

6    collect the documents, to begin looking through them to make a

7    determination for myself whether there is, in fact, any

8    potential *Brady* material in there.

9              THE COURT:  But see, that's where I'm having the

11:53AM 10   disconnect.  Given -- we're not just talking this is the normal

11   case.  We're talking this is a case where the percipient

12   witnesses are involved in the jailhouse informant scandal,

13   something of major legal significance.  In fact, my time on the

14   bench and in Orange County, it is probably the most significant

11:54AM 15   issue since I've been here.

16        And then almost two-and-a-half years ago you have a sworn

17   deputy assert -- with four others assert their Fifth Amendment

18   rights and having a murder conviction set aside.  And then

19   we've had, I think, what was it, seven murder cases set aside.

11:54AM 20        Again, I -- maybe this is before your time, there is this

21   program called "Hogan's Heroes."  Sergeant Schultz, "see

22   nothing, hear nothing, know nothing."  I would think that any

23   reasonable prosecutor, if they have this case against

24   Mr. Govey, they need to know about the informant scandal.  They

11:55AM 25   need to know and they're on notice that Deputy Larson asserted

his Fifth Amendment rights.

You're going to have to do discovery on *Brady* and disclose all the information relevant to credibility.  And the fact of your motion, you concede that this information is material.  Because you're saying don't -- we don't want to disclose this because of privilege that the Orange County Sheriff's deputies are telling you to assert or the District Attorney's Office are telling you to assert who are the ones who are being investigated by the feds for now almost two years.

And like I said, I'm frustrated.  I don't understand why I'm in this position, or more importantly, why Mr. Govey is in this position over 37.5 grams.

You know, if you told me he was *Dekraai*, mass murderer, if you told me he was the leader of the Aryan Brotherhood ordering hits, I'd say, you know what, life's tough and maybe we got to deal with it.  But this is 37.5 grams, and we're compromising all of these issues for this case?

MR. MARRETT:  Well, I mean, Your Honor, I wasn't involved in the initial charging decision in this case, but this is a case that meets federal guidelines for mandatory minimum sentences.  Those are Congress's laws.  Those aren't the laws that I wrote.  I just work for the prosecutor's office prosecuting those crimes.  So this is a federal offense.  It's not a, you know, solely a state offense.  And it is, I think, a very serious offense, although there are more serious offenses

1    that the Court sees.  This is still a federal case.

2           THE COURT:  All right.  Well, it's probably not

3    productive for you and I to be beating up on one another on

4    that point.  But the point that really does matter is how is

11:57AM  5    the government -- and when I say "the government," the royal

6    government.  Not you personally, but the whole team of the

7    United States Attorney's Office, when you take a case like this

8    involving percipient witnesses with Mr. Govey that are involved

9    in the jailhouse informant scandal, and he is, how could you

11:57AM 10    not realize at the get-go before you even go to the grand jury

11    for an Indictment, we're going to have a significant discovery

12    obligation?

13       This is not your typical 37.5 grams case.  This is

14    something unique.  I wish it wasn't.  I wish it was just one of

11:57AM 15    those run-of-the-mill cases that, okay, we're going to

16    prosecute it.  It's worth the resources.  Mr. Govey's this

17    dangerous guy.  We don't want him on the street.  I get that.

18    But this is much more than that.  This case is connected to the

19    informant scandal.

11:58AM 20       And not realizing that, that's what I'm having a problem

21    with.  You don't need a request from Mr. Scott.  I don't know

22    what -- the attorneys who are working on it before, but I would

23    argue and I would assert to you, it is ineffective assistance

24    of counsel for them not to be all over you saying, "I want

11:58AM 25    everything on Larson.  I want everything on Beeman."  I would

1    be concerned if they weren't asking you for those.

2        I mean, the Rules of Evidence, 608, right of

3    confrontation, they don't have any meaning.  You're just going

4    to ask a witness about what's favorable to the government?

11:59AM 5  He's going to attack their credibility.

6        And like I said before to you on the simple basis general

7    level, Deputy Larson, when the government calls him to testify,

8    he'll talk about the informant scandal.  When the defense wants

9    him to talk about it, he refuses, just on that simple level.

11:59AM 10  That shows a mode of bias towards the government.  That's going

11   to come out.

