**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**

**HONORABLE CORMAC J. CARNEY, U.S. DISTRICT JUDGE**

UNITED STATES OF AMERICA,           )
                                     )
                  Plaintiff,         )   **CERTIFIED TRANSCRIPT**
                                     )
         vs.                         )
                                     )   Case No.
JOSEPH MARTIN GOVEY,                 )   8:17-cr-00103-CJC-1
                                     )
                  Defendant.         )
_____)

REPORTER'S TRANSCRIPT OF

PRETRIAL CONFERENCE

THURSDAY, DECEMBER 21, 2017

9:05 A.M.

SANTA ANA, CALIFORNIA

**DEBBIE HINO-SPAAN, CSR 7953, CRR**
FEDERAL OFFICIAL COURT REPORTER
411 WEST FOURTH STREET, ROOM 1-191
SANTA ANA, CALIFORNIA 92701-4516
dhinospaan@yahoo.com

**UNITED STATES DISTRICT COURT**

1    **APPEARANCES OF COUNSEL:**

2

3    **FOR THE PLAINTIFF:**

4         NICOLA T. HANNA
          United States Attorney
5         BY:  BRADLEY MARRETT
               Assistant United States Attorney
6         United States Courthouse
          General Crimes Section
7         411 West Fourth Street
          Suite 8000
8         Santa Ana, California 92701
          (714) 338-3505
9
     **FOR THE DEFENDANT:**
10
          SCOTT TRIAL LAWYERS APC
11        BY:  TIMOTHY A. SCOTT, ESQ.
          1350 Columbia Street
12        Suite 600
          San Diego, California 92101
13        (619) 794-0451

14

15

16

17

18

19

20

21

22

23

24

25

**UNITED STATES DISTRICT COURT**

**SANTA ANA, CALIFORNIA; THURSDAY, DECEMBER 21, 2017**

**9:05 A.M.**

**- - -**

THE COURTROOM DEPUTY:  Calling Item No. 2,
SACR17-103, United States of America versus Joseph Martin
Govey.

Counsel, please state your appearances.

MR. MARRETT:  Good morning, Your Honor.  Brad
Marrett for the United States.

THE COURT:  Hello, Mr. Marrett.

MR. SCOTT:  Good morning, Your Honor.  Tim Scott for
Mr. Govey.  He's present before the Court in custody.

THE COURT:  Hello, Mr. Govey.  Hello, Mr. Scott.

Well, we have quite a number of things we need to do
today.  What I wanted to do first was address the motions.  And
there's one of the motions I have a concern about, and I wanted
to get everybody's thoughts to see how we resolve it, if it can
be resolved.  And that motion deals with -- I mean, that issue
deals with the motion to exclude the Orange County Sheriff's
Department inmate-informant scandal.

Let me tell you what my tentative is on this motion, and
then I will tell you the issue that I'm having.  My inclination
is to deny the motion because the Orange County Sheriff's
Department jail informant scandal is relevant to proving
Deputy Larson's motive, bias, and character for truthfulness or

1    untruthfulness.

2        I'm aware that Deputy Larson is a key witness in that

3    scandal, and in the subsequent criminal case asserted his Fifth

4    Amendment right and refused to testify regarding his

09:07AM 5    involvement in the scandal and the truthfulness of his

6    testimony in an earlier criminal case where Judge Goethals

7    found intentional misconduct on the deputy's part.

8        In a subsequent case before Judge King, the defendant, I

9    believe, was Eric Ortiz, I believe it was murder charges, the

09:07AM 10   DA had to dismiss the charges because Deputy Larson asserted

11   his Fifth Amendment rights.  So as I understand it in this

12   case, Deputy Larson is one of the two deputies that did the

13   search, so he is a percipient witness whether the government

14   calls him, which I understand they intend to, or the defense

09:07AM 15   calls him.

16       My issue, is he going to assert his Fifth Amendment

17   rights?  Because it is totally appropriate for Mr. Scott to

18   cross-examine him about whether he was truthful or not truthful

19   with that.  And if he's going to assert his Fifth Amendment

09:08AM 20   rights, we got a problem.

21           MR. MARRETT:  So I guess to address first, Your

22   Honor, the -- I just want to clarify what the Court's concerns

23   are.  Your understanding is that there was two cases where

24   Deputy Larson asserted his Fifth Amendment rights?

09:08AM 25           THE COURT:  No, I'm aware of one case.  He -- are

**UNITED STATES DISTRICT COURT**

1    you familiar with the *Dekraai* case, I assume?

2         MR. MARRETT:  Generally familiar with it, yes, Your

3    Honor.

4         THE COURT:  The *Dekraai* case was before

09:08AM 5    Judge Goethals, and the public defender in that case from the

6    get-go had believed that there was this unconstitutional

7    informant program that the deputies were running with the

8    knowledge of the gang unit DAs.

9         And Mr. Scott, if you have more to add on anything, you're

09:09AM 10   not going to offend me if you correct me.  In fact, I want you

11   to correct me if you have more or different information.  But

12   my understanding is the public defender smelled a rat that what

13   the deputies were doing was there would be defendants that are

14   represented by counsel, and the deputies would be moving

09:09AM 15   informants to be their cellmate and try to get the defendants

16   to confess.  And that is, according to the United States

17   Supreme Court and California Supreme Court, unconstitutional,

18   violates *Massiah*, because the informants are an agent of the

19   government, and the defendant is represented by counsel.

09:10AM 20        My understanding, there were four deputies that were

21   involved, and the four were:  Deputy Tunstall, Deputy Garcia,

22   Deputy Larson and Deputy Grover.  And Judge Goethals had a

23   hearing -- evidentiary hearing that went on for quite a while.

24   And he concluded at that point that there was negligence,

09:11AM 25   serious negligence by the deputies, but no intentional

1   misconduct after listening to these deputies' testimony.

2        Then as I understand it chronologically, Judge Selna had

3   what we call the Mexican Mafia case.  And some way, somehow

4   it's not clear to me that two or more of these deputies, not

09:11AM 5   Deputy Larson, could be witnesses in his case.  And based on

6   Judge Goethals' finding that it was just negligence, he

7   concluded it wasn't relevant.

8        Okay.  Next thing that happened is public defender finds

9   out that the testimony of these deputies and what was before

09:11AM 10   Judge Goethals was false and it wasn't true.  He persuades -- I

11   don't know how many times it took him, but he persuades

12   Judge Goethals to reopen the proceedings.  Judge Goethals

13   reopens the proceedings.  You have these guys testify.  I

14   believe the sheriff herself had to testify.  Other people

09:12AM 15   testified.

16        To make a long story short, Judge Goethals makes

17   credibility findings about the witnesses and believes that

18   they've been dishonest -- willfully dishonest and withholding

19   and destroying documents and feels that the DAs are responsible

09:12AM 20   because they can't control the deputies and then boots off the

21   DA from prosecuting the death penalty.

22        My understanding, Dekraai had pled guilty to the murders,

23   but he was just challenging the death penalty.  Judge Goethals

24   removed the DA's office from the case based on his findings,

09:13AM 25   based on the testimony of these deputies.  That was appealed.

**UNITED STATES DISTRICT COURT**

1   And the Court of Appeal, I think it was Justice O'Leary wrote

2   the opinion, it was pretty stinging about the integrity,

3   honesty of the Sheriff's Department and this informant program

4   called an informant scandal.

09:13AM 5       That's not the end of the story.  My understanding is

6   there were several cases -- I want to say five, but I -- please

7   don't hold me to that number, but I know at least one case

8   where there were two deputies, if not three, but two deputies

9   that were involved and in uniform on the stand, they asserted

09:14AM 10  their Fifth Amendment rights and would not answer questions

11  about their testimony before Judge Goethals or anything about

12  this informant program.  And one of those deputies was

13  Deputy Larson.

14      And again, the case that he did that is Eric Ortiz,

09:14AM 15  11CF0862, and he asserted his Fifth Amendment rights, I

16  understand, on October 8, 2015.  I don't know whether this is

17  hearsay or just in some of the communities one of the -- or

18  raised in the press, one of the issues the press has criticized

19  the sheriff for is why are you -- why this cloud of controversy

09:15AM 20  is going on?  And as I understand, the feds are investigating

21  the DA, the informant program that they allegedly had in the

22  Sheriff's.

23      Why are you continuing to allow the deputies allegedly

24  involved and accused of this misconduct working in the field?

09:15AM 25  Because anything they work on, they're compromised.  And it

doesn't matter if there's three other deputies that have

nothing to do with the scandal, if you have one that's involved

in the scandal as a percipient witness, whether the DA's office

calls that witness or the defense says, "We're going to call

09:16AM   him as a percipient witness, because what the deputies who are

not involved in the scandal just testified is not true, and so

we think that the other percipient witness will tell the truth,

and so we're going to call him."  And is this deputy going to

then tell a different story than the other ones?

09:16AM        Let's assume no, that he's going to tell his version,

which is inconsistent with the defendant.  And then the defense

has the right to cross-examine the deputy on untruthful

conduct.  Or worse, candidly, legally and aesthetically the

deputy asserts his Fifth Amendment rights.  And so then you

09:16AM   have to dismiss a murder case.  Because now the defendant is

being denied his right to compulsory process.

       So that's the issue I have, Mr. Marrett.  And I -- I'm

basing this on some information, inside knowledge that I have.

Some of it is just based on what I read in the newspapers.  But

09:17AM   I think if you check that file, you'll see that Deputy Larson

asserted his Fifth Amendment rights.  And your papers indicate

Deputy Larson is a percipient witness to this search.  And I

take from Mr. Scott's motion, he is going to play this card

hard.  I don't know if that's a fair statement.

09:17AM        Do you have -- I think it's important because I'm not

obviously Judge Goethals, and I'm not Judge King.  Do you have

more up-to-date information?  Anything I said inaccurate or

incomplete?

MR. SCOTT:  Nothing the Court said is inaccurate to

the best of my knowledge, including the fact that we are going

to pursue this vigorously at trial.  Call it playing this card

or pursuing this aspect of the case, we're certainly going to

do that with vigor.  And it is our intention to make this very

much what Mr. Govey's trial is about or at least a large facet

of it.

What I would add are specific facts that we put into the

record that relate to Mr. Govey himself beyond just the Orange

County scandal generally.  My understanding -- and my

understanding is based on conversations with his former

attorney -- Mr. Govey's former attorney who litigated his 2012

case in Orange County, as well as the at least publicly

available documents in that case, is that Mr. Govey himself was

one of the early key victims, for lack of a better word, or key

figures in the Orange County scandal.  And he was one of the

persons that Attorney Scott Sanders spoke to and helped develop

a lot of this information early on.

To be even more specific, and I did put this in my papers,

but I'll just say it for the record as well, but my

understanding is that Mr. Govey was absolutely one of the

inmates that the Orange County sheriffs would try to plant

1    informants and inmates in close proximity to, in his cell,

2    around his cell in an attempt to talk to him in violation of

3    *Massiah,* as the Court had said.

4        I should also say more specifically that one such inmate

09:19AM 5    is a gentleman by name of Frosio, and I believe that's

6    F-r-o-s-i-o.

7            THE DEFENDANT:  Yes.

8            MR. SCOTT:  Alexander is his first name?

9            THE DEFENDANT:  Yes, sir.

09:20AM 10            MR. SCOTT:  And this came to a head when, as I

11    understand it, when among the documents that the Superior Court

12    judge in Mr. Govey's case ordered turned over was the,

13    quote-unquote, "Frosio file," the informant file, the

14    cooperator file for this informant Frosio, was among the

09:20AM 15    materials.  Not exclusively materials, but among the materials

16    that the DA was ordered to turn over.  And then shortly

17    thereafter, the case was dismissed instead, which was also

18    Judge Goethals, who I understand was the trial judge on that

19    case.

09:20AM 20        So I say that just to sort of augment the record on that

21    part, but also to make very clear that, you know, beyond our

22    more general *Henthorn* and *Giglio* request, we're also asking for

23    that Frosio file along with everything else.

24        Some other things that I understand happened to Mr. Govey

09:20AM 25    is that there were efforts to persuade other inmates to turn on

**UNITED STATES DISTRICT COURT**

Mr. Govey, that there's some pretty hard evidence of them

offering both carrots and sticks to try to turn them as

informants against Mr. Govey for the earlier case, attempts to

talk to Mr. Govey directly on the part of officers, so not even

09:21AM  using the informant intermediary while he was in custody.

And then as I understand it, at least, the attorney in his

underlying case was able to make a pretty good prima facie case

that officers in this case, specifically Officer Beeman whose

name I put in the papers, but who hasn't come up yet, presented

09:21AM  testimony before the grand jury, that appears to have been

false regarding Mr. Govey and his role both in the gang that

he's alleged to be in as well as in his standing in that same

group as well as some of the underlying conduct.

And so I say that to articulate the Frosio thing to also

09:22AM  make clear that this Officer Beeman, I believe, is also at the

epicenter of this.  He may not have invoked his rights the way

that Larson did at some point, but I do have a good-faith

belief from prior counsel that he arguably perjured himself in

front of the grand jury, that he is also --

09:22AM  THE COURT:  Grand jury in what case?

MR. SCOTT:  In the state case.  It was the --

THE COURT:  The 2012 case?

MR. SCOTT:  That's my understanding, that it was

a -- you know, I don't want to say rare, but rather than going

09:22AM  to prelim, they elected to use a grand jury in the state case,

**UNITED STATES DISTRICT COURT**

```
  1   which they have the right to do.  And I understand he was
  2   untruthful.  That's what I'm told by the underlying attorney as
  3   part of the backstory of this being dismissed over there.
  4        And then finally, in addition to Beeman and Frosio, just
  5   to make clear, that these things happened to Mr. Govey himself.
  6   This isn't just sort of the specter of Orange County more
  7   generally.
  8        So with that, I think I've kind of completed my part of
  9   the record on the Orange County thing, and I appreciate the
 10   Court letting me do that.
 11            THE COURT:  Mr. Scott, do you -- can you confirm and
 12   corroborate that Deputy Larson did assert his Fifth Amendment
 13   rights in the Ortiz case?  Had you heard that?
 14            MR. SCOTT:  I have heard that anecdotally.  I would
 15   not have been able to quote page and verse to the name of the
 16   case and case number.  But what the Court shared is absolutely
 17   consistent with my understanding.  So I agree, I don't think
 18   the Court's wrong.  I would not have been able to give the same
 19   level of detail as the Court did, but it is my understanding
 20   that he invoked in a subsequent hearing about these issues.
 21        And I'll tell you, I think that in our case, it would be
 22   fair game for me to ask him the very same questions.  Setting
 23   aside the act of him invoking and "Isn't it true you invoked?"
 24   that's not what I'm talking about for the moment.  I think it
 25   would be fair to ask him the exact same questions that he
```

invoked on before because I think it would, you know, show that

he perjured himself.  That would be absolutely essential to his

credibility.  And I think the Court's right, then he has a

choice.  Either he invokes again here on the witness stand or

09:24AM  he, you know, is forced to admit that he did commit serious

misconduct.  Or I guess the third option is that arguably he,

you know, tells an untruth about that here on the witness

stand.

THE COURT:  Or fourth, he says, "I invoked my rights

09:24AM  before because that was the advice of counsel.  But I'm here to

tell the truth.  And I told the truth before Judge Goethals

despite what Judge Goethals may or may not have thought or

found, but I told the truth, and I'm going to tell the truth

now."

09:24AM  But I think the point I'm making, and I know you agree,

but for Mr. Marrett, I can't exclude you from going into that

because it relates directly to the truthfulness of the witness.

And he's a percipient witness.  So I'm not aware of any law

that would allow it.

09:25AM  And I understand Judge Selna's decision, but again, that

was made before all the intentional misconduct findings were

made and before Deputy Larson asserted his Fifth Amendment

rights.  This is not legalese, I'm just trying to give --

Unless, Mr. Marrett, is this news to you what I'm saying

09:25AM  about him invoking his Fifth?  Are you aware of that?

1          MR. MARRETT:  I am aware of that, Your Honor.

2          THE COURT:  So we don't -- I don't need to do a

3     quick search.  Because I think it was in the "Register" or the

4     "OC Weekly" where I read that.  Or it might have been the

09:25AM  5     "Daily Journal."  I can't remember.

6          MR. MARRETT:  Your Honor, I do want to unpack this a

7     little bit because I think, you know, we are sort of -- this is

8     sort of an Indictment on just the Orange County Sheriff's

9     Department generally as far as what Mr. Scott intends to bring

09:25AM 10     up as his defense in this case.  My understanding is that there

11     is no finding against Deputy Larson by Judge Goethals that he

12     was untruthful in any testimony.  And even if there was, I

13     don't think that finding would be admissible here.  It's

14     hearsay, and I think --

09:26AM 15          THE COURT:  I agree with -- I agree with that, but

16     defense is entitled to inquire under 608 any acts of

17     untruthfulness.

18          MR. MARRETT:  Well, but I think, Your Honor, part of

19     the basis of that is there has to be some untruthfulness in the

09:26AM 20     first instance, and there is no finding that Deputy Larson was

21     untruthful.  In order to bring that into evidence and

22     cross-examine him on it, they would have to prove up that by

23     extrinsic evidence, which the rules don't allow them to do,

24     that, in fact, he was untruthful.  There is no -- there's

09:27AM 25     nothing in the record that shows that Deputy Larson's testimony

1    was untruthful.

2              THE COURT:  We're going to miss each other.  I'm

3    concerned about how much we're going to have to hear of this,

4    and that's unfortunate.  But under 608, Mr. Scott can ask a lot

09:27AM  5    of questions about this.  Can he then put on his own evidence

6    and prove it up with extrinsic evidence?  No, he cannot.  I

7    don't disagree with you.  But he can ask a lot of questions.

8    And I'm here to tell you, I don't see how I can prevent him.

9        I agree with you, Judge Goethals, I did -- do know made

09:27AM 10    some credibility findings on some of the deputies.  I don't

11    know if he highlighted Deputy Larson specifically.  I believe

12    he did highlight Deputy Tunstall; I don't know if he did

13    Larson.  But I do know Larson was one of the four critical

14    witnesses in that scandal.  And I don't think they testified

09:28AM 15    inconsistently.  Some knew more than others.  And I do know

16    that Deputy Larson asserted his Fifth Amendment rights and it

17    seems you're confirming that.

18        And so the question, I don't disagree with you that if

19    Judge Goethals made a finding, that should come here, no.  That

09:28AM 20    would be, I think, improper hearsay opinion.  But Mr. Scott is

21    entitled to ask about any untruthful acts.  And when -- I don't

22    know whether him asserting his Fifth Amendment rights in this

23    case, that might -- that might come out.  I don't know.

24              MR. MARRETT:  Well, Your Honor, I want to, I guess,

09:29AM 25    maybe even take a step further back.  There's no allegation, at

least by the defense in this case, that there were any

informants used; that any of what is the alleged misconduct --

        THE COURT:  I understand.  I'm going to -- I'm going

to assume that.  But it's really at the get-go.  You have a

percipient witness.  And a percipient witness is going to say,

"This is what went down."

    And Mr. Govey disputes that, "That's not how it went down.

I wasn't in control or possession of the counterfeiting

evidence or the drugs.  I wasn't -- it ain't mine."

    And Deputy Larson and the other deputy are going to

present testimony, "No, it was."

    Mr. Scott's going to now get to cross-examine.  He gets to

cross-examine on motive, bias and untruthfulness and he can ask

away as long as he has a good-faith basis and he's just not

making it up, "Tell me about all acts of untruthfulness."  And

that's going to get you right into the informant's scandal.

    So it's going to be a question of there's no way -- I

mean, I'm just being candid with you, there's no way I'm going

to exclude him from asking these questions.  I think I would

get immediately reversed in a nanosecond.  What I can do is

maybe try to control -- I don't see by subject matter, but

maybe by time limits.  I mean, how -- because what I don't want

to do is have a retrial of the informant scandal.

    But he's going to be able to ask questions, but then we're

assuming that Deputy Larson is going to even answer any

question when Mr. Scott starts asking him a question about the

informant scandal of what he allegedly did or did not do.  If

he asserts his Fifth Amendment rights, we have a problem.  And

that's obviously got to happen outside the presence of the

09:31AM  jury.

MR. MARRETT:  I think, you know, Your Honor said

that you don't want this to devolve into a retrial in the

*Dekraai* case, and I think that's part of the --

THE COURT:  Yes, because I think Judge Goethals,

09:31AM  what was it, like, two years?

MR. MARRETT:  Well, and I think that's part of the

problem is that once we start going down this road, it is

effectively a retrial in the *Dekraai* case.  There are no

findings against -- against Deputy Larson.  There's nothing to

09:31AM  suggest in the record that Deputy Larson was involved in the

2012 case with this defendant.  So there's no bias that's been

tied specifically to Deputy Larson as a witness.

And so in order for the defense to get into this, they're

going to have to get into effectively a retrial in the *Dekraai*

09:32AM  case, which then will, I think, confuse and mislead the jury

into believing that that's what this case is about, when

there's no allegation much less evidence in the record that

there is an informant or any of the other sort of underlying

issues that were related to the *Dekraai* case.

THE COURT:  Mr. Marrett, I share your concerns,

1    but -- and I might have a disagreement, I cannot and I will not

2    preclude Mr. Scott from asking questions about that.  I don't

3    see -- he's -- Larson's a percipient witness.  You have serious

4    allegations of misconduct against him.  So serious that he, an

09:32AM 5    officer in uniform in a murder case, asserted his Fifth

6    Amendment rights.

7        Mr. Scott has a good-faith basis to inquire into this.  I

8    share your concern.  How unfortunate it is that we're going to

9    get into this, but I don't see as a matter of law how I can

09:33AM 10    say, "You're not going to ask him any questions about that."  I

11    would be denying the defense the right to cross-examine --

12            MR. MARRETT:  Well --

13            THE COURT:  -- under 608.

14            MR. MARRETT:  Well, I think, Your Honor, if the

09:33AM 15    Court is -- obviously I'm fighting an uphill battle here.  I

16    think one of the things that the government would request is

17    that the Court in advance set the limitations and the

18    parameters around what the extent of that cross-examination can

19    be.

09:33AM 20            THE COURT:  See, I can't -- I can -- what we're

21    going to have to do candidly to resolve this, if you're going

22    to pursue the issue, is we're going to have to schedule an

23    evidentiary hearing where Deputy Larson's here and you're going

24    to need to do a dry run.  And you're going to need to ask the

09:34AM 25    questions that you're going to ask at trial in front of the

jury, and then I'm going to need to give Mr. Scott -- ask his

questions, because I've got to make an informed decision.

I'm not familiar with the informant scandal other than

what I've read in the newspaper.  And then I did read

09:34AM 5   Judge Goethals' opinions months ago, but I just read them.

So -- and a lot of this might be moot because -- I don't want

to speculate, but if Deputy Larson has asserted his Fifth

Amendment rights, I would think there's a good chance he's

going to assert his Fifth Amendment rights here if asked about

09:35AM 10  that.  And I'm here to tell you, I'm going to let him, at least

in an evidentiary hearing.  Mr. Scott's going to be able to ask

some questions.

So is he going to take a position different than he did in

the Ortiz case?  Do you know?

09:35AM 15          MR. MARRETT:  I don't know what he's going to do,

Your Honor, if asked those same questions.

THE COURT:  See, because -- and it sounds like I'm

arguing with you, but I'm more concerned if that's what you

sense in my tone.

09:35AM 20  We need a little bit more information.  I'm aware of him

asserting his Fifth Amendment rights.  I am not -- at least in

an evidentiary hearing, I'm going to at least allow Mr. Scott

an evidentiary hearing outside the presence of the jury to ask

questions concerning this scandal, because Mr. Scott has

09:36AM 25  represented to me in writing and here today that he believes

**UNITED STATES DISTRICT COURT**

1   Deputy Larson was dishonest and untruthful and engaged in

2   willful misconduct.  So that goes to his credibility as a

3   witness.

4       So we're going to have a hearing.  He's going to be asked

09:36AM 5   those questions on cross-examination, and he might -- he might

6   not even, once he knows that this is coming, he might not even

7   answer your questions.  And if he doesn't answer your questions

8   or he asserts his Fifth Amendment during Mr. Scott's

9   questioning, we got a problem; right?

09:36AM 10          MR. MARRETT:  Sure.  I don't disagree with the Court

11   there, Your Honor, if he invokes his Fifth Amendment rights,

12   and there's a whole separate issue involved.

13          THE COURT:  Yeah.  So I don't -- I don't know

14   exactly how you want to resolve this or how we can procedurally

09:37AM 15   and timewise, but we got to resolve it before we impanel a jury

16   on this case.

17          MR. MARRETT:  I do think, Your Honor, an evidentiary

18   hearing would be appropriate, No. 1.  I think it's, you know,

19   certainly outside the presence of the jury if Mr. -- excuse

09:37AM 20   me -- Deputy Larson is going to invoke, that that's done

21   outside the presence of the jury.

22       In addition, I think it's a good idea to hold an

23   evidentiary hearing or to at least frame the issues and draw

24   limits and parameters around what cross-examination can be done

09:37AM 25   in front of the jury.

**UNITED STATES DISTRICT COURT**

1      THE COURT:  All right.  Now again, thinking out loud

2  is a dangerous thing, but Mr. Scott, you've been nothing but

3  professional and civil in all my dealings with you, and we've

4  had some pretty tough cases.  Mr. Govey has a speedy trial

09:37AM  5  right, and I know he has been adamant he wants to go to trial

6  on January 9.  I don't know under the law technically if we

7  have this evidentiary hearing involving a pretrial motion that,

8  you know, we've satisfied it or not.

9      So I don't know whether I should just let you two confer

09:38AM 10  and see if you can agree on a process for this and a time for

11  this evidentiary hearing or how you want to proceed.  But I

12  guess I just -- I want -- because I have an obligation to not

13  only protect Mr. Govey, but I have an obligation to protect

14  Deputy Larson too, and I take that seriously.

09:38AM 15      I would want him to know that he's going to be asked

16  questions about the informant scandal.  I don't want him

17  blindsided by this.  And he might want to have counsel present;

18  right?  I mean, you can't represent him.

19          MR. MARRETT:  That's correct, I can't advise him.

09:39AM 20          THE COURT:  So he's going to need his counsel

21  present too.  And it would be helpful for all our planning

22  purposes whether he can give us an indication, is he going to

23  assert his Fifth Amendment rights.  Because if he does, then

24  the hearing will go a certain way and we'll have specific

09:39AM 25  questions.  He goes on the record, he asserts his rights, and

1    then I have to make a decision whether that's a valid assertion

2    of the privilege.  If I do, then we're going to have to see

3    what happens in this case.  If I say it's not, guess what I

4    have to do?  I have to put a sworn police officer in custody if

09:39AM 5    I don't sustain the privilege.

6        If I say, "You know what, no, you got to answer this," and

7    he won't talk, then I've got to exercise my contempt powers and

8    get him to purge.  You see what I'm saying?  Maybe none of this

9    will happen.  Maybe he will come here, he will answer your

09:40AM 10    questions, Mr. Marrett, he'll answer Mr. Scott's questions, and

11    then I will conclude, you know, this is a fishing expedition.

12    You're trying to have a retrial of the evidentiary hearing that

13    took months, you know.  I don't know which way this is going to

14    go.  All I'm saying, this is a problem and this is an issue we

09:40AM 15    have to address.

16        MR. SCOTT:  Can I share a thought or two, Your

17    Honor?  I'm not sure which way it's going to go either, but I

18    have to prepare for either way it's going to go.  One concern

19    that I have now hearing the government's view and some of the

09:40AM 20    questions from the Court is there's at least the possibility

21    that the officer -- the deputy take the fourth option that the

22    Court described where, "Yes, I invoked before, but that was --

23    you know, my attorney told me to do it in an abundance of

24    caution, and here I am today to tell the truth."

09:41AM 25        And the government kind of alluded to that, you know, that

```
 1    I can ask questions under 608, but then I take the answer as it

 2    sits and no extrinsic evidence.  So my concern with that is if

 3    we take that sort of agnostic approach --

 4              THE COURT:  Can I interrupt you?

 5              MR. SCOTT:  Yes, please.

 6              THE COURT:  I was incomplete.  If we're dealing with

 7    character for truthfulness or untruthfulness, you're stuck with

 8    the answer.  But if you're, as I understand it -- I'm not

 9    putting words in your mouth, your brief made this clear.

10    You're going beyond untruthfulness -- you're saying motive,

11    bias, this was a vindictive prosecution.

12              MR. SCOTT:  That's right.

13              THE COURT:  That's different.  You can prove that up

14    with extrinsic evidence.  I know that.

15              MR. SCOTT:  Okay.

16              THE COURT:  But I don't want to sit here and start

17    scripting your case.  I don't know what they're going to say.

18    But I can say in the evidentiary hearing you're going to have

19    pretty wide latitude to ask whatever you want.  And then I can

20    figure it out and make an informed decision, okay, is this

21    inquiry relevant to motive, bias, or truthfulness or

22    untruthfulness of a witness?  If it's dealing with

23    untruthfulness of a witness, you're limited by no extrinsic

24    evidence.  But like I indicated before, you may be able to ask

25    over an hour, two hours of questions about it.
```

**UNITED STATES DISTRICT COURT**

1     If it's a retrial of Goethals, like I said, that was

2  months and months and months of testimony.  I can't believe you

3  want to do a retrial of all that.  But you might want to be

4  spending some time on this.  And if this goes to motive, bias,

09:43AM 5  you're going to be able to call up your own witnesses.  And

6  you're not limited by the 608.

7          MR. SCOTT:  So for what it's worth, the Court's not

8  arguing my case for me.  I was going to make that same argument

9  about motive and bias and being able to build a case like that.

09:43AM 10  But I won't belabor that anymore because the Court said it

11  well.

12     The concern I was starting to address is for the sake of

13  argument, if there are strictly 608 extrinsic evidence issues,

14  the concern that arises for me at that point is that I think it

09:43AM 15  becomes a discovery issue.  I'm uncomfortable with sort of the

16  agnostic approach of having the officer testify.  You know, we

17  take him at his word and then that's it.  The remedy that I

18  have for that is a robust *Henthorn* and *Giglio* disclosure

19  combined with the government's ethical and constitutional *Napue*

09:44AM 20  limitations on not being able to present or even passively

21  allow a witness to say things even on cross is my understanding

22  of the law that it knows not to be true.

23     And so the reason I bring that up is not in any way to

24  suggest that Mr. Marrett or his office would do that, but my

09:44AM 25  concern is -- not knowingly, but my concern is that if we don't

get robust disclosure of the files that were ordered to be

turned over in Superior Court as well as the files that the

Department of Justice civil division is evidently building and

investigating in this case, then in addition to the 608

09:44AM limitation, I'm also deprived of the limitation that exists

under the Constitution and under the ethical rules to prevent

this officer from arguably being able to say things that I

can't impeach.

So that's a long way of sort of reraising and reaffirming

09:45AM the discovery request that I've made in this case, which then

leads me to the timing issues that the Court brought up.  We're

approaching an unenviable position where trial is upon us.  We

have not been provided any of that discovery.  And I agree with

the Court, that in the best of all worlds, I would be able to

09:45AM take more time to prepare for the evidentiary hearing that we

envision and to build a potential bias and motive case.

I think that that's kind of a somewhat unfair position to

put Mr. Govey in.  Certainly he's adamantly asserting his

rights to speedy trial.  I don't quarrel with the Court that

09:45AM under 3161, once you file motions, that's tolled.  So I don't

think that it's, strictly speaking, a statutory speedy trial

issue, but I do think that he's not unreasonable and not wrong

to say, you know, we've had this trial date for some time.  It

was continued once with some misgivings, and he shouldn't be,

09:46AM you know, punished for these things that are going on in Orange

1   County by moving it back further.

2       My preference would be either to have robust and immediate

3   disclosure of this information and then stay on track for

4   January 9.  Or even better, if we want to measure twice and cut

09:46AM 5   once and kind of do this in a more deliberate and thorough

6   fashion, I would want to make an application for bail for

7   Mr. Govey, and that would take the pressure off a little bit.

8   At least he's not in custody waiting for his day in court.

9       And I think under these unique circumstances, that would

09:46AM 10  be a change in circumstance that would justify some sort of

11  modest and reasonable bail for him to be able to fight this

12  case from the outside.

13          THE COURT:  I understand.  And we need to talk about

14  this, because this relates to one of your motions, Mr. Scott,

09:47AM 15  to compel discovery.  And my tentative on that was to deny it

16  without prejudice.  And my thought is I can't micromanage the

17  government's *Brady*, *Giglio* and *Henthorn* obligations, and I know

18  you know that.  So I can't be looking over their shoulder and

19  going through the whole file with Judge Goethals and now

09:47AM 20  Judge King on that case and trying to say, "Did you turn

21  everything over that you were supposed to?"

22      And in fairness to Mr. Marrett, there's a lot of

23  information.  You know, he was hoping that this was going to be

24  completely off the table.  He now knows it's not off the table.

09:47AM 25  So there is a pretty burdensome -- you used the word "robust."

I'll use -- there's a very robust investigation he has to do
and thorough research.

And yes, I can put pressure on him to do it, but, you
know, there's only so many hours in the day and there's only so
many people that can be devoted to this without tripping over
themselves.  And he will produce the stuff as he gets it, but
then it's kind of in a situation where, Mr. Scott, you're in a
difficult situation because you have a client who's very
anxious to push this and push it forward.  And, you know, I
don't know how you resolve that tension quite frankly.

Government says, "Okay, we disagree with you, Judge, we
shouldn't have to do this, but you're ordering us to do it.
We'll do it.  But we might not have it done by January 9th.  We
might not even have it done until February or March."  Because
like I said, it's a lot of documents.  I mean, I don't know how
I resolve this.  And so then you can take the risk of, okay,
well, we'll just go to trial on what we have, and then in
habeas we'll figure out if there was something that was
withheld that should have been disclosed, you know.

Do you understand what I'm saying?  I can't do his job,
and he's -- he might have a couple lawyers help him to try to
figure out what's there and get to you everything that they
have to get to you, but I don't know how long that's going to
take, because I am aware that there's extensive record on this
informant scandal.

1          MR. MARRETT:  I do want to share with the Court that

2     the government does take its discovery responsibility

3     seriously.  This morning -- earlier this week or late last

4     week, Mr. Scott made another discovery request to the

09:50AM 5     government that's not the subject of this motion.  And this

6     morning we produced over a thousand pages of documents to the

7     defense, you know, on a disk that responds to that discovery.

8     And the government is, you know, doing its diligence to

9     promptly review and produce whatever information that would be

09:50AM 10    subject to Rule 16 or *Brady* or *Giglio* that it has in its

11    possession.

12          THE COURT:  All right.  I'm thinking off the top of

13    my head, so this might be a bad idea.  And please tell me if

14    you think it is, but does it make sense, maybe we should even

09:50AM 15    try today or soon, let's check in with Deputy Larson.  Because

16    if he says, "I'm asserting my Fifth," we'll have to go through

17    that process.  But, you know, the government might just say,

18    "If he's going to assert his Fifth, that's a critical

19    percipient witness, I don't know how we can proceed."

09:51AM 20          MR. MARRETT:  And, Your Honor, I'm not sure on the

21    timing of this, because if this issue comes up, Deputy Larson

22    may want to retain counsel, and he'll need time to do that and

23    confer with his counsel.

24       In the meantime, the government will comply with the

09:51AM 25    discovery obligations and look through these materials.  But I

don't know if today or any time this week would be reasonable

for Deputy Larson to come to an informed decision on what he's

going to do.

THE COURT:  Well, I can tell you, he is going to

have to get counsel because I will make sure he gets counsel.

I've been told he asserted his Fifth Amendment rights, so I

have a duty and obligation to protect all witnesses.  So I have

to make sure that whatever he decides to do is based on

informed counsel.  And I have to believe that the County has

appointed him counsel.  So I don't know who that is.

Do you know?

MR. SCOTT:  I don't, Your Honor.  The thing I was

going to add is -- and I understand the tension that the

Court's describing, the argument I would make, and I think in

all fairness, Mr. Govey was indicted in August.  And I

understand the government may have disagreements.  We don't

think it's relevant, but we'll sort of comply with the Court's

order.  But I think an argument can be made that while being in

a legal community in Orange County and, you know, just reading

the newspaper, it's not inconceivable that this would come up.

And I would have hoped that the government would have started

their *Henthorn* and *Giglio* process when they indicted this case

in August.

So I think -- you know, I'm not totally persuaded that

this is an 11th-hour burden that's been thrown on the

government unfairly in some way or they couldn't have seen this

coming.  So I would just say that.

THE COURT:  Your rights on that are fully preserved,

and all I'm saying is I don't know.  That's why I was denying

09:53AM  the motion without prejudice.  I can't micromanage him.  I

don't know what's been produced, what was withheld, why it was

withheld.  I don't have a sense of what more needs to be done.

And I guess I need you guys to tee it up for me and then tell

me what you want.  If you want to file a motion, you can do it.

09:53AM  But at this point, I feel at a loss.  I don't know.

MR. SCOTT:  So just for the record, I'll say -- and

without ascribing any specific intent, so to speak, or any

malintent on the part of the government, that we received zero

discovery in terms of the Orange County scandal or impeachment

09:53AM  on Larson or Beeman or any deputies or the Frosio file or any

of these things we've been talking about, there's been no

disclosures.  And I say that, again, without accusing the

government of anything.  That's just a factual statement for

the record.

09:54AM  But I would reiterate my point.  I think that in

conferring here briefly with Mr. Govey, we would be

comfortable, you know, resolving this in a more thorough and

deliberate fashion in February or March, if I can get him bail

so that he's not prejudiced by, you know, working this through.

09:54AM  I can represent to the Court that the methamphetamine case

**UNITED STATES DISTRICT COURT**

1       that he stands charged with here in Federal Court was

2       originally charged in State Court.  And that's separate and

3       apart from the 2012 conviction that -- 2012 case that I've been

4       describing earlier.  This was just a sort of pedestrian drug

09:54AM 5   possession case, possession with intent to distribute in Orange

6       County Superior Court, and he was out on bond on that case,

7       made bail, was complying with bail.  Was then arrested actually

8       at a court hearing for that case and then brought over to

9       Federal Court where he was detained.

09:54AM 10      And so I bring that all up just to say that I think this

11      isn't a case where he needs to be detained.  I think there are

12      changes in circumstances.  I think that we should figure out

13      bail and then we can resolve this, you know, whether it be

14      February or March or whatever is good for the parties to allow

09:55AM 15  the government to comply with its discovery obligations.

16          MR. MARRETT:  So two things, Your Honor:  First,

17      defense request for this broad discovery and especially the

18      underlying state files in the *Dekraai* case, the request was

19      only made about two-and-a-half weeks ago.  So the cases were

09:55AM 20  pending since August, this specific request for this

21      information, which at the time, the government didn't believe

22      was relevant was only made two-and-a-half weeks ago.  And the

23      government's been working since then to review and produce

24      documents.

09:55AM 25      I think the application of bail is a separate issue.

**UNITED STATES DISTRICT COURT**

1   There are separate considerations at play.  I think if the

2   defendant wants to make that application, he should make it in

3   writing to the Court and allow the government to respond in

4   writing before the court makes a decision on that.

09:55AM  5        THE COURT:  Well, I agree with that.  But I think he

6   should make it right away.  And it does -- it has some appeal

7   quite frankly.  Unless I'm overstating it, I think you got a

8   lot of work to do, unfortunately, not preparing your case to go

9   to trial, to deal with this discovery.  Because I just have to

09:56AM 10  believe there's an enormous amount of information that you have

11  to go through to see "what of that I have to turn over."  And

12  if you're saying you only started this two weeks ago, you're

13  not even close to having done the investigation that's

14  necessary.

09:56AM 15       MR. MARRETT:  Sure.  And I think, though, that

16  discovery issues are a separate consideration from things like

17  danger to the community, intervening between the time defendant

18  made bail in State Court and his arrest on the federal

19  Indictment.  There was a second arrest in Huntington Beach.  So

09:56AM 20  there's other issues that I think need to be addressed separate

21  on the bail motion that don't depend on the discovery.

22       THE COURT:  They don't depend on the discovery

23  certainly academically, but you understand the problem we have

24  here, he wants to go to trial on the 9th, and the key witness

09:57AM 25  in the case has issues, and including he might assert his Fifth

Amendment rights.  And he can literally jam us.  And we can go

through this and it's going to be an ugly, terrible trial, a

lot of hearings outside the presence of the jury.

You're going to be -- instead of worrying about your

opening statement, witness examinations, redirect examinations,

closing arguments, jury instructions, you're going to be bogged

down with all this discovery.  It's a train wreck.  And so

there's something to the criticisms that I understand is I'm

not sure why these deputies are in the field when this cloud is

hanging.  Because when the cloud is hanging, every case that

they're involved in is potentially compromised.

In this case, it sounds to me it's potentially

compromised.  It might not be.  It might not.  I hope not, but

it might be.  And I -- it's related, Mr. Marrett, because he's

in custody.  He doesn't want to be in custody.  And because we

need now more time to figure out the issues with Deputy Larson,

he's got to remain in custody and he can't have his day of

reckoning.  So in a way, it is related.

MR. MARRETT:  Understood, Your Honor.  The

government will respond to their bail application when it's

made.  I think we'll be able to, you know, offer -- enlighten

the Court on the reason why detention remains appropriate

pending whatever the continued trial date is.

THE COURT:  Well, I'm also worried about the passage

of time and the holidays and everything.  So, you know, there's

 1    a part of me, and please be frank, should I just give you a

 2    little time to discuss this to see if you can reach an

 3    agreement on any of it, on the scheduling, on how we proceed

 4    or what?  Because I'm a little bit at a loss of where we're

09:59AM  5    going from here.  I have a lot of issues I want to talk to you

 6    about concerning jury instructions, and I don't know whether

 7    that's not a good use of our time.

 8              MR. MARRETT:  I'd be happy to have a discussion with

 9    Mr. Scott.  I don't know if we'll be able to reach an agreement

10:00AM 10    on anything.  But I'd be happy to have a discussion with him

11    and see if we can.

12              THE COURT:  I'm here.  Just tell me when you're

13    ready.

14              MR. SCOTT:  I think there's always potential

10:00AM 15    benefits in us getting together and talking.  And I see there's

16    several members of the U.S. Attorney's Office here, so maybe we

17    can powwow and see if there's anything that we can come up with

18    on any of these issues.

19              THE COURT:  Good.  I appreciate that.

10:00AM 20              MR. SCOTT:  So maybe 15 minutes or 30 minutes.  I

21    don't know what's good for the Court.

22              THE COURT:  Whatever you need.  Whatever you need.

23    Because I'd much -- I'd much rather try to have some sort of

24    game plan today.

10:00AM 25              MR. SCOTT:  I agree.  All right.

1          THE COURT:  Okay.

2          MR. SCOTT:  Very good.  Thank you, Your Honor.

3          THE COURT:  I'm sorry, that might include -- see if

4     you can get Deputy Larson on the phone and get us his thoughts

10:00AM 5     about this.  If he indicates to you, "Hey, I'll talk to my

6     attorney, but I'm going to be asserting Fifth Amendment

7     rights," you know, maybe we don't have to go through all this.

8     See what I'm saying?

9          MR. MARRETT:  We can try to do that, Your Honor.  I

10:01AM 10     don't know if I'll be able to get ahold of him.

11          THE COURT:  I understand.  But I don't see how the

12     trial can proceed if he asserts his Fifth Amendment rights,

13     unless I'm missing something.

14          MR. MARRETT:  I do think we have other witnesses who

10:01AM 15     can testify to the percipient witnesses.  But certainly --

16          THE COURT:  Not on the defense of compulsory

17     process.  He has a constitutional right to call all the

18     witnesses that are percipient, and especially if it's a witness

19     from law enforcement who did the search.  So regardless, if you

10:01AM 20     say, "I don't want him," he's calling him.

21          MR. SCOTT:  That's correct for the record.

22          THE COURT:  And I got to give him -- I got to use my

23     powers to allow that or I'd be denying Mr. Govey his

24     constitutional right to compulsory process.

10:01AM 25          MR. MARRETT:  Understood.

```
 1              THE COURT:  Okay.
 2              (Recess from 10:01 a.m. to 10:41 a.m.)
 3              THE COURT:  Please be seated.  Where are we?
 4              MR. SCOTT:  Well, Your Honor, I think it's fair to
 5    characterize our conversations as more pleasant than
 6    productive.  I think where we're at is it's -- we had a
 7    discussion about whether we can make an agreement on bail, and
 8    I don't think that's in the cards.  I think the government
 9    feels strongly that this is a detention case.  So for that
10    reason, we're standing by our request that we go ahead and go
11    to trial on January 9.
12              And it's our position that, you know, the government
13    either has to comply with their discovery obligations by then
14    or they're at their own peril.  But I think the government is
15    going to make a motion to move the date over our objections,
16    and then I'll kind of let it unfold from there.
17              THE COURT:  Okay.
18              MR. MARRETT:  That's accurate, Your Honor.  The
19    government is going to make a motion under 3161(h)(1)(D) to
20    continue the trial date to February 13, if the Court has that
21    available, and set an evidentiary hearing on the pretrial
22    motion for January 30th of 2018, if the Court has that date
23    available.
24              THE COURT:  Give me that code section again.
25              MR. MARRETT:  Sure.  It's 3161(h)(1)(D), excludable
```

1    time for delay resulting from pretrial motions through the

2    conclusion of such hearing on such motion.

3            THE COURT:  So I have to deal with the motion

4    promptly.  And the motion I'm trying to deal with promptly is

10:43AM 5    the motion to compel discovery as well as the motion in limine

6    to exclude evidence, the parameters of it.  That's the

7    government's position?

8            MR. MARRETT:  Yes, Your Honor, that's correct.

9            THE COURT:  Okay.  And there's an objection to that.

10:43AM 10   So those dates you're talking about, the evidentiary hearing,

11   Deputy Larson would be January what, 30th?

12           MR. MARRETT:  30th.  And I have cleared the dates

13   with defense counsel, but we haven't cleared it with the Court

14   yet.

10:43AM 15           THE COURT:  Melissa, what are we looking like

16   January 30th?

17           **(Court and clerk conferred off the record.)**

18           THE COURT:  I would like to do the evidentiary

19   hearing earlier, but what is counsel's thinking?  You need more

10:44AM 20   documents so you can be prepared for that hearing to

21   cross-examine or examine Deputy Larson?  Is that the thinking?

22           MR. SCOTT:  Well, I think if we're putting off the

23   trial and the evidentiary hearing for purposes of disclosing

24   discovery and giving us what we need, then I do want to have

10:45AM 25   those things for the evidentiary hearing as much as the trial.

1  Because as the Court described it, it's essentially a dry run.

2          THE COURT:  Right.

3          MR. SCOTT:  And I'm saying this mostly for

4  Mr. Govey's benefit.  The government did clear those dates in

10:45AM 5  the sense that I'm available those dates.  I can do them those

6  dates, but I want Mr. Govey to know that I am objecting to any

7  continuance, and we're making our record on that.  And I'm

8  certainly not agreeing to those dates.  It's our position we

9  should go on January 9.

10:45AM 10         THE COURT:  It's clear in my mind.  And now it's

11  abundantly clear you're opposing it and want Mr. Govey to go to

12  trial on January 9.  And all this information should have been

13  produced long ago.  That's clear.  But I'm in the situation,

14  it's frustrating that I find myself in this situation, but I am

10:45AM 15  going to grant the government's motion.  I will want the

16  government to move with haste to get all the information

17  together and disclose it to the defense, No. 1.

18      No. 2, why don't you file, because I would like something

19  in writing, a motion for reconsideration on bail.  Do you want

10:46AM 20  to do that next week?

21          MR. SCOTT:  I'd like to do it as soon as -- as soon

22  as it can be heard.  I don't know if the Court is even here

23  tomorrow, how quickly we can fast track this.  Candidly, I

24  was -- I'm supposed to be out of the office next week.  I don't

10:46AM 25  know if the Court has court next week.

1          THE COURT:  Well, the Court's closed Monday,

2   Tuesday.  But these things happen.  So it would have to be

3   Wednesday of next week.

4          MR. SCOTT:  Like Wednesday morning?

10:47AM 5          THE COURT:  Yep.

6          MR. SCOTT:  Okay.  If that's what -- if that's what

7   the Court has, we would take that.

8          THE COURT:  All right.

9          MR. MARRETT:  The government can be prepared that

10:47AM 10  day.  We'll file something in advance of that.

11          THE COURT:  All right.  So can you get me your

12  papers in tomorrow?

13          MR. SCOTT:  Yes, Your Honor.

14          THE COURT:  Okay.  And then government, you need to

10:47AM 15  get your papers in Tuesday.

16          MR. MARRETT:  If not sooner, yes, Your Honor.

17          THE COURT:  Okay.  All right.  And then we'll have

18  the hearing next Wednesday, which is the 27th at 9:00 a.m.  And

19  then we will deal with the other logistics of the trial after

10:48AM 20  we do the bail.

21          MR. MARRETT:  Okay.  Thank you, Your Honor.

22      And just to be clear, the two dates that were proposed,

23  are those the dates the Court is setting for the evidentiary

24  hearing and the trial?

10:48AM 25          THE COURT:  Trial, you're February.  You said

UNITED STATES DISTRICT COURT

1    February what?

2        MR. MARRETT:  February 13, I believe.

3        **(Court and clerk confer off the record.)**

4        THE COURT:  I have other criminal cases that date,

10:48AM 5    so we're going to have to move it up, the trial date.  Might

6    have to move up our evidentiary hearing, then, too.  Obviously

7    any civil case I can kick, but I can't obviously kick the

8    criminal cases.

9        MR. MARRETT:  Let me confer with defense counsel on

10:49AM 10   available dates, Your Honor.

11       **(The defendant left the courtroom.)**

12       THE COURT:  What's going on?

13       MR. SCOTT:  With the Court's permission, I'd like to

14   waive Mr. Govey's presence while we're discussing sentencing

10:49AM 15   issues.  He's -- he's been pretty candid that he wanted the

16   marshals to take him in the back so he wouldn't have a verbal

17   reaction to the trial being moved.  So he was concerned he

18   wasn't going to be able to comport himself, so he asked to step

19   outside.

10:49AM 20       THE COURT:  Okay.  So he waived his presence.  He

21   just left.

22       MR. SCOTT:  Yes, Your Honor.

23       THE COURT:  A little disappointed, but he can't be

24   just getting up and leaving when he wants to.  It's not an ego

10:50AM 25   thing.  This is quite frustrating that I'm finding myself in

this position, to be honest with you.  I've got an incredibly

busy criminal calendar, let alone I got some civil cases that

have been years and I'm pushing them out, and I just don't

understand why I'm getting jammed with this this time.

10:50AM    How could the government not know these issues with

Deputy Larson when they went to the grand jury for an

Indictment?

        MR. MARRETT:  Well, again, Your Honor, I don't think

largely there are going to be very many issues with

10:50AM  Deputy Larson at the end of the day.  And largely, I think the

documents that the defense counsel has requested aren't

documents that are in the government's possession, they're

documents that might be with the state DA or they might be

other publicly available documents that are accessible by both

10:50AM  the defense, and there's equal access to those documents.

        THE COURT:  I guess, Mr. Marrett, I'm not trying to

shoot the messenger, but, you know, putting aside the

voluminous nature of the documents, you have a deputy that's

asserting his Fifth Amendment rights in uniform in a court.

10:51AM  That is very, very significant.  You know that's a problem

witness.  That's the problem I'm having.

        Put aside the voluminous amount of information and

documents and whether all of that is relevant, the defendant

has a right to cross-examine every key percipient witness.  And

10:51AM  he has the right to cross-examine him on truthfulness or

1    untruthfulness.  And rightfully or wrongfully, the deputy has

2    been accused of giving false testimony and intentional

3    misconduct of violating defendant's constitutional rights.

4    They might not be true, but the issue is there front and

10:52AM 5    center.  That's a problem.  It's going to be dealt with in

6    every case that he is a percipient witness.  Every single case

7    it's going to be an issue.

8         And so now I've got a defendant who has his own issues and

9    he's screaming he wants his trial now.  He feels this is a

10:52AM 10   vindictive prosecution.  I mean, it looks bad.  It makes us all

11   look bad.  And I don't understand, you know, why this happened.

12   This issue should have been -- it should have been thought

13   through and should have been at the time the Indictment was

14   returned.  Because an Indictment you should be ready to go to

10:52AM 15   trial; right?

16        MR. MARRETT:  Understood, Your Honor.  And, you

17   know, for the record, as the Court asked us to do, to try to

18   reach out Deputy Larson obviously, I think he's going to be --

19   he's going to need to have counsel appointed for him before he

10:53AM 20   testifies, but all indications are that he will testify at the

21   evidentiary hearing and at the trial.  So I think largely these

22   concerns are going to be allayed at the end of the day, and we

23   will be able to move forward with the presentation of the

24   government's case.

10:53AM 25        THE COURT:  Did you -- I'm not holding you to it,

1    but you made contact with someone who said he's going to

2    testify?  He's not going to assert his Fifth?

3              MR. MARRETT:  I spoke with Deputy Larson during the

4    break.

10:53AM 5              THE COURT:  And he said, "I'll testify"?

6              MR. MARRETT:  The indications are that he is going

7    to testify.

8              THE COURT:  Okay.

9              MR. MARRETT:  He's going to obviously, I think, you

10:53AM 10   know, have counsel appointed and advise him on ultimately what

11   to do, but the indications are that he's going to testify

12   and -- and both in the evidentiary hearing.  And I think

13   largely at the evidentiary hearing, I think a lot of these

14   issues that are, you know, seemingly broad and vast right now,

10:54AM 15   I think we'll be able to narrow it down to what's potentially

16   even relevant to the trial in this case, which I think, if

17   anything, will be a very limited universe, and we'll be able to

18   go to trial and present our case.

19              THE COURT:  Okay.  All right.  So the problem we

10:54AM 20   have is the dates you want, I have other criminal jury trials

21   that are not waiving time and have represented to me that

22   they're going forward.

23              MR. MARRETT:  So I suppose as far as the evidentiary

24   hearing, if the Court's available on a day other than a Tuesday

10:54AM 25   during the week of January 30th, I don't know how long the

1    other trials are scheduled for, but perhaps one of those dates

2    would be available.  And I obviously have to confer with

3    defense counsel as well to make sure those dates are open.

4         THE COURT:  Well, the evidentiary hearing, I can

10:54AM 5    accommodate you.  It was the trial that I couldn't accommodate

6    you.  So then I said, okay, I've got to give you an earlier

7    trial.

8         So when is the best possible date, Melissa, I can give the

9    jury trial in this case?  And then once we figure out that

10:55AM 10   date, then we can figure out when we're going to have this

11   evidentiary hearing.

12             **(The Court and clerk conferred off the record.)**

13             THE COURT:  How long will this trial be?

14             MR. MARRETT:  Two to three days, Your Honor.  I

10:55AM 15   believe the government's case in chief will be two days, and

16   the defense is --

17             THE COURT:  Depends on whether -- defense could be

18   several months.

19             **(The Court and clerk conferred off the record.)**

10:56AM 20             THE COURT:  I think we're going to have to set the

21   jury trial date for January 30th at 9 o'clock.  And we're going

22   to have to have the evidentiary hearing -- we're going to have

23   to have that -- I think we're going to have to do it either the

24   9th or some day the week of the 9th.

10:56AM 25             MR. MARRETT:  I'm available those days, Your Honor.

**UNITED STATES DISTRICT COURT**

I don't know if defense counsel is.  Obviously from the

government's position, you know, some of the documents, I

think, are going to be in possession of the state's DA's

office, which wouldn't be in our custody or control.  I will

10:57AM  make an expeditious request to have those documents produced to

us.  But the farther out the evidentiary hearing is, the more

likely that, you know, we'll at least be able to get those

documents or know well enough in advance what the DA's position

is with respect to them.

10:57AM           MR. SCOTT:  I'm concerned, Your Honor, and I hope

I'm not talking out of both sides of my mouth, but I'm

concerned about going forward with the evidentiary hearing

before we have the documents that are going to be forthcoming

for the trial, particularly if it's the government's position

10:57AM  that the evidentiary hearing is going to dispel some of these

concerns and is going to narrow the issues.

      And frankly, I'm not sure how the government can feel

confident saying that before they receive the files and before

they know really the substance of what we're talking about

10:57AM  here.  But at the end of the day, I think if -- I'd be

comfortable with -- or I'd prefer an evidentiary hearing date

closer to the trial date, if it's at all possible, so that I

could have as much material as is available before I cross him

at the evidentiary hearing.

10:58AM           THE COURT:  Okay.  You want to set the evidentiary

1    hearing for the 23rd --

2          MR. SCOTT:  Very good.

3          THE COURT:  -- at 9:00 a.m.?

4      Evidentiary hearing January 23rd, 9:00 a.m.; trial,

10:58AM  5  January 30th, 9:00 a.m.

6      Isn't the first day of trial we do 9:00?  Oh, 8:30 is the

7    trial time.  So January 30th, 8:30, start trial.  The

8    evidentiary hearing we'll do the 23rd at 9:00 a.m.  Would it be

9    a good idea for me to appoint counsel for the deputy, or does

10:59AM  10  he have his current counsel?

11          MR. MARRETT:  My understanding is that he doesn't

12    currently have counsel.

13          THE COURT:  He does not?

14          MR. MARRETT:  He does not currently have counsel.  I

10:59AM  15  think he had counsel in the past, but my understanding is that

16    he currently is not represented.  So I believe, you know, an

17    appointment with counsel sooner rather than later may be --

18    would help to expedite at least his preparation.

19          THE COURT:  All right.  We'll appoint counsel.

10:59AM  20      Where is Mr. Govey now?

21          U.S. MARSHAL:  He's in the back here.  He

22    communicated that he was very upset and he felt like he needed

23    to get a little break, so to speak.  So he conveyed to his

24    lawyer to have us take him in the back briefly.

11:00AM  25          THE COURT:  Just take him in the back.

1        MR. SCOTT:  And I'm sorry for that, Your Honor.  I'm

2  certainly not encouraging people to walk out in the middle of

3  court, but I figured it was the lesser of two evils to

4  communicate his request to the marshals rather than have an

11:00AM  5  outburst in court.  I thought it would be less harmful than

6  walking out.

7        THE COURT:  Oh, you don't need to apologize at all.

8  He's a pretty strong-willed man.  He was going to leave

9  regardless of what you said, at least that was from my

11:00AM 10  observation.  I couldn't hear what he was saying, but he was

11  getting up to leave and he just left.  But obviously I have a

12  duty to maintain the integrity of the proceedings, and I just

13  can't have counsel or parties, defendants just walking out when

14  they want to leave.  But I just don't know whether this is --

11:01AM 15  it's necessary to have this conversation with him now.  Maybe

16  you should talk to him about it, and then I will have a

17  conversation with him when we're back together on the 23rd.

18        MR. SCOTT:  I think that's best.  I think it's

19  probably more productive to speak to him about that at the next

11:01AM 20  date after a little time has passed.

21        MR. MARRETT:  Your Honor, I want to note for the

22  record, my understanding is that a lot of the panel attorneys

23  may have been appointed either in state cases or other cases

24  representing Orange County Sheriff's deputies.  So there may be

11:01AM 25  a conflict with the Orange County panel as far as appointment

1    purposes go.

2            THE COURT:  Right.  Okay.  Well, it's going to be

3    interesting.  We'll see where we are.  If there's any

4    developments, please let me know sooner rather than later,

11:02AM 5    okay.

6        And would you please follow up, Mr. Marrett, with a

7    written order reflecting the excludable time and the new trial

8    date and the date of the evidentiary hearing.  And I guess

9    we'll just have to see where we are there.

11:02AM 10       Mr. Scott, you've had trials with me before, so you know

11   where we're going, but for planning purposes for the trial, I'm

12   not inclined to sever.  We didn't get there.  I do think it

13   would be unfair to the jurors to have to have two separate

14   trials when it's the same witnesses, the same search, the same

11:02AM 15   day in the same room.  And I don't think the counterfeiting

16   claim is legally or factually complex.

17       In light of what's happened today, I was going to say but

18   if you feel you need a continuance to more gather your

19   thoughts, I would certainly give you that continuance, but

11:03AM 20   that's a little moot at this point given Mr. Govey doesn't even

21   want a continuance for this.

22            MR. MARRETT:  Thank you, Your Honor.  And as far as

23   jury instructions go, does the Court want to address those

24   today, or does the Court want to do that at the evidentiary

11:03AM 25   hearing?

**UNITED STATES DISTRICT COURT**

1          THE COURT:  I think you have a lot of work to do to

2     get that stuff to him.  I think we can schedule that for last

3     minute the one -- there was a couple legal issues I had with

4     the jury instruction and the verdict form.  The jury

11:03AM  5     instructions is possession is a lesser included crime than

6     possession for distribution.  And I didn't see the lesser

7     included instruction plus the elements of possession, and I

8     believe you need that.

9          Defense is going to have to make a decision on whether

11:04AM 10    they want -- if any of the jurors feel that the greater is not

11    proven or all the jurors have to determine that before they

12    consider the lesser.  If you look at the model instruction, it

13    gives the defense the option of whether they want the jurors to

14    address this if just one has a doubt or does all of them.  But

11:04AM 15    that's Mr. Scott's and Mr. Govey's call.

16         So I think you're going to have to have the lesser

17    included instruction.  I think it's 3.14 of the model

18    instructions.  And then you're going to have to set forth the

19    elements for simple possession.

11:04AM 20         I'm not sure exactly the defense's theory of the case,

21    Mr. Scott, but I know vindictive prosecution.  But I'm assuming

22    he's taking the position that they weren't his drugs.  But if

23    they were his drugs, they were for personal use.  Or are you

24    even going to make any of those alternative arguments something

11:05AM 25    else?

1          MR. SCOTT:  I think that -- frankly I don't think

2    that the possession of the drugs themselves is going to be a

3    big issue.  I think the heart of the matter is whether they

4    were possessed with intent to distribute.

11:05AM  5          THE COURT:  All right.  So we definitely need that

6    lesser included.  And then --

7          MR. MARRETT:  And, Your Honor, just -- the

8    government would prepare a proposed instruction.  But I think

9    largely whether that instruction is appropriate to give at the

11:05AM 10   end of trial sort of depends on what the weight of the evidence

11   is that comes in.  It may be appropriate and we'll prepare that

12   instruction, but at this time at least the government would

13   object to giving it.

14         THE COURT:  I'm not sure -- my understanding of the

11:06AM 15   law is I would have to overrule that in a nanosecond is because

16   a lesser included offense of possession for distribution is

17   simple possession.  And I have an obligation to instruct on the

18   lesser.  If all he does is ask a question that would suggest or

19   takes the position that it was his own personal use, that's

11:06AM 20   good enough now.  It doesn't really matter -- he doesn't have

21   to testify to get the lesser included instruction is I guess

22   what I'm trying to say.  He can just take the position that

23   given the quantity of the narcotics, it wasn't for

24   distribution, it was his own personal use.  He's got a drug

11:07AM 25   problem.

1        MR. MARRETT:  And if that's -- obviously that's what

2   we're sort of discussing is maybe the defense's case at trial.

3   But until that presents itself, I don't think the government --

4   if that is what the defense presents, then I think it would be

11:07AM 5   appropriate.  But --

6        THE COURT:  Well, you know, I've been doing this now

7   for state and federal almost 17 years, and every drug case

8   where you have possession for sale, I always have the lesser

9   included, including in federal court.  So unless Mr. Scott's

11:07AM 10  got some mysterious defense I've never heard and seen, it's

11  always asserted.  Unless you're dealing with kilos, then kilos

12  you're going to have a hard time explaining to the jury that it

13  was simple possession for personal use.  But the quantities

14  we're talking about here, you know, he certainly is within his

11:07AM 15  rights and passes the smell test to say that this wasn't for

16  distribution.

17       So for planning purposes, again, I want a lesser included

18  instruction and then the elements of simple possession.  The

19  way I've done it in the past is it's all in the same

11:08AM 20  instruction.  The verdict forms got to reflect that on the

21  lesser included and then track the language of the jury

22  instruction.

23       Then on the quantity of the narcotics, I think you need

24  another option for the jury.  You have at least five grams or

11:08AM 25  more, but you got to put in less than five grams.  And I forgot

1    the -- in the comment section to the jury instruction on this,

2    there is the category that you need to put there.

3         MR. MARRETT:  I think that's right, Your Honor.  I

4    think the subsequent set that I sent to defense counsel that

11:08AM 5    adds in the counterfeiting charges reflects that change in the

6    proposed verdict form.

7         THE COURT:  Okay.  So I'm going to need a revised

8    joint statement to reflect the two counts.  I'm going to need

9    revised jury instructions and a revised verdict form.  And then

11:09AM 10   we can go over the mechanics of the trial and jury selection

11   either when we're here on the 23rd or we'll schedule a date

12   soon thereafter but before obviously the 30th.

13        And I don't know if Mr. Tenley is going to be on the case,

14   too, but he's had many trials with me and he knows the

11:09AM 15   rigamarole.  I'm sure he can tell you what needs to be done.

16        MR. MARRETT:  I will consult with him.

17        THE COURT:  Mr. Scott, you've had many trials with

18   me, so you know.

19        MR. SCOTT:  One of them will go smoothly one day,

11:09AM 20   Your Honor.

21        THE COURT:  I'm not going to have to set up another

22   camera, am I?

23        MR. SCOTT:  At some point you wonder what the common

24   denominator is.  I have to question myself.

11:10AM 25        THE COURT:  Is it you or me?

1          MR. SCOTT:  Well, it's one of us.

2          THE COURT:  Okay.  All right.  Anything further we

3    should discuss today?

4          MR. SCOTT:  No, thank you, Your Honor.

11:10AM  5     MR. MARRETT:  I don't think so.  Thank you.

6          THE COURT:  Thank you.

7          THE COURTROOM DEPUTY:  All rise.

8          **(Proceedings concluded at 11:10 a.m.)**

9                        **--oOo--**

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*CERTIFICATE OF OFFICIAL REPORTER*

COUNTY OF LOS ANGELES   )
                        )
STATE OF CALIFORNIA     )

I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME COURT REPORTER, in and for the United States District Court for the Central District of California, do hereby certify that pursuant to Section 753, Title 28, United States Code that the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

*Date:  March 9, 2018*

                           */S/ DEBBIE HINO-SPAAN_*

                        *Debbie Hino-Spaan, CSR No. 7953*
                        *Federal Official Court Reporter*

**UNITED STATES DISTRICT COURT**