1           **UNITED STATES DISTRICT COURT**

2       **CENTRAL DISTRICT OF CALIFORNIA – SOUTHERN DIVISION**

3         **HONORABLE CORMAC J. CARNEY, U.S. DISTRICT JUDGE**

4

5   UNITED STATES OF AMERICA,           )
                                         )
6                   Plaintiff,           )   **CERTIFIED TRANSCRIPT**
                                         )
7           vs.                          )
                                         )   Case No.
8   JOSEPH MARTIN GOVEY,                 )   8:17-cr-00103-CJC-1
                                         )
9                   Defendant.           )
    ─────────────────────────────────────)
10

11

12

13

14                REPORTER'S TRANSCRIPT OF

15             FURTHER PRETRIAL CONFERENCE

16             WEDNESDAY, JANUARY 24, 2018

17                     2:03 P.M.

18              SANTA ANA, CALIFORNIA

19

20

21

22

23
    ──────────────────────────────────────────────────────────

24            **DEBBIE HINO-SPAAN, CSR 7953, CRR**
              FEDERAL OFFICIAL COURT REPORTER
              411 WEST FOURTH STREET, ROOM 1-191
25            SANTA ANA, CALIFORNIA 92701-4516
                   dhinospaan@yahoo.com

1                    **APPEARANCES OF COUNSEL:**

2

3     **FOR THE PLAINTIFF:**

4              NICOLA T. HANNA
               United States Attorney
5              BY:  BRADLEY MARRETT
                    GINA KONG
6                   Assistant United States Attorneys
               United States Courthouse
7              General Crimes Section
               411 West Fourth Street
8              Suite 8000
               Santa Ana, California 92701
9              (714) 338-3505

10    **FOR THE DEFENDANT:**

11             SCOTT TRIAL LAWYERS APC
               BY:  TIMOTHY A. SCOTT, ESQ.
12             1350 Columbia Street
               Suite 600
13             San Diego, California 92101
               (619) 794-0451

14

15

16

17

18

19

20

21

22

23

24

25

                    **UNITED STATES DISTRICT COURT**

SANTA ANA, CALIFORNIA; WEDNESDAY, JANUARY 24, 2018

9:05 A.M.

THE COURTROOM DEPUTY:  Calling Item No. 2,
SACR 17-103, United States of America versus Joseph Martin
Govey.

Counsel, please state your appearances.

MR. MARRETT:  Good afternoon, Your Honor.  Brad
Marrett for the United States.  And with me at counsel table is
AUSA Gina Kong.

THE COURT:  Good afternoon to both of you.

MR. SCOTT:  Good afternoon, Your Honor.  Tim Scott
here with Mr. Govey.  He is present before the Court in
custody.

THE COURT:  Hello, Mr. Govey.  Hello, Mr. Scott.

Okay.  Well, on my list we have four items to talk about.
Maybe there's more items that you want to add.  Why don't I
just get to my four.

First of all, one deals with Agent Paris's testimony.
I've gone through both sides' briefs.  Let me tell you what my
thoughts are.  Agent Paris should be able to testify regarding
drug distribution practices and methods including packaging and
quantities sold.  He has 25 years of experience, participated
in over 1,000 investigations and spoken to hundreds of suspects
and cooperating witnesses.

His testimony is based on this extensive experience and

will be helpful to the jury in determining the critical issue

of whether the meth seized was for distribution or Mr. Govey's

own personal use.

I do not believe a *Daubert* hearing is necessary with

respect to his testimony on these issues.  But Agent Paris's

testimony should not include giving a legal opinion whether the

quantities involved were distribution or personal use

quantities.  That would not be helpful to the jury, and it

would usurp the jury's function of determining whether the

government has met its burden of proving Mr. Govey's guilt.  In

effect, he is saying that Mr. Govey is guilty of distributing

methamphetamine if I allow the testimony in the form indicated

in the briefs.

Agent Paris also should not be summarizing or highlighting

or arguing the evidence that was seized in this case.  Indeed,

I think he would be an improper summary witness, again,

usurping the jury's function.

So that's the line that I'm trying to walk.  I don't know

if it's an impossible one to walk, but as long as he's not

talking about the actual evidence in this case, it would seem

to be fair and appropriate, because a jury is not going to

understand distribution of meth, how it's packaged, baggies,

pay/owe sheets.  He's not -- the jury is not going to

understand what is a personal use; someone lights up meth, how

many grams or percentage of grams.  They're not going to know

1  that.  At least I hope they don't know that.  And they're not

2  going to have familiarity with the quantity if it's sold.  But

3  where I think it crosses the line and it's improper legal

4  conclusions and opinions, if he's going to start to say, "They

02:07PM 5  seized this much.  Was that for Mr. Govey's personal use or was

6  it for distribution?" that's improper.  I'm not comfortable

7  with that at all.  That's that issue.

8          MR. SCOTT:  Your Honor, can I make a comment on that

9  issue?

02:07PM 10          THE COURT:  I think what would be more efficient is

11  if I go -- because the brass knuckles and what I'm calling the

12  gang evidence, I understand they're going to try to get this

13  through Agent Paris.  So it might be better if I got all of it.

14  And then I'll give everybody an opportunity to clarify or

02:07PM 15  explain things.

16          MR. SCOTT:  Very good.

17          THE COURT:  The brass knuckles evidence I don't

18  think is relevant, quite frankly.  And I'm a little surprised

19  that the agent and the government would try to get that in.  It

02:08PM 20  just smacks of character evidence to me.  It's not evidence of

21  drug distribution, it's not unique to drug crimes.  I mean, I

22  see actually more semiautomatic weapons involved in drug

23  distribution cases than I see brass knuckles.  I think it's

24  going to be very difficult for the jury, if not impossible, to

02:08PM 25  consider this evidence for proper purposes, not improper

character purposes, specifically that Mr. Govey is a dangerous
person.

And then my feeling is the same with respect to the gang
markings.  Again, this is not a gang case.  The charges are not
gang charges.  I realize, and that's one of the issues I do
want to get clarification from the defense, and this, I think,
will pertain to the next motion dealing with vindictive
prosecution and punishment, is I don't see how I'm going to be
able to keep out gang evidence.

But with that said, if it comes in, it's going to be for a
proper purpose.  It's not going to come in as character
evidence.  And I believe with respect to this motion and the
discrete piece of evidence that Mr. Scott and Mr. Govey are
attacking, this is character.

Then the third issue is the vindictive prosecution and
sentences of punishment.  And it's kind of been an evolving
process for me.  I don't believe I've said anything
inconsistent with what my current thoughts are on this subject,
but I'm open to be persuaded either way on this issue.

The line that I've tried to walk is if an Orange County
Sheriff deputy or an Orange County Sheriff investigator is a
percipient witness, like Deputy Larson or Investigator Beeman,
the defense can cross-examine them regarding any motive or bias
they have against Mr. Govey.  And if that motive or bias is
based on or relates to the informant scandal or Mr. Govey's

2012 case, so be it, it's going to come in.

What I'm trying to say and at least it's more clear in my mind, I don't see this case being *Dekraai* 2 and calling witnesses to prove up the informant scandal and any wrongdoing by the Orange County Sheriff's Department if it isn't directly linked to a percipient witness in this case.

My understanding is Deputy Larson and Deputy Beeman are percipient witnesses in this case. Defense has a right to elicit any motive or bias that any witness has as does the government on any witness the defense may call. And if that motive or bias is grounded in the informant scandal, again, so be it. There's nothing I can do about it.

I agree with you, Mr. Marrett, but I don't want us to be talking by one another. We're not here to say that you and the U.S. Attorney's Office has a vindictive motive against Mr. Govey. You're not a percipient witness. But if it's a percipient witness, it's coming in.

And again, I don't know what exactly the defense has in mind, but if part of the motive and bias deals with punishment and the fact that you have mandatory minimums in federal court, and that deals with punishment, the defense wants to bring it in, they can.

And Mr. Scott, we had a discussion, it wasn't a debate, it was discussion -- you know, it's a two-edged sword, you know. I -- I'm going to leave it to you and Mr. Govey to do the

1    defense.  I'm not here to armchair quarterback you and

2    micromanage.  But, you know, Public Enemy Number One, the Aryan

3    Brotherhood, mandatory minimums is pretty scary stuff.  And I

4    can give limiting instructions, and I'm prepared to give

02:13PM  5    limiting instructions, but, you know, I don't know if you're

6    going to get the bang for the buck for that.  So I don't know

7    exactly how you need to -- or want to present it.

8         But at a very simple level, and I hope you at least -- you

9    might not agree with me, Mr. Marrett, but where I'm trying to

02:13PM  10   walk the line is a percipient witness has to answer questions

11   about any motive or bias he or she might have.  That's pretty

12   fundamental Rules of Evidence, and I can't keep it out.  And if

13   that deals with punishment, mandatory minimums, deals with the

14   informant scandal, deals with asserting your Fifth Amendment

02:14PM  15   rights, it is what it is.  It's coming in.

16           MR. MARRETT:  Can I address the motion, Your Honor?

17   I think you said you had four points.

18           THE COURT:  I had four.  And the fourth is just -- I

19   don't want us to forget it -- is if the defense is going to

02:14PM  20   probe with percipient witnesses, the motive or bias, then I do

21   believe gang evidence of Public Enemy Number One and the Aryan

22   Brotherhood, the jury is going to hear about it.  And I have

23   some proposed language dealing with the limiting instruction

24   that I would give to the jury during jury selection, at the

02:14PM  25   beginning of the trial, during the trial, and at the end of the

1    trial.

2            MR. MARRETT:  So I'm going to try to take these in

3    order, Your Honor.

4        So just I just want to make sure that I'm clear as to the

02:15PM 5    Court's ruling regarding Special Agent Paris's testimony.  And

6    I suppose that would -- it would apply to any expert testimony

7    on the subject.

8            THE COURT:  True.  And just so we're all clear,

9    these are my tentatives.  I was looking forward to hearing

02:15PM 10   everybody's thoughts.  So if I change, I don't want anybody to

11   say, "Oh, he's flip-flopping."

12           MR. MARRETT:  Understood, Your Honor.  And so I may

13   have just misunderstood what the Court was saying, but what I

14   understand the Court to be -- its tentative ruling is that the

02:15PM 15   witness cannot opine on the ultimate issue of whether the 44

16   grams -- net grams were for the purposes of distribution.

17           THE COURT:  That's correct.  And just so we're

18   clear, I'm not commingling the 704 issue with the 702 issue.

19   My issue is a 702, 403 issue.  704, I understand, is the issue

02:16PM 20   about a person's mental state.  That's not what I'm talking

21   about.

22       What I'm talking about here is it cannot be a legal

23   conclusion that the jury needs to make, and it would not be

24   helpful for the jury to hear the expert say Mr. Govey's guilty.

02:16PM 25   Because that's, in effect, if I'm understanding your disclosure

UNITED STATES DISTRICT COURT

1    correctly, you're basically saying Mr. Govey had the 37.5 grams

2    to -- and that was obviously for distribution purposes, not

3    personal use.  I think that's an improper legal conclusion.

4              MR. MARRETT:  And so -- and I suppose we're talking

02:17PM 5    about potentially dangerous line-drawing scenarios here.  But I

6    think if I'm hearing the Court correctly, the Court is going to

7    allow the experts to testify as to the ultimate issue of intent

8    to distribute and the expert's opinion as to what items are,

9    say tools of the trade for somebody who's distributing drugs

02:17PM 10   and why that's indicative of an intent to distribute.

11             THE COURT:  Yes.  Based on his experience, not on

12   the facts of this case.  Because he's not -- as I understand,

13   he's not a percipient witness in this case.  He wasn't

14   involved; correct?

02:17PM 15             MR. MARRETT:  Right.  He was not a percipient

16   witness.

17             THE COURT:  So if he wants to talk about, "Okay,

18   I've done hundreds of drug cases, investigations.  I've talked

19   to hundreds of people.  This is how you distribute meth.  This

02:17PM 20   is the quantities.  This is the packaging.  This is the pay/owe

21   sheets, indicia of distribution," I think that's proper.

22        And Mr. Scott can cross-examine as aggressively as he

23   wants on those opinions.  If you want to ask him about, "Okay,

24   what is the most amount of drugs that you've seen an individual

02:18PM 25   possess?  What is the least amount of drugs that you've seen an

individual or suspect distribute?  What in your experience in

these cases talking to people is a usable amount of meth?"

That's okay.

    And then you, in closing argument, you're going to have

to, you know, connect the dots, so to speak.  You're going to

have to say, "Okay, you heard this agent say this is what a

usable quantity is, and you heard him when he said what a

distributable amount is, and Mr. Govey was found with this

amount, he had it for distribution."

    Mr. Scott's going to do the opposite.  He may be able to

elicit testimony that relatively speaking for DEA cases, 37

grams, with all due respect, doesn't seem to be a lot.  I have

many, many more cases where the quantities are much, much

larger.  And for whatever it's worth, it's not my place,

it's -- there must be a story why Mr. Govey is here in Federal

Court, because I'm having a hard time believing it's over 37.5

grams.  That's not an international cartel distribution,

assuming it's a distribution.  That sounds like he's doing it

for friends and acquaintances.

    But you have the right to bring the charges.  That's your

job, it's not my job.  But like I -- I don't think I'm saying

anything that's shocking you.  I remember one of our earlier

hearings I was wondering about the quantity of drugs here, wow,

we're making this a big federal case over this quantity, and

that surprised me.

1          MR. MARRETT:  Well, I mean certainly, Your Honor, we

2     do bring cases that have much larger quantities involved.  The

3     quantities involved here are still substantial quantities that

4     are, in the government's view, distribution quantities.  So,

02:20PM 5     you know, I don't think it takes away from the seriousness of

6     the offense that it's not a multi-kilo case.  I think it's

7     still a large quantity that, you know, merits the prosecution

8     here.

9          THE COURT:  And that's -- and I don't mean any

02:21PM 10    disrespect.  That is your call.  I'm just -- this case, we got

11    to now deal with the informant scandal.  We have to deal with a

12    deputy, sworn police officer asserting his Fifth Amendment

13    rights.  We got -- I've had to now sign off on a protective

14    order where you have to review and disclose to the defense

02:21PM 15    confidential information about the federal investigation of the

16    Orange County Sheriff's and DA's office.  I mean, that's pretty

17    serious stuff.  And I'm not saying in any way you're

18    compromising that investigation.  I sure hope you're not.  But,

19    you know, I sure hope Mr. Govey's worth it.  That's my point.

02:21PM 20         MR. MARRETT:  Sure.  And I guess, Your Honor, at the

21    risk of skipping over your second point, a few of the things

22    the Court touched on bleed into the third point, which is the

23    motion the government filed about excluding reference to or

24    arguing about vindictive prosecution and the, you know,

02:22PM 25    punishment in this case.

1    I think, you know -- I do want to be clear that the

2    government's not seeking to relitigate the Court's prior

3    rulings.  Obviously we made our motion.  The Court made its

4    rulings about the percipient witnesses and their potential

02:22PM  5    biases and potential motives, but there is a -- and I think

6    where the line needs to be drawn, and this is the purpose of

7    filing the motion that we did, is that the line needs to be

8    drawn at the point where the deputies are making charging

9    recommendations to the DA.

02:22PM 10    Because at the point that the DA is determining at least

11    initially in the State case whether to bring charges and then

12    from there whether the case is referred to a federal agency and

13    referred to the U.S. Attorney's Office, all of that is a

14    question about the motivations for the prosecution itself.  And

02:22PM 15    that's not something that a percipient witness is going to have

16    knowledge about to testify to.

17    THE COURT:  Stop you there, because you just said

18    something that I don't know whether it's true.  If you're -- if

19    what you just said there is true, that these percipient

02:23PM 20    witnesses had no involvement in these charges being referred to

21    the feds and then the feds prosecuting, then I think you and I

22    have an agreement, Mr. Marrett.  Let me repeat that.  We have

23    an agreement.  But that's not my understanding.  That's the

24    problem.

02:23PM 25    Now maybe Mr. Scott is now more informed and knows stuff,

but I recall Mr. Scott telling me that Investigator Beeman was involved in the referral.  And if that's the case, then I don't see how I can keep that out because that is part of the motive or bias.

02:23PM    MR. MARRETT:  Well, and I guess I think there's still the issue, Your Honor, of the fact that it was discussed or referred to a federal agency.  There is further decision-making that goes on before the U.S. Attorney's Office accepts the case and decides to prosecute a case going forward.

02:24PM    THE COURT:  I agree, but that's a separate point, Mr. Marrett.  I want you to understand, it's the witness's motive or bias.  What the witness did to try to get Mr. Govey, it's not your conduct, it's not the fed's conduct, it's the percipient witness's conduct.

02:24PM    MR. MARRETT:  Well, what I'm saying, Your Honor, is that it's -- the decision whether to prosecute the case or not is solely with the U.S. Attorney's Office.  It's not -- it's not influenced by who brought the case or what their motivations were for bringing the case.

02:24PM    THE COURT:  And I would agree with you it's not a defense to the charges, but it is an issue of motive or bias that the jury needs to be told about.

    MR. MARRETT:  And so I think, Your Honor, and this was one of the points we raised in our motion, is that to the 02:25PM extent the defense is allowed to get into the motive or bias, I

think in fairness the government should be able to rebut that

by bringing in evidence of why the charges were brought to

rebut that motive or bias, and that evidence would include

things like defendant's prior criminal history and other

02:25PM evidence that -- the convictions that the Court has said aren't

coming in.  I think in fairness, the government needs to use

that evidence to rebut the bias that defense is suggesting is

present.

THE COURT:  Maybe.  And that was the basis of my

02:25PM comment earlier to Mr. Scott, is that this is a two-edged

sword.  And I say "maybe" if it goes through the percipient

witness.  If the percipient witness knows about Mr. Govey's

past, which I assume Agent Beeman did -- Investigator Beeman

did, then I agree with you.  You got to take the good and the

02:26PM bad.

And that's what I was trying to tell Mr. Scott is he's got

a decision to make.  Because if Agent Beeman -- excuse me,

Investigator Beeman is this link to the informant scandal and

to Mr. Govey and the motive and bias, then what he's doing,

02:26PM what he knows, what he says, it's all relevant for the motive

or bias.  And it would seem to me if Investigator Beeman is

recommending to the feds that they take the case, he probably

knows who Mr. Govey is, and he probably knows about his

background.

02:27PM And whether it's true or not doesn't matter.  That's his

frame of mind.  That's what he's thinking.  So it's not being
offered for the truth, it's being offered to show motive, bias,
impact on the listener.  So I agree with you, it comes in,
including punishment.

02:27PM    MR. MARRETT:  And so let me back up a second, Your
Honor, because as far as -- you know, the government's not
going to be calling Investigator Beeman in its case in chief.
He's not actually a percipient -- I understand the defense
intends to call him, but he's not a percipient witness to the
02:27PM search, to the recovery of the evidence which is being charged
in this case.  And so --

        THE COURT:  You can't split hairs that way.  He was
called to the scene.  Why was he called to the scene?  Why was
he at the scene?  He talked to Mr. Govey.  He has a right to
02:27PM call him.  I can't -- I'm not going to exclude him.

        MR. MARRETT:  Understood, Your Honor.  I think what
is -- I mean, what I'm trying to at least make a record on,
Your Honor, is Deputy Larson, the other deputies that were in
the room that conducted the search, that went to the house for
02:28PM the probation check, the reasons they went to the house, the
evidence that they recovered and found, that's the prosecution
in this case.  Those are the facts that go to the defendant's
guilt.

        Investigator Beeman's presence happens after all of that
02:28PM during interviews at the house.  And if he's brought in -- it

sounds like perhaps this is what the defense is suggesting --

that he's brought in solely to further a prosecution against

Mr. Govey.  That goes directly to and solely to a motive for a

vindictive prosecution.  If that's the defense's theory, that

needs to be raised in a pretrial proceeding and not presented

to the jury at trial because that -- it's an improper purpose

to -- for calling Investigator Beeman to testify solely about,

well, why was this case brought against Mr. Govey?  Why was it

referred to the federal government?  Is it because there's more

severe sentences?  That's all that I anticipate

Investigator Beeman would be able to testify about.  Because

all the other evidence and facts he wasn't present there for,

he wasn't part of the search.  He's not part of any of the

evidence of defendant's guilt in this case.  And so although

he's percipient in the sense that he was at the scene that

day --

THE COURT:  And he talked to Mr. Govey in connection

with this case.

MR. MARRETT:  And he talked with Mr. Govey in

connection with this case.  But none of that is being put in

the government's case in chief to prove the defendant's guilt.

THE COURT:  I understand that.  I understand that.

But what -- I'm frustrated because I don't seem to be clear

with you is you get to call your witnesses; defense gets to

call their witnesses.  And as long as Investigator Beeman is on

1    the scene and talking to Mr. Govey in connection with this

2    case, he is a percipient witness and they have the right to

3    call him.

4            MR. MARRETT:  And, Your Honor, I'm not trying to

02:30PM  5    argue against you.  I'm making my record.  I think -- you know,

6    I understand what the Court's ruling is, and I'm not trying to

7    frustrate the Court.

8            THE COURT:  No, I guess you will not frustrate me as

9    long as you convey to me that it is clear what I'm trying to

02:30PM 10    say, and if I'm not, please tell me, because you need to talk

11    to your witnesses.  And I don't want them volunteering any of

12    the information that shouldn't be coming out.  And I'm hoping

13    at the end of today at least we have an understanding of what

14    the lines are.  And I'm going to be the first to say the lines

02:30PM 15    might be difficult.  And the line that I'm trying to draw here

16    is percipient witness.

17        If it's a percipient witness, both sides can deal with the

18    motive/bias issue.  And if that involves the informant scandal,

19    so be it.  If that involves punishment, so be it.  If that

02:31PM 20    involves Mr. Govey's 2012 case in State Court, so be it.  But

21    what we're not going to do is call witnesses that have no

22    percipient knowledge about anything to do with this case.

23        Even though they might have a lot to do with the informant

24    scandal or individuals other than Mr. Govey or the federal

02:31PM 25    investigation, we're not going to have a *Dekraai* 2.  We're not

1    here to try the informant scandal, the DA's office or the

2    sheriff's department.  That's not the purpose.  But if there's

3    any witness who has percipient knowledge and has a motive or

4    bias against Mr. Govey, he's going to have -- that's going to

02:31PM  5    have to be talked about by both sides.

6                MR. MARRETT:  And I think I understand what the

7    Court's saying.  I think it's clear the Court's ruling on that.

8                THE COURT:  Okay.

9                MR. MARRETT:  The other -- I did want to touch

02:32PM 10    briefly on the point about the punishment and sentencing --

11    potential sentence in this case.  And I think, you know, as we

12    put forth in the brief, I think as a general matter the law's

13    pretty clear that that's not relevant.  It shouldn't be put in

14    front of the jury.

02:32PM 15        To the extent that the defense's argument is that this

16    goes to motive because they know that in federal cases there

17    are more severe punishments, I think that could be said for

18    almost any case that's adopted from the State prosecuting

19    agencies by the federal government.  And I think that it's a,

02:32PM 20    you know, dangerous precedent to be setting, that that's motive

21    evidence that comes in every single case.

22                THE COURT:  But if that is the motive or one of the

23    factors that Investigator Beeman was thinking about when he was

24    supposedly recommending that the feds prosecute Mr. Govey, if

02:33PM 25    the defense want to bring that out, again, it's a two-edged

sword, but they're free to do that because that played a role on why he did what he did.  And like I said, it's a two-edged sword.

Maybe the jury's going to like Investigator Beeman.  Maybe they're going to say, you know, "Good for you.  You made that recommendation."  And that's the concern I have for Mr. Govey is, you know, I could see this helping his cause and discrediting the credibility of the government's witnesses or the percipient witnesses, but it could also backfire where they like Investigator Beeman.  I mean, I don't know.  But that's not my call.  That's going to be the jury's call.  I just have to make sure that everybody has a fair shot at this, so to speak, and that any motive or bias of any percipient witness is exposed.  That's as simple as that to me.

MR. MARRETT:  Okay.  So this was the last one is the motion in limine regarding the brass knuckles.  So I think -- I want to be clear because when the Court was discussing its tentative, it was focusing on the piece of the intent to distribute element.

The cases that we cited in the opposition that we filed with the Court, a number of them talk about weapons being circumstantial evidence of intent to distribute.  Some of the cases talk specifically about brass knuckles or other types of weapons that aren't just semiautomatic pistols.  And the government's position is that the brass knuckles are indicative

of something that people distributing drugs use, and it

demonstrates an intent on the part of Mr. Govey to distribute

the drugs that he had in his possession.

THE COURT:  Mr. Marrett, you're walking a real

dangerous line.  I mean, you know what circuit we're in?  They

are very critical.  And I've had some recent cases where

they've been critical of what you get in through experts.  And

judges in this courthouse have been reversed with experts.  You

got to be very careful what you try to get in through an

expert.

And, you know, again, usually in the cases that I've had,

we're dealing with much greater quantities.  And there's a

weapons charge in addition to the drug charge.  So that

evidence about the weapon and laser scopes and everything,

that's coming in.

You're trying to -- I -- it just is -- it's not passing my

smell test.  The brass knuckles is you're just trying to dirty

up Mr. Govey.  And I'm quite frankly surprised and, to a

certain extent, disappointed that a federal agent would say

he's a drug dealer because he's got brass knuckles.

I don't know if you're aware, but there was an e-mail that

just came around that they were -- there was two jurors within

the last week or two weeks in Los Angeles, they had brass

knuckles that were detected and withheld at the scan by

security.  I've seen brass knuckles in a life before this job.

It's -- a lot of people have them.  They're not supposed to

have them.  It's illegal to have them.  But that is your

evidence that Mr. Govey is a drug dealer; he had brass

knuckles?

02:37PM      MR. MARRETT:  Well, of course, that's not our only

evidence, Your Honor.  And I think -- first of all, I want to

be clear that it's not coming in through our expert.  I mean,

this is evidence that was recovered in the room.  It will come

in through the deputies testifying that they seized it as part

02:37PM  of the evidence in the case.

THE COURT:  Not if I say -- well, first of all, the

motion was -- at least it was teed up with me is that

Agent Paris was going to say that this is indicia of drug

distribution, and I say "no."  And if it's not coming in

02:37PM  through the agent, you're saying now, "When we search, this is

the stuff we seized," I'm not inclined to allow you to even say

anything of that, nor am I inclined to allow you to talk about

the white supremacist's writings and box and stuff.  Because

again, that's going to be character evidence.

02:37PM      MR. MARRETT:  Well, I think -- let me talk about

these two things separately because I think what the expert is

going to testify is that weapons are a common tool used by drug

traffickers to either protect their drugs or to enforce their

drug debts.  And in argument, we'll be able to argue that the

02:38PM  presence of weapons in this case is circumstantial evidence of

defendant's intent to distribute the drugs that he possessed.

And I think that's a completely fair and correct argument to make that wouldn't be reversible error under the Ninth Circuit even.  And so it is probative of the defendant's intent in this case.  It's one of the circumstantial pieces of evidence that go to proving the defendant's intent.

Separately the box on the outside, it has defendant's moniker written on it.  On the inside it had the brass knuckles found.  And on the bottom of the inside it has his name, and it has the reference "White Power" on it.

THE COURT:  But first of all, I think it's very prejudicial if -- if Mr. Govey contests possession of the meth, you and I would probably be on the same page.  But you have no dispute over ownership and possession of the meth.  Since you have no dispute about that, what -- I just find it not that -- that's the best evidence that he's distributing drugs?  He has brass knuckles?  I would say the more logical inference is he's protecting his own drugs if he wants to use them.  He doesn't want anybody else trying to take them.  Or he's using them for other activities dealing with any gangs that he's affiliated with.

And why I raise that is it's not for me to weigh the strength of the evidence, but I have a 403 call.  And that is just jumping out at me that this is -- could be used by the jury for improper character purposes.

1    So again, I'm inclined to keep out the "white supremacist"

2  language, "evil," "666," "brass knuckles" on 403 grounds,

3  because I think it's going to be very difficult, if not

4  impossible, for the jury to use it for proper purposes and not

02:40PM 5  improper character purposes.

6    And again, I reiterate, you respectfully disagree with me,

7  and it sounds like you think I'm out to lunch here, but I'm

8  having a hard time believing a federal agent with DEA is going

9  to come into this court and say he's a drug dealer because he

02:40PM 10  had brass knuckles.  I don't know what his experience is, but I

11  can -- I've seen brass knuckles thousands of times in life and

12  as a judge.  And it's not -- very rarely have I seen brass

13  knuckles with drug cases.

14    I've seen brass knuckles with gangs.  I've seen brass

02:41PM 15  knuckles with white supremacist organizations.  I've seen brass

16  knuckles in theft cases.  I've seen brass knuckles in

17  assault/battery cases.  I mean, I can go on and on.  It's not

18  unique to drug distribution cases.

19    MR. MARRETT:  Well, Your Honor, I do want to go back

02:41PM 20  to one thing that you had mentioned is that the defense is not

21  challenging possession of the methamphetamine in this case.

22  The defense, at least to my understanding, is challenging

23  possession of other items in the room including the computer

24  that was in the room, which is part of the evidence in -- that

02:42PM 25  the government's going to offer in the case as to the second

1    count in the Indictment.  And so there is still a dispute over

2    possession of items in the room.

3        The box, the fact that it contained personal effects that

4    the defendant had brass knuckles, has his name written all over

02:42PM  5    it.  That's relevant to establishing possession of all the

6    items in the room.

7            THE COURT:  Well, so would the drugs.  If you have

8    the drugs, which you say is a large enough quantity for serious

9    distribution, right, why do you need a frickin' box with his

02:42PM 10    initials on it?  And I don't see -- again, it's a 403 balancing

11    for me.  You know, maybe it has some minimum probative value.

12    I'm not fighting you on that.  What I'm fighting you on is it

13    has undue prejudicial effect.  And it's just bringing character

14    evidence front and center.

02:43PM 15            MR. MARRETT:  So I think, No. 1, as far as the brass

16    knuckles themselves, I don't think there's anything inherently

17    prejudicial about brass knuckles.  The jury -- the Court can

18    give the jury a limiting instruction that they're only to be

19    used for the purposes of determining defendant's intent in this

02:43PM 20    case or defendant's possession of other items in the room.

21        And as to the box itself, I think, you know, part of the

22    probative value here, Your Honor, is although they're not

23    distributing the possession of the drugs, although there are

24    other -- a few other items in the room with his name on it, he

02:43PM 25    is challenging the possession of the computer in the room.  So

**UNITED STATES DISTRICT COURT**

1  it's the collective value that all of the other items found in

2  the room are his.  It makes it more probative or more likely

3  that the computer was also his.

4       And so that's -- it's not just the probative value, the

02:43PM 5  piece by itself, but it's the collective probative value that

6  all the other evidence points to the computer and the other

7  items in the room belonging to him.

8            THE COURT:  Well, we'll hear what Mr. Scott has to

9  say.  I guess I've argued enough with you.

02:44PM 10            MR. MARRETT:  All right.  Thank you, Your Honor.

11            THE COURT:  Okay.  Mr. Scott.

12            MR. SCOTT:  Thank you, Your Honor.  I'll try to

13  maintain sort of the same order that the Court laid out and

14  focus on the things that I think are still of concern or in

02:44PM 15  dispute as far as I'm concerned.  And I say that without

16  suggesting that the Court has said anything other than the

17  tentative rulings.  I'm not being presumptuous in terms of

18  finality, but at the same time I don't want to snatch defeat

19  from the jaws of victory.  So I want to steer my comments

02:44PM 20  around things where I think I ought to.

21       In terms of Agent Paris and the *Daubert* hearing, I would

22  start by saying that I agree with the Court insofar as I think

23  based on the experience and training that's been laid out in

24  the papers, that this agent should be able to testify about

02:45PM 25  things like pay/owe sheets and packaging and common tactics and

1    so forth.  I think that's -- you know, I can cross-examine on

2    that.  I may or may not agree with his conclusions, but I think

3    that's fair game in the battle of the experts.

4        The specific concern -- and I also agree with that legal

02:45PM 5    line, although I think it's sometimes easier to say than it is

6    to perform in court that line in terms of him saying, "This is

7    a personal use amount," or "This is a distributable amount."

8    Certainly it would be on the wrong side of the line, I think,

9    for him to say the drugs that Mr. Govey had in this case were

02:45PM 10   clearly for distribution.  I think that everyone is sort of on

11   the same page that that's across the line.

12             THE COURT:  I'm not sure we were all on the same

13   page.  You and I are on the same page.

14             MR. SCOTT:  Some of us are.  And again, I say that

02:46PM 15   not to be at the expense of Mr. Marrett, but I think what I'm

16   hearing and my argument certainly is that that would be on the

17   wrong side of the line at least in terms of the Court's

18   tentative.

19             THE COURT:  Yeah.  And Mr. Marrett's a big boy, he

02:46PM 20   can take the criticism as I can take the criticism.  I was only

21   trying to belabor the point because he needs to talk to his

22   expert and I don't want this to come out.  I want him staying

23   away from the evidence that was seized in this case.  Because

24   then he's doing the jury's job or he's doing his job in closing

02:46PM 25   argument.  He's got to connect the dots.

1         MR. SCOTT:  So here's where it gets a little bit

2    trickier.  If we assume that that first part is clearly on the

3    wrong side of the line, I can envision it not being too

4    difficult for an experienced agent to do a pretty simple end

02:46PM 5    run around that concern and say, "Well, let me give you a

6    hypothetical where there's 37.7 grams" --

7         THE COURT:  There's going to be no hypotheticals.

8         MR. SCOTT:  Okay.

9         THE COURT:  I'm interrupting you because I agree

02:47PM 10   with you, I'm not going to allow that, and you need to object.

11   No.

12        MR. SCOTT:  Okay.

13        THE COURT:  He's only going to testify about his

14   experience and if there is some -- okay, "What is the typical

02:47PM 15   amount that you see dealers sell to users?  And what is the

16   least amount that you've seen a dealer distribute or have in

17   his or her possession?  And what is the largest amount?"  And

18   you'll probably ask the opposite, "What is the largest amount

19   you've seen a user possess for his or her own personal use?"

02:47PM 20   Those questions are fair.

21        MR. SCOTT:  So here's where it gets a little

22   trickier.  So I'm glad we at least resolved the hypothetical

23   issue.  I think it gets a little trickier because I'm trying to

24   learn about Agent Paris.  And I read some of his prior

02:48PM 25   testimony.  And from what I've seen, it often goes something

**UNITED STATES DISTRICT COURT**

1  along the lines of, "Agent Paris, let me ask you this:  What

2  would you consider a personal use amount of narcotics?"

3       And then he says something to the effect of, "Well, the

4  DEA considers as much as a 20th of a gram to be a personal use

02:48PM 5  amount.  That's one dose, like if a doctor were to prescribe

6  you amphetamines for weight loss, let's say.  But what I do in

7  the subtext is, you know, just to be very fair and conservative

8  is I allow for tolerance and addiction and, you know, the need

9  to get high.  So I'm going to say a tenth of a gram is a

02:48PM 10 personal use amount.  That's one dose."

11      And then it sort of cascades into the math, "Well, how

12 many grams are in an ounce?"

13      "Well, there's 28 grams in an ounce," and then it goes on.

14 So this many grams would be, you know, thousands and thousands

02:49PM 15 of doses.

16      The concern I have specifically with that, and I'm trying

17 to cabin this to this specific testimony, "The DEA says 1/20th

18 of a gram; I say it's 1/10th of a gram."

19      "Well, where do you get that from?"

02:49PM 20      I think that it would be a closer call, and, in fact, I

21 think it's probably legitimate for him to say, "I've

22 interviewed a thousand drug users, addicts, and they tell me,

23 'I smoke a tenth of a gram a day,' or 'I smoke a tenth of a

24 gram at a time.'"  So be it.

02:49PM 25      In fact, we've proposed a counter expert who's an

1    addiction therapist to combat that kind of testimony to say,

2    "You know, in my experience, you know, regular heavy users tend

3    to -- they can use several grams a day easy.  That happens all

4    the time."  And I think that's fair game obviously.  But to say

02:50PM 5    because doctors prescribe amphetamines in 1/20th of a milligram

6    capsules, and I'm just going to double that to be fair, I don't

7    think that that passes muster under *Daubert* for the street use

8    of methamphetamine to get high and then to use that as a

9    springboard into the argument that obviously this was for

02:50PM 10   distribution, because it's so much higher than that.

11           THE COURT:  I'll give Mr. Marrett a chance to

12   respond, but I agree with you.  And I'm not agreeing with you

13   quickly.  I was thinking the exact same thing.  I thought that

14   would be another area where I think we need to stay out of.  Or

02:50PM 15   my other option is I'm going to have to bring you back here and

16   we're going to have to have a *Daubert* hearing.  And I was

17   hoping to avoid a *Daubert* hearing because I think at the end of

18   the day I'm going to have to exclude it.

19       If Mr. Marrett is adamant about asking the agent those

02:51PM 20   questions, then we'll have to have a *Daubert* hearing.  But I'm

21   parroting what you said because I thought the same thing, is if

22   it's based on his own personal observations, it's okay.  But if

23   it's just some part of a DEA manual, or it's just what

24   prescribed doses of legal prescriptions are, that doesn't seem

02:51PM 25   to me to be a reliable method or practice, and I don't think it

**UNITED STATES DISTRICT COURT**

1    would survive the *Daubert* challenge.

2         But if the government isn't willing to agree to that,

3    we'll have to have a *Daubert* hearing and we'll have to schedule

4    it and see where it goes.  But my hope is that we don't have

02:51PM  5    to.

6              MR. SCOTT:  Well, consistent with the maximum that I

7    said at the beginning, I'm going to move on, then, from that

8    topic and go to the vindictive prosecution argument.  And I

9    just want to make clear, and I think the Court was alluding to

02:52PM 10    the same questions to Mr. Marrett, my theory is not that this

11    case should be dismissed for vindictive prosecution, that this

12    is like a Rule 12 motion.

13         And I'm not accusing Mr. Marrett of himself having some

14    sort of animus against Mr. Govey or even necessarily

02:52PM 15    United States Attorney's Office having an animus against

16    Mr. Govey.  Those would be legal issues.  This is the factual

17    issue against Investigator Beeman and Bryan Larson.  Anything

18    that I'm going to try to do is related to these witnesses.

19         But as the Court correctly pointed out, that may include

02:52PM 20    me talking about their motivations.  And I am mindful -- you

21    know, these are difficult calls to make -- I am mindful of the

22    Court's, you know, caution or suggestion that, you know, it

23    could be dangerous waters getting into the minimum mandatories

24    and things like that.  So I accept that.  And if I go there,

02:53PM 25    then I guess the record will reflect it's with eyes open.

**UNITED STATES DISTRICT COURT**

1          THE COURT:  Okay.

2          MR. SCOTT:  So I do appreciate that.

3          What I am going to try to avoid, though, because I think

4     the Court makes a great point, I don't necessarily think it's

02:53PM 5     to Mr. Govey's benefit to spend a great deal of time talking

6     about the Aryan Brotherhood and Public Enemy Number One and

7     swastikas.  I think with some focus and precision on my part --

8     and it's my responsibility to do that, I think I can still

9     present evidence of some bias on the sheriff's part and the

02:53PM 10    portions of the jail incidents that relate to Mr. Govey alone,

11    not the *Dekraai 2* or *3,* but as it relates to Mr. Govey and his

12    involvement with these deputies.  I think I can do that in a

13    way that doesn't lead me to be talking about gangs and white

14    supremacy and all that.

02:54PM 15    You know, if it's some point I open the door and the

16    government can persuade the Court that I have opened the door,

17    then so be it, but I want to state my intention at the

18    beginning that certainly, you know, I'm not going to leave my

19    chin on that issue, and I'm going to do my level best to stay

02:54PM 20    short of that line even if reasonable minds may differ on where

21    that line is.

22    So I'm basically complying with the Court's request before

23    that I should be clear about my strategies, vis-à-vis gangs or

24    no gangs beforehand.  So I'm trying to say I'm not planning on

02:54PM 25    getting into gangs.  If I cross the line, I cross the line.

**UNITED STATES DISTRICT COURT**

1    But I'm not trying to.

2         THE COURT:  And I do appreciate that.  But for

3    planning purposes, Mr. Scott -- and I understand your position,

4    and I say that respectfully -- I do understand what you're

02:54PM 5    doing.  But for preparation, I've got to determine how do I

6    deal with this issue, if at all, during jury selection,

7    preliminary instructions.  It seems to me even with your

8    strategic -- your hopeful strategic questioning of just two

9    witnesses on this subject, if the evidentiary hearing we had

02:55PM 10   with Deputy Larson was any indication, the Aryan Brotherhood,

11   Public Enemy Number One is going to come up.

12        I feel since it's going to come up, I need to tell the

13   jury something about that.  I have -- just to put it on the

14   table now, I have a proposed instruction that I would give, and

02:55PM 15   I'm not wedded to this.  What I'm wed to is I think I have to

16   say something to the jury on that.  Because when they hear

17   "Aryan Brotherhood" or they hear "white supremacist gang" and

18   they hear a person from law enforcement saying Mr. Govey's part

19   of that or is involved with that, that's not good for him.  And

02:56PM 20   I want to make sure that this jury does not use that for

21   character purposes.

22        So what I was going to propose, and I'll read it real

23   slow, this would be during jury selection, but we would dupe

24   and revise it for the instructions before, during and after the

02:56PM 25   case. (Reading:)

1       "If on the jury, you may hear evidence

2   regarding Public Enemy Number One, the Aryan

3   Brotherhood and other street or prison gangs, you

4   may consider this evidence only for the limited

02:56PM 5   purpose of determining whether any witness from the

6   Orange County Sheriff's Department has a bias or

7   motive against the defendant in determining the

8   credibility and believ ability of that witness.  You

9   may not consider this evidence for any other

02:56PM 10   purpose.

11       "It is not a crime for a person to be a

12   member of a gang or to be associated with a person

13   who is a member of a gang; therefore, if a

14   juror" -- "therefore, if a juror, you may not

02:57PM 15   conclude from this evidence that any" -- "that the

16   defendant is a person of bad character because of

17   such membership or association, or that the

18   defendant has a disposition to commit any of the

19   crimes charged in the First Superseding Indictment

02:57PM 20   because of such membership or association."

21   I'm -- you want me to read it again?

22           MR. SCOTT:  Sure.  Maybe one more time.

23           THE COURT:  It's handwritten because I just came up

24   with it before I took the bench because you guys were hitting

02:57PM 25   me with a lot of stuff last minute.  (Reading:)

1        "If on the jury, you may hear evidence

2    regarding Public Enemy Number One, the Aryan

3    Brotherhood and of other street or prison gangs,

4    you may consider this evidence only for the limited

02:58PM 5    purposes of determining whether any witness from

6    the Orange County Sheriff's Department has a bias

7    or motive against the defendant in determining the

8    credibility and believability of that witness.  You

9    may not consider this evidence for any other

02:58PM 10    purpose.

11        "It is not a crime for a person to be a

12    member of a gang or to be associated with a person

13    who is a member of a gang; therefore, if a juror,

14    you may not conclude from this evidence that the

02:58PM 15    defendant is a person of bad character because of

16    such membership or association or that the

17    defendant has a disposition to commit any of the

18    crimes charged in the First Superseding Indictment

19    because of such membership or association."

02:59PM 20        MR. MARRETT:  At the risk of taking Mr. Scott's time

21    from him, the only concern that the government has with that

22    instruction is the reference to Orange County Sheriff's

23    Department specifically.  But to the extent that the Court

24    gives the instruction, the government would ask that it just

02:59PM 25    say "any witnesses" generally.

**UNITED STATES DISTRICT COURT**

1          THE COURT:  I don't have a problem with that.

2          MR. SCOTT:  I actually agree with that, believe it

3    or not.

4          THE COURT:  Okay.  Any witness -- okay.  (Reading:)

02:59PM 5          "You may consider this evidence only for the

6          limited purposes of determining whether any witness

7          has a bias or motive against the defendant in

8          determining the credibility and believability of

9          that witness.  You may not consider this evidence

02:59PM 10         for any other purpose.

11          "It is not a crime for a person to be a

12         member of a gang or to be associated with a person

13         who is a member of a gang; therefore, if a juror,

14         you may not conclude from this evidence that the

03:00PM 15         defendant is a person of bad character because of

16         such membership or association or that the

17         defendant has a disposition to commit any of the

18         crimes charged in the First Superseding Indictment

19         because of such membership or association."

03:00PM 20    Good?

21          MR. MARRETT:  Yes.

22          MR. SCOTT:  Here's my thought, Your Honor.  I agree

23    with the change as to the sheriff and making it more general.

24    I would ask at the risk of this being surplusage, I would like

03:00PM 25    it to say, "You may or may not hear evidence of Aryan

1    Brotherhood and" --

2             THE COURT:  Okay.

3             MR. SCOTT:  I mean --

4             THE COURT:  I don't have a problem with that.

03:00PM  5    MR. SCOTT:  I guess that's implicit in the word

6    "may," but I kind of like that better.

7             THE COURT:  Okay.  "If on the jury, you may or may

8    not hear evidence."

9             MR. SCOTT:  And I understand why the Court proposes

03:01PM 10   it, but, you know, to the extent that it's Mr. Govey's

11   prerogative, if it is, my suggestion would be starting with "It

12   is not a crime" down.  I would ask that we sort of take that

13   part of it under advisement.  And if there comes a time during

14   the trial when evidence actually comes in and actually

03:01PM 15   suggests, you know, that that is -- that is the state of

16   affairs as to Mr. Govey, then we consider whether we want to

17   give it then.

18        The reason I say that is I think the -- I think the

19   research and trial dynamics suggests that what you spent a lot

03:01PM 20   of time talking about in voir dire gives certain signals to the

21   jury.  My concern is that the subtext is that the jury will

22   instantly say, "Okay, I get it.  Mr. Govey is a white

23   supremacist," or "I get it.  Mr. Govey is a PENI or Aryan

24   Brotherhood member," and that will set -- you know, as a -- I

03:02PM 25   think hopefully was demonstrated at the last court date, I

1    think there's some dispute about that.  Certainly Mr. Govey

2    doesn't admit.

3            THE COURT:  And I understand that.

4            MR. SCOTT:  So maybe I'm overtalking this, but I

03:02PM  5    would prefer not to have everything from "It's not a crime"

6    down, because it sort of suggests that it's a subtle issue.

7    Not intentionally, but that's the subtext that Mr. Govey is, in

8    fact, a gang member.

9            THE COURT:  First of all, I am very open to getting

03:02PM 10   rid of it, especially if -- this whole instruction is for

11   Mr. Govey.  And if you don't want it, of course I'm going to do

12   that.  And I'm not trying to sell you, I'm just trying to

13   explain my position.

14           In cases that I've had dealing with gangs, and Mr. Tenley

03:02PM 15   is in the audience, we had one just recently with him dealing

16   with the Bloods, gang evidence is a hot topic.  Most people are

17   familiar with them.  To my knowledge, in my experience, most

18   people are -- a lot of people are familiar with Public Enemy

19   Number One or the Aryan Brotherhood.  And most, but not all,

03:03PM 20   that's not a positive thing.  And I -- I'm concerned about

21   that.  For Mr. Govey's perspective is I don't want to sugarcoat

22   it, I want to hit it head on.

23           In the case that I had with Mr. Tenley dealing with the

24   Bloods, the defense lawyers were very adamant with me that that

03:03PM 25   be in there because they wanted to really have some comfort

1  that any juror on this case is not going to use that against

2  their client.  And if it's not hashed out and brought front and

3  center, then you won't know that.

4      You know, it's very seldom that you're going to get any

03:04PM  5  person, Mr. Scott, to say, "Yeah, I have a bias against the

6  Bloods.  I have a bias against the white supremacists."  And if

7  people have very strong, negative feelings about Public Enemy

8  Number One, the Aryan Brotherhood, you need -- Mr. Govey and

9  you need to know that.  And unless you talk about it, you're

03:04PM 10  not going to know that.

11      So again, I don't want to come off like I'm trying to

12  convince you to keep it in, I'm just trying to say, you know,

13  if this is an issue for people, unless you bring it up and you

14  hit it head on -- because that language says, "You can't use

03:05PM 15  this against him.  Are you going to have a problem with that?"

16  Because if you are, you need to tell me now.  You need to tell

17  the lawyers now.

18      "Well, you know, actually I am.  They scare me.  And if

19  Mr. Govey is associated with it, he scares me."  That's not a

03:05PM 20  juror you want.

21          MR. SCOTT:  Well, I agree and I appreciate the Court

22  articulating that.  I do think that we -- I do think that it's

23  worthwhile to explore this.  I guess my thinking was that by

24  raising this at all, that's certainly -- I hope we'll begin to

03:05PM 25  kind of begin that conversation and smoke out some of these

1  issues in a jury selection.  I was just concerned -- as I said,

2  I was concerned about it being a foregone conclusion that he,

3  in fact, was or is, you know, a member of either of these

4  organizations.  Because I don't know that the evidence supports

03:06PM 5  that or -- and certainly it will be disputed evidence if that

6  was.

7  THE COURT:  Well, like I said, I'm not even going to

8  try to talk about it.  I think we should add "may or may not."

9  The more neutral and objective that we can do it, the better.

03:06PM 10  Again, it's that bracketed language you want me to put in

11  brackets.  I'm just worried to seriously address this issue,

12  you're going to need to inquire.

13  And then I don't want the whole jury pool tainted, so I

14  want to make it -- you know, what makes this country great is

03:06PM 15  we do have that First Amendment.  And Mr. Govey and all of us

16  have a constitutional right to associate with whoever we want,

17  and that cannot be used against him.  And I like to think most,

18  but not all, most people buy into that.  But there are some

19  people that don't.  And if one of those people who doesn't buy

03:07PM 20  into this is in that box, I think we all need to know it.  And

21  I say "all," even though it's going to be prejudicial to

22  Mr. Govey, the government has to have a good record, and I want

23  to make sure I do my job.

24  MR. SCOTT:  Well, the Court had proposed some pretty

03:07PM 25  strong language in terms of not holding this against, you know,

1    Mr. Govey or only using it in certain ways.  What if it was,

2    you know, "any party or witness" or words to that effect?

3            THE COURT:  I just don't know if we can do it that

4    way because the concern is, and you'll see the model

03:08PM  5    instructions, is the prejudice against the defendant.  You

6    know, I'm not worried about a prejudice against the government.

7            MR. SCOTT:  My thought is that we can still remove

8    the, you know, "it's not a crime" and all that, but just ask if

9    people have very strong feelings.  Or if they do hear evidence

03:08PM 10    and we don't yet know what if any evidence it will be, is this

11    going to -- does anyone have strong emotional reactions, is it

12    going to be difficult for them to sit on this case?  We can do

13    all the regular things without directly suggesting that, in

14    fact, Mr. Govey is in this situation himself.

03:08PM 15            THE COURT:  Well, why don't we just table it for a

16    few minutes.  Why don't we talk about any other issues you

17    have.  I don't think you addressed the brass knuckles or what I

18    call the gang markings.  You call them prejudicial markings,

19    but I think it's the white supremacist or gang.

03:09PM 20            MR. SCOTT:  Yeah, I don't know if I have a great

21    deal to add about the brass knuckles on the papers.  I would --

22    you know, one thing I would point out under our 403 analysis is

23    it strikes me, at the risk of being cynical, that if this was

24    so probative and so helpful, I would have expected that we

03:09PM 25    would have seen it in the government's initial 404(b) motions

1    where they did move affirmatively to admit a number of other

2    documents, and I would have expected to see it in Agent Paris's

3    initial Rule 16 disclosure.

4        It sort of smacks as -- it smacks of the notion that, you

03:09PM 5    know, the priors didn't come into evidence, and so now there's

6    a stretch for the brass knuckles.  Maybe I'm being cynical, but

7    that's how it looks and that's how it appears to the defense.

8    So I think if nothing else under 403, it should be excluded.

9        In terms of -- you know, in terms of his name, Joey Govey,

03:10PM 10   I think -- we're not disputing that there's any number of

11   different items that do belong to him in that room.  And so I

12   think the additional probative value of the brass knuckles

13   themselves are some of these inflammatory markings I don't

14   think withstand a 403 analysis.

03:10PM 15           THE COURT:  Are you going to be disputing that he

16   occupied the room?

17           MR. SCOTT:  No, his stuff was in there.  His jacket

18   was in there.  No, we're not going to dispute that.

19           THE COURT:  Okay.

03:10PM 20           MR. SCOTT:  I think that's a different thing in

21   saying that every single thing that was in that room belonged

22   to him.

23           THE COURT:  Specifically the computer?

24           MR. SCOTT:  Yeah, there is going to be a fight about

03:10PM 25   the computer.  And I'll say right now, too, there's not going

1    to be a fight that he possessed individual bills too.  That

2    just is what it is.  It was in his wallet.  He was arrested on

3    a different occasion within (sic) his wallet.  I think that's

4    different than saying that he was the person that was

03:11PM  5    manufacturing them frankly.  So I think that's where more the

6    dispute is going to be rather than "I didn't know there was any

7    bills in here" type of defense.

8         With that, I wanted to -- so I don't want to get ahead of

9    the Court's list, we did want to provide sort of a discovery

03:11PM 10   update to the Court as much for the record as for anything

11   else, but that's what I have in terms of the Court's list right

12   now.

13             THE COURT:  Okay.  Well, Mr. Marrett, anything else

14   you want to add to these motions in the instructions?

03:11PM 15             MR. MARRETT:  Just two points briefly, Your Honor.

16   I guess first as to the instruction, I think it's -- the

17   instruction is for the defense.  I think it's, you know, their

18   call as to whether they want to have that in or not.  I think

19   it is appropriate to have it in there, but the government

03:12PM 20   doesn't have an objection to taking it out.

21             THE COURT:  They want it out.

22             MR. MARRETT:  If the defense asks for it, right.

23             THE COURT:  Okay.  Well, Mr. Scott, you want it out?

24             MR. SCOTT:  Yes, Your Honor.

03:12PM 25             THE COURT:  So then it's just going to be -- let me

**UNITED STATES DISTRICT COURT**

1    read it so we're all in agreement, because this is going to

2    be -- I'm going to say this during jury selection.  (Reading:)

3              "If on the jury, you may or may not hear

4         evidence regarding Public Enemy Number One, the

03:12PM 5         Aryan Brotherhood and other street or prison gangs,

6         you may consider this evidence only for the limited

7         purposes of determining whether any witness has a

8         bias or motive against the defendant in determining

9         the credibility and believability of that witness.

03:12PM 10         You may not consider this evidence for any other

11         purpose."

12         MR. MARRETT:  Government has no objection to that

13    form of the instruction.

14         MR. SCOTT:  Yes, Your Honor.

03:13PM 15         THE COURT:  That's good.  Okay.  That's what I will

16    do during jury selection.  It will also be the one that I will

17    give before trial.  It will probably be the one that I give

18    during trial before this evidence comes in.  And I will -- we

19    can talk about what the instruction should read at the end of

03:13PM 20    the case after we've heard all the evidence.  And maybe this

21    evidence might -- maybe this language might have to be added if

22    we're concerned too much of it came in.

23         MR. MARRETT:  Understood, Your Honor.  So the other

24    two points that I wanted to address on the first -- the

03:13PM 25    defense's *Daubert* motion, I think defense is mischaracterizing

a little bit what I anticipate our expert's testimony to be.  I
think that our expert will testify that his -- what he
understands to be a personal-use quantity is based on his
experience interviewing folks who have been arrested or who
03:14PM have been cooperating witnesses or that have been confidential
informants.  So I think it is going to be testimony from his
personal knowledge and training and experience.

I don't -- I think the defense is suggesting that he's
making some sort of inferential, just ad hoc double the dosage
03:14PM amount, and I don't anticipate that to be what the testimony
is.  And I'm not sure if the Court had another concern about
that type of testimony.

THE COURT:  Well, I guess we'll just have to be --
what I was hoping is we could avoid a *Daubert* hearing.  But
03:14PM again, there's this one specific amount that if you are at that
or below, it's for personal use.  And if you're above it, it's
for distribution.  That, I'm having a problem with, because --

MR. MARRETT:  No, I know.

THE COURT:  -- that is totally inconsistent with my
03:15PM knowledge and experience.  I'm not a DEA agent.

MR. MARRETT:  My thing is the testimony is not going
to be some bright line that if you have more than this amount,
it's always for distribution.  If you have less, it's always
for personal use.  I think it's going to be testimony about
03:15PM what in his training and experience he sees as the type of

quantities that are personal-use-type quantities and the type
of quantities that are distribution-type quantities.

And I think, you know, my understanding is that this is
precisely the same type of testimony that the defense is
03:15PM anticipating its expert to offer.  So I'm not sure what the
defense objection is to that type of testimony.  It's going to
be based on training, experience, interviews with the
arrestees, cooperating witnesses, confidential informants,
investigations, surveillance, those type of things.

03:16PM         THE COURT:  Well, the way you just said it there, I
didn't have a problem with.

Mr. Scott, do you have a problem with the way he said it?
Sounds like he's saying he's going to do the opposite -- I mean
have the opposite testimony, but on -- in the exact same format
03:16PM that you were planning with your expert.

MR. SCOTT:  Well, I can tell you what I read in
terms of testimony and other cases.  And I can represent to the
Court that time and again the agent says, "Well, the DEA
considers 1/20th of a gram to be a standard dosage.  But
03:16PM accounting for tolerance and for addiction, my opinion is it's
1/10th of a gram."

Now whether at Mr. Marrett's behest this time, he will
say -- and this is based on me talking with a whole bunch of
addicts and users over the years, I suppose that's fine, but I
03:16PM think we need to have that *Daubert* hearing to see where he's

actually obtained that information from.  Because, you know,
again, he's -- I'm just relying on the transcripts I've read
already, he says, you know, a tenth of a gram is, in my mind, a
personal use amount.

03:17PM    I've even seen him testify on some occasions that in his
view people wouldn't really buy or have more than just a couple
uses at a time because it's easy to get meth.  And so there
wouldn't be a reason to do that.  I mean, I've seen him.  It
depends on the outset, but I've seen him give that exact kind
03:17PM of testimony.  So I have my concerns, I'm trying to head it off
by making my record.  And I think -- you know, I think we do
need to have a *Daubert* hearing if he's going to opine on what a
standard dose is or personal use at a time or in a day amount
is.

03:17PM         THE COURT:  Okay.  We need to schedule a *Daubert*
hearing, then.  Do we want to do this during trial or do we
want to do it Monday?

             MR. SCOTT:  I'm at the Court's convenience.  I'm
coming up here this weekend, so I'll be here.  Whatever's good
03:18PM for the Court.

             MR. MARRETT:  I'm going to have to confer with
Special Agent Paris to see what his availability is.

             THE COURT:  Okay.

             MR. MARRETT:  And, Your Honor, I would also --
03:18PM because it does seem to me that this is -- that Special Agent

Paris's testimony is going to be the exact same testimony based

on the same type of experience-type bases as the defense's

expert.  So I think if we're going to have a *Daubert* hearing

into the bases of these opinions, I think equally the defense's

03:18PM  expert should be subject to the same *Daubert* hearing.

THE COURT:  That's fair.  Okay.  So it's going to

have to be mutual.  And you sure you guys want to do this?  I

mean --

MR. MARRETT:  Well, Your Honor, I don't think a

03:18PM  *Daubert* hearing is necessary.  I think that the bases for the

testimony are adequate.  I think Special Agent Paris's training

and his experience investigating and arresting and interviewing

folks who both distribute and use methamphetamine, I think, is

an adequate basis to testify based on that experience what he

03:19PM  has seen as distribution versus personal-use quantities.

I'm not exactly aware of the precise testimony that

Mr. Scott is referring to in his prior cases, but I think there

is probably a context to it as to what was the question that

was asked, how far did the line of questioning go into what

03:19PM  were the bases for that opinion, "Is that an average opinion?"

"Is that an opinion about every single time that you've seen

it?"  And I think we can explore that during the trial as to

what his bases for his opinions are, and I think that will, I

think, elicit that it's based on a proper training,

03:20PM  experience --

1      THE COURT:  What's training -- I guess, but given

2  there's been a defense objection, I got to go through the

3  *Daubert*.  I don't want to go through it, but I don't want

4  to mess up the record, create a record for appeal.

03:20PM  5      If what you're saying is true, I agree with you.  But the

6  way Mr. Scott presented it earlier, it sounded like -- and

7  maybe this is unfair characterization, if it's doctors

8  prescribe 1/20th of a gram, and -- well, that's a legal

9  prescription, what the heck does that have to do with what

03:20PM 10  people use?  You're commingling apples and oranges.

11      MR. MARRETT:  And I don't think that -- and I want

12  to be clear, I'm not disputing that there may have been

13  testimony about that before because my understanding is that

14  the DEA does have -- methamphetamine is a Schedule II

03:21PM 15  substance.  There are medical uses for it.  There is a sort of

16  medically accepted dosage amount.

17      But I don't -- I don't anticipate that the medically

18  accepted dosage amount is going to be the basis for his

19  testimony as to what the street use amount is, which is, I

03:21PM 20  think that's the connection that Mr. Scott is suggesting

21  occurs.  And my understanding is that Special Agent Paris's

22  testimony about what a street use amount is is going to be

23  based upon his training and experience and those bases.

24      THE COURT:  All right.  Well, Mr. Scott, you want a

03:21PM 25  *Daubert* hearing?  You still think it's necessary?

       1          MR. SCOTT:  Yes, it is, Your Honor.

       2          THE COURT:  Both experts?  All right.  So we got to

       3   schedule it.  We don't have much time left.  Do you want to do

       4   it during trial or before?

03:22PM 5          MR. SCOTT:  I'm happy to do it during trial if we

       6   need to.  Again, I know a lot of this is coming in and I do

       7   appreciate the Court's patience.  I hope I'm speaking for both

       8   of us, we're kind of taking it as it comes on a short timeline

       9   here.  We're not trying to leave things at the last minute.

03:22PM 10  It's just -- I get it.

       11         So like I said, I can do it Monday.  I can do it after --

       12  I don't want to burden the staff, but I can do it before jury

       13  trial day, after the jury trial day, really whenever the Court

       14  would like.

03:22PM 15         THE COURT:  Okay.  When were you planning on calling

       16  Agent Paris?

       17         MR. MARRETT:  I suppose depending on whether we get

       18  through more than one witness on Tuesday, I would anticipate

       19  probably Wednesday afternoon.

03:22PM 20         THE COURT:  So we need to do this, then, Monday

       21  afternoon or Tuesday afternoon.  So why don't you both confer.

       22  Confer with your experts and see when we can do it.

       23         **(Court and clerk conferred off the record.)**

       24         THE COURT:  Okay.  So Monday at 3 o'clock or

03:23PM 25  Tuesday, what -- we'll pick the jury hopefully pretty early in

the morning.  Hopefully by the end of the morning we'll have

our jury picked, and then we'll have one witness.  So we'll

probably be breaking at no later than 4:30.  So it's either

Monday at 3:00 or Tuesday, sounds like 5 o'clock.

03:23PM      MR. MARRETT:  I'll confer with Special Agent Paris

and let the Court know as soon as possible.  And will we be

doing the defense expert simultaneously, at the same time?

THE COURT:  Or, you know, if you want to wait till

later when the defense is going to call its expert.  But

03:24PM  hopefully, whatever we do for your expert, it's going to be the

same for the defense expert.  I'm not going to restrict the

government's expert and then allow the defense to talk about

these things or raise them in.  So it's going to be equal.

MR. MARRETT:  Understood, Your Honor.

03:24PM      THE COURT:  So I don't know how you want to proceed

that way.  And I'm an optimistic guy.  Maybe -- I still think

you should meet and confer on this.  And I'm not saying you

have to script your entire testimony, but share with each other

the kind of questions you're going to ask and see if you can

03:24PM  resolve this.  Because you're going to be tired, and I want you

focusing in on your questions and your opening statements and

your closing arguments as opposed to having to do two runs --

dry runs of your experts in the evening.

MR. MARRETT:  Understood.  I will speak with

03:25PM  Mr. Scott, see if we can resolve this in advance of that.  But

otherwise, I'll let the Court know as soon as possible about the availability of Special Agent Paris.

THE COURT:  Right.  Again, I stand by what I said earlier.  Each side's expert should be able to say based on their experience and training, this is the amounts that is for our personal use when you're doing it on any one given occasion.  And each can talk about, "Well, what's the lowest amount of quantity of drugs that you've seen for distribution?" "What's the highest amount of drugs that you've seen for personal consumption?  And explain that."  Well, they don't want to have to buy every time they take a hit or ingest it, so they keep a supply.  And they'll be able to explain what it is.

But if I'm hearing testimony from either expert that this is based on scientific medical data, then I'm becoming very suspect.  Because I've done this a long time and my understanding is it's not scientific, it's based on experience. It's not a scientific medical principle.

MR. MARRETT:  And I think I generally agree with that, and I anticipate that's what our expert's testimony will be.  But I will meet and confer with Mr. Scott on it.

THE COURT:  I appreciate it.

MR. MARRETT:  The other point I wanted to bring up is as far as the defense's ability to get into potential punishment or the difference between federal and state Sentencing Guidelines, with the witnesses for purposes of bias

53

or motive, the government would still ask that the Court

exclude any reference to specific punishments, the specific in

terms of imprisonment or potential specific punishments that

can be imposed.  I think the defense can cross-examine the

03:27PM  witnesses for their bias based on their knowledge of, you know,

generally the differences between state and federal sentences

without referencing the specific sentences that might apply in

a federal versus state case.

THE COURT:  I'm going to deny that with the

03:27PM  understanding that the witness in this instance, it sounds like

we're talking about Investigator Beeman, that he is aware of

what those mandatory minimums are and that played a factor in

his analysis purportedly recommending that the feds take the

case.

03:28PM  MR. MARRETT:  Well, and just for the record, I want

to be clear, Your Honor, that we're making this motion also

under 403, that it's prejudicial evidence.  It's potentially

misleading the jury as to what the punishment may be in this

case.  And what's really probative as to what the Court is

03:28PM  suggesting is bias or motive is whether he knew there are

greater sentences in Federal Court versus State Court.  Defense

can reference that without referencing the specific sentences.

THE COURT:  I understand, but it's denied.  Again,

assuming that this punishment in these Sentencing Guidelines

03:28PM  are mandatory minimums was something that Investigator Beeman

was aware of.  And I would expect Mr. Scott would not ask a

question about that unless he has a good-faith basis and

believing that Investigator Beeman knew about that.

MR. MARRETT:  I'm just checking off my list to see

if there's anything else.  I don't have anything else to

address with the Court.

THE COURT:  So I think we've discussed all my

issues.

I think, Mr. Scott, you wanted to give me an update on

discovery.  But before we get to that, so the ball's in

counsel's court to confer, see if they can resolve this.  If

they can't, to propose a *Daubert* hearing schedule.  And I'm

going to need to know that within the next two days.  I want to

know no later than Thursday.

MR. SCOTT:  Yes, Your Honor.  As we were sitting

here, I sent my expert an e-mail asking if he could be

available either Monday at 3 o'clock or Tuesday at 5 o'clock,

and I'll report back as soon as I hear.  And if -- and I told

him we would make that happen, you know, under CJA and

everything if he needs to come up here an extra time.  And if

he's testifying somewhere else, then maybe if it's acceptable

to the government he'll need to accomplish that hearing before

he goes on the witness stand.  Or maybe we end up both putting

our pistols down and backing away expertwise if it comes to

that.

          1          THE COURT:  For what it's worth, that's my hope.

          2    Because I see in both sides' interest to get this testimony in.

          3    And I mean that sincerely.  I just sense now -- you guys know

          4    the case much better, but the real fight is going to be is this

03:30PM   5    personal use or distribution?  And both experts, I think, the

          6    jury is going to want to hear from.  There's not many cases

          7    where I think expert testimony is really critical, but I think

          8    it's going to be quite important in this case.

          9          Just for planning purposes, has Mr. Govey made a decision

03:31PM  10    about whether he's going to testify or not, or is he still

         11    keeping that open?

         12          MR. SCOTT:  The proverbial game day decision, Your

         13    Honor.  So we're -- we don't know.

         14          THE COURT:  I think, again, please confer, because I

03:31PM  15    don't want to have to hear the testimony four times; right?

         16    Dry run for each expert and then hear it again in trial.

         17          MR. SCOTT:  Understood, Your Honor.

         18          In terms of discovery, there's a couple items I wanted to

         19    put on the record.  I did see the order that the Court issued

03:31PM  20    regarding in camera documents, what we've been referring to

         21    here as the Frosio file.  I met and conferred with the

         22    government.  I have been advised and absolutely accept the

         23    representation that what the Court has ordered disclosed was in

         24    a rather large batch of discovery that --

03:32PM  25          THE COURT:  This thick.  That's what I was given.

1          MR. SCOTT:  Court's holding his finger up about two,

2     two and a half inches?

3          THE COURT:  Wasn't it, Mr. Marrett?  Was about this

4     thick?

03:32PM 5          MR. MARRETT:  I believe it was about 50 or 60 pages,

6     if I remember correctly.

7          THE COURT:  I think it was more than 50 or 60 pages

8     there.  Was a lot of fluff, but --

9          MR. SCOTT:  So I've been told that I received that,

03:32PM 10    that it was in a kind of a larger batch of other things as

11    well.  My paralegal is going through that as we speak.  But I

12    did want to make clear that I did -- I asked the government and

13    was told that what they provided to the Court and have

14    subsequently provided to us was given to them by the District

03:32PM 15    Attorney's Office.

16         And just in conferring with Mr. Govey, I'm made to

17    understand that the file that the district attorney had on this

18    Mr. Frosio apparently is a different file than what the special

19    handling unit or the Orange County Sheriff's Department

03:33PM 20    maintained for Mr. Frosio.  And I've been trying to sort of

21    describe that distinction, but I wanted to put it again on the

22    record that we are trying to obtain as well the Orange County

23    Sheriff's Department's Frosio file.  So I say that for the

24    government's benefit.

03:33PM 25         You know, and that's the specific file for what it's

worth, that Judge Goethals' order disclosed -- and then almost

immediately the case against Mr. Govey was dismissed in State

Court.  The parties differ on the significance of that, but

chronologically that is how it happened.  So it's that

03:33PM   sheriff's deputy file that we continue to be pressing for.

One additional discovery request I did want to make is

that in arguing the vindictive prosecution motion, the

government, at least from my perspective, seemed to not quarrel

with the idea that there were some conversations between

03:34PM   Mr. Beeman -- Investigator Beeman and counterparts on the

federal side that eventually made their way up to the decision

of whether or not to charge him.

And I do agree as a general matter, the attorney's

decision to charge or not to charge, that's kind of beyond the

03:34PM   ambit of what we're doing here.  But I didn't hear objection or

contradiction of the notion, which has always been my belief --

my information or belief that Investigator Beeman, you know,

did, in fact, take some affirmative steps to pitch this case,

to put it colloquially, to his federal counterparts.

03:34PM   And if I can be even more specific, it is my information

and belief that ATF Agent Sanders, who is in the back of the

courtroom, I understand him to be functioning as the case

agent.  He's been at every court date in this case.  I believe

that Investigator Beeman made overtures and made communications

03:35PM   with Agent Sanders in an effort to have this case brought over

1   federally.

2       So in light of at least what I interpreted as sort of not

3   quarreling that that happened on the part of the government, I

4   would ask for any, you know, communications, whether it be, you

03:35PM 5   know, e-mail or text or memorialization of that effort on

6   Investigator Beeman's part specifically to Mr. Sanders -- to

7   Agent Sanders -- excuse me -- or to any other persons on the

8   federal side of the fence.  For the reasons that the Court

9   stated before, I do think that that goes towards our theory of

03:35PM 10  the case vis-à-vis Investigator Beeman.  So that's my request.

11              THE COURT:  And I think, Mr. Marrett, what I want

12  you to do is do an investigation to see if there are -- before

13  you decide whether you're going to fight it, is there any

14  documents out there that the agent has reflecting communication

03:36PM 15  with Mr. Beeman that are relevant?

16              MR. MARRETT:  Understood.  And I do want to make

17  clear for the record that my failure to comment on that is not

18  me not objecting to it or agreeing that those occurred, I don't

19  have information as to whether that occurred or not.  But I

03:36PM 20  will look into it before deciding whether we're going to agree

21  or litigate whether that's discoverable.

22              THE COURT:  Right.

23              MR. MARRETT:  The only other piece that I just

24  wanted to put on the record for the Court is since we're --

03:36PM 25  Mr. Scott brought up discovery update is just to put on the

1   record -- and I know the Court's not micromanaging discovery,

2   but just to put on the record that the government is in the

3   process of reviewing additional documents that it's going to

4   produce to the defense and is prioritizing the documents for

03:36PM 5   the witnesses that the government intends to call for

6   Investigator Beeman who the defense has suggested they've --

7   they have an intent to call as well as some search terms that

8   the defense has proposed to the government as well.  So we're

9   in the process of doing that as expeditiously as we can in

03:37PM 10   advance of trial.  So I want to put that on the record.

11          THE COURT:  I appreciate that.

12          MR. MARRETT:  There were just a couple things that

13   I -- just miscellaneous items that we haven't discussed in

14   other pretrial conferences, and I want to know what the Court's

03:37PM 15   preferences were.

16      As far as things like having the drugs in the courtroom,

17   we plan on having them in the courtroom with the agent at

18   counsel table and for the witnesses to -- for the case agent to

19   maintain custody and control of those, show them to any

03:37PM 20   witnesses and maintain custody of them in the courtroom.  Is

21   that the Court's general practice or --

22          THE COURT:  Pretty much, yes.  Evidence like that, I

23   would want the agent to keep control of it.  I'm a little bit

24   nervous of having drugs passed around to the jury just for the

03:38PM 25   simple fact, I don't want any liability or anybody saying

```
 1    anything seeped through any of the material and got in their
 2    skin or their blood system, if you follow me.  If there's
 3    irritation or burning, I don't want any of that.  So I'm not
 4    sure that we're going to need to pass around any package of
 5    drugs.
 6         For example, in cases with firearms, the firearm has
 7    been -- all ammunition is taken out, it's been disarmed, and
 8    the firearm is passed around the jurors.  Or jurors, if they
 9    want, they can come up and hold it.  Our -- what are you
10    suggesting in this case that you want to do?  Are you
11    envisioning just showing the jury the drugs, or are you
12    actually envisioning handing it to them and that they can pass
13    it around?
14              MR. MARRETT:  And I don't intend to hand out the
15    drugs to the jury.  My image in this is the case agent, the
16    witness on the stand, we have pictures of the drugs that we can
17    show to the jury.
18              THE COURT:  Okay.
19              MR. MARRETT:  So that would be my anticipation is
20    just for identification of the physical exhibit.
21         Relatedly there is the counterfeit or the ultra
22    obligations in this case as well as some of the templates and
23    other items of evidence that we'll be introducing.  But I do
24    intend to ask the Court for permission to have the jury be able
25    to handle those and pass those around.
```

03:38PM (line 5)
03:38PM (line 10)
03:39PM (line 15)
03:39PM (line 20)
03:39PM (line 25)

1          THE COURT:  That would be fine.

2          MR. MARRETT:  The only other thing I want to update

3    the Court on is I think we'll be filing an amended witness list

4    today.  I anticipate calling two additional, very short

03:39PM  5    witnesses to testify, and we'll submit that updated witness

6    list today.

7          I think in our trial brief we updated the trial estimate

8    to three days.  It's not due to the addition of these two

9    witnesses, it's due to the length of the cross-examination that

03:40PM 10    we experienced during the hearing last week.  I think it was a

11    little more expansive than what I had anticipated in our

12    original trial estimate.  So just for planning purposes for the

13    Court, I think that's -- our revised estimate would be three

14    days.

03:40PM 15          THE COURT:  I was thinking of telling the potential

16    jurors that the trial is going to be four to six days.  Is that

17    still a fair estimate?

18          MR. MARRETT:  I think that's a fair estimate as long

19    as -- I believe it was two to three days is what the defense

03:40PM 20    had estimated for their defense case.

21          THE COURT:  But as you're preparing for it,

22    Mr. Scott now, you know even more, do you think you can do it

23    in two days?

24          MR. SCOTT:  I do.  And, in fact, I think two days

03:41PM 25    would be the conservative kind of the outside goalpost.

1    While we're talking scheduling, I don't mean to interrupt,

2  but I wanted to flag for the Court, I think it's entirely

3  possible that this will be to the jury by Tuesday, February 6.

4  I think that would be the sixth trial day which, again, I think

03:41PM 5  is definitely an outside estimate.  But I wanted to let the

6  Court know Murphy's law being what it is, I'm scheduled for

7  oral argument before the Ninth Circuit Tuesday morning at 9:30.

8  It's just here in Pasadena.  I say "here," but it's up in

9  Pasadena.

03:41PM 10    If the jury is deliberating already, my intention is to

11  have a colleague there for that couple-hour block in case

12  something happens with the jury.  But if -- and I think it's

13  very unlikely that we'll still be taking testimony or doing

14  anything like that.  But I wanted to alert everyone of that

03:41PM 15  potential scheduling conflict at the front end and hopefully

16  it's not something that will end up interrupting.

17            THE COURT:  And I appreciate that.  And I'm taking

18  what you're saying, if the jury is out, that Mr. Govey would be

19  comfortable with someone replacing you for that?

03:42PM 20            MR. SCOTT:  Just in terms of fielding jury notes.

21  Yes, it would be Mr. Jimenez that the Court knows.

22            THE COURT:  Okay.  All right.  That's helpful.  So

23  as far as the time estimate -- okay.

24            MR. MARRETT:  And I don't have anything further

03:42PM 25  unless the Court has other issues.

**UNITED STATES DISTRICT COURT**

1          THE COURT:  No.  Just resolve the *Daubert*.

2      Okay.  All right.  Well, then, I may see you before the

3  second -- excuse me.  The trial is going to start the 30th.

4  Hopefully I won't.  And assuming for the moment I won't see you

03:43PM 5  before we start the trial, if you could be here at 8 o'clock.

6  Usually the first day the jurors get up here late, but we're

7  going to try to get them up here on or before 9 o'clock.  But I

8  want to be ready to go.  Once we're in trial, we'll be starting

9  at 8:30.  The first day they might be up here a little bit

03:43PM 10  late.  Okay.  All right.  Thank you.

11          THE COURTROOM DEPUTY:  All rise.  Court is

12  adjourned.

13          **(Proceedings concluded at 3:43 p.m.)**

14                        **--oOo--**

15

16

17

18

19

20

21

22

23

24

25

1                    *CERTIFICATE OF OFFICIAL REPORTER*

2

3    COUNTY OF LOS ANGELES   )
                            )
4    STATE OF CALIFORNIA     )

5             I, DEBBIE HINO-SPAAN, FEDERAL OFFICIAL REALTIME

6    COURT REPORTER, in and for the United States District Court for

7    the Central District of California, do hereby certify that

8    pursuant to Section 753, Title 28, United States Code that the

9    foregoing is a true and correct transcript of the

10   stenographically reported proceedings held in the

11   above-entitled matter and that the transcript page format is in

12   conformance with the regulations of the Judicial Conference of

13   the United States.

14

15   *Date:  March 9, 2018*

16

17

18

19                              */S/ DEBBIE HINO-SPAAN_*

20                              *Debbie Hino-Spaan, CSR No. 7953*
                               *Federal Official Court Reporter*
21

22

23

24

25

**UNITED STATES DISTRICT COURT**