**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**SOUTHERN DIVISION AT SANTA ANA**

**HONORABLE CORMAC J. CARNEY, JUDGE PRESIDING**


UNITED STATES OF AMERICA,                )
                                         )
            PLAINTIFF,                    )
                                         )
        vs.                              ) SACR NO. 17-00103-CJC
                                         )
JOSEPH MARTIN GOVEY,                     )
                                         )
            DEFENDANT.                    )
_____ )


REPORTER'S TRANSCRIPT OF PROCEEDINGS

SANTA ANA, CALIFORNIA

WEDNESDAY, DECEMBER 27, 2017

9:00 A.M.


**DEBORAH D. PARKER, CSR 10342**
**OFFICIAL COURT REPORTER**
**UNITED STATES DISTRICT COURT**
**411 WEST FOURTH STREET**
**SUITE 1-053**
**SANTA ANA, CALIFORNIA 92701**
**(657) 229-4305**
**transcripts@ddparker.com**


*DEBORAH D. PARKER, U.S. COURT REPORTER*

APPEARANCES OF COUNSEL:

    FOR THE PLAINTIFF, UNITED STATES OF AMERICA:

                        ANDRE BIROTTE, JR.
                        UNITED STATES ATTORNEY

                        DENNISE D. WILLETT
                        ASSISTANT UNITED STATES ATTORNEY
                        CHIEF, CRIMINAL DIVISION

                        BRADLEY E. MARRETT
                        ASSISTANT UNITED STATES ATTORNEY
                        UNITED STATES DISTRICT COURT
                        8000 RONALD REAGAN FEDERAL BUILDING
                        SANTA ANA, CALIFORNIA 92701
                        (714) 338-3500


    FOR THE DEFENDANT, JOSEPH MARTIN GOVEY:

                        TIMOTHY A. SCOTT
                        SCOTT TRIAL LAWYERS APC
                        1350 COLUMBIA STREET
                        SUITE 600
                        SAN DIEGO, CALIFORNIA 92101
                        (619) 794-0451

1    **SANTA ANA, CALIFORNIA; WEDNESDAY, DECEMBER 27, 2017;**

2                              **9:06 A.M.**

3              THE COURT:  Good morning.

4              THE CLERK:  Calling Calendar Item No. 1,

09:06:29  5    SACR 17-00103-CJC, United States of America versus Joseph

6    Martin Govey.

7              Counsel, your appearances, please.

8              MR. MARRETT:  Good morning.  Bradley Marrett, on

9    behalf of the United States.

09:06:35  10              THE COURT:  Good morning, Mr. Marrett.

11              MR. SCOTT:  Good morning, Your Honor.

12              Tim Scott for Mr. Govey.  He's present before the

13    Court out of custody -- I mean, in custody.  Excuse me.

14              THE COURT:  Good morning, gentlemen.

09:06:45  15              MS. MARTINEZ:  Good morning, Your Honor.

16              Marina Martinez with Pretrial Services.

17              THE COURT:  Good morning.  Thank you for being

18    here.  While there were a few things that I wanted to

19    address today, but first up is the motion, Mr. Scott, that

09:06:57  20    you filed for bail.  I passed out a tentative.  Hopefully,

21    you've had a chance to review it.

22              Is there anything you would like to argue to

23    convince me I'm wrong?

24              MR. SCOTT:  No thank you, Your Honor.

09:07:11  25              We've set forth everything as best we could in our

*DEBORAH D. PARKER, U.S. COURT REPORTER*

09:07:14  1   briefing.  I have received and reviewed the Court's

2   tentative, and I'm prepared to submit on the issue at this

3   point.

4                  THE COURT:  Mr. Marrett, anything further?

09:07:24  5                  MR. MARRETT:  Nothing further from the Government.

6                  THE COURT:  Okay.  And Ms. Martinez, from

7   Pretrial, I did receive your letter also recommending

8   detention, but I don't know if there's anything you would

9   like to add.

09:07:38  10                  MS. MARTINEZ:  No further information was received

11   at this time.

12                  THE COURT:  Well, unless you would like to stay,

13   Ms. Martinez, the other items I need to discuss with the

14   lawyers deal with some pretrial motions and the trial.

09:07:50  15                  You're free to leave, if you would like.

16                  MS. MARTINEZ:  If I may stay, I would like to.

17                  THE COURT:  You may.

18                  MS. MARTINEZ:  Thank you.

19                  THE COURT:  Okay.

09:08:01  20                  Then, I will make the tentative order the final

21   order of the Court.  What I'd like to discuss is the

22   pretrial motions.  We discussed them when we were here last,

23   but I did not make final rulings on the record, so I need to

24   do that.  What I'd like to do is just summarize again my

09:08:25  25   findings on the three motions that were before me and then

09:08:31  1   give a chance for anybody to give comments for the record.

2          The Government's motion to preclude extrinsic

3   facts relating to the Orange County Sheriff's Department

4   Inmate Informant scandal and defendant's dismissed 2012

09:08:51  5   state case, I'm inclined to deny that motion.  I believe the

6   informant scandal is relevant to proving Deputy Larson's

7   motive/bias and character for truthfulness or

8   untruthfulness.  I'm also aware that Deputy Larson was a key

9   witness in the scandal and in the subsequent criminal case

09:09:13 10   asserted his Fifth Amendment and refused to testify

11   regarding the scandal and the truthfulness of his testimony

12   in the earlier criminal case where the intentional

13   misconduct was discovered.

14          We had spoken earlier about whether Deputy Larson

09:09:34 15   would assert his Fifth Amendment rights.  And Mr. Marrett,

16   you indicated to me you spoke to him very briefly.  He did

17   not have the opportunity to consult with counsel, but he had

18   indicated that he intended to testify and not assert his

19   Fifth Amendment rights.  I don't know if there's been any

09:09:57 20   change to that, but I would like to get an update from you

21   on that.

22          The other Government motion was regarding

23   Mr. Govey's priors -- convictions and other acts, and my

24   inclination is to grant that motion.  The evidence regarding

09:10:21 25   Mr. Govey's possession of altered Federal Reserve notes in

*DEBORAH D. PARKER, U.S. COURT REPORTER*

09:10:25  1   July and August of 2017 is relevant to proving a common plan

2   or scheme to alter reserve notes from $1 to $100 -- his

3   knowledge of how to do it and his intent to do it.  It is

4   not unfairly prejudicial because the evidence will not

09:10:40  5   confuse or mislead the jury, nor will it take much time to

6   present.  It is also not inflammatory in nature, nor will it

7   extract the jury from considering all the evidence that's

8   presented at trial.

9          Finally, I will give a jury instruction that

09:11:00 10   limits how they can consider this evidence and,

11   specifically, not to consider it for improper character

12   purposes.

13          Similarly, evidence regarding Mr. Govey's prior

14   drug convictions and possession of meth in August 2017 is

09:11:18 15   also relevant to proving his knowledge and intent to possess

16   and traffic in drugs.  It is not unfairly prejudicial

17   evidence, because it will not confuse or mislead the jury.

18   It will not take much time to present.  It is not

19   inflammatory, nor will it distract the jury from considering

09:11:37 20   all the evidence presented at trial.  And, again, I will

21   give the jury a limiting instruction to make sure the jury

22   does not consider the evidence for improper character

23   purposes.

24          The next motion -- I think there's four motions

09:11:54 25   before me now.  This is the defense motion to sever.  I'm

09:11:59  1    inclined to deny that motion.  There's a substantial overlap

2    in the Government's evidence for both the drug and

3    counterfeiting counts.  Those counts arise out of the same

4    search of the same bedroom at the same time by the same

09:12:14  5    deputies.  And even the counterfeiting evidence found in

6    Mr. Govey's wallet is relevant to proving his knowledge and

7    control over the drug and counterfeiting evidence seized in

8    the bedroom.

9         Severing the trials would cause duplication of

09:12:29  10   effort, unnecessary waste of resources and burden on jurors,

11   nor do I see any unfair prejudice to the defense.  The

12   counterfeiting count is straightforward and not complicated

13   factually or legally, and I don't see any basis for why more

14   time is needed to prepare for these counts.  But I'll keep

09:12:49  15   an open mind, Mr. Scott, if you feel that more time is

16   needed for the defense to prepare for both of these counts.

17        The motion to compel discovery, I don't know

18   whether I'm granting it in part or denying it without

19   prejudice.  As I indicated before, I do believe that this

09:13:15  20   information is very relevant and I do intend to allow the

21   defense leeway into raising the informant scandal.  We're

22   going to have an evidentiary hearing, though, so to make

23   sure that Deputy Larson is going to testify and not assert

24   his Fifth Amendment rights and then if there's some fair way

09:13:42  25   to both sides that I could limit the scope of the

09:13:44 1   cross-examination but, certainly, some evidence is going to

2   come in.

3          The reason why I said I don't know if I'm denying

4   it without prejudice, is because I'm not in a position, nor

09:13:58 5   do I feel it would be appropriate for me to micromanage the

6   Government's discovery obligations under *Brady, Giglio* and

7   *Henthorn*, and I have no idea what discovery has been

8   produced, or what has been, or will be.  So I'm going to

9   really need lawyers to guide me through this.  But out of an

09:14:20 10  abundance of caution, I would want the Government to give a

11  robust production of all relevant information from that.

12         Those are the motions.  Mr. Marrett, do you want

13  to be heard on them?

14         MR. MARRETT:  Just briefly, Your Honor.

09:14:39 15        The first motion -- and I suppose it relates to

16  the fourth motion as well, the -- and I know the Court is

17  familiar with the Dekraai history and background and

18  everything.  There's one thing that I do want to make sure

19  that the Court is aware of, if it's not already, and that's,

09:14:58 20  there are two Deputy Larsons that worked for the Orange

21  County Sheriff's Department.  There was a Deputy Jonathan

22  Larson whose testimony was involved in the actual *Dekraai*

23  case.  And my understanding is his testimony is what

24  revealed or shed light on the existence of these thread

09:15:19 25  reports and was in conflict with the testimony that other

09:15:24 1    deputies, such as Deputy Tunstall, had given at the Dekraai

2    evidentiary hearings over the course of that proceeding.

3          The deputy that is involved in this case is Deputy

4    Bryan Larson.  My understanding is that Deputy Bryan Larson

09:15:39 5    didn't testify in the *Dekraai* case with the evidentiary

6    hearings.  He was later called, as the Court pointed out, as

7    a witness in a separate criminal proceeding on a motion for

8    a new trial in the *Ortiz* case, in front of Judge King and

9    during that hearing did invoke the Fifth Amendment on advice

09:15:59 10   of counsel.

11         My -- as we discussed at the last hearing, my

12   understanding is that Deputy Larson will not be taking the

13   Fifth in this case.  That hasn't changed so far; if it does,

14   I will, you know, advise the Court of that, or I'm sure it

09:16:17 15   will come to light during the evidentiary hearing.

16         There's also something I wanted to point out for

17   the Court as well that Deputy Bryan Larson did testify in

18   the *Ojeda* case that was in front of Judge Selna, and that

19   was after he had invoked -- my understanding, after he

09:16:33 20   invoked in the state case.  He was able to testify

21   successfully in the *Ojeda* case and be subject to

22   cross-examination and didn't invoke there.  So I suspect

23   that would result and be the same here.  He'll be able to

24   testify successfully without invoking.  Again, if that

09:16:52 25   changes, I'll let the Court know.  I just wanted to make the

*DEBORAH D. PARKER, U.S. COURT REPORTER*

09:16:55  1   Court aware of the fact that there were two Deputy Larsons

2   that worked for the sheriff's department at that same time.

3         THE COURT:  I wasn't aware of that, and I

4   appreciate you letting me know that.  But I guess I'm still

09:17:06  5   a little confused about the chronology.

6         Judge Selna made his ruling early on when

7   Judge Goethals had just made a negligence finding.  And then

8   there were further proceedings and then he found willful

9   intentional misconduct.  And what you're telling me is that

09:17:35 10   Deputy Larson invoked his Fifth Amendment rights before the

11   intentional findings and before Judge Selna had ruled?

12         MR. MARRETT:  So -- I think there's maybe two

13   separate things here:  One, my understanding is -- and this

14   is my understanding from reading Judge Selna's prior

09:18:00 15   ruling -- is that at the time Judge Selna made his ruling

16   there had already been misconduct findings by

17   Judge Goethals, because -- and the reason that that's my

18   understanding --

19         THE COURT:  But it was negligence.

09:18:12 20         MR. MARRETT:  I could be mistaken, Your Honor, but

21   I believe there were credibility findings that had been made

22   at that time and findings that they had engaged in

23   misconduct.

24         And -- because in Judge Selna's ruling is the

09:18:24 25   references to the underlying misconduct were going to be

09:18:28   1   allowed at trial but not some of the other surrounding

2   circumstances around everything else that was going on in

3   the Dekraai proceedings.  After those rulings had happened,

4   there was a trial in Ojeda.  And during that trial,

09:18:48   5   Deputy Bryan Larson testified and my understanding testified

6   successfully without invoking.

7            THE COURT:  But my understanding is, at some later

8   point after Judge Selna's trial, the hearings got more

9   intense and more serious and then there were actual findings

09:19:15  10   by Judge Goethals of intentional misconduct, not only by the

11   sheriffs but by the DA's office.  And based on those

12   findings, actually removed the DA from prosecuting the

13   *Dekraai* case and the attorney general had to step in.

14            MR. MARRETT:  And -- Your Honor, I don't have the

09:19:37  15   chronology right in front of me to say for certain exactly

16   when those -- I know the DA's findings were later on.  But I

17   think at least as to Deputy Tunstall and one of the other

18   deputies, I think those misconduct findings were made

19   earlier on.

09:19:53  20            THE COURT:  We don't want to be litigating the

21   procedural history and debating it.  I get that.  The reason

22   why I'm trying to understand the chronology, though, is when

23   specifically Deputy Larson assert his rights, and I thought

24   it was later in the process.  I thought it was in 2015 that

09:20:20  25   he asserted his Fifth Amendment rights.  And that was later

09:20:24  1   in the stage when it was getting very serious before

2   Judge Goethals.  I don't know whether it was before he

3   removed them from -- removed the D.A.'s office from

4   prosecuting the case or not.  I don't know.  But I think

09:20:50  5   what I'm trying to get at is, Deputy Larson asserted his

6   Fifth Amendment rights after -- wasn't it after Judge Selna

7   made his finding and he testified in that case or not?

8          MR. MARRETT:  I'm not certain on the chronology.

9          My understanding is that he had testified in

09:21:21 10   Judge Selna's trial after the invocation in the state

11   proceedings, but I'm not certain of that.  I can check on

12   that.  That's something that we can discuss or, perhaps, I

13   can brief it in advance of the evidentiary hearing for the

14   Court.

09:21:36 15          THE COURT:  Yes, you may want to.  Because, I

16   mean, if Judge Selna gave him an indication that you weren't

17   going to be cross-examined on it, then I guess I can

18   conceptually, putting aside whether that was right or wrong

19   thing to do -- but I, conceptually, could understand why he

09:21:57 20   says, *Okay, I'll testify.*

21          Do you see where I'm getting at?  Whereas, in this

22   case -- I've indicated and I'm not going to change my

23   mind -- some inquiry is going to be allowed and he needs to

24   know that, if I'm making sense.

09:22:14 25          MR. MARRETT:  No, I understand what the Court is

09:22:15  1   saying.  And I think, you know, my discussion with

2   Deputy Larson has been that everything would be on the table

3   effectively -- for his preparation or understanding about

4   whether he may or may not invoke, that everything may be on

09:22:28  5   the table for the evidentiary hearing, or -- and, perhaps,

6   trial, depending on whether we can set limits or constraints

7   around the scope of cross-examination.

8           But even given that, my understanding is that he

9   does not intend at least, presently, to invoke during the

09:22:45 10   testimony of this case.

11          MR. SCOTT:  Can I -- according to the Orange

12   County Register, I'm looking at an article that's dated

13   January 5th, 2016, reporting on what at that time -- so this

14   is January 2016 -- was the recent invocation of four Orange

09:23:05 15   County Sheriff deputies, including Deputy Larson.  And for

16   what it's worth, the answer -- the question that provoked

17   the invocation was:  *Are you presently employed by the*

18   *Orange County Sheriff's Department?*

19          *I invoke my Fifth Amendment rights.*

09:23:23 20          So we know that in front of Judge King, it was

21   early 2016 or very late 2015 at the very earliest.  So we

22   can compare that to what -- you know, when he testified,

23   quote, unquote, successfully in front of Judge Selna.

24          THE COURT:  Right.  If it's not obvious why I'm so

09:23:44 25   concerned about this is because I don't want the situation

09:23:48   1    where he's unfairly taken advantage of.  I have an

           2    obligation to protect Mr. Govey's rights, and I have an

           3    obligation to protect Deputy Larson's rights, and I take

           4    both of those obligations very seriously.  So he needs to be

09:24:06   5    advised by counsel.  And I believe we have appointed counsel

           6    to talk to him about this.

           7                Melissa has indicated --

           8                Do we know who that counsel is?

           9                Kate Corrigan has been appointed to confer with

09:24:19  10    him.  She's quite knowledgeable of events in Orange County,

          11    so he's got competent counsel.  That gives me some comfort.

          12    And maybe at some point both you and Mr. Scott need to

          13    contact her and get a sense of where we're going from here.

          14                But as I understand it -- and I don't know whether

09:24:46  15    you can speak to this or whether it's appropriate for you to

          16    speak to it, but I understand the fed's still investigating

          17    that whole informant scandal.  And it's part of, I believe,

          18    a criminal or at least a civil investigation.  And so I

          19    think you're in an awkward position of the right arm is

09:25:14  20    investigating and Deputy Larson is going to be a witness and

          21    the left arm is, he's your witness in this case.  So I don't

          22    know how you're going to walk the -- that ethical minefield,

          23    and I don't mean to suggest how you walk it.  All I'm saying

          24    is, I got to make sure that he has been adequately advised

09:25:46  25    of his rights and potential to incriminate himself.

*DEBORAH D. PARKER, U.S. COURT REPORTER*

09:25:52  1          And the fact that we appointed Kate Corrigan, I

2   have some comfort, but you need to be aware that of what

3   these issues are, right?

4          MR. MARRETT:  Sure.  And I recognize it's a

09:26:05  5   challenge for me, Your Honor.  And we take seriously all the

6   parties' rights involved as well.  So I think we'll be able

7   to manage that.  But if there comes a point where we can't,

8   then maybe there's a different conversation that we have.

9   But at this point I believe that we will be able to manage

09:26:22  10   that.

11          THE COURT:  Okay.  All right.  Obviously Kate

12   Corrigan will be here on the 23rd, but I would ask that you

13   and Mr. Scott contact her before then to get an update.

14   Because that hearing, it's going to go very differently if

09:26:46  15   he invokes, as opposed to, *No, I'm going to testify.*  Again,

16   if he decides to testify, my objective of that hearing is

17   not to do a complete script of what his examination is at

18   trial.  It's to try to get -- if I can get a better sense

19   of, is there some way how we can limit this so we don't turn

09:27:09  20   this trial into the informant scandal.  But at the same

21   time, give Mr. Govey and Mr. Scott full opportunity to

22   cross-examine as his credibility as a witness, whether that

23   be character for truthfulness or untruthfulness or, as

24   Mr. Scott has indicated, he intends to present motive/bias

09:27:35  25   evidence.

09:27:37   1          Okay.

2               MR. MARRETT:  So other than that, I don't have

3     anything to add, Your Honor.  I just wanted to discuss the

4     two Larsons issues.  Unless the Court has questions, I'm

09:27:47   5     prepared to submit on the --

6               THE COURT:  Would you give me -- today is the

7     27th.  Would you give me a report -- a joint report on --

8     after Ms. Corrigan has had an adequate opportunity to

9     consult with Deputy Larson on how he intends to proceed?

09:28:11  10          MR. MARRETT:  Sure, we can do that.  When would

11    you like that by, Your Honor?

12              THE COURT:  Let's see.  Could you give it to me

13    the week of January 8th?  If you need more days in the week,

14    that's fine.  But get it in by January 12th.

09:28:34  15          MR. MARRETT:  Yes, Your Honor.

16              THE COURT:  Okay.  Mr. Scott, the motions, is

17    there anything you would like to add, including on this one

18    dealing with Deputy Larson?

19              MR. SCOTT:  No, thank you, on Deputy Larson.  I

09:28:49  20    sort of interjected to add my two cents on that already.

21              With the Court's permission, I would like to speak

22    to the 404(b) issue.

23              THE COURT:  You may.

24              MR. SCOTT:  And, candidly, I had -- I was

09:29:00  25    intending to respond orally to the Government's *in lims* --

09:29:14  1        *(Court Reporter requests clarification for the*

2        *record.)*

3              MR. SCOTT:   -- *in lims* -- motions *in limine* at the

4        last hearing.  So I -- and I should have done it in writing.

09:29:19  5  But sort of in the flurry of these things last minute, I

6        didn't do so yet.

7              So if I can say my piece on that, quickly.  The

8        three convictions -- well, I should back up and start by

9        saying, on the counterfeit -- the possession of dummy bills

09:29:38 10  or blanks of actual counterfeit notes later, I think fair is

11       fair.  And, quite candidly, I'd submit on that issue, and I

12       don't have a great deal to say on that portion of it.

13             I do think the convictions for narcotics-type

14       offenses are a different matter entirely, though.  And so --

09:29:57 15  so while I submit on the counterfeit, I do object and hope

16       to persuade the Court that we should revisit the prior

17       convictions.

18             As I understand it from pages 3 and 4 of the

19       Government's motions to admit, there are three drug

09:30:14 20  convictions that the Government is looking to put before the

21       jury in its case-in-chief:  A 1996 conviction for possession

22       of a controlled substance for sale and transportation of

23       methamphetamine; a 2007 conviction for simple possession of

24       methamphetamine and a 2011 conviction for sale and

09:30:36 25  transportation of heroin.

09:30:38   1          So to take each in order, the 1996 offense is more

2     than 10 years -- more than 10 years old and predates the

3     instant offense by a substantial period of time.  It does

4     appear at least by the -- by the conviction to be similar,

09:30:59   5     but the factual similarity is something that I think is

6     still very much in question.  And so, the argument or the

7     proposition I would state to the Court is that under -- and

8     I'm not, of course, presuming to tell the Court the law but

9     just making my record on my understanding of the law -- is

09:31:15  10     that 404(b) as opposed to 609 is key to and is determined by

11     the factual similarity.  It's a rule of facts rather than

12     just the legal significance of a conviction, of course.  And

13     so the factual similarity I would suggest hasn't been

14     determined.  You know, was Mr. Govey convicted of having,

09:31:40  15     you know, several kilos in duffel bags in the trunk of a

16     car?  If so, that seems to be quite different than having a

17     smallish baggie of methamphetamine in one's bedrooms.

18          Was he out on the street corner, you know,

19     scoring; and then, giving a little bit, you know, to the

09:31:59  20     middleman?  Or was this, you know, a different conviction

21     where he was -- you know, had a certain amount in the place

22     where he was staying?  Did that case have scales and

23     individual baggies, or did it not as in this case?

24          And regardless the fact that it is so old, I think

09:32:16  25     cuts very much against a 404(b) analysis.

09:32:20 1      As to the April 2007 conviction, that is from what

2    I can see here simply a simple possession conviction.  And

3    as I stated to the Court at the last hearing and I'll state

4    it again, because I want to make sure that Mr. Govey is here

09:32:35 5    so that he can correct me if I'm wrong, my understanding is

6    that this -- this trial isn't going to be about whether or

7    not those drugs were found and were in Mr. Govey's

8    constructive possession or actual possession.  The question

9    is going to be:  Is this a distribution case?

09:32:53 10           THE COURT:  Or personal use.

11           MR. SCOTT:  Versus personal use.

12           So my suggestion is that a personal-use case from

13    2007 doesn't move the ball on whether or not this is a

14    distribution case here today in 2017.  It's also 10 years

09:33:09 15    old, but it also just doesn't go to the facts that are in

16    dispute here.

17           And, finally, as to January 2011, we have the sale

18    and transportation of heroin.  And so while at least

19    ostensibly that's a -- or on its face that is a narcotics

09:33:29 20    offense, it's not -- it doesn't seem to have that factual

21    similarity to what's at issue here.  And I know that the

22    Government cited one case -- I believe it's called *Rubio*

23    *Villarreal* -- for the proposition that the drug doesn't have

24    to be the same to pass muster under 404(b).  I would point

09:33:53 25    out that in that case, I believe, it was a border bus case.

09:33:56  1        And so, you know, whether you're driving across

2   the San Ysidro port of entry with, you know, cocaine in the

3   gas tank versus driving across San Ysidro port of entry

4   with, you know, methamphetamine in the gas tank, I think a

09:34:08  5   fair argument could be made especially under an abuse of

6   discretion standard that those were, in fact, factually

7   similar.  Again, the Government hasn't contributed anything

8   to the factual matrix that I think we're supposed to analyze

9   here to determine is that heroin situation factually

09:34:24 10   analogous to what's going on here.

11        And if we don't do those -- that factual analysis,

12   what we're left with is, he was convicted for possession

13   with intent to distribute before, so that's pretty good

14   evidence that he was intending to distribute here today.

09:34:42 15   And we often describe character evidence.  Well, this

16   doesn't go to his character.  It's not saying he's a bad

17   person is often the way that the Government argues this.

18   But that, frankly, isn't the question.  The question is

19   propensity.  The biggest concern and hurdle is:  He did it

09:35:00 20   before.  He probably did it this time.  I mean, that's

21   propensity evidence at its very core.  And I think that

22   unless there's some factual similarities that we can point

23   to, well, this is -- this is, you know, his idiosyncratic

24   manner of doing this, for example, would be a very good

09:35:18 25   example.  Or, you know, he pled guilty to a very similar

09:35:23  1   amount of methamphetamine under very factual circumstances,

2   that does cut against the argument that this is personal

3   use.  Absent something like that, it's just plain propensity

4   evidence and I do think that that violates 404(a).

09:35:38  5   So thank you very much for letting me say my piece

6   on that.

7   THE COURT:  Well, you have me thinking.  Your

8   statement of the law is my understanding of the law, so I

9   agree with you that when you're talking about 404(b), the

09:35:50  10  more similarity, I guess it's -- it's more probative than --

11  and I do have concerns, and I had concerns about the

12  possession conviction, but I felt, given it was around the

13  same time in connection with the others, it was relevant and

14  arguably showed knowledge and intent that Mr. Govey knows

09:36:22  15  what methamphetamine looks like.  It's not baby powder or

16  some legal drug.

17  Mr. Marrett, why don't you respond to that and,

18  particularly, do you have the information about these

19  priors -- the facts and circumstances, so I can make an

09:36:45  20  informed decision on how similar they are?

21  MR. MARRETT:  So -- as far as the specific facts

22  and circumstances go, Your Honor, I'm in the process of

23  collecting the police reports from those underlying

24  offenses, especially the older offenses.  We have to go to

09:36:58  25  archives to get that information, and I don't have it yet.

09:37:02  1   So I can provide that to the Court and provide further

2   details to the Court as to why -- I think these are relevant

3   and admissible other acts that can be admitted at trial.

4        The only other point that I wanted to touch on is

09:37:19  5   even though the defense has suggested that maybe they won't

6   be disputing knowledge or possession at trial, it's still an

7   element that the Government has to prove beyond a reasonable

8   doubt.  And so, his knowledge of what methamphetamine is and

9   that it's not something like baby powder, it's still

09:37:39  10   something the Government has to prove beyond a reasonable

11   doubt, so I don't think that that, even if they're not

12   really challenging it, changes the analysis for the Court

13   and the admissibility of the evidence.

14        THE COURT:  All right.  Well, what I guess I would

09:37:56  15   like to do then is I would like supplemental briefing on

16   this motion.  And I think we've now at least teed it up more

17   accurately and more precisely -- and I would like a very

18   clear statement from the Government what 404(b) categories

19   that these prior convictions would fall under.

09:38:24  20        I'm going to stick with my tentative on the

21   counterfeiting evidence; but on the drug evidence, I'd like

22   further briefing and then we can talk about this in

23   connection with the hearing on Deputy Larson.

24        MR. SCOTT:  I was just going to say, Your Honor,

09:38:43  25   as soon as I receive those underlying documents, I will

09:38:46  1   certainly do some supplemental briefing on that.  And I'll

2   address this in the briefing but just -- until then, in

3   response to the Government's argument, I think on the heels

4   of a 404(b) analysis is always a 403 balancing as well.

09:39:04  5   And, certainly, under *Old Chief* and its progeny if we're

6   standing there and representing to the Court that we're not

7   contesting personal use, then I think that -- it does factor

8   quite prominently into an *Old Chief* 403 analysis, which is

9   part of the 404(b) analysis, but I will brief that.

09:39:23  10          Thank you.

11          THE COURT:  I appreciate that.  It's a question.

12   Not a suggestion and certainly not a directive.  Are you

13   entertaining or would you be willing to stipulate to

14   possession?

09:39:42  15          MR. SCOTT:  We would certainly entertain that.

16   And I take the Court's question in the spirit I think it's

17   intended.  It's just an inquiry, and it's certainly

18   something I will discuss with Mr. Govey, but I certainly --

19   I certainly wouldn't rule that out or put that outside the

09:39:58  20   realm of possibility, particularly if that provides the

21   Government more comfort and makes more clear that this isn't

22   any kind of, you know, head fake, or bait and switch, that

23   that really is absolutely our intention.

24          THE COURT:  And I appreciate that.  Because I

09:40:12  25   don't know how much it impacts, but it certainly is relevant

09:40:16  1    to the 403 analysis here.  If defense is stipulating to that

2    element, then candidly I'm a little bit more nervous about

3    using convictions that are more than 10 years old that have

4    certainly some different facts and circumstances.  They

09:40:34  5    might be similar -- substantially similar; but if the

6    defense is willing to do that, Mr. Marrett, then I'm having

7    a harder time particularly why are we introducing the

8    possession conviction, if you follow me.

9         MR. MARRETT:  I understand, Your Honor.

09:40:54 10         I think it will turn, maybe, on the facts of the

11    possession and conviction itself.  But, certainly, the other

12    convictions, because they are distribution contributions,

13    could go to intent and knowledge and how -- and knowing how

14    drugs are distributed and the amounts distributed and those

09:41:10 15    types of things.

16         THE COURT:  I'll keep an open mind.  So I'll look

17    forward to the briefing on that.  Obviously, the sooner I

18    get that, the better.  We're almost in January now.

19         When do you reasonably think you can give me

09:41:34 20    supplemental briefing on that?

21         MR. MARRETT:  I think I could get that to you next

22    week, Your Honor.

23         THE COURT:  Okay.  And Mr. Scott, once you have

24    that, you'll be able to move pretty quickly, you think?

09:41:51 25         MR. SCOTT:  Yes, Your Honor.  I could respond in

09:41:52  1   48 hours either of the Government's briefing or 48 hours of

2   their disclosure of the underlying facts to me.

3              THE COURT:  That would be great.

4              Okay.  So for the record, this motion is granted

09:42:10  5   in part and then I'm going to reserve my decision on the

6   drug convictions for a later date.

7              I think I've ruled on the other motions, and I'll

8   stick with my tentatives on those.

9              When we were here last at the end, I indicated I

09:42:31 10   need some revised pretrial filings.  I need the joint

11   statement of the case.  I need the witness list, because I

12   use that for jury selection.  And then revised jury

13   instructions and revised verdict form.

14             Mr. Marrett, when are you going to get me revised

09:43:12 15   filings?

16             MR. MARRETT:  May I confer with Mr. Scott for a

17   moment?

18             THE COURT:  Please do.

19        (Pause.)

09:43:36 20             MR. MARRETT:  Your Honor, we could have you [sic]

21   those by Tuesday.

22             THE COURT:  Great.  Next week.  Okay.  So you

23   will -- if you get them to me by next Tuesday, that should

24   be plenty of time.  And do you think it would be necessary

09:43:54 25   to schedule another pretrial conference, or do you -- sounds

*DEBORAH D. PARKER, U.S. COURT REPORTER*

09:43:59  1   like you both have plenty to do before the evidentiary

2   hearing, so I don't want to needlessly waste anybody's time.

3   If there are other issues that come up concerning the joint

4   statements, the witness list, the verdict, or jury

09:44:13  5   instructions, we can talk about that when we're here on the

6   23rd.

7            MR. MARRETT:  I think that would work fine,

8   Your Honor.  I don't expect there to be a lot of disputes

9   between the parties.  I know the Court has some issue that

09:44:24 10   it wants to discuss with us, as far as the content of some

11   of the instructions.  But if the Court is comfortable with

12   discussing that the 23rd, I think we would be prepared to do

13   that then.

14            THE COURT:  Okay.  So that deals with that.

09:44:39 15            Mr. Scott, you've had many trials with me, so you

16   know the logistics of the trial.

17            Mr. Marrett, you may know this, so I can go over

18   it quickly; but either of you want me to slow down, I will

19   do so.

09:44:56 20            But how jury selection will work is we will call

21   14 people from the audience.  We'll have a panel here on the

22   30th.  How many people, approximately, are we going to have

23   here?

24            We'll have about 50 people.  We'll call 14 to the

09:45:16 25   box.  Before they sit in the box, I will ask them whether

09:45:20  1    they want to be excused for economic hardship or medical

2    necessity, which will be a difficult showing to make.  Do we

3    have any general sense of how long this trial is going to

4    take?  I know the Government thinks it can put on its case

09:45:39  5    in just two days.  Was that my understanding?

6            MR. MARRETT:  I think two days is a reasonable

7    estimate for the Government, Your Honor, obviously depending

8    on the length and scope of cross-examination in particular

9    of Deputy Larson.  But I think two days, probably -- maybe

09:45:58 10    three days, if cross-examination is extended.

11           THE COURT:  All right.  Mr. Scott, do you have any

12    sense of what you think the estimate would be so I can just

13    prepare the jurors?

14           MR. SCOTT:  Yeah.  This is a tougher than normal

09:46:11 15    question to answer because of the Orange County thing.  If

16    we were to completely set that aside, I would say tack a day

17    onto the Government's trial estimate.  I'm somewhat at a

18    loss because I don't yet know everything that I'll be

19    receiving and for what extent I can -- we'll marshal that

09:46:30 20    into a motive and bias case-in-chief.  So I'm obviously at a

21    little bit of a loss.  I don't know if we should say,

22    you know, a couple of days; you know, two, three more days

23    to be conservative.  You know, call it five court days

24    total, or -- but it could be less than that.

09:46:47 25           THE COURT:  All right.  Why don't I just indicate

*DEBORAH D. PARKER, U.S. COURT REPORTER*

09:46:49  1    we think it's going go four to six days.  Could be less, but

2    that's what we're thinking.  It makes me feel better,

3    Mr. Scott, saying this:  I know you.  I've seen you.  You're

4    very efficient.  And, obviously, even something is -- I

09:47:14  5    don't want to say intense, but on this informant's scandal,

6    I just don't see you wanting to put on the informant scandal

7    and retrying that.  You just want to make your points about

8    motive/bias about Deputy Larson or the Orange County

9    Sheriff's Department.  And I think it's going to be -- am I

09:47:40 10    missing it?

11           You don't want to be spending days doing that.

12    You just want to make your points, and it's going to be

13    pretty hard for the Government to rebut anything you're

14    saying, because I imagine you're going to be using stuff or

09:48:01 15    findings that -- or testimony was given in the informant

16    scandal.  I'm babbling a bit, and I don't mean to be

17    babbling.  But I just don't see you wanting to spend any

18    more time than you need to, because you want to make a very

19    powerful, short and precise presentation of this informant

09:48:25 20    scandal as it relates to motive/bias or untruthfulness as a

21    witness.

22           Am I missing it?

23           MR. SCOTT:  No, I don't think so, Your Honor.  I

24    think almost always the right thing also happens to be the

09:48:38 25    smart thing.  And I think that wandering around for two

09:48:42   1   weeks is not going to do Mr. Govey any favors in front of

2   the jury in terms of their attitude and their appreciation

3   for what they're doing.  I can just tell the Court that I

4   think the things that are most germane to what we're trying

09:48:53   5   to do are, if the percipient witnesses have pretty clearly,

6   you know, perjured themselves or committed, you know,

7   serious moral turpitude where it affects their credibility

8   generally.  I think whether that was in a *Govey* case or not

9   a *Govey* case, I think that that's pretty important.

09:49:13  10        But beyond that in terms of, sort of, the

11   motive/bias, our sort of case-in-chief, if you will, as

12   opposed to simply impeaching witnesses, my thought on that,

13   at least as I stand here right now and without having

14   received the robust disclosure that I look forward to, I

09:49:29  15   think there is a lot of these kinds of things that pertain

16   to Mr. Govey, specifically, and these officers,

17   specifically.

18        My plan would be to limit it to that, based on

19   what I know so far.  To the extent that I can build a case

09:49:43  20   that, you know, they've been doing the Messiah violations,

21   they've been trying to talk to him without attorneys,

22   they've been misrepresenting things to the grand jury about

23   Mr. Govey, then that is what I would try to put on.

24        THE COURT:  And I hear you.  And I think we're

09:50:01  25   generally on the same page.  Questions.  Again, it's not

09:50:05  1   suggestions, arguments, or directives on my part.  I'm just

2   trying to get a sense of this issue and how it's going to

3   play out.  That's why I'm glad we're having the evidentiary

4   hearing, because that will probably be helpful.

09:50:21  5          But as you sit here today, are you going to -- do

6   you anticipate at least introducing him asserting his Fifth

7   Amendment rights?  Are you going to try to get that before

8   the jury?

9          MR. SCOTT:  I very well may.  And I'll tell you

09:50:40 10   why I say that, is because the impression I'm getting from

11   the Government is that -- and maybe I'm wrong.  But it feels

12   like he may be kind of trying to sidestep.  And by "he," I

13   mean, Larson.  I could anticipate something like, *Oh,*

14   *well* -- not in front of the jury him saying to this Court,

09:51:00 15   *Yeah, I invoked, but basically the lawyer told me to and,*

16   *you know, that was kind of an abundance of caution thing.*

17   *And I've got absolutely nothing to hide here.*

18          I think that puts him in a little bit of a fork, a

19   little bit of a pickle, because I don't think you can just

09:51:15 20   go around invoking unless you have a good faith basis

21   that -- you know, the answers you were going to give could

22   be incriminating.  And so, I think he has to pick his

23   poison.  Either he really did have a good faith belief that,

24   perhaps, what he was going to say was going to incriminate

09:51:30 25   him; or he was saying that, but that wasn't true.  And I

09:51:34  1    think either one has some -- certainly some probative value

2    at least, so -- I hope I'm not babbling myself.  It's a

3    little bit longer answer, but the short answer is:  Yes, I

4    don't rule that out.  I may try to get that in front of the

09:51:48  5    jury.

6             THE COURT:  And I don't have a negative reaction,

7    Mr. Marrett.  I'm not -- you might have a different view,

8    but I've obviously been thinking through this in the past

9    few days.  And I anticipate that that's coming up in trial.

09:52:04 10    What I candidly -- and you can -- I certainly have an open

11    mind -- and try to convince me otherwise.  I don't see how

12    any of the findings made by Judge Goethals would come in.

13    That would be, basically, irrelevant opinion hearsay.  But

14    any testimony that was given that was relevant that you

09:52:37 15    could connect with Deputy Larson, or the other deputy, or in

16    the prosecution of this case, I would see that coming in.

17             MR. SCOTT:  I'm inclined to agree, Your Honor.  I

18    think -- and I'm often on the opposite side of this when a

19    judge has made some adverse credibility findings of a client

09:53:01 20    of mine in an FCC proceeding or something like that, you

21    know, I'd certainly complain to the high heavens that it's

22    almost like super-vouching to have a judge's credibility

23    findings and opinions put before the jury.  So I think fair

24    is fair.  I don't see me trying to tell the jury what

09:53:18 25    Judge Goethals said about these particular witnesses.  I

09:53:21   1   think that's sort of the jury's job to decide and my job to

2   prove up.

3           THE COURT:  Mr. Marrett.

4           MR. MARRETT:  I just want to step back for a

09:53:30   5   moment to the invocation to the Fifth Amendment, reference

6   to that in front of the jury.  I think maybe the way we'll

7   handle that is, I'll submit briefing on that, Your Honor.  I

8   think his invitation in a separate case to separate

9   questions is not relevant.  In particular, if he's asked

09:53:47  10   those same questions here and doesn't invoke, the question

11   of whether there's a good faith basis for the invocation,

12   that was Judge King in the *Ortiz* case.  That was a decision

13   that he was making in that moment.  I think there may be

14   different circumstances and considerations at play here and

09:54:08  15   different advice he's getting from different attorneys.  So

16   I don't think a prior invitation, it doesn't reflect

17   culpability.  It doesn't reflect anything.  So I don't think

18   it's relevant to his testimony here, but I can brief that

19   for the Court and provide that to you.

09:54:26  20           THE COURT:  Well, I won't make a final decision

21   until after the hearing on the 23rd.  But just as in the

22   spirit of transparency, I see that testimony coming in.  I

23   think it is probative.  And I just don't see how I should

24   keep that out or why I should keep it out.  But it sounds

09:54:58  25   like we're on the same page.  I don't think any findings

09:55:03  1    made by Judge Goethals see the light of day before this

2    jury.

3              So then I guess it might not be that productive to

4    try to script this out anymore.  I think, Mr. Scott, you

09:55:23  5    just need to give me a good sense and when we're here on the

6    23rd, what you feel is really important to make your

7    presentation.  Obviously, any statements, prior statements

8    that Deputy Larson has made, including invoking his

9    Fifth Amendment rights, would seem to me to be relevant and

09:55:41 10    appropriate.  But if you're trying to get in other evidence

11    of what's going on in the sheriff's department or the DA's

12    office, then I have to understand why is that coming in and

13    why is that relevant.

14              MR. SCOTT:  I agree, Your Honor.

09:55:57 15              Certainly, the sooner I can get this disclosure

16    from the Government, the sooner I can begin that process.

17    And I understand it's been the holidays and it is what it

18    is.  I know just for starters -- and I've said this before

19    on the record -- there's this -- the Frosio file, this

09:56:16 20    particular informant named "Frosio," you know, if I can just

21    get that sooner rather than later and then everything else,

22    as soon as I can get it, I think that will go a long way to

23    me building my case.

24              THE COURT:  Right.  And I'm still struggling with

09:56:31 25    how he would assert his Fifth Amendment rights in a prior

09:56:36   1   criminal proceeding and now he's not going to.  So I'll be

2   interested to see what he actually does on the 23rd.

3          But, please, Mr. Marrett, get with Ms. Corrigan

4   and give me a sense of how he's going to go forward.

09:56:57   5          MR. MARRETT:  I will make sure to do that,

6   Your Honor.

7          THE COURT:  Okay.  How did we get off on this,

8   again?

9          Oh, we were talking about the length of the trial.

09:57:10  10   That's how.  That's how.

11          Okay.  So we'll call the 14 people to the box.

12   Once they're in the box, I will ask them some basic

13   questions.  First, I'll introduce the Government.  I'll

14   introduce the defense.  I'll identify the witnesses.  That's

09:57:37  15   why, Mr. Marrett, I need that witness list.

16          And, Mr. Scott, if there's any witnesses that you

17   feel comfortable putting on there, I would appreciate it.

18          Then, I'll talk about the three fundamental

19   principles of our criminal justice system:  The presumption

09:57:53  20   of innocence, the burden of proof on the Government to prove

21   the defendant guilty beyond a reasonable doubt and the

22   defendant's right to remain silent and not say anything at

23   the trial or to present any evidence.

24          These are little bit sensitive issues, but I

09:58:08  25   thought they'd be appropriate to inquire, unless counsel

09:58:14  1   have problems and would like me not to address them, but if

2   jurors have strong views about our drug laws; and then, even

3   more sensitive:  Has any juror or immediate family member

4   ever been addicted to or had a similar problem with drugs or

09:58:32  5   alcohol?

6            If they have, then this might not be the

7   appropriate case for them sit on.

8            Has any of the jurors been a victim of a crime?

9   Then, talk about law enforcement witnesses and how important

09:58:50 10   it is to evaluate their credibility like any other witness.

11   Just because someone's from law enforcement doesn't mean

12   that the juror should take whatever that law enforcement

13   witness says as the truth or accurate.

14            Then I was just going to go into some general

09:59:14 15   background information about each juror, their city of

16   residence, their marital status, their occupation, their

17   employer, prior juror service and their favorite movie or

18   book.

19            After that, then I would turn it over to the

09:59:29 20   lawyers.  And, Mr. Marrett, I'll give you about 10 or 15

21   minutes to ask the 14 people in the box any questions you

22   might have.  Then, Mr. Scott, same for you, sir.  And then

23   after you've asked any questions you have, then we'll take

24   any challenges for cause.  Assuming we remove people for

09:59:48 25   cause, we'll bring one or more people up to replace any of

09:59:54  1    the 14 that have been removed.  And then, I'll ask a few

2    minutes of questions and then I'll give each side a few

3    minutes to ask just the new people to the box questions.

4              After that process is completed and we have a jury

10:00:10  5    that we think can be fair and impartial, we'll go to the

6    peremptory challenges phase of the trial.  The Government

7    has seven peremptory challenges and the defense has 11.  And

8    what I try to do is do rounds.  But if either side reserves

9    a peremptory in any given round, then we'll have an eighth

10:00:39 10    round.  But my hope is to complete juror selection in eight

11    rounds.

12              In the first round, the Government would have one

13    peremptory; the defense would have one.  The second round,

14    the Government would have one peremptory; the defense would

10:00:55 15    have two.  The third round, the Government has one; defense

16    has two.  Fourth round, Government has one and the defense

17    has two.  Fifth round, Government has one; the defense has

18    two.  The sixth round, the Government has one; defense has

19    one.  And then, the seventh round, the Government has one;

10:01:14 20    defense has one.  Again, if there are any peremptories that

21    have been reserved, then we'll have an eighth round.  And I

22    would want, assuming we don't have a lot of peremptories in

23    reserve, for those peremptories to be exercised in the

24    eighth round.

10:01:37 25              If the defense only exercised one peremptory in a

*DEBORAH D. PARKER, U.S. COURT REPORTER*

10:01:48  1   round where they have two and then the Government passes on

2   the next round, you know, my intent is that we don't pick

3   the jury.  We would only -- the jury wouldn't be selected.

4           In other words, the Government passes.  Defense --

10:02:17  5   and we're in a round where you have two peremptories,

6   Mr. Scott.  And you say, *We'd like to thank and excuse*

7   *Mr. Smith*, then we'll replace Mr. -- and then I'd say -- I

8   guess what we would do is -- I'm sorry, I want to be clear.

9           You have two peremptories and you say, *We'd just*

10:02:49 10  *like to thank and excuse Mr. Smith*, but you don't exercise

11  the other one.  We get rid of Mr. Smith.  We bring in that

12  person.  Then, the Government -- we'd go to the next round.

13  The Government passes.  We still haven't picked the jury.

14  You still have your remaining peremptories, plus one in

10:03:13 15  reserve.  We wouldn't pick the jury unless the Government

16  pass and then you pass, if you follow me.

17          MR. SCOTT:  I do, Your Honor.

18          MR. MARRETT:  I do.

19          THE COURT:  Okay.  During trial, no speaking

10:03:33 20  objections.  If you have an objection to any question that's

21  asked, just state the objection -- hearsay, argumentative --

22  but doesn't start arguing or giving a narrative in front of

23  the jury.  That's not fair.  I really do not like sidebars

24  when we have the jury here.  Their time is precious to me.

10:03:53 25  And if we have any legal issues we need to discuss, we can

*DEBORAH D. PARKER, U.S. COURT REPORTER*

10:03:56  1   do that at the end of the day and I'm perfectly willing to
        2   stay as late as necessary to discuss any issue.  So, please,
        3   don't ask for a sidebar unless it's an issue that you think
        4   is so fundamental that a mistrial will result.

10:04:13  5       I follow the two examination rule:  Direct, cross,
        6   redirect, recross.  That's it.  Don't ask me, *Just one more*
        7   *question.*  No.  You just have two opportunities to ask a
        8   witness any question.  But with that, I'm very lenient, and
        9   I'm not very receptive to beyond the scope of direct, beyond
10:04:42 10   the scope of recross.  That's usually a loser with me.

       11       Hours of operation.  We'll hopefully start
       12   promptly every day at 8:30, after the first day.  Usually
       13   we're starting a little bit late, because by the time
       14   orientation is completed or concluded downstairs, they're
10:05:05 15   not here until after 9:00 o'clock, but we'll see if we can
       16   get them here early.  But once the jury is impaneled, I will
       17   expect all the jurors to be here seated ready to go at 8:30.

       18       We'll take a morning break of 15, 20 minutes.
       19   Take a lunch break of, approximately, an hour.  We'll take
10:05:28 20   an afternoon break and then we'll finish between 4:00 and
       21   5:00, depending on how things are going.

       22       Movement in the courtroom is fine.  But I know the
       23   court reporter much prefers -- and I do as well -- that
       24   if -- when you're asking a witness any question, if you are
10:05:54 25   close to that lectern and the microphone, that will add --

*DEBORAH D. PARKER, U.S. COURT REPORTER*

39

10:06:00  1    can't be moving around here.  Also, I don't like asking

2    questions right next to the witness box.  But if you have to

3    show a witness a document or you want to orientate a

4    witness, I don't have a problem with that.  But, generally,

10:06:13  5    please ask your questions of the witness from the lectern.

6              Those are basically the rules.

7              Mr. Marrett, do you have any questions about them?

8              MR. MARRETT:  No questions, Your Honor.

9              THE COURT:  Mr. Scott, I assume you have none.

10:06:29 10    MR. SCOTT:  No thank you, Your Honor.

11             THE COURT:  All right.  Well, I don't have

12    anything further I wanted to discuss with you.

13             Just to summarize then:  Mr. Marrett, you're going

14    to get me the revised joint statement, the witness list, the

10:06:44 15    verdict form, the jury instructions sometime next week.

16             You're also going to get with Mr. Scott and just

17    give me a joint report status sometime by the end of next

18    week, right?  Is it next week -- no, or is it the following

19    week, the following week on Deputy Larson, after you have

10:07:10 20    spoken to Ms. Corrigan?  So by January 12th, you'll have --

21    give me an updated report.  And then you're also going to --

22             I'm going to have complete briefing on the issue

23    of the prior drug convictions.  All the briefing will be in

24    by the 12th.  I think you and -- indicated, Mr. Marrett,

10:07:39 25    you'll get something to me next week and then, Mr. Scott,

10:07:42   1   you said you just needed 48 hours.

2            MR. SCOTT:  Yes, Your Honor.

3            THE COURT:  I don't have anything else.

4            Anything else from the Government?

10:07:52   5            MR. MARRETT:  Nothing further.  Thank you,

6   Your Honor.

7            MR. SCOTT:  No thank you.

8            THE COURT:  All right.  Fine.  Thank you.

9            THE CLERK:  All rise.

10:07:59  10        *(At 10:08 a.m., proceedings were adjourned.)*

11

12                              -oOo-

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATE

I hereby certify that pursuant to Section 753, Title 28, United States Code, the foregoing is a true and correct transcript of the stenographically reported proceedings held in the above-entitled matter and that the transcript page format is in conformance with the regulations of the Judicial Conference of the United States.

Date:  March 2, 2018


_____/s/DEBORAH D. PARKER_____
DEBORAH D. PARKER, OFFICIAL REPORTER

*DEBORAH D. PARKER, U.S. COURT REPORTER*