12       You're going to need to do a *Brady* obligation, *Brady*

13   review, *Brady* disclosure right away.  You don't need to wait

14   for defense counsel to be asking it.  I mean, the --

11:59AM 15          MR. MARRETT:  And so, Your Honor, I do just want to

16   at least put on the record what has transpired over the last

17   couple weeks and what we've done, because we received the

18   documents.  We reviewed them --

19          THE COURT:  I'm going to assume, because you

12:00PM 20  apprised me and you're probably getting frustrated with me

21   because I interrupted, I read it.  You put 12 U.S. attorneys on

22   it.  You're reviewing thousands of documents.  I get that.  But

23   it's too late is what I guess I'm saying.  It's too late.

24   You've given me 20,000 pages of documents that I have to look

12:00PM 25  through to make these incredibly significant legal decisions.

1    And then whatever I decide to do, Mr. Scott's got to get

2    through 20,000 pages of documents that are material, I should

3    add, and that's all going to happen by Tuesday?

4            MR. MARRETT:  Well, Your Honor, I don't know if the

12:00PM 5    government's conceding that the information is material.  I

6    mean, part of the problem is going through these records as the

7    defense's theory has been amorphous.  It's been shifting.  And

8    it's a broad theory of general bias for the government and

9    against Mr. Govey.  They've asked for records -- housing

12:01PM 10   records from inmates that aren't on trial here.

11           The defense has asked for essentially the discovery so

12   that it could prove up its own variation of the *Dekraai* case.

13   They've asked for all the housing records, all the special

14   handling records, all of the records from these deputies, their

12:01PM 15   time in the jail or their connection, their conversation with

16   people in the jail.  Their --

17           THE COURT:  But they have to, Mr. Marrett.  If he

18   didn't, they'd be ineffective.

19           MR. MARRETT:  I understand it, Your Honor.

12:01PM 20           THE COURT:  Whether you like it or I like it,

21   because I don't, Mr. Govey is involved in that.  He is.

22           MR. MARRETT:  And I'm --

23           THE COURT:  Just like Deputy Larson and

24   Investigator Beeman are.  I wish they weren't.  Gosh, you know,

12:01PM 25   just on the jury instructions alone on this 37.5 grams, I spent

UNITED STATES DISTRICT COURT

1  more time on your jury instructions than I did in my six-week

2  Howard trial with Mr. Tenley in the back there.

3          MR. MARRETT:  And I understand, Your Honor, and I'm

4  not faulting the defense for asking for those documents, but

12:02PM  5  they asked for them.  And the government has gone -- not only

6  met its discovery obligations, produced these documents to the

7  defense before trial, but it's gone -- it's gone --

8          THE COURT:  You're saying you met your discovery

9  obligations.  I would beg to differ.  You haven't met your

12:02PM 10  discovery obligations.  You dumped 75,000 pages of documents on

11  the defense.  You dumped over 20,000 pages of documents on me.

12  And there is no realistic way that Mr. Scott and Mr. Govey or I

13  can get through those documents through Tuesday.  That's not my

14  problem, that's not Mr. Govey's problem, that's not Mr. Scott's

12:02PM 15  problem, that's the government's problem.

16          The government was the one who brought these charges.  The

17  government's witnesses are Larson.  They're the ones who did

18  the search.  They were the ones who seized the evidence.

19  That's your problem.  And that gets into the former discussion

12:03PM 20  we had, Mr. Marrett, is -- and you weren't involved in the

21  charging, so I got the wrong person.  Whoever the U.S. Attorney

22  was involved at the time charging and going to the grand jury

23  should have known about this and should have known what they

24  were getting the feds into.  And I'm saddened that they've

12:03PM 25  sucked the United States Attorney's Office, which I hold in

very high esteem, and they sucked us and dragged us into the
informant scandal.  And I'm worried you're compromising the
federal investigation of it.

Why in the world should Mr. Govey and Mr. Scott be getting
documents from that confidential investigation that's quite
important that was ordered by the Attorney General of the
United States?  I'm at a loss to understand that there was
just, like, no foresight on where are we going with this?  Is
Mr. Govey worth it?

And again, Mr. Marrett, I'm frustrated because now it's my
problem.  I have to make a decision.  Am I going to dismiss
these charges against Mr. Govey or not?  Where before, you
know, those decisions are your decisions.  And I might not
agree with them, but separation of powers, that's your call.
But now you're telling me, "Here's all these documents.  Go
look at them, Judge.  Mr. Scott, go look at them.  And you have
to look at them and meaningfully adopt them into your trial
strategy, 100,000 pages of documents by Tuesday."  I mean, I
don't -- I don't even know if a computer inputting it, you
could do it.

MR. MARRETT:  Well, I do want to point out a couple
things, Your Honor.  No. 1, of the documents, this isn't just a
single document dump.  The government began producing documents
on February 15.  On February 17 by then, 56,000 of the pages
had been produced.  So defense had this for a week now.  And

```
 1   I --
 2              THE COURT:  Really?
 3              MR. MARRETT:  Well, and, Your Honor --
 4              THE COURT:  Oh, my God.  75,000 pages you can get
 5   over in a week?  Really?
 6              MR. MARRETT:  Your Honor, we were here a couple
 7   weeks ago and -- when the government asked for its continuance
 8   initially.  And the government was reviewing documents and
 9   producing them and was going through 25,000 records.  We culled
10   that down to about 2,000 records or so.  And that's what has
11   been turned over to the defense.
12        The government's put in substantial effort to assist the
13   defense in -- I guess let me back up a little further.  The way
14   that we got those documents was by running search terms for the
15   deputies' names, for search terms also that the defense had
16   provided and asked the government to search through.
17              THE COURT:  I get it.
18              MR. MARRETT:  We did that.
19              THE COURT:  And I sense since I was beating on you,
20   you made great efforts, and I'll take that into account.  But
21   the problem is it was flawed at the inception and that's where
22   you're just not addressing and you're trying to tell me, "Well,
23   look at all the great things we've done."  Well, you know,
24   Mr. Govey's speedy trial rights, he's probably saying, "I don't
25   care.  You violated my -- because you've now given me 100,000
```

The timestamps in the left margin read: 12:05PM (line 5), 12:05PM (line 10), 12:06PM (line 15), 12:06PM (line 20), 12:06PM (line 25).

1   pages of documents to look over by Tuesday."

2       So it doesn't -- you know, quite frankly, it doesn't

3   matter what great efforts you've made over the past couple

4   weeks that I've been beating on you.  The fact of the matter is

12:07PM 5   you didn't get the job done.  You didn't get the job done

6   because -- and what it now sounds like is you couldn't get the

7   job done.  You physically could not get the job done.

8       The problem was, again, at the time these charges were

9   brought, no one was thinking or cognizant, and I'm at a loss to

12:07PM 10   understand why not, that there was a lot of baggage with these

11   witnesses.  And if you're going to prosecute this case against

12   Mr. Govey, you're going to bring the feds right into the

13   informant scandal, and you're going to be disrupting and

14   interfering with the federal civil rights investigation.

12:07PM 15       And I saw that last year and I made comments, maybe some

16   were appropriate, maybe some were inappropriate, but that was

17   your call.  But now you've made it my call.  You made it my

18   call because now there's no way that Mr. Scott nor I can get

19   through 100,000 pages of documents by Tuesday.  We just can't

12:08PM 20   do it.  And since we can't do that, we would have to have a

21   continuance.  If we have a continuance, his speedy trial rights

22   are violated.  So that's not an option.

23       So the argument is, you know, I don't think your conduct

24   personally was intentional.  But I'm having, as you can tell, a

12:08PM 25   hard time believing that there wasn't misconduct on the

government's part.  And the misconduct started not realizing

what you were getting yourself into by prosecuting these

charges against Mr. Govey when Deputy Larson and Deputy Beeman

are percipient witnesses.  That was your problem.

12:09PM   MR. MARRETT:  Now I will say, Your Honor, and I'm

not trying to offend the Court, but -- or Mr. Govey or his

counsel, but the government has now produced all of these

records to the defense.  It has the universe of documents that

are both potentially relevant.  Also things that the government

12:09PM has gone, I think, beyond its discovery obligations in order to

ensure however broad the defense theory is, the documents have

been produced.  The defense can ask for a continuance and not

violate his speedy trial rights.

THE COURT:  So give up your speedy trial rights as

12:09PM we go through these?

MR. MARRETT:  And, Your Honor, we have satisfied our

discovery obligation by producing these documents in advance of

trial.  I know there's a large volume of it and there's a lot

to get through for the defense, but they can run their own

12:09PM searches on them.  They can review them.  They can ask for

continuance if they need more time to get through the

documents.  That's a decision that the defense can make.  The

government has produced the documents in advance of trial and,

I think, satisfied its discovery obligations.

12:10PM   THE COURT:  Okay.  All right.

1          MR. MARRETT:  Can I just have one moment, Your

2     Honor?

3          THE COURT:  You may.

4          **(Government counsel conferred off the record.)**

12:10PM 5          THE COURT:  You may.  It's your record.

6          Mr. Scott, if you'd be kind enough to confer with

7     Mr. Govey.  Make sure there's nothing else that he thinks is

8     important that I should know as part of the record.

9          MR. SCOTT:  Yes, Your Honor.

12:12PM 10          **(Pause in proceedings.)**

11          THE COURT:  Mr. Marrett.

12          MR. MARRETT:  So the only other two points that I'd

13    make just for the purposes of making a record, No. 1, as far

14    as -- and again, I don't mean to beat a dead horse, but I just

12:12PM 15    want to make sure it's in the record is when we went and

16    searched for these documents, we used very broad search terms.

17          The searches -- the government was searching for these

18    records not because we were aware of anything that was material

19    or relevant to the defense or any *Brady* or *Giglio*.  But in

12:12PM 20    order to both comply with the Court's order that we search this

21    discovery and to ensure ourselves that there is no *Brady* or

22    *Giglio* material.

23          So I think, you know, partly in the volume of records that

24    we've given to the defense, I don't think -- I mean, not all of

12:13PM 25    those records certainly are material to the defense.  A lot of

 1   the records, in my understanding, relate to the defendant's

 2   2012 state case, which defendant either likely already has or

 3   received in discovery in those cases.

 4       I understand there was discovery that wasn't produced, and

12:13PM  5   I think we've now produced to the defense what they had asked

 6   for in that prior case.  So a lot of the discovery, if not the

 7   vast volume of it, is discovery related to his 2012 state case

 8   and the issues that came up there.  And so I don't think

 9   there's been any record made by the defense.  There's no

12:13PM 10   evidence that the government knew or should have been -- should

11   have known about the discovery issues in the defendant's 2012

12   state case, the issues with informants in that case, the issues

13   involving their claims relating to not getting discovery in

14   that case.  That's one, Point 1.

12:14PM 15       The second point is, Your Honor, there's also no evidence

16   that the government knew or should have known that

17   Deputy Larson had invoked the Fifth in a prior case in state

18   court not involving Mr. Govey.

19           THE COURT:  Really?  I mean, I was the one who

12:14PM 20   raised this and confirmed it.  That was common knowledge of the

21   deputies.  I think it was all plastered over "OC Weekly,"

22   "Orange County Register."  I can't sit here and tell you

23   the "L.A. Times," but I can assure you it was in the "Register"

24   and the "OC Weekly."  And I believe the "Daily Journal" might

12:15PM 25   have reported it as well.

**UNITED STATES DISTRICT COURT**

1       And I just know in all legal circles, whether you're at

2   Bar events or whatever, it was the talk of the town.  Can you

3   imagine the sight of five uniformed Orange County Sheriff

4   deputies asserting their Fifth Amendment right, saying if they

12:15PM 5   answer questions about how they handled the informants in the

6   jail, that they could incriminate themselves?  That's pretty

7   darn significant.  And I knew about it.

8           MR. MARRETT:  Those were the only two points, Your

9   Honor.

12:16PM 10          THE COURT:  All right.  Mr. Scott.

11          MR. SCOTT:  The only reply to what the government

12   has said is I just wanted to make one factual clarification

13   because there was at least one point where the government said,

14   you know, we started making efforts to gather these things, you

12:16PM 15   know, from the moment it was brought to our attention or words

16   to that effect.  And I want to clarify that we laid our

17   requests out at Docket 36.  So this is in the record where I

18   put in the letters that I had been sending since essentially

19   the moment I started working with Mr. Govey and then I filed

12:16PM 20   all of those at Docket 36.

21       The government at Docket 88 acknowledged in moving for the

22   continuance that it wasn't until late December -- until shortly

23   before the trial date that was originally set in January 9 that

24   they requested the information from the Department of Justice.

12:17PM 25   So I just don't want there to be any, you know, confusion or

1    misperception that the government, you know, started gathering

2    Department of Justice investigative files when they indicted

3    the case.  That certainly would have been the best practice.

4    But then they also didn't start gathering it when I started

12:17PM 5    asking for it in late November.  They --

6            THE COURT:  When was the Indictment returned?

7            MR. SCOTT:  August of --

8            THE COURT:  Of 2017?

9            MR. SCOTT:  Yes, Your Honor.

12:17PM 10            THE COURT:  And then -- so -- and Deputy Larson

11   invoked in 2015.  I can't remember the month.

12            MR. SCOTT:  January '15 sounds right.

13            MR. MARRETT:  I believe it was October of 2015.

14            THE COURT:  It was 2015 --

12:17PM 15            MR. SCOTT:  It was before.

16            THE COURT:  -- in any event.

17            MR. SCOTT:  Before the Indictment, I think, is what

18   matters.

19            THE COURT:  Right.  And when was the Court of

12:17PM 20   Appeals' decision affirming Judge Goethals disqualifying the

21   Orange County District Attorney's Office from prosecuting the

22   *Dekraai* case?

23            MR. SCOTT:  You know, I don't know that off the top

24   of my head.  I could provide that to the Court, but I don't

12:18PM 25   have it in at my fingertips.

1        THE COURT:  No, I can figure it out.

2        MR. SCOTT:  So the point I was making is that the

3    government acknowledged, and this was on the docket at CR 88

4    that they didn't request the files from the Department of

12:18PM 5    Justice until late December of 2017.  So I just want to make

6    sure that that's clear.

7        The Court invited me to confer with Mr. Govey, and so I

8    want to reemphasize that it was, you know, the informant

9    documents having to do with Alexander Frosio.  It is our

12:18PM 10   earnest belief that that really lays out what was done to

11   Mr. Govey incorrectly.  That's what they tried to protect in

12   dismissing his state court case, and that's still to this day

13   what we're trying to get to.

14        THE COURT:  And it has not been produced, and the

12:19PM 15   sheriffs aren't giving it to you; right?

16        MR. SCOTT:  That's my understanding.  Mr. Marrett

17   has represented that he gave me what the District Attorney's

18   Office had, which I have reason to believe is separate and

19   apart from what the special handling unit had.  And it wouldn't

12:19PM 20   surprise me, frankly, if that's what's in this 25,000 pages

21   that is sitting in camera right now.  At least I would hope

22   that it is.

23        THE COURT:  I can't represent -- I didn't even

24   attempt to look at the 20,000 pages.

12:19PM 25        MR. SCOTT:  And I'm not fishing for information.

**UNITED STATES DISTRICT COURT**

1    I'm just saying that to my knowledge, I don't have the -- the

2    real special handling unit Frosio file to the best of my

3    knowledge.

4        Mr. Govey also just wanted to point out that in -- it's

12:19PM 5    his view that the circumstances of his arrest while he was on

6    bond for what originally was a state court case in this case

7    further support the theory of animus.  And I didn't include

8    that when I was laying out the whole timeline.  He -- before

9    the government obtained the Indictment that they did in this

12:20PM 10   present case, he was in state court on this matter.

11       He went to court one day as he was directed to do, and he

12   was arrested in the parking lot on this federal Indictment.

13   And to this day we're trying to get the keys that were taken

14   from him, the money that was on him, and he was then

12:20PM 15   transported in apparently, according to him, personal vehicles

16   of the arresting agents that were involved here, Larson in

17   particular.  So in his view, that adds to kind of the

18   appearance of animus and vendetta theory that we've been --

19       THE COURT:  Give me that one again.  That

12:20PM 20   Deputy Larson was involved in the federal arrest?

21       THE DEFENDANT:  Yes.

22       MR. SCOTT:  Yes.

23       THE DEFENDANT:  I was transported in his truck to

24   Agent Sanders over there, his personal truck.  I was put in the

12:21PM 25   front seat, and he drove me somewhere, and I was transferred to

ATF Agent Sanders' vehicle and then brought to federal court

that day within a couple hours.

I went to court -- I was out on bail.  I went to court.

They jumped me in the parking lot.  One cop took my phone, one

12:21PM 5 took my keys, one took my money.  They put me in Larson's car.

After three hours standing in the parking lot, they put me in

Larson's truck, and he drove me to a location I didn't really

know where it was at, but they transferred me to ATF

Agent Sanders' vehicle, and he brought me to federal court.

12:21PM 10          THE COURT:  Okay.

           MR. SCOTT:  And that's all we have to add.  Thank

you.

           MR. MARRETT:  Three quick things, Your Honor.

First, I can represent to the defense that -- well, back up --

12:21PM 15 I'm not sure exactly what the defense thinks is the Frosio

file.  The defense has never made it clear what it believes is

contained in this Frosio file.  However, I can represent that I

have produced to Mr. Scott under the protective order the TRED

records that he's asked for for Mr. Frosio, the housing -- the

12:22PM 20 other housing records for Mr. Frosio and the special handling

log, any of the entries that mention either Mr. Govey or

Mr. Frosio and other entries as well.

           But I've produced to the defense whatever they've asked

for with respect to this Frosio file and -- or what I

12:22PM 25 understand could potentially even be considered in their idea

UNITED STATES DISTRICT COURT

of whatever this Frosio file is.  And I think they're using

that term loosely.  But I believe we've produced all of that to

the defense.  And that's not what the Court has in camera.

    I also want to clarify the record that Mr. Scott had

talked about the day he made his request, and the government's

filing went ahead and requested information from the DOJ.  The

government also in between searched its own records, and it

made inquiries of its own civil division to gather documents as

well.  So our efforts started before the timeline that

Mr. Scott suggested.  It was immediately after we received that

request that we began requesting information.

    And then -- and I think the last point is Mr. Scott

brought up the circumstances of Mr. Govey's arrest, and my

understanding is that there was an Indictment returned.  The

federal arrest warrant was issued, and he was arrested pursuant

to that warrant.  I think Mr. Scott had said that it was before

the Indictment was issued, and I think that's factually

inaccurate.  There was an Indictment and then an arrest warrant

that was served the next day.

                THE COURT:  Okay.

                MR. SCOTT:  Maybe I misspoke, but he was arrested on

the federal Indictment.  He had been in state court proceedings

prior to the federal Indictment being brought.  So if I gave a

misimpression, I didn't mean to.  He was arrested on the

federal Indictment.

As to the state of discovery, I just wish I knew whether or not what Mr. Marrett is representing is true, but I just don't know because I can't get through all that material.

THE COURT:  All right.  Well, this is obviously a very significant decision and one that I will be issuing a written order on.  I don't know whether I'll be able to get the order out next week or the following week, but I will get a written order out.  Given the trial is set to happen Tuesday, though, I will give you my oral ruling, but that's just for your notice purposes.  My reasoning will be set forth in the written order.

I am going to dismiss the charges with prejudice.  I believe Mr. Govey's Sixth Amendment rights to a speedy trial, compulsory process and confrontation have been denied by the government's failure to timely disclose material documents that Mr. Govey needs to expose percipient witnesses' bias against him and to attack their character for truthfulness.

Again, I will have my reasoning set forth in detail and findings of fact and conclusions of law in a written order that will be out certainly within two weeks.  But given the significance, I want to take my time with it.

My understanding, Mr. Govey, is you have no holds or detainers, so I will order the marshals to release you forthwith.  You'll probably have to go back to MDC for processing.

1          THE DEFENDANT:  Thank you.

2          U.S. MARSHAL:  If I may, Your Honor.  Marcelino

3    Hazelwood on behalf of the Marshal Service.

4       It is my understanding that Mr. Govey does have a $5,000

12:26PM 5    misdemeanor warrant out of the Orange County Sheriff's office,

6    so it's really dependent on whether or not they would pick him

7    up on that warrant.  I don't know that for sure.  We haven't

8    conferred with them, but that warrant is in the system.

9          THE COURT:  Okay.  So you're just giving me the

12:26PM 10   heads-up.  I obviously -- you're going to transport him back to

11   MDC, and then you're going to let the County authorities know,

12   and then they'll either come or they won't.

13         U.S. MARSHAL:  That's right, Your Honor.

14         THE COURT:  Anything further?

12:26PM 15   MR. SCOTT:  No.  Thank you.

16         THE COURT:  Okay.

17         THE COURTROOM DEPUTY:  All rise.

18         **(Proceedings concluded at 12:26 p.m.)**

19                        **--oOo--**

20

21

22

23

24

25

1          *CERTIFICATE OF OFFICIAL REPORTER*

2

3    COUNTY OF LOS ANGELES    )
                             )
4    STATE OF CALIFORNIA      )

5              I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, in and for the United States District Court for

7    the Central District of California, do hereby certify that

8    pursuant to Section 753, Title 28, United States Code that the

9    foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14

15   *Date:  February 27, 2018*

16

17

18

19                              */S/ DEBBIE HINO-SPAAN_*

20                              *Debbie Hino-Spaan, CSR No. 7953*
                               *Federal Official Court Reporter*
21

22

23

24

25

**UNITED STATES DISTRICT COURT